1
2
3
4
5

Gary G. Kreep (SBN 066482)
Attorney at Law
932 D Street, Suite 1
Ramona, CA 92065
760-803-4029
gary@ggkmail.us
*Attorneys for Plaintiffs*

6
7
8

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

JUDY GEORGE, PATRICIA
SPARKS, CARLOS DE LA
LAMA, DORA MEZA, JESS
PEREZ, PAUL
BONKOWSKI, MARY KATE
PLANETA

     *Plaintiffs*,

v.

GROSSMONT CUYAMACA
COMMUNITY COLLEGE
DISTRICT BOARD OF
GOVERNORS, LYNN NEAULT,
GCCCD BOARD OF TRUSTEES,
DEBBIE JUSTESON, ELENA
ADAMS, BRAD MONROE,
LINDA CARTWRIGHT, JULIE
SCHORR, BENJAMIN BLEVINS,
KRISTIE MACOGAY, AIMEE
GALLAGHER, SAN DIEGO
COMMUNITY COLLEGE
DISTRICT, CARLOS O. TURNER
CORTEZ, SDCCD BOARD OF
TRUSTEES, BERNIE
RHINERSON, CRAIG MILGRIM,
GEYSIL ARROYO, MARIA
NIETO SENOUR, MARY
GRAHAM, GREG SMITH,
SOUTH ORANGE COUNTY
COMMUNITY COLLEGE
DISTRICT, KATHLEEN F.
BURKE, SOCCCD BOARD OF

Case No. **'22CV424 L    BLM**

**COMPLAINT**

(Jury Trial Demanded)

1   TRUSTEES, MARCIA
2   MILCHIKER, TIMOTHY JEMAL,
    CAROLYN INMON, BARBARA
3   J. JAY, T.J. PRENDERGAST III,
    JAMES R. WRIGHT, TERRI
4   WHITT RYDELL, CINDY
    VYSKOCIL, ELLIOT STERN,
5   JOHN C. HERNANDEZ

6         *Defendants*.

7

8                    **<u>INTRODUCTION</u>**

9          1.      Plaintiffs bring this complaint for declaratory judgment and injunctive relief

10   against Defendant Community College Districts ("CCD's") to challenge their adoption of a

11   vaccination/testing/masking mandate requiring students and employees to be vaccinated/

12   tested/masked as a condition of attending classes in-person and/or working on campus in a

13   non-healthcare related capacity. Plaintiffs contend that CCD's (1) lacked the authority to adopt

14   a vaccination/testing/masking mandate; (2) are preempted by the State of California's

15   comprehensive regulatory scheme concerning aerosol transmissible diseases; (3) engaged in

16   discrimination against Plaintiffs, on the basis of religion, since CCD's require, as a condition

17   of being granted a religious belief exemption from the vaccination mandate, that Plaintiffs

18   subject themselves to twice-weekly testing, and masking. CCD's conduct this policy without

19   any reasonable belief that Plaintiffs had symptoms, had contracted COVID-19, or had been in

20   close contact with a person known to be infected with COVID-19; (4) violated Plaintiff's

21   rights to free exercise of religion through the coercive policy of twice-weekly testing, and

22   masking, that is enforced through the threat of being disenrolled, loss of employment and the

23   economic duress that would result; and (5) failed to treat the employees and students as

24   "exempt" from the vaccination requirement because it requires a repetitive and invasive

25   medical procedure that is not required of the similarly situated students and employees who are

vaccinated and, therefore, does not offer a meaningful "reasonable accommodation" as required under California Code of Regulations ("CCR") § 11062.

2.      Plaintiffs are employees or students of various Districts of the California Community College system who, because of deeply held religious beliefs or medical conditions, are unable or unwilling to receive the COVID-19 vaccine.  For similar reasons, Plaintiffs oppose the onerous testing and masking requirements being forced upon them. Plaintiffs challenge the legality of the vaccine mandates, and the discriminatory treatment of the staff and students, on the basis of their religion, by each of the three CCD's.

3.      Plaintiffs hereby sue Defendants in their official capacities only.

## **PARTIES**

*Plaintiffs*

4.      Plaintiff, Judy George, is an employee of Grossmont Cuyamaca Community College District.

5.      Plaintiff, Patricia Sparks, is an Administrative Assistant IV employed by Grossmont Cuyamaca Community College District.

6.      Plaintiff, Carlos de la Lama, is an employee of San Diego County Community College District.

7.      Plaintiff, Dora Meza, is a Student Services Supervisor employed by San Diego Community College District.

8.      Plaintiff, Jess Perez, is a Senior Administrative Assistant employed by South Orange County Community College District.

9.      Plaintiff, Paul Bonkowski, is an employee of South Orange County Community College District in the Maintenance and Operations Department.

10.      Plaintiff, Mary Kate Planeta, is a student at San Diego Community College District.

COMPLAINT

*Defendants*

11. Defendant, Grossmont Cuyamaca Community College District ("GCCCD").

12. Defendant, Lynn Neault, is Chancellor of GCCCD.

13. Defendant, Grossmont Cuyamaca Community College District Governing Board.

14. Defendant, Debbie Justeson, is 2022 Board President and a Board Member of GCCCD.

15. Defendant, Elena Adams, is 2022 Board Clerk and a Board Member of GCCCD.

16. Defendant, Brad Monroe, is 2022 Vice President and a Board Member of GCCCD.

17. Defendant, Linda Cartwright, is a Board Member of GCCCD.

18. Defendant, Julie Schorr, is a Board Member of GCCCD.

19. Defendant, Benjamin Blevins, is a Student Board Member of GCCCD.

20. Defendant, Kristie Macogay, is a Student Board Member of GCCCD.

21. Defendant, Aimee Gallagher, is Interim Vice Chancellor of Human Resources of GCCCD.

22. Defendant, San Diego Community College District ("SDCCD").

23. Defendant, Carlos O. Turner Cortez, is Chancellor of SDCCD.

24. Defendant, San Diego Community College District Board of Trustees.

25. Defendant, Bernie Rhinerson, is a Board Member of SDCCD.

26. Defendant, Craig Milgrim, is a Board Member of SDCCD.

27. Defendant, Geysil Arroyo, is a Board Member of SDCCD.

28. Defendant, Maria Nieto Senour, is a Board Member of SDCCD.

29. Defendant, Mary Graham, is a Board Member of SDCCD.

30. Defendant, Greg Smith, is Vice Chancellor of Human Resources of SDCCD.

31. Defendant, Natalia Trinh, is a Student Board Member of SDCCD.

32. Defendant, Victoria Owusu, is a Student Board Member of SDCCD.

33. Defendant, Edward Borek, is a Student Board Member of SDCCD.

34. Defendant, South Orange County Community College District ("SOCCCD").

35. Defendant, Kathleen F. Burke, is Chancellor of SOCCCD.

36. Defendant, South Orange County Community College District Board of Trustees.

37. Defendant, Marcia Milchiker, is President and a Board Member of SOCCCD.

38. Defendant, Timothy Jemal, is Vice President and a Board Member of SOCCCD.

39. Defendant, Carolyn Inmon, is a Board Member of SOCCCD.

40. Defendant, Barbara J. Jay, is a Board Member of SOCCCD.

41. Defendant, T.J. Prendergast III, is a Board Member of SOCCCD.

42. Defendant, James R. Wright, is a Board Member of SOCCCD.

43. Defendant, Terri Whitt Rydell, is Board Clerk and a Board Member of SOCCCD.

44. Defendant, Cindy Vyskocil, is Vice Chancellor of Human Resources of SOCCCD.

45. Defendant, Setarra Martin, is a Student Board Member of SOCCCD.

46. Defendant, Elliot Stern, is President of Saddleback College of SOCCCD.

47. Defendant, John C. Hernandez, is President of Irvine Valley College.

### JURISDICTION AND VENUE

48. This action arises under the Free Exercise Clause of the First Amendment, the Due Process Clause and the Equal Protection Clauses of the Fourteenth Amendment, the Right

to Bodily Integrity and Bodily Autonomy of the Fifth Amendment, and the Fourth Amendment to the United States Constitution, the Emergency Use Authorization provisions of the Federal Food Drug and Cosmetic Act, 21 U.S.C. § 360bbb-3 ("FDCA"), the California Fair Employment and Housing Act ("FEHA"), and Title VII of the Civil Rights Act of 1964, the Unruh Civil Rights Act, and 42 U.S.C §1983.

49.     This Court has jurisdiction to issue writs of mandate pursuant to 28 U.S.C. §§ 1331, 1343(a).

50.     Venue is properly laid in this district pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

51.     This court has personal jurisdiction over defendants GCCCD, SDCCD, SOCCCD, which are public entities that operate within the State of California.

## STATEMENT OF FACTS

**I.     Timeline of Rulemaking Events of COVID-19 Vaccine Mandates and Withdrawal of Rules following the U.S. Supreme Court's ruling on *NFIB v. OSHA***

52.     On July 30, 2021, the Center for Disease Control ("CDC") published a statement from CDC Director Rochelle Walensky admitting that the COVID-19 vaccinations do not prevent transmission of COVID-19. "Delta infection resulted in similarly high SARS-CoV-2 viral loads in vaccinated and unvaccinated people. High viral loads suggest an increased risk of transmission and raised concern that, unlike with other variants, vaccinated people infected with Delta can transmit the virus."[1]

53.     On August 5, 2021, Dr. Walensky, during an interview by Wolf Blitzer on

---

[1] Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR
https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html

CNN, said of the COVID-19 vaccines "[t]hey continue to work well with 'Delta' with regard to severe illness and death, but what they can't do anymore is prevent transmission."[2]

54.     On August 16, 2021, SOCCCD streamed a video titled "President's Welcome – Fall 2021 PD Week", in which the President of SOCCCD, Elliot Stern, gave a speech to staff and board members stating "I'm mad at all the unvaccinated people. I completely share your feelings. You should not be ashamed of those [feelings], that is completely natural. It is completely natural to be mad at people who didn't get vaccinated…. I am mad at those people, and I have every right to be…".[3] Transcript of President's Welcome – Fall 2021 PD Week, 65:26-65:59, a copy of which with the relevant pages is attached hereto and made a part hereof, marked as "Exhibit A."

55.     On August 27, 2021, SDCCD Vice Chancellor of Human Resources Gregory Smith ("Smith") sent an email to all SDCCD employees titled "PLEASE READ: COVID-19 Testing Procedures" in which he stated that all employees who have not submitted proof of COVID-19 vaccination must be tested weekly for COVID-19, regardless of whether they work 100% remotely or on-site. See Email PLEASE READ: COVID-19 Testing Procedures, Aug 27, 2021, a copy of which is attached hereto and made a part hereof, marked "Exhibit B."

56.     On September 9, 2021, President Joseph Biden issued an Executive Order directing the Occupational Safety and Health Administration ("OSHA") to create a rule that all federal employees, federal contractors, and health care workers will be required to be vaccinated. Remarks on the COVID–19 Response and National Vaccination Efforts, 2021 Daily Comp. of Pres. Doc. 775, p. 2, a copy of which is attached hereto and made a part hereof, marked as "Exhibit C."  The President also announced that the Department of Labor

---

[2] CDC Director: Vaccines No Longer Prevent You From Spreading COVID, Real Clear Politics, Aug 6, 2021, https://www.realclearpolitics.com/video/2021/08/06/cdc_director_vaccines_no_longer_prevent_you_from_spreading_covid html

[3] President's Welcome – Fall 2021 PD Week, 65:26-65:59; https://www.youtube.com/watch?v=uPAxG6C1WXk

would issue an emergency rule requiring all employers with at least 100 employees "to ensure their work forces are fully vaccinated or show a negative test at least once a week." *Ibid*.

57.     On September 15, 2021, CDC published a study on its website entitled "Science Brief: COVID-19 Vaccines and Vaccination," in which CDC aggregated information from multiple studies that "further characterize reduced COVID-19 vaccine effectiveness against asymptomatic and mild symptomatic infections with the Delta variant of SARS-CoV-2".[4] The study states "For the Delta variant, early data indicate vaccinated and unvaccinated persons infected with Delta have similar levels of viral RNA and culturable virus detected, indicating that some vaccinated people infected with the Delta variant of SARS-CoV-2 may be able to transmit the virus to others." Science Brief: COVID-19 Vaccines and Vaccination, Sept 15, 2021, p10.

58.     On September 23, 2021, SDCCD, in response to the Executive Order issued by President Biden, adopted a Resolution directing the Chancellor "to take actions necessary to develop and implement a COVID-19 vaccine requirement for all District employees, students, and individuals accessing services and utilizing facilities at all District locations in accordance with federal and state law, including eligible exceptions." Resolution of the Board of Trustees of the San Diego Community College District in San Diego, California, September 23, 2021, a copy of which is attached hereto and made a part hereof, marked "Exhibit D."

59.     On September 24, 2021, SDCCD Vice Chancellor Smith sent an email to all employees titled "SDCCD Vaccination Requirement Update," in which Smith discussed the vaccine mandate as a condition of employment. Smith stated that employees who had previously submitted a religious exemption request would need to submit a new religious exemption request form. Email SDCCD Vaccination Requirement Update, p3, a copy of which

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html

is attached hereto and made a part hereof, marked "Exhibit E." The email also set a deadline of October 8, 2021, to request a religious exemption request. *Id*. Smith stated that "[e]xemptions will be considered on an individual basis. Employees approved for an exemption will go through an interactive process to determine whether a reasonable accommodation to the vaccination requirement can be made without posing a health and safety risk to others." *Id*.

60.     On November 5, 2021, the United States Secretary of Labor, acting through OSHA, enacted a vaccine mandate for all employers with 100 or more employees, requiring employers to ensure workers are vaccinated or tested weekly for COVID-19. 86 Fed. Reg. 61402 (2021).

61.     On November 9, 2021, GCCCD announced that the GCCCD Governing Board had adopted a COVID-19 vaccine requirement for employees, students, and individuals accessing services and utilizing facilities at all District locations, a copy of which is attached hereto and made a part hereof, marked as "Exhibit I". This announcement made specific reference to the Board's reliance on the Federal vaccine mandate imposed by President Joseph Biden, which was later overturned by the courts.

62.     On November 17, 2021, SOCCCD distributed a file titled "Memorandum of Understanding between South Orange County Community College District and its California School Employees Association" ("MOU"), a copy of which is attached hereto and made a part hereof, marked "Exhibit F." In MOU, SOCCCD announced the new COVID-19 vaccination mandate as a "condition of employment and will remain in effect unless it is deemed by the District that it is no longer necessary during the present *public health emergency*…" (Italics added). *Id*. at 1. MOU provided a deadline of November 18, 2021, for requesting a "disability/medical accommodation, or sincerely held religious belief exemption", creating a limited 24-hour window during which an employee may make a request for an exemption. MOU stipulated that all unvaccinated employees "who are approved for an

accommodation/exemption are required to test at least two times per week," and that they may be subject to "other safety measures beyond what is required for vaccinated individuals, including but not limited to: asymptomatic (public health surveillance) testing and symptomatic testing; physical/social distancing; avoiding large gatherings; wearing acceptable facial coverings and/or other personal protective equipment; frequent handwashing and cleaning; practicing respiratory etiquette; and/or exclusion from the physical worksite when warranted." *See id*. at 1-2. The twice-weekly testing is required regardless of whether the unvaccinated employee is displaying symptoms of illness. There is no such requirement for vaccinated employees. The antigen test involves a nasopharyngeal swab, thrusting a nasal swab deep within the sinus cavity of the test subject, often causing unwanted discomfort to the test subject. Plaintiffs are informed and believe, and thereon allege, that the nasal swabs are being used to collect and sequence the DNA of test subjects without their informed consent. According to CDC, at least 10% of the testing swabs are being sent to labs for genomic sequencing, which includes both human DNA and COVID-19 RNA sequencing, which is a violation of genetic privacy.[5]

63.    On January 2, 2022, SOCCCD Chancellor Kathleen F. Burke distributed an email through SOCCCD Communications titled "SOCCCD Message - 2022 COVID Update from Chancellor Burke", in which Ms. Burke delayed the in-person return-to-work of employees until February 7, 2022. SOCCCD Message - 2022 COVID Update from Chancellor Burke, Jan 2, 2022, at 1, a copy of which is attached hereto and made a part hereof, marked "Exhibit G." Ms. Burke conceded that both vaccinated and unvaccinated employees are capable of transmitting the virus when she explained her decision by stating: "The Omicron

---

[5] "How Nose Swabs Detect New Covid-19 Strains", published by WIRED, January 27, 2022, https://www.youtube.com/watch?v=TllUFqyKdtc. See also statement from CDC@CDC.gov, February 16, 2022, https://twitter.com/CDCgov/status/1493982257790570501.

and Delta variants of COVID have contributed to high transmission rates in Orange County. Bringing <u>all</u> employees back to work now could increase the number of positive cases on our campuses and worsen the public health crisis." *Id*.

64.    On January 11, 2022, SDCCD Vice Chancellor Smith sent an email to all employees titled "SDCCD Spring Operations Update PLEASE READ". Smith, acting as an agent of SDCCD, conceded that vaccines do not prevent transmission of COVID-19, and that both vaccinated and unvaccinated people may transmit the disease in his statement that "data and research increasingly demonstrate the omicron variant is much more transmissible, including among individuals who are fully vaccinated against COVID-19…". Email from Smith, January 11, 2022, a copy of which is attached hereto and made a part hereof, marked "Exhibit H." Smith also stated that "[d]ue to the much higher rate of covid transmission occurring in our region, in-person instruction will be limited primarily to students who have been fully vaccinated." *Id*.

65.    On January 13, 2022, the Supreme Court of the United States stayed the vaccine mandate enacted by OSHA in the case *National Federation of Independent Business, et al., v. Department of Labor, Occupational Safety and Health Administration*, et al., 595 U.S.___(2022). The Court held that the mandate exceeded OSHA's statutory authority because OSHA is empowered to "set *workplace* safety standards, not broad public health measures." *Id*. at 6. The Court found that COVID-19 is not an *occupational* hazard, but, rather, a "universal risk…no different from the day-to-day dangers that all face from crime, air pollution, or any number of communicable diseases." (Italics in original) *Id*. at 6-7.

66.    On January 25, 2022, the US Department of Labor, in response to the Supreme Court's ruling in NFIB v. OSHA, withdrew the Emergency Temporary Standard mandating COVID-19 vaccination and testing issued on November 5, 2021, effective January 26, 2022. 87 FR 3928.

67.     On January 28, 2022, the CDC published an article titled "COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis – California and New York, May – November, 2021"[6], a copy of which is attached hereto and made a part hereof, marked "Exhibit ZZ." The article discusses a study on infection-derived protection or "immunity." The study focused on infection and reinfection rates of four classes of people: (1) vaccinated, with no history of a previous infection; (2) unvaccinated, with no history of a previous infection; (3) vaccinated, with a history of a previous infection; and (4) unvaccinated, with a history of a previous infection. The report states that "surviving a previous infection protects against a reinfection and related hospitalization. Importantly, infection-derived protection was higher after the Delta variant became predominant, a time when vaccine-induced immunity for many persons declined because of immune evasion and immunologic waning." See Exhibit ZZ. This article shows that unvaccinated persons with a history of a previous COVID infection are likely protected by infection-induced immunity against COVID-19 and do not pose a threat to themselves or others. After the Delta variant became predominant, persons with infection-derived immunity, including those who are unvaccinated, were better protected from reinfection. Because infection-derived immunity makes a person less likely to be contract the virus, they are, therefore, less likely to spread the virus.

68.     Since January 28, 2022, all three CCD's have continued to enforce their respective vaccine mandates and requirements that employees wear masks, despite the Supreme Court staying the Federal OSHA mandate and the subsequent withdrawal of the vaccine mandate by the US Department of Labor. All three CCD's have refused to recognize the protections offered by infection-induced immunity. CCD's have denied or withdrawn

---

[6] CDC Morbidity and Mortality Weekly Report, Jan 28, 2022, 71(4);125-131, https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm

approval of religious belief exemptions from several Plaintiffs without adequate explanation of how the grant of the exemption and subsequent accommodation would create an undue hardship for the entities. All three CCD's have refused to provide meaningful accommodations for Plaintiffs who have been approved for a religious belief exemption. All three have claimed that the risk of transmission is too high to permit unvaccinated employees to work on-site without twice weekly testing, while simultaneously permitting the similarly situated vaccinated employees to work on-site without twice-weekly testing. All three Districts have failed to show how permitting on-site work by unvaccinated employees who are not infected with COVID-19 and who display no symptoms or signs of a COVID-19 infection would create an undue hardship on the employer.

## II.     History Of COVID-19 Vaccination Development and Legislation

69.     Beginning December 11, 2020, the U.S. Food and Drug Administration ("FDA") approved three COVID-19 vaccines for emergency use in the United States.  The first was Pfizer-BioNTech[7] (December 11, 2020), the second was Moderna (December 18, 2020)[8], and, finally, Janssen Biotech (a Janssen Pharmaceutical Company of Johnson & Johnson, February 27, 2021)[9].

70.     All three COVID-19 vaccines remain in use under an Emergency Use Authorization ("EUA"), but none have been given full FDA approval (licensure). Unless and until the COVID-19 vaccines become fully licensed, they are still under EUA issuance, and are, therefore, considered investigational.[10]

---

[7] Comirnaty and Pfizer-BioNTech COVID-19 Vaccine | FDA; https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/comirnaty-and-pfizer-biontech-covid-19-vaccine (updated October 29, 2021)
[8] Moderna COVID-19 Vaccine | FDA; https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/moderna-covid-19-vaccine (updated October 20, 2021)
[9] Janssen COVID-19 Vaccine | FDA; https://www.fda.gov/emergency-preparedness-and-response/coronavirus-disease-2019-covid-19/janssen-covid-19-vaccine (updated October 20, 2021)
[10] COVID-19 Vaccine Questions and Answers | NIH: National Institute of Allergy and Infectious Diseases; https://www.niaid.nih.gov/diseases-conditions/covid-19-vaccine-faq

71.     The Pfizer, Moderna, and J&J products are gene therapy products, as shown on October 24, 2021, in a speech given by the President of Bayer's Pharmaceutical Division, Stefan Oelrich, wherein he speaks about the pandemic, and the COVID-19 vaccines, and stated, "…ultimately the mRNA vaccines are an example for that cell and gene therapy."[11]

72.     Since Plaintiffs will be recipients of an EUA investigational medical product, it must be "ensure[d] that individuals to whom the product is administered are… informed of the **option to accept or refuse administration of the product**." (Emphasis added) FDCA § 564(e)(1)(A)(ii)(III).

73.     The Executive Secretary of the CDC's Advisory Committee on Immunization Practices, Dr. Amanda Cohn, stated that, "…under an EUA, vaccines are not allowed to be mandatory. Therefore, early in the vaccination phase individuals will have to be consented and cannot be mandated to be vaccinated."[12] This statement, from the CDC's Advisory Committee on Immunization Practice, points to the fact that even the CDC is aware that the vaccines authorized under EUA must be consented to and cannot be mandated.

74.     Furthermore, both Moderna and Pfizer, in their Clinical trials, outline the fact that their study of the investigational vaccine is designed to be evaluated for 2 years for Moderna[13] and for 26 months for Pfizer[14].

75.     The available two dose primary series for the Pfizer-BioNTech vaccine is merely authorized under EUA.[15]

---

[11] KEY 01 - Opening Ceremony - World Health Summit 2021 - YouTube; https://www.youtube.com/watch?v=OJFKBritLlc&list=PLsrCyC4w5AZ8F0xsD3_rzLcfxHbOBRX4W (at 1:37:41 – 1:38:08).
[12] ACIP Summary Report August 26, 2020 Atlanta, Georgia (cdc.gov); https://www.cdc.gov/vaccines/acip/meetings/downloads/min-archive/min-2020-08-508.pdf at page 56.
[13] Microsoft Word - mRNA-1273-P301 Protocol.docx (modernatx.com); https://www.modernatx.com/sites/default/files/mRNA-1273-P301-Protocol.pdf at page 41.
[14] C4591001_Clinical_Protocol_Nov2020_Pfizer_BioNTech.pdf (tghn.org); https://media.tghn.org/medialibrary/2020/11/C4591001_Clinical_Protocol_Nov2020_Pfizer_BioNTech.pdf at page 15.
[15] Pfizer-BioNTech COVID-19 Vaccine EUA LOA reissued December 9 2021 (fda.gov); https://www.fda.gov/media/150386/download page 2, footnote 9;

76.     Meanwhile, the approved Comirnaty and Spikevax vaccines remain unavailable.

III.     **Timeline of Plaintiff's request for Religious Belief Exemption from the District's COVID-19 Vaccine and Testing Mandate**

A.     **Timeline of Plaintiff Judy George**

77.     On November 9, 2021, Judy George ("George") received notice from GCCCD that GCCCD had implemented a COVID-19 vaccine requirement for employees and students. See "Exhibit I."

78.     On November 25, 2021, George applied for a religious belief exemption to the GCCCD COVID-19 vaccine requirement, a copy of which is attached hereto and made a part hereof, marked as "Exhibit J."

79.     On December 1, 2021, George received notice via email that GCCCD had approved her religious exemption request, a copy of which is attached hereto and made a part hereof, marked as "Exhibit K." The email also informed her that Human Resources required her to participate in an "interactive accommodation process to determine whether a reasonable accommodation can be made based on specific circumstances" of her employment.

80.     On December 3, 2021, George agreed to meet with Human Resources on December 7, 2021, to participate in the interactive accommodation process.

81.     On December 7, 2021, George met with Human Resources to participate in the interactive accommodation process.

82.     On January 4, George received notice that her accommodation was denied, a copy of which is attached hereto and made a part hereof, marked as "Exhibit L". GCCCD stated that the reason for the denial was "because the risk of transmission is too high based on

---

Q&A for Comirnaty (COVID-19 Vaccine mRNA) | FDA; https://www.fda.gov/vaccines-blood-biologics/qa-comirnaty-covid-19-vaccine-mrna

your specific position, location, and job duties." *Id*. At the time of the denial, George had not been diagnosed with COVID-19 and, therefore, could not have transmitted the disease to another person.

83.     On January 4, 2022, George sent an email to Aimee Gallagher, Interim Vice Chancellor, Human Resources, appealing the decision of denial of her accommodation. *Id*. At the time of filing this complaint, George has not received a response to her appeal. Since then, she has been on accrued paid leave and is not currently working either on-site or off-site for GCCCD because of the vaccine mandate.

**B.     Timeline of Plaintiff Patricia Sparks**

84.     On November 9, 2021, Patricia Sparks ("Sparks") received notice from GCCCD that GCCCD had implemented a COVID-19 vaccine requirement for employees and students. See Exhibit I, GCCCD Resolution 21-204 COVID-19 Vaccination Requirement.

85.     On November 16, 2021, Sparks received an email from Cuyamaca College Academic Senate President and Associate Professor Manuel Mancillas-Gomez ("Gomez"), a copy of which is attached hereto and made a part hereof, marked as "Exhibit TT". In the email, Gomez criticized Sparks for her desire to remain unvaccinated. Gomez dismissed Sparks concerns as an "anti-vaxxer's misinformation campaign". *Id*. This comment from Gomez came several months after the CDC published its statement that vaccinated individuals can be infected with COVID-19 and carry similar viral loads compared to unvaccinated persons who have been infected, meaning that both vaccinated and unvaccinated people may contract and spread COVID-19.[16] Gomez displayed his dearth of knowledge on COVID-19 vaccines and simultaneously expressed his disregard for the Constitutional rights of his coworkers in his statement "[w]hile here anti-vaxxers speak of freedom of choice, I guess it would be their

---

[16] Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR
https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html

choice to get infected and die, but they shouldn't have the freedom to continue spreading the virus, so folks like my uncle wouldn't have to die so tragically because of someone who only thought of their individual freedom." The animosity and vitriol of Gomez's email caused Sparks to feel that her religious beliefs were being attacked and disregarded by a fellow coworker, and from someone who was a high ranking of the campus bureaucracy.

86.     On November 30, 2021, Sparks submitted a request for a religious belief exemption from the COVID-19 vaccination requirement, a copy of which is attached hereto and made a part hereof, marked as "Exhibit M".

87.     On January 21, 2022, Sparks received notice from GCCCD of their decision to deny her a reasonable accommodation to work on-site for her religious belief exemption request, a copy of which is attached hereto and made a part hereof, marked as "Exhibit N". GCCCD granted her the ability to use accrued vacation and/or personal necessity leave, or unpaid leave, through June 20, 2022, which they referred to as an "accommodation". The effect of this accommodation would be to exclude Sparks from the campus without proof that she was infected with COVID-19 or was contagious. There was no discussion of when she could return to work. Ultimately, her accrued vacation time and unpaid leave would run out and she would be forced to find other employment. If Sparks declined the "accommodation" of remaining off-campus and using her accrued vacation time and unpaid time off, GCCCD would commence termination proceedings. Adding insult to injury, GCCCD reminded Sparks that, as an alternative to this "accommodation", she could receive the vaccine.

88.     Sparks continues to refuse to receive the vaccine and is concerned that her continued refusal will result in the termination of her employment with GCCCD.

**C.     Timeline of Plaintiff Carlos de la Lama**

89.     On September 23, 2021, Carlos de la Lama ("Lama") received notice from SDCCD that SDCCD had implemented a COVID-19 vaccine requirement for employees and students. See "Exhibit D".

90.     On September 30, 2021, Lama sent a letter to SDCCD Human Resources and Management, requesting a religious belief exemption to the SDCCD COVID-19 vaccine requirement, a copy of which is attached hereto and made a part hereof, marked as "Exhibit O".

91.     On October 26, 2021, Lama received notice from SDCCD that his request for exemption based on religious belief was denied, a copy of which is attached hereto and made a part hereof, marked as "Exhibit P". The stated reason for the denial was that the committee determined that information submitted by Lama "does not demonstrate that you have a sincerely held religious belief that prevents you from being vaccinated." Lama promptly appealed the decision.

92.     On October 28, 2021, Lama received notice from SDCCD that his appeal was granted and that his religious accommodation request has been approved, a copy of which is attached hereto and made a part hereof, marked as "Exhibit Q". SDCCD informed Lama that a determination would need to be made whether it could accommodate his request. This process required Lama to fill out a form entitled "Vaccination Exemption Accommodation Questionnaire".

93.     On November 1, 2021, Lama emailed the completed "Vaccination Exemption Accommodation Questionnaire" to SDCCD Risk Management, a copy of which is attached hereto and made a part hereof, marked as "Exhibit R".

94.     On January 27, 2022, Lama received notice from SDCCD Risk Management stating that his "request for accommodation" has been granted subject to certain conditions, a

copy of which is attached hereto and made a part hereof, marked as "Exhibit T". This notice was sent only two days prior to the commencement of classes. The conditions imposed by SDCCD were that Lama must teach classes remotely, that he would perform his duties remotely, and that he would not access any District facilities in-person.

95.     Lama has been unlawfully excluded from the campus despite being similarly situated to other employees who are vaccinated. Lama is concerned that he may be terminated at any time because SDCCD stated that they may revoke the accommodation at any time in the future.

**D.     Timeline of Plaintiff Dora Meza**

96.     On May 24, 2021, Dora Meza ("Meza") received notice from SDCCD Vice Chancellor Smith, that, beginning July 1, 2021, all employees returning to work on-site will be required to be vaccinated or have an approved exemption, a copy of which is attached hereto and made a part hereof, marked as "Exhibit U".

97.     On July 1, 2021, Meza was approved by the SDCCD Human Resources Division for a religious belief exemption to the vaccination requirement, a copy of which is attached hereto and made a part hereof, marked as "Exhibit V".

98.     On August 20, 2021, Meza received notice from Smith, that all employees must be vaccinated or have a negative COVID-19 test within the prior seven days, regardless of work location, including remote work assignments, a copy of which is attached hereto and made a part hereof, marked as "Exhibit W". The communication clarified that "the District will require all employees who have not provided proof of vaccination to be tested for COVID-19 weekly effective August 30th," and that "[t]his means employees teaching and working remotely must be tested for COVID-19 weekly." *Id*.

99.     On August 27, 2021, Meza received notice from Smith confirming that all employees who are unvaccinated must be tested weekly for COVID-19. This rule applies to all employees, including those who are working 100% remotely. See "Exhibit B".

100.    On September 23, 2021, Meza received notice from SDCCD that the Board had implemented a COVID-19 vaccine requirement for employees and students. See "Exhibit D".

101.    On September 28, 2021, Meza received notice from Carlos Cortez, SDCCD Chancellor, that the "Board of Trustees has authorized [him] as chancellor to implement consequences for employees who chose not to comply" with the vaccination requirement, a copy of which is attached hereto and made a part hereof, marked as "Exhibit X".

102.    On September 29, 2021, Meza emailed Carlos Cortez, SDCCD Chancellor, with a request that the COVID-19 testing mandate be expanded to include fully vaccinated individuals because of recent scientific evidence showing that vaccinated individuals may contract and spread COVID-19. See "Exhibit X".

103.    On October 13, 2021, Meza received notice from Ljubiša Kostić, Director of Legal Services for SDCCD, that her request for a religious belief exemption had been denied, a copy of which is attached hereto and made a part hereof, marked as "Exhibit Y". The reason for the denial was that the committee determined that information submitted by Meza "does not demonstrate that you have a sincerely held religious belief that prevents you from being vaccinated." Meza promptly appealed the decision the same day. Meza informed SDCCD in her appeal that, prior to the denial, she had not been afforded the opportunity to engage in an interactive accommodation process as required by Title VII of the Civil Rights Act of 1964. *Id*. Ljubiša Kostić informed her that there was no need to engage in an interactive accommodation process because her accommodation was provided when the vaccination was non-mandatory and no further information was necessary. *Id*. Ljubiša Kostić then stated that "per the communication from the [Vice Chancellor, Human Resources], the District is requiring

resubmission [of the religious exemption request] now that it has a vaccination requirement." *Id*.

104.    On November 3, 2021, Meza contacted Ljubiša Kostić to inquire about the status of her appeal. *Id*.

105.    On November 5, 2021, Meza received notice from SDCCD Risk Management that the Religious Exemption Review Committee had granted her appeal and approved her request for a religious exemption from the COVID-19 vaccination requirement, a copy of which is attached hereto and made a part hereof, marked as "Exhibit Z".  SDCCD informed Meza that the College District would determine whether it could accommodate her exemption. SDCCD claimed that "in most cases, allowing an unvaccinated employee to work on-site at District facilities will present an unacceptable threat to the health and safety of others." *Id*. The email from SDCCD included a questionnaire form and a request that Meza fill out the form and return it to SDCCD, a copy of which is attached hereto and made a part hereof, marked as "Exhibit AA".

106.    On November 9, 2021, Meza emailed the completed questionnaire form to SDCCD Risk Management, and included a copy of a negative COVID-19 test for her.

107.    On February 7, 2022, SDCCD emailed Meza, informing her that her "accommodation request" had been granted, subject to certain conditions, a copy of which is attached hereto and made a part hereof, marked as "Exhibit BB". The conditions listed were: (1) Wear a mask at all times; (2) Whenever practicable, maintain at least six feet of distance from others; (3) Use best efforts to minimize or eliminate prolonged close contact with others that would potentially result in exposure (less than six feet of distance for 15 minutes or more); (4) Self-screen for COVID-19 symptoms and absent yourself from work as necessary to comply with District guidelines; (5) Test for COVID-19 on a weekly basis and report the results to the District in accordance with existing procedure which may be updated from time

to time; and (6) This approval may be reevaluated as needed based on changes in conditions and District policies. The notice also stated that the granting of an accommodation for the current period does not guarantee any accommodation in the future.

108.    Meza continues to be discriminated against by SDCCD due to her refusal to receive the vaccine and is concerned that her employment will be terminated at any time because SDCCD has previously revoked the approval of her religious belief exemption suddenly and without warning or apparent cause.

**E.    Timeline of Plaintiff Jess Perez**

109.    On September 27, 2021, SOCCCD approved a COVID-19 vaccination mandate for all students, employees, and volunteers coming onto any District campus or worksite as of January 8, 2022. See Exhibit F.

110.    On or before October 18, 2021, Jess Perez ("Perez") requested a religious belief exemption from the SOCCCD COVID-19 vaccine mandate.

111.    On or before October 18, 2021, Perez requested a medical exemption from the SOCCCD COVID-19 vaccine mandate.

112.    On October 18, 2021, Perez received an email from Rebecca Wicks, an employee of third-party consulting firm Shaw HR Consulting ("Wicks"), requesting that Perez contact his medical provider and have them fill out a Supplemental Medical Questionnaire Request as part of the evaluation process of SOCCCD to determine his eligibility for a medical exemption, a copy of which is attached hereto and made a part hereof, marked as "Exhibit CC".

113.    On October 19, 2021, Perez received an email from Wicks, requesting that he complete and return the "Religious Accommodation Verification Form for COVID-19 Vaccination" as part of the evaluation process of SOCCCD to determine his eligibility for a

religious belief exemption, a copy of which is attached hereto and made a part hereof, marked as "Exhibit DD".

114.     On November 17, 2021, Perez received notice from SOCCCD and the California School Employees Association ("CSEA"), an employment union for community college employees, that SOCCCD and management for CSEA had come to an agreement regarding the COVID-19 vaccine mandate for all students, employees, and volunteers coming onto any District campus or worksite as of January 8, 2022. See Exhibit F.

115.     On November 17, 2021, Perez filled out and emailed the "Religious Accommodation Verification Form for COVID-19 Vaccination" to Wicks.  See Exhibit DD.

116.     On November 23, 2021, Perez received the completed Supplemental Medical Questionnaire from Dr. Eric Brenner, which he promptly sent to Wicks. See Exhibit CC.

117.     On December 3, 2021, Perez received notice from Cindy Vyskocil, Vice Chancellor of Human Resources ("Vyskocil"), that he had been approved for the medical exemption, a copy of which is attached hereto and made a part hereof, marked as "Exhibit EE". His approval required that he submit to testing for COVID-19 twice per week. The letter stated that failure to comply with this requirement could result in termination. Included in the letter was a form entitled "Vaccine Exemption Accommodation Agreement", which Perez was asked to sign and return to demonstrate his acceptance of the terms of the testing requirement.

118.     On December 8, 2021, Perez received notice from Vyskocil, that he had been approved for the religious belief exemption, a copy of which is attached hereto and made a part hereof, marked as "Exhibit FF". His approval required that he submit to testing for COVID-19 twice per week. The letter states that failure to comply with this requirement could result in termination. Included in the letter was a form entitled "Vaccine Exemption Accommodation Agreement", which Perez was asked to sign and return to demonstrate his acceptance of the terms of the testing requirement. *Id.*

119.   On December 15, 2021, Perez signed the "Vaccine Exemption Accommodation Agreement" for both the medical exemption and the religious belief exemption under protest, by adding to the form his hand-written sentence "I, Jess Perez, am signing this agreement against my will, under duress, as I am being constrained by force." See Exhibit EE, Exhibit FF. Perez believed that he was under economic duress when he signed the documents because, based on the communications from SOCCCD, he had a reasonable belief that he would lose his employment if he did not sign the document. He then promptly returned the document to Vyskocil. *Id*.

120.   On December 16, 2021, Vyskocil emailed Perez to inform him that SOCCCD had received the document and that, despite the additional handwritten statement, the College District would consider it as a valid acceptance of the agreement, a copy of which is attached hereto and made a part hereof, marked as "Exhibit GG". Vyskocil included in the email a list of options that SOCCCD suggested Perez may consider instead of agreeing to testing. These options were (1) using paid and unpaid leave; (2) choosing to work for an employer who does not require employees to become vaccinated; and (3) [b]ecoming fully vaccinated. *Id*.

121.   On January 20, 2022, Perez received an email from Vyskocil stating that Health Services had made an error in testing him that morning because the consent form that he had signed under protest/duress on December 15 was not legally sufficient to permit medical services be performed by Health Services on Perez, a copy of which is attached hereto and made a part hereof, marked as "Exhibit HH". Vyskocil stated that Perez would need to sign a new form "without [his] opinion attached" or else Health Services would not be able to provide testing, resulting in a failed test according to the "Vaccine Exemption Accommodation Agreement". *Id*. Vyskocil reminded Perez that "after a [second] failed test, the employee will be placed on leave and issued an intent to discipline and the district will begin the process of terminating employment." *Id*.

122.   On January 20, 2022, Perez replied to the email from Vyskocil, stating that he had complied with all testing requirements and that he understood her email as a threat to terminate his employment despite having complied with the testing requirements. *Id.*

123.   Perez continues to be discriminated against by SOCCCD because of his status as unvaccinated. Perez is concerned his position will be terminated because of threats from SOCCCD staff to terminate him for failing to follow the twice-weekly testing requirement, despite the fact that Perez has, in fact, complied with the twice-weekly testing requirement.

F.   **Timeline of Plaintiff Paul Bonkowski**

124.   On September 27, 2021, SOCCCD approved a COVID-19 vaccination mandate for all students, employees, and volunteers coming onto any District campus or worksite as of January 8, 2022. See Exhibit F.

125.   On or before October 19, 2021, Paul Bonkowski ("Bonkowski") requested a religious belief exemption from the SOCCCD COVID-19 vaccine mandate.

126.   On October 19, 2021, Bonkowski received an email from Wicks requesting that he complete and return the "Religious Accommodation Verification Form for COVID-19 Vaccination" as part of the evaluation process of SOCCCD to determine his eligibility for a religious belief exemption, a copy of which is attached hereto and made a part hereof, marked as "Exhibit II".

127.   On November 17, 2021, Bonkowski received notice from SOCCCD and CSEA that SOCCCD and management for CSEA had come to an agreement regarding the COVID-19 vaccine mandate for all students, employees, and volunteers coming onto any District campus or worksite as of January 8, 2022. See Exhibit F.

128.   On December 2, 2021, Bonkowski received notice from Vyskocil, that he had been conditionally approved for an exemption to the vaccine mandate, provided that he "sign the agreement", a copy of which is attached hereto and made a part hereof, marked as "Exhibit

JJ". Vyskocil then listed three options available to Bonkowski: "(1) Sign the agreement and test twice per week on site at no expense to you; (2) begin using your vacation and then unpaid leave beginning January 10, 2022, with the understanding that your health benefits will be ended after 90 days of being on unpaid leave (but knowing your job will only be protected until June 30, 2022); or (3) Withdraw your request for a religious exemption and provide proof of full vaccination (via a QR code not a vaccine card) on or before January 7, 2022." *Id*. Vyskocil stated that Bonkowski had only five days to reply and accept the accommodation agreement, otherwise it would be withdrawn by SOCCCD. *Id*.

129.    On December 3, 2021, Bonkowski replied to Vyskocil's email stating that he did not know what "the agreement" was to which Vyskocil was referring, and he requested that she email him a copy, a copy of which is attached hereto and made a part hereof, marked as "Exhibit KK".

130.    On December 3, 2021, Bonkowski received an email from Vyskocil with the "Vaccine Exemption Accommodation Agreement" attached. *Id*. Vyskocil reiterated the three options of sign the agreement, use paid and unpaid leave, or get vaccinated. *Id*.

131.    On December 4, 2021, Bonkowski emailed Vyskocil, requesting an in-person meeting with her to discuss the "Vaccine Exemption Accommodation Agreement", a copy of which is attached hereto and made a part hereof, marked as "Exhibit LL". Bonkowski indicated that he would also bring an individual to observe the process. *Id*.

132.    On December 5, 2021, Vyskocil replied to Bonkowski's email, stating that she was happy to meet with him, but that the "observer" must be a union representative, otherwise they would not be permitted to attend the meeting. *Id*.

133.    On December 7, 2021, Bonkowski met with Vyskocil and Cindy Barron. Rob Hartman acted as the CSEA observer on behalf of Bonkowski. At this meeting, Bonkowski informed Vyskocil that his religious beliefs prevent him from receiving the COVID-19

vaccine as well as the twice-weekly testing. *Id*. The response from Vyskocil, memorialized in her email to Bonkowski later that same day, was that the twice-weekly testing is a requirement and that the District would "understand if you decide that you would rather go on leave without pay beginning January 10, 2022[,] instead of agreeing to test". *Id*. The District did not consider any other possible accommodation for Bonkowski that did not include twice-weekly testing. *Id*.

134.    Bonkowski continues to be discriminated against by SOCCCD because of his status as unvaccinated. Bonkowski is concerned his position will be terminated because of threats from SOCCCD staff to terminate him for failing to follow the twice-weekly testing requirement, which he is unable to do because of his religious beliefs.

**G.    Timeline of Plaintiff Mary Kate Planeta**

135.    On September 8, 2021, Mary Kate Planeta ("Planeta") requested from SDCCD a religious belief exemption for the COVID-19 vaccination requirement for attending in-person classes, a copy of which is attached hereto and made a part hereof, marked as "Exhibit MM".

136.    On September 9, 2021, Planeta received notice from SDCCD of approval of her request for a religious belief exemption. *Id*.

137.    On November 8, 2021, Planeta emailed Mary Kjartanson, Miramar College EMT Program Director, to inquire about immunization requirements for the EMT program, a copy of which is attached hereto and made a part hereof, marked as "Exhibit NN". Planeta informed Ms. Kjartanson that she had a religious exemption for the COVID vaccination requirement. *Id*. In response, Ms. Kjartanson told Planeta that the EMT program does not accept COVID-19 exemptions. *Id*.

138.    On January 10, 2022, Planeta sent an email to SDCCD expressing her concerns about the revocation of her religious belief exemption, a copy of which is attached hereto and

made a part hereof, marked as "Exhibit OO". The classes in which she was enrolled for in-person instruction were not available online. These same classes were a requirement to be able to transfer to another school and to enroll in the Coast Guard. Prior to receiving this notice, and in reliance upon SDCCD having granted her religious belief exemption and permitting her to enroll in classes, Planeta had made the decision to leave her full-time employment and to become a full-time student, taking out a student loan for living expenses and relying upon a scholarship that she had earned. *Id*. The removal of Planeta from the classes for which she had enrolled forced her to enroll in other classes that are not a requirement of her educational plan or else risk losing her student loan and scholarship, which require her to be enrolled in classes. *Id*.

139.    On January 18, 2022, Planeta received notice from SDCCD that she was no longer eligible for in-person instruction due to her religious belief exemption from the COVID-19 vaccination requirement. Exhibit NN at 5. As a result, she would be dropped on January 21, 2021, from the in-person classes in which she had enrolled, including BIOL 210 Intro to the Biological Sciences I, CHEM 200 General Chemistry I Lecture, CHEM 200L General Chemistry I Laboratory, and PHYS 126 General Physics II. *Id*. This notice was sent out three weeks prior to the beginning of the Spring semester, leaving little to no practical time for Planeta to seek alternative educational options. Due to the brief amount of time available to her, and in order to protect her eligibility for student financial aid, Planeta has had to register and attend online classes for lower division classes that offer credits that will not transfer to her preferred educational program. SDCCD made no attempt to accommodate Planeta's religious belief exemption. In fact, her religious belief exemption was cited as the reason she could not attend in-person instruction and needed to be removed from the classes.

140.    Planeta continues to be discriminated against by SDCCD because of her status as an unvaccinated student. Planeta has been denied any form of accommodation without an explanation why her religious belief exemption cannot be granted.

**IV.    The CCD's Lack the Authority to Issue a Vaccination Mandate**

**A.    California has pre-empted the issue of vaccination requirements related to occupational exposure to aerosol transmissible diseases**

141.    California State agencies have established and enacted regulations establishing appropriate protocols for employee vaccinations in the most hazardous occupational conditions, which protocols are found in CCR, Title 8 § 5199, Aerosol Transmissible Diseases. According to the website of the State of California's Office of Administrative law, "The California Code of Regulations (CCR), is the official compilation and publication of the regulations adopted, amended or repealed by state agencies pursuant to the Administrative Procedure Act (APA). Properly adopted regulations that have been filed with the Secretary of State have the force of law.  The scope and application of the section is defined in § 5199(a)(1)(A-I). This section applies to facilities, service categories, or operations, including, but not limited to: Hospitals, skilled nursing facilities, clinics, medical offices, outpatient medical facilities, facilities where high hazard procedures are performed, Home health care, Long term health care facilities and hospices, Medical outreach services, Paramedic and emergency medical services including these services when provided by firefighters and other emergency responders, medical transport, hazardous waste operations, emergency response, police services provided during transport or detention of persons reasonably anticipated to be cases or suspected cases of aerosol transmissible diseases, and police services provided in conjunction with health care or public health operations, public health services, such as communicable disease contact tracing or screening programs that are reasonably anticipated to be provided to cases or suspected cases of aerosol transmissible diseases, and public health

services rendered in health care facilities or in connection with the provision of health care,

correctional facilities and other facilities that house inmates or detainees, homeless shelters,

and drug treatment programs

142.     The scope so described shows an intent to apply to any facility, service

category, or operation that may cause employees to be exposed to individuals that are likely to

have an aerosol transmissible disease, such as COVID-19. These rules were drafted by

California state agencies, with the intent to govern occupations and employees at the greatest

risk of exposure to all forms of aerosol transmissible diseases.  As such, the requirements set

forth therein may be considered a "high-water mark" for occupational health and safety

protocol. Said California state agencies have established therein the appropriate protocol for

employee vaccination in the most "at risk" occupations.

143.     §5199 applies to Defendant Community College Districts and their college

campuses because the campuses each have a medical services facility wherein employees and

students may be tested or may receive the vaccine, and because of the high number of persons

that utilize each campus. Individuals who plan to be tested by the medical facilities for

COVID-19 have access to most if not all parts of each campus. While some individuals who

seek testing will not be infected, it is likely that some of the tested individuals will currently be

infectious. Those same individuals may use a bathroom, have a meal in the cafeteria, visit the

library, or access other parts of the campus not related to the medical facility. It is reasonable

that individuals who access the medical facilities for COVID-19 testing may also access other

parts of the campus, therefore, the entirety of the campus must be considered within the ambit

of §5199 because the medical facilities are not operated in a sufficiently discrete and separate

manner from the rest of the campus to ensure that the risks posed by testing of aerosol

transmitted diseases will not also pose a risk to the campus at large.

144.     The information regarding the laws, rights and rules governed by CCR Tit. 8, §

5199 has been made available and disseminated in "The California Workplace Guide to

Aerosol Transmissible Diseases," published in April, 2020, by the Department of Industrial

Relations Division of the Occupational Safety and Health Publications Unit.[17] § 5199 creates a

duty in the employer to report any time an employee declines a vaccination. The act does not

create a right to terminate an employee for declining a vaccination.

145.    On page 36 of this document, within the section titled "Medical Services," is

the statement:

> "EMPLOYEES ARE PERMITTED TO DECLINE ANY RECOMMENDED
> VACCINATION, BUT THE EMPLOYER MUST ENSURE THAT THEY SIGN THE
> STATEMENT IN APPENDIX C1 (REPRODUCED BELOW) FOR EACH
> DECLINED VACCINE."

146.    The document provides an example of the Vaccination Declination Statement,

reproduced below:

> APPENDIX C1 – VACCINATION DECLINATION STATEMENT
> (MANDATORY)
> THE EMPLOYER SHALL ENSURE THAT EMPLOYEES WHO DECLINE TO
> ACCEPT A RECOMMENDED VACCINATION OFFERED BY THE EMPLOYER
> SIGN AND DATE THE FOLLOWING STATEMENT AS REQUIRED BY
> SUBSECTION (H)(5)(E):
> I UNDERSTAND THAT DUE TO MY OCCUPATIONAL EXPOSURE TO
> AEROSOL TRANSMISSIBLE DISEASES, I MAY BE AT RISK OF ACQUIRING
> INFECTION WITH _____ (NAME OF DISEASE OR PATHOGEN). I
> HAVE BEEN GIVEN THE OPPORTUNITY TO BE VACCINATED AGAINST
> THIS DISEASE OR PATHOGEN AT NO CHARGE TO ME. HOWEVER, I
> DECLINE THIS VACCINATION AT THIS TIME. I UNDERSTAND THAT BY
> DECLINING THIS VACCINE, I CONTINUE TO BE AT RISK OF ACQUIRING
> _____, A SERIOUS DISEASE. IF IN THE FUTURE I CONTINUE TO
> HAVE OCCUPATIONAL EXPOSURE TO AEROSOL TRANSMISSIBLE
> DISEASES AND WANT TO BE VACCINATED, I CAN RECEIVE THE
> VACCINATION AT NO CHARGE TO ME.
>
> _____   _____
> EMPLOYEE SIGNATURE        DATE

147.    The recommended vaccines and the related diseases are referenced in the same

document on p. 36, which is taken from § 5199, Appendix E. These diseases are Influenza,

---

[17] https://www.dir.ca.gov/dosh/dosh_publications/ATD-Guide.pdf

Measles, Mumps, Rubella, Tetanus, Diphtheria, Acellular pertussis, and Varicella-Zoster. The vaccines for these diseases must be made available by employers within the scope of § 5199 at no charge to the employees. COVID-19 is not listed. The publication of the document was in April, 2020, a month after Governor Newsom declared a state of emergency on March 4, 2020, and subsequently issued the first COVID-19 related executive order, N-25-20, on March 12, 2020. In that executive order, there is no mention of § 5199, or the suspension of the rules contained therein. For these reasons, employees within the scope of § 5199 continue to enjoy the right to decline vaccinations for aerosol transmissible diseases without fear of termination.

**B.      The U.S. Supreme Court has established that vaccination mandates are outside the scope of power of occupational authorities in the case NFIB v. OSHA**

148.    "Administrative agencies are creatures of statue. They accordingly possess only the authority that Congress has provided." *NFIB v. OSHA*, 595 U.S. ____(2022), 5.

149.    The Supreme Court found that the statute that granted power to OSHA allowed them to "make *workplace* safety standards, not broad public health measures." *Id*. at 6, emphasis in original.

150.    "Although COVID-19 is a risk that occurs in many workplaces, it is not an *occupational* hazard in most. COVID-19 can and does spread at home, in schools, during sporting events, and everywhere else that people gather. That kind of universal risk is no different from the day-to-day dangers that all face from crime, pollution, or any number of communicable diseases." *Id*., at 6-7, emphasis in original.

151.    Congressionally granted authority to regulate occupational safety does not confer the additional and greater authority to regulate health and safety measures generally. Vaccine mandates fall within the ambit of the latter category and, therefore, cannot be understood as within the general authority of an employer, regardless of how benevolent their intentions may be, to require a vaccination, or invasive testing, as a means of ensuring

occupational workplace safety. "Experience should teach us to be most on our guard to protect liberty when the government's purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding." *Olmstead v. United States*, 277 U.S. 438, 479 (1928) (Brandeis, J., dissenting).

**C.      Education Code ("EC") §70900, et seq., grants to the Board of each CCD only the powers listed, and it does not grant the authority to regulate vaccination, or testing, of employees or students**

152.    The California Legislature created the Community College System in 1975 through the enactment of EC §70900. The Legislature charged the local community college districts to "establish, maintain, operate, and govern one or more community colleges in accordance with law." EC §70902(a). The Legislature empowered the governing boards to "initiate and carry on any program, activity, or may otherwise act in any manner that is not in conflict with or inconsistent with, or preempted by, any law and that is not in conflict with the purposes for which community college districts are established." *Id*. Governing boards are charged with numerous responsibilities and powers, including, but not limited to, "establish academic standards" [EC §70902(b)(3)], "establish rules and regulations governing student conduct" [EC §70902(b)(7)], "establish student fees" [EC §70902(b)(9)], "[m]anage and control district property" [EC §70902(b)(6)], and "[e]mploy and assign all personnel not inconsistent with the minimum standards adopted by the board of governors and establish employment practices, salaries, and benefits for all employees not inconsistent with the laws of this state." [EC §70902(b)(4)]

153.    EC §70900, et seq., is silent regarding vaccines. There is a provision that permits any community college district to exclude "students suffering from contagious or infectious diseases." [EC §76020(a)]. This would permit the school to exclude a student who

has been diagnosed with COVID-19. It may also permit testing of that same student to ensure they are no longer contagious. However, this provision does not grant the authority to require testing of employees for an illness for which they display no symptoms.

154.    The construction of the statute evinces the intent of the Legislature to retain authority in the field of law relating to vaccination in occupational settings because there is no language either explicitly or impliedly granting the authority to the College Districts or to their Governing Boards. "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose." *People v. Murphy*, 25 Cal.4th 136, 142 (2001); 105 Cal.Rptr.2d 387, 19 P.3d 1129. "We begin by examining the statutory language because the words of a statute are generally the most reliable indicator of legislative intent." *People v. Watson*, 42 Cal.4th 822, 828 (2007); 68 Cal.Rptr.3d 769, 171 P.3d 1101; *Hsu v. Abbara*, 9 Cal.4th 863, 871 (1995); 39 Cal.Rptr.2d 824, 891 P.2d 804. "We give the words of the statute their ordinary and usual meaning and view them in their statutory context." *People v. Watson*, supra, at p. 828; 68 Cal.Rptr.3d 769, 171 P.3d 1101. "We harmonize the various parts of the enactment by considering them in the context of the statutory framework as a whole." *People v. Cole*, 38 Cal.4th 964, 975 (2006); 44 Cal.Rptr.3d 261, 135 P.3d 669; *Cummins, Inc. v. Superior Court*, 36 Cal.4th 478, 487 (2005); 30 Cal.Rptr.3d 823, 115 P.3d 98. "If the statute's text evinces an unmistakable plain meaning, we need go no further." *Beal Bank, SSB v. Arter & Hadden, LLP*, 42 Cal.4th 503, 508 (2007); 66 Cal.Rptr.3d 52, 167 P.3d 666; *In re C.H.*, 53 Cal.4th 94, 100, (2011); 133 Cal.Rptr.3d 573, 264 P.3d 357. "Ultimately we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute." *Allen v. Sully-Miller Contracting Co.,* 28 Cal.4th 222, 227 (2002); 120 Cal.Rptr.2d 795, 47 P.3d 639; *Shorts v. Superior Court*, 24 Cal.App.5th 709, 720, (2018); 234 Cal.Rptr.3d 392.

1
2

**D.      Defendant Districts Have Implemented a New COVID-19**

**Vaccination/Testing Mandate Without Authority**

3       155.    On September 23, 2021, SDCCD implemented a COVID-19 vaccine

4  requirement for employees and students. Employees are required to be fully vaccinated and

5  provide proof of vaccination on or before October 8, 2021, as stated in an email from Vice

6  Chancellor Smith, a copy of which is attached hereto and made a part hereof, marked as

7  "Exhibit PP". Failure to become fully vaccinated will result in discipline up to and including

8  termination. *Id*. The mandate does not recognize natural immunity resulting from previous

9

10 infection as an alternative to vaccination.

11       156.    On November 9, 2021, GCCCD implemented a COVID-19 vaccine

12 requirement for employees and students. Employees are required to be fully vaccinated and

13 provide proof of vaccination on or before January 31, 2022. Exhibit L, p 5. Failure to become

14 fully vaccinated will result in discipline up to and including termination. *Id*. The mandate does

15 not recognize natural immunity resulting from previous infection as an alternative to

16
17 vaccination.

18       157.    On or about November 17, 2021, SOCCCD approved a mandate to require all

19 workers to be vaccinated against COVID-19 to continue to work on-site. [Exhibit F CSEA

20 Memorandum of Understanding (MOU), Nov 17, 2021]. Employees are required to be fully

21 vaccinated and provide proof of vaccination on or before January 7, 2022. Failure to become

22
23 fully vaccinated will result in discipline up to and including termination. Exemption requests

24 were not being accepted by SOCCCD after the November 18, 2021, deadline. The mandate

25 does not recognize natural immunity resulting from previous infection as an alternative to

26 vaccination.

27       158.    The vaccination mandates of each District are unenforceable because the

28 mandates (1) do not arise from a power vested by the Legislature in the CCD's; (2) are not

based on regulation of an occupational risk or a "business necessity"; and (3) are preempted by the State of California through the regulation of occupational exposure to aerosol transmissible diseases through § 5199, which does not provide for termination of employment for refusing vaccination.

## V.   The Community Colleges have a financial interest in the implementation of COVID-19 prevention measures

### A.   Federal Grants created a Significant Financial Incentive for each Community College District

159.   The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was passed by Congress on March 27th, 2020. This bill allotted $2.2 trillion to provide fast and direct economic aid to the American people negatively impacted by the COVID-19 pandemic.[18] Of that money, approximately $14 billion was given to the Office of Postsecondary Education as the Higher Education Emergency Relief Fund ("HEERF 1").

160.   The Coronavirus Response and Relief Supplemental Appropriations Act of 2021 ("CRRSAA"), Public Law 116-260, was passed by Congress and signed into law on Dec. 27, 2020.[19] CRRSSA authorized the Higher Education Emergency Relief Fund II ("HEERF 2"). In total, the CRRSAA authorizes $81.88 billion in support for education.

161.   The American Rescue Plan (ARP), Public Law 117-2, was passed by Congress and signed into law on March 11, 2021.[20] The Higher Education Emergency Relief Fund III ("HEERF 3") is authorized by the ARP to provide $39.6 billion in support to institutions of higher education to serve students and ensure learning continues during the COVID-19 pandemic. ARP funds are in addition to funds authorized by the CRRSAA, Public Law 116-

---

[18] U.S. Department of Education, https://www2.ed.gov/about/offices/list/ope/caresact.html
[19] U.S. Department of Education, https://www2.ed.gov/about/offices/list/ope/crrsaa.html
[20] U.S. Department of Education, https://www2.ed.gov/about/offices/list/ope/arp.html

260 and the CARES Act, Public Law 116-136. Emergency funds available to institutions and their students under all emergency funds total $76.2 billion.

### B.    Conditions Imposed by the Federal Grants

162.    Grants awarded under HEERF 1 are subject to expenditure requirements and limitations outlined in the "Recipient's Funding Certification and Agreement for the Institutional Portion of the Higher Education Emergency Relief Fund Formula Grants Authorized by Section 18004(a)(1) of the Coronavirus Aid, Relief, and Economic Security (CARES) Act", a copy of which is attached hereto and made a part hereof, marked as "Exhibit QQ." The agreement states that "use up to 50 percent of the funds received to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus…". See Exhibit QQ. A list of which public and non-profit entities have received funding from HEERF 1 is found in the document titled "Allocations for Section 18004(a)(1) of the CARES Act", published by the U.S. Department of Education, a copy of which is attached hereto and made a part hereof, marked as "Exhibit QQ1."

163.    Grants awarded under HEERF 2 are subject to expenditure requirements and limitations outlined in the "Coronavirus Response and Relief Supplemental Appropriations Act, 2021 Certification and Agreement (CFDA 84.425F) ((a)(1) Institutional Portion)", a copy of which is attached hereto and made a part hereof, marked as "Exhibit RR." The agreement states that "Recipient may use these grant funds for Recipient's Institutional Costs to defray expenses associated with coronavirus (including lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff trainings, and payroll…". See Exhibit RR. A list of which public and non-profit entities have received funding from HEERF 2 is found in the document titled "HEERF II Allocations for Public and Nonprofit Institutions under CRRSAA section 314(a)(1)", published by the U.S. Department of Education, a copy of which is attached hereto and made a

part hereof, marked as "Exhibit RR1."

164.    Grants awarded under HEERF 3 are subject to expenditure requirements and limitations outlined in the "American Rescue Plan Act of 2021 Certification and Agreement (ALN 84.425F) ((a)(1) Institutional Portion)", a copy of which is attached hereto and made a part hereof, marked as "Exhibit SS." The agreement requires that "Recipient must use a portion of their institutional funds received under this award to… implement evidence-based practices to monitor and suppress coronavirus in accordance with public health guidelines…". See Exhibit SS. A list of which public and non-profit entities have received funding from HEERF 3 is found in the document titled "HEERF III Allocations for Public and Nonprofit Institutions under ARP section 2003(a)(1)", published by the U.S. Department of Education, a copy of which is attached hereto and made a part hereof, marked as "Exhibit SS1."

**C.    Amounts awarded to each Community College District**

165.    GCCCD received awards from HEERF 1, HEERF 2, and HEERF 3.  The total amount received by GCCCD is $74,684,148.00, of which $42,312,014.00 is designated as Institutional portion. See Exhibit QQ1, Exhibit RR1, Exhibit SS1.

166.    SDCCD received awards from HEERF 1, HEERF 2, and HEERF 3.  The total amount received by SDCCD is $112,012,055.00, of which $65,942,255.00 is designated as Institutional portion. See Exhibit QQ1, Exhibit RR1, Exhibit SS1.

167.    SOCCCD received awards from HEERF 1, HEERF 2, and HEERF 3.  The total amount received by SOCCCD is $61,225,209.00, of which $35,339,457.00 is designated as Institutional portion. See Exhibit QQ1, Exhibit RR1, Exhibit SS1.

**D.    The significant amount of the grants awarded have led the Community College Districts to overzealously pursue compliance.**

168.    The multi-million-dollar grants that each Community College District has

received come with restrictions on expenditures. Violation of these restrictions by a Recipient could result in the Recipient having to return the money previously awarded. The most notable restriction is in HEERF 3, which requires that Recipients use a portion of the funds received to "implement evidence-based practices to monitor and suppress coronavirus in accordance with public health guidelines…". See Exhibit SS. The practices adopted by the CCD's are draconian in application because they have resulted in the disregard of the Constitutional rights of numerous employees and students in favor of protecting the budgets of each CCD by overzealously adhering to the conditions of the grant. The CCD's have been faced with a choice; recognize the Constitutional rights of its employees and students, and possibly refund tens of millions of tax dollars, or, alternatively, keep the money and continue persecuting employees and students seeking to exercise their rights as guaranteed by the U. S. Constitution, the Bill of Rights, and the Civil Rights Act of 1964. Unfortunately, although predictably, they have chosen to "take the money and run."

**E.** **Defendants' financial conflicts of interest remain undisclosed to Plaintiffs**

169.    Defendants' have not disclosed to Plaintiffs how the money from the grants received has been apportioned at each school. The terms of the grants specifically state that a certain portion, roughly 50%, must be spent on helping students adversely affected by the COVID-19 pandemic. The acceptance of the grant money has created a fiduciary duty in the Board to ensure that the grant money is properly spent to help the students. However, the remaining portion may be allocated to operational expenses such as payroll. There is no provision that prevents Defendants from allocating all of the remaining grant money to increase the funding for payroll, which would personally benefit the various officers, board members, and employees. While this may be within the discretion of the authority of each CCD, it creates a financial conflict of interest regarding the decision whether and how to implement COVID-19 prevention measures. This conflict of interest regarding the actual

allocation of the grant money received has not been disclosed to Plaintiffs. An investigation into the budgetary spending of each school did not find any information made available to the public that shows with specificity how the grant money has been apportioned. Therefore, a reasonable inference exists about a possible conflict of interest that may have influenced the decisions of the Defendants' Board of Trustees and Board of Governors.

**F.      Defendants' Failure to Disclose the Potential Conflict of Financial Interest Precludes any Judicial Deference to the Decision to Implement the Mandates**

170.    The common law business judgment rule creates "a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions." *Gaillard v. Natomas Co.*, (1989) 208 Cal.App.3d 1250, 1263; 256 Cal.Rptr. 702.

171.    [It] is based on the premise that those to whom the management of a business organization has been entrusted, and not the courts, are best able to judge whether a particular act or transaction is helpful to the conduct of the organization's affairs or expedient for the attainment of its purposes. *Eldridge v. Tymshare, Inc.*, (1986) 186 Cal.App.3d 767, 776; 230 Cal.Rptr. 815.

172.    The rule establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest. *Katz v. Chevron Corp.*, (1994) 22 Cal.App.4th 1352, 1366; 27 Cal.Rptr.2d 681.

173.    "A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be "attributed to any rational business purpose.'" *Katz*, supra, 22 Cal.App.4th at p. 1366; 27 Cal.Rptr.2d 681.

174.    An exception to the presumption afforded by the business judgment rule accordingly exists in "circumstances which inherently raise an inference of conflict of interest"

and the rule "does not shield actions taken without reasonable inquiry, with improper motives, or as a result of a conflict of interest." *Everest Investors 8 v. McNeil Partners*, 114 Cal.App.4th 411, 430, 8 Cal.Rptr.3d 31.; *Lee v. Interinsurance Exchange* (1996) 50 Cal.App.4th 694, 715, 57 Cal.Rptr.2d 798.

175.    The failure of the Defendants to disclose (1) the potential financial conflict of interest and (2) how the grant money has been apportioned creates a reasonable inference of a conflict of interest. Therefore, Defendants' may not shield their actions behind the business judgement rule and the Court should apply strict scrutiny when reviewing the relevant decisions of Defendants' Boards.[21] Accordingly, Plaintiffs ask the Court to deny any request for deference to the decisions made by the Board regarding the adoption of the vaccine/testing/masking mandate.

## VI.    The Mask Requirement and Mandatory twice-weekly testing violate Title VII of the Civil Rights Act

176.    The Equal Employment Opportunity Commission ("EEOC") has published guidance on their website titled "What You Should Know about COVID-19 and the ADA, the Rehabilitation Act, and other EEO laws" to help employers navigate the challenges created by

---

[21] See e.g., *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011) ("Even without the special skepticism we are to apply in cases of conflict of interest, deference to the plan administrator's judgment does not mean that the plan prevails. 'Deference' is not a 'talismanic word[ ] that can avoid the process of judgment.'"); *Coley v. Eskaton*, 51 Cal. App. 5th 943, 953, 264 Cal. Rptr. 3d 740, 748 (2020) (rejecting deference for a director where a conflict of interest is present, "A director, however, cannot obtain the benefit of the business judgment rule when acting under a material conflict of interest…. Deference under the business judgment rule is premised on the notion that corporate directors are best able to judge whether a particular transaction will further the company's best interests."); *United States v. Seminerio*, 680 F. Supp. 2d 523, 544 (S.D.N.Y. 2010) ("Anthony Seminerio breached the public trust not only by failing to disclose his conflict of interest, but also by receiving payments for certain actions that plainly would be expected of a reasonably diligent legislator. What is more, Seminerio received payments for actions that would not be expected of a diligent public servant, such as collecting debts, using official clout to maintain contracts that were lucrative to the Assemblyman, and even trading state funding for jobs."); *Powers v. Dickson, Carlson & Campillo*, 54 Cal. App. 4th 1102, 1115, 63 Cal. Rptr. 2d 261, 269 (1997) (discussing whether to strictly scrutinize contractual provision if there were a conflict of interest, the court stated "No conflict of interest rules are applicable and, thus, strict scrutiny is not required.").

COVID-19 and how best to comply with Federal employment laws during this time.[22] In Section A.6, the EEOC stated that "The ADA requires that any mandatory medical test of employees be "job related and consistent with business necessity." *Id.* "Testing administered by employers consistent with current CDC guidance will meet the ADA's "business necessity" standard." *Id.* Title VII of the Equal Rights Act of 1964 uses a similar standard of "business necessity" to determine whether an employment practice is prohibited. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). "If an employment practice which operates to exclude [a protected class] cannot be shown to be related to job performance, the practice is prohibited." *Id.*

177.    The EEOC has advised in section A.8 that an employer "may ask all employees who will be physically entering the workplace if they have COVID-19 or symptoms associated with COVID-19, and ask if they have been tested for COVID-19." *Id.* The EEOC elaborated that "for those employees who are teleworking and are not physically interacting with coworkers or others (for example, customers), the employer would generally not be permitted to ask these questions." *Id.*

A.     **CDC Recommended COVID-19 Prevention Strategies as of October 5, 2021, are inconsistent with the CCD's twice-weekly testing policy and mask requirement**

178.    On October 5, 2021, the CDC published recommendations for employers titled "Interim Guidance for SARS-CoV-2 Testing in Non-Healthcare Workplaces"[23], a copy of which is attached hereto and made a part hereof, marked as "Exhibit VV". The guidance

---

[22] "What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and other EEO laws", U.S. Equal Employment Opportunity Commission, https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws
[23] "Interim Guidance for SARS-CoV-2 Testing in Non-Healthcare Workplaces.", Center for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/testing-non-healthcare-workplaces.html#anchor_1615914276994

indicates that "screening testing", which the CDC refers to as the testing of asymptomatic persons without known or suspected exposure to SARS-CoV-2 (COVID-19) for early identification, isolation, and disease prevention, may be appropriate for employers depending upon several criteria. *Id*. The criteria used to determine when screening testing is appropriate include: (1) the availability of testing, turnaround time, and cost; (2) the latency of period between exposure and development of a positive SARS-CoV-2 viral test; (3) type of workplace; (4) level of community transmission; (5) number of employees who tested positive during previous rounds of testing; and (6) relevant experience with outbreaks at the workplace. *Id*.

179.    The CDC provides two tables to help employers determine the appropriate recommended prevention strategy, including when screening testing is appropriate. The first, titled "Table 2. Level of Community Transmission", establishes the risk of transmission can be determined by the percentage of positive nucleic acid amplification tests ("NAATs") during the last seven days within a particular county. *Id*. At the time of publication, October 5, 2021, counties with a rate of less than 5% are considered "Low Transmission". A county with a rate of 5-7.9% is considered to have "Moderate Transmission". A county with a rate of 8-9.9% is considered to have a "Substantial Transmission". A county with a rate of 10% or greater is considered to have a "High Transmission".

180.    The second table, titled "Table 3. Potential Actions Based on Community Transmission Level", provides a cross-reference that employers may use to determine what prevention strategy is recommended by the CDC for communities with different transmission levels as determined in Table 2. *Id*. This table shows that CDC recommends screening testing only for counties within the Substantial Transmission or High Transmission category. Counties with Low or Moderate transmission are recommended to "Facilitate diagnostic testing for symptomatic persons and all close contacts cases."

181.    Since October 5, 2021, CDC has recommended that businesses located in counties with Low Transmission implement a prevention strategy of "Facilitate diagnostic testing for symptomatic persons and all close contacts cases." CDC did not recommend screening tests when the transmission rate is below 8%. The recommendations do not make a distinction between vaccinated and unvaccinated individuals.

**B.     CDC Recommended COVID-19 Prevention Strategies as of March 17, 2022, are inconsistent with the CCD's twice-weekly testing policy and mask requirement**

182.    The CDC has published on their website information on community levels of infection and COVID-19 prevention strategies titled "COVID-19 Community Levels", last updated on March 17, 2022, a copy of which is attached hereto and made a part hereof, marked as "Exhibit WW".[24]   The prevention strategies recommended by the CDC are based on "our current understanding of SARS-CoV-2 infection, immunity from vaccination and infection, and the tools we have available." See Exhibit WW. This statement acknowledges that prior infection of COVID-19 can lead to immunity to the disease. The site features a tool that lets users search by state and county to see what the current transmission rate is for that county, with a potential rating of "Low", "Medium", and "High". *Id*. The site includes a color-coded map of all counties in the United States to visually represent the three different levels of transmission rates.

183.    At the time of publication, March 17, 2022, the CDC website shows that the recommended community prevention strategy for businesses located within a county with a rating of Low are not recommended to use screening testing. Individuals located within a county with a rating of Low are not recommended to use a facemask. For businesses located

---

[24] "COVID-19 Community Levels", https://www.cdc.gov/coronavirus/2019-ncov/science/community-levels.html#anchor_47145

within a county with a rating of Medium or High, the CDC recommends implementing screening testing like the twice-weekly testing that is required by the CCD's. *Id*. A rating of Medium or High also includes a recommendation to individuals to discuss with a doctor whether they should wear a mask. The recommendations do not make a distinction between vaccinated and unvaccinated individuals.

**C.    Current Community Level ratings for San Diego and Orange Counties are Low**

184.    As of March 23, 2022, San Diego County is rated by the CDC as in the Low Transmission category. This was determined by using the county search tool on the CDC website and recording the results, a copy of which is attached hereto and made a part hereof, marked as "Exhibit XX".

185.    As of March 23, 2022, Orange County is rated by the CDC as in the Low Transmission category. This was determined by using the county search tool on the CDC website and recording the results, a copy of which is attached hereto and made a part hereof, marked as "Exhibit YY".

**D.    The CCD's masking requirement and twice-weekly testing requirement for unvaccinated employees go beyond the recommendations of the CDC and, therefore, do not meet the "business necessity" rule of Title VII**

186.    All three CCD's are located in counties with low transmission rates; however, all three CCD's have continued to use a prevention strategy for communities with medium to high transmission ratings, such as requiring twice-weekly screening tests for unvaccinated, asymptomatic workers, and students and requiring all employees to wear masks. Therefore, all three CCD's are not following the guidance and recommendations of CDC with regards to their treatment of unvaccinated workers. The mask requirement and mandatory twice-weekly

testing of unvaccinated, asymptomatic employees and students do not meet the "business necessity" standard of Title VII, because the CCD's have implemented a prevention strategy that is not consistent with the recommendations of the CDC. Furthermore, the CCDs have not referenced any scientific findings to support a masking requirement that goes beyond the recommendations for the CDC, which shows that the decision to implement the masking policy is arbitrary in nature. Therefore, the twice-weekly testing requirement should be enjoined as violative of Title VII.

## VII. The CCD's Have Discriminated Against Plaintiff Employees Based on Their Religious Beliefs

### A. Religion is a Protected Class

187. 42 U.S.C. §2000e, et seq., and California Government Code ("GC") §12900, et seq., provide broad workplace protections for people with sincere religious beliefs. It is unlawful for an employer to "exclude or to suspend an employee, or otherwise to discriminate against any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(c)(1).

188. Title VII of the Civil Rights Act of 1964, as well as California's Fair Employment and Housing Act ("FEHA"), apply to employees seeking reasonable accommodations from their employers for sincerely held religious beliefs.

### B. The Community Colleges are State Actors

189. The CCD's of the State of California were created by the enactment of EC §70900. The CCD's receive financial support from the state. All three of the CCD's are State Actors, as they are part of the California Community College system and they are bound to the rules and regulations that govern public educational programs in this state.

**C.     Unvaccinated people are similarly situated to vaccinated people**

190.    The statement from CDC Director Rochelle Walensky, published on July 30, 2021, that people who have been vaccinated against COVID-19 have similar viral loads as unvaccinated people, and, therefore, can transmit the disease, makes it clear that both the vaccinated and the unvaccinated students and employees at CCD's are similarly situated with regard to the risk of transmitting COVID-19.[25]

191.    SOCCCD has admitted that both vaccinated and unvaccinated persons may contract and spread COVID-19 (See SOCCCD COVID-19 Prevention and Return to Work 05.06.21, p 26, L 1). SOCCCD has admitted that vaccination status does not change the threat of spreading the virus posed by a person who is infected. SOCCCD should be estopped from claiming that vaccination makes an infected person less of a threat to the workplace.

192.    SDCCD has admitted that both vaccinated and unvaccinated persons may contract and spread COVID-19. See Exhibit H Email from Smith, January 11, 2022. On January 11, 2022, Smith sent an email to all employees titled "SDCCD Spring Operations Update PLEASE READ". Smith, acting as an agent of SDCCD, conceded that vaccines do not prevent transmission of COVID-19, and that both vaccinated and unvaccinated people may transmit the disease in his statement that "data and research increasingly demonstrate the omicron variant is much more transmissible, including among individuals who are fully vaccinated against COVID-19…". *Id.*

**D.     Plaintiffs have been, and continue to be, subjected to discriminatory treatment by Defendant Districts**

193.    Unvaccinated employees and students who have submitted a request for religious/personal belief exemption, or a medical exemption, to the COVID-19 vaccine

---

[25] Statement from CDC Director Rochelle P. Walensky, MD, MPH on Today's MMWR
https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html

mandate are required to test twice-weekly by all three CCD's. All three CCD's, therefore, are discriminating against unvaccinated employees and students based on their religious beliefs, in violation of the Equal Protection Clause of the Fourteenth Amendment, because they are similarly situated to vaccinated employees, whom the CDC admits can contract and spread the COVID-19 disease. However, only the unvaccinated employees and students are subject to the twice-weekly antigen test requirement.

194.    The CCD's fail to recognize employee's and student's religious/personal belief exemptions or medical exemptions even when approved, because the twice-weekly testing requirement is a mandate imposed by the CCD's "in lieu of" the vaccination mandate. The testing requirement is a retaliatory and coercive action against employees and students who choose to decline the COVID-19 vaccine.

195.    The retaliatory and coercive nature of the action is evidenced by statements of animosity and hatred towards the unvaccinated by Elliot Stern, President of Saddleback College, a campus of SOCCCD, during the President's Welcome Back Speech on August 16, 2021.[26]

196.    The animosity and hatred towards the unvaccinated on the GCCCD campus is evidenced by the statements within the email sent by Gomez to Sparks, both employees of GCCCD, on November 16, 2021, in which Gomez derided the unvaccinated and incorrectly assigned blame to the group for spreading the virus. See Exhibit TT.

197.    The animosity and hatred towards the unvaccinated on the SDCCD campus is evidenced by the statements within the email sent December 16, 2021, by Jim Mahler ("Mahler"), President of the local American Federation of Teachers Guild and Professor of Engineering, Mathematics, and Physics at SDCCD, a copy of which is attached hereto and

---

[26] "Presidents' Welcome - Fall 2021 PD Week" published by SOCCCD, Streamed live on Aug 16, 2021, at 65:26, https://www.youtube.com/watch?v=uPAxG6C1WXk

made a part hereof, marked as "Exhibit UU". In the email, Mahler states that the Guild "feel[s] very strongly that allowing unvaccinated students on our campuses in the spring, **regardless of reason**, presents a hazardous working condition for our members that we simply cannot allow to happen." See Exhibit UU, emphasis in original. Mahler continues, stating that the Guild is considering filing an Unfair Labor Practices Charge against the District and to lead a walk-out strike in protest of SDCCD permitting unvaccinated persons on campus under any condition. These statements evince the belief on the part of Mahler and the Guild that unvaccinated people are to be considered second-class citizens and should be relegated to the fringes of society, in complete disregard for their Constitutional rights.

198.     The intentionally coercive nature of the testing/masking/vaccination mandates is evidenced by an email sent August 12, 2021, by Mahler to Lama, a copy of which is attached hereto and made a part hereof, marked as "Exhibit AAA". Mahler's email was sent in response to an inquiry from Lama as to why unvaccinated employees who work remotely and do not go to the campus except on rare occasions are still required to test weekly. Mahler responded "Because we want to able to use our leverage to protect the community at-large so we can end this mess.  It's not just a workplace issue." Mahler's statements show that the masking/testing/vaccination mandates are designed to impact more than just the workplace of the CCD's and are intended to regulate the lives of employees and students outside of their roles with the CCD's. This is the exact type of regulation that was disfavored and stayed by the Supreme Court in *NFIB v. OSHA*. *See NFIB v. OSHA*.

199.     The CCD's have offered only three alternatives to the twice-weekly testing requirement for employees: (1) using paid and unpaid leave; (2) seek alternative employment, effectively terminating their employment with the CCD's; or (3) becoming vaccinated.

200.     SOCCCD offered only three alternatives to the twice-weekly testing requirement for students: (1) not being allowed to register for in-person classes; (2) being

dropped from classes; or (3) becoming vaccinated.

201.    The CCD's, therefore, fail to treat the employees and students as "exempt" from the vaccination requirement because they, instead, mandate a repetitive and invasive medical procedure that goes beyond the recommendations of the CDC, and does not offer a meaningful "reasonable accommodation" as required under CCR 11062.

202.    Employees who request a disability/medical exemption or a religious/personal belief exemption must complete the evaluation process of each CCD, and provide sufficient information to permit an initial determination, including any necessary forms online at a third-party website. *Id*. If the employee is approved for an exemption, they will be required to submit to an antigen test twice per week.

203.    The requirement of twice-weekly testing as a condition for granting a religious belief exemption, without a reasonable belief that the employee is displaying symptoms of the illness, or was recently in close contact with a person that is known by the Districts to have been diagnosed with the illness, is discriminatory because the condition of employment imposed by the District on the Plaintiffs is a coercive measure intended to discourage the Plaintiffs from exercising their religious rights, to set them aside, and to undergo a medical procedure that they believe to be morally wrong.

204.    The CCD's fail to recognize employee's religious exemptions as required by Title VII of the Civil Rights Act of 1964, §2000e-2(a)(1) and the Equal Protection Clause of the Fourteenth Amendment, as the twice-weekly testing requirement is a mandate imposed by the District "in lieu of" the vaccination mandate (See email from Vyskocil to Bonkowski, dated December 7, 2021). This twice-weekly testing mandate is discriminatory, as it imposes a disparate working condition on the unvaccinated employees who are similarly situated to the vaccinated employees. The studies published by the CDC and the statements made by CDC Director Rochelle Walensky support the claim that both unvaccinated and vaccinated people,

when infected, may ransmit COVID-19. Despite this admission, only the unvaccinated

employees are subject to the twice-weekly test mandate.

**VIII.   The Individual Right to Decline the Medical Procedure Outweighs the**

**Government Interests**

205.    Plaintiffs have constitutionally protected liberty and privacy rights to exercise

sovereignty over their own body, and to decline medical procedures that they do not want.

206.    The government's asserted interests must be weighed against the individual

right to decline medical procedures.

**A.    The COVID-19 Vaccines Carry Risk.**

207.    Pursuant to the FDA and Pfizer, "…because all subjects were observed for only

two to six months, the long-term safety of the vaccine for any age group is not known." U.S.

Food and Drug Administration, Vaccines and Related Biological Products Advisory

Committee. FDA briefing document: EUA amendment request for Pfizer-BioNTech COVID-

19 vaccine for use in children 5 through 11 years of age. Vaccines and Related Biological

Products Advisory Committee Meeting: October 26, 2021: 20, 24, 26-29.[27] Moreover,

pursuant to Moderna, "…because all subjects were observed for only two months, the long-

term safety of the vaccine for any age group is not known. The FDA has also noted, "[l]ong-

term safety and long-term effectiveness are areas the Sponsor [Moderna] identified as missing

information." U.S. Food and Drug Administration, Vaccines and Related Biological Products

Advisory Committee. FDA briefing document: Moderna COVID-19 vaccine. Vaccines and

Related Biological Products Advisory Committee Meeting: December 17, 2020: 5, 13, 17, 21,

---

[27] Vaccines and Related Biological Products Advisory Committee October 26, 2021 Meeting Briefing Document-FDA; https://www.fda.gov/media/153447/download ;
Pfizer-COVID-19-Vaccine-Risk-Statement-PDF.pdf (physiciansforinformedconsent.org);
https://physiciansforinformedconsent.org/Pfizer-COVID-19-Vaccine-Risk-Statement-PDF.pdf

24, 29, 30, 36-38, 46- 49.[28] Lastly, for the Johnson & Johnson, the FDA states that "due to the length of the clinical trial's observation period, 'it is not possible to assess sustained efficacy over a period longer than 2 months.'" U.S. Food and Drug Administration, Vaccines and Related Biological Products Advisory Committee. FDA briefing document: Janssen Ad26.COV2.S vaccine for the prevention of COVID-19. Vaccines and Related Biological Products Advisory Committee Meeting: February 26, 2021: 12-15, 17, 19, 25, 27, 29, 31, 33, 35, 37-39, 41, 56-57.[29]

B.     **The Individual Right to Decline the Medical Procedure Outweighs the Government Interests for Several Reasons**

208.    It is not known how long or how well the experimental vaccines work to prevent viral transmission or sickness.[30]

209.    There are known risks of taking the experimental vaccines[31], such as "dramatically increase[ing] inflammation on the endothelium and T cell infiltration of cardiac muscle and may account for the observations of increased thrombosis, cardiomyopathy, and other vascular events following vaccination."[32] Moreover, the Vaccine Adverse Event

---

[28] Vaccines and Related Biological Products Advisory Committee December 17, 2020 Meeting Briefing Document - FDA; https://www.fda.gov/media/144434/download ; Moderna-COVID-19-Vaccine-Risk-Statement.pdf (physiciansforinformedconsent.org); https://physiciansforinformedconsent.org/wp-content/uploads/2021/05/Moderna-COVID-19-Vaccine-Risk-Statement.pdf
[29] Vaccines and Related Biological Products Advisory Committee February 26, 2021 Meeting Briefing Document- FDA; https://www.fda.gov/media/146217/download ; Janssen-Johnson-Johnson-COVID-19-Vaccine-Risk-Statement.pdf (physiciansforinformedconsent.org); https://physiciansforinformedconsent.org/wp-content/uploads/2021/05/Janssen-Johnson-Johnson-COVID-19-Vaccine-Risk-Statement.pdf
[30] Correlation of SARS-CoV-2-breakthrough infections to time-from-vaccine (nature.com); https://www.nature.com/articles/s41467-021-26672-3.pdf; Protective immunity after recovery from SARS-CoV-2 infection - The Lancet Infectious Diseases; https://www.thelancet.com/journals/laninf/article/PIIS1473-3099(21)00676-9/fulltext
[31] Infection-enhancing anti-SARS-CoV-2 antibodies recognize both the original Wuhan/D614G strain and Delta variants. A potential risk for mass vaccination? - Journal of Infection; https://www.journalofinfection.com/article/S0163-4453(21)00392-3/fulltext ; Comparing SARS-CoV-2 natural immunity to vaccine-induced immunity: reinfections versus breakthrough infections (medrxiv.org); https://www.medrxiv.org/content/10.1101/2021.08.24.21262415v1 full.pdf
[32] Abstract 10712: Mrna COVID Vaccines Dramatically Increase Endothelial Inflammatory Markers and ACS Risk as Measured by the PULS Cardiac Test: a Warning | Circulation (ahajournals.org);

52

COMPLAINT

Reporting System ("VAERS") has reported approximately 20,622 deaths from the experimental vaccine, 35,997 cases of severe allergic reactions, 8,590 cases of anaphylaxis—a severe, potentially life-threatening allergic reaction that is rapid in onset that can cause throat swelling, shortness of breath and/or death, 12,317 cases of Bell's palsy—a type of facial paralysis, 10,429 cases of heart attacks, 3,365 cases of miscarriages, 20,560 cases of Myocarditis—inflammation of the heart muscle/Pericarditis—inflammation of the outer lining of the heart, 11,292 cases of shingles—viral infection that cause a painful rash, and 34,615 cases of permanent disability.[33]

210.    The long-term risks of the experimental vaccines are totally unknown.

211.    The targeted virus has a low mortality rate. For example, the United States has an observed case-fatality ratio of 1.6%.[34]

212.    There are a wide range of treatments available for people who do become sick with the virus.

213.    The medical procedure is likely to make an individual sick in the short term, through noted acute allergic reactions of anaphylaxis, myocarditis/pericarditis, and permanent disability.[35]

214.    The medical procedure involves a new technology called "gene therapy[36]" that

---

https://www.ahajournals.org/doi/10.1161/circ.144.suppl_1.10712
[33] COVID Vaccine Data (openvaers.com); https://openvaers.com/covid-data (last viewed December 28, 2021). However, the deaths reported on VAERS are only an estimation, and the true number of deaths from the COVID vaccine is likely much higher--Estimating the number of COVID vaccine deaths in America (skirsch.com); http://www.skirsch.com/covid/Deaths.pdf
[34] Mortality Analyses - Johns Hopkins Coronavirus Resource Center (jhu.edu); https://coronavirus.jhu.edu/data/mortality ; Mortality Risk of COVID-19 - Statistics and Research - Our World in Data; https://ourworldindata.org/mortality-risk-covid
[35] Acute Allergic Reactions to mRNA COVID-19 Vaccines | Allergy and Clinical Immunology | JAMA | JAMA Network; https://jamanetwork.com/journals/jama/fullarticle/2777417; COVID Vaccine Data (openvaers.com); https://openvaers.com/covid-data (last viewed December 14, 2021).
[36] What is Gene Therapy? | FDA; https://www.fda.gov/vaccines-blood-biologics/cellular-gene-therapy-products/what-gene-therapy ; KEY 01 - Opening Ceremony - World Health Summit 2021 - YouTube; https://www.youtube.com/watch?v=OJFKBritLlc&list=PLsrCyC4w5AZ8F0xsD3_rzLcfxHbOBRX4W(at 1:37:41 – 1:38:08).

has not previously been approved of, or used in healthy humans, and is still experimental.[37]

215.    The Mandates do not account for "natural" immunity acquired through recovery.

216.    Thus, the mandates are unconstitutional.

217.    The vaccine mandates imposed by the CCD's violate the Fifth Amendment due process clause and the right to bodily integrity, the Fifth Amendment Equal Protection Clause, the religious liberty protected by the Free Exercise Clause of the First Amendment, and the Fourth Amendment right against unconstitutional seizures enjoyed by all individuals, including Plaintiffs.

218.    The CCDs violate these rights by encouraging, endorsing, and participating in the role of carrying out their vaccine mandate, and setting unlawful conditions upon Constitutionally enumerated rights through coercively withholding benefits from those who exercise such rights.

## CAUSES OF ACTION

## IX.    FIRST CAUSE OF ACTION—Fourteenth Amendment—Equal Protection

219.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth hereat.

220.    CCD's have an official policy of a vaccination/testing/masking mandates requiring students and employees to be vaccinated/ tested/masked as a condition of attending classes in-person and/or working on campus in a non-healthcare related capacity, and that as a condition of being granted a religious belief exemption from the vaccination mandate, that Plaintiffs subject themselves to twice-weekly testing, and masking without evidence of COVID-19 infection or a recent close contact with a known case of COVID-19;

---

[37] Gene therapy: advances, challenges and perspectives (nih.gov);
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5823056/

221.    The policy was enacted and promulgated by Defendants who were board members, officers, or employees of Defendant Community College Districts;

222.    Defendants intentionally subjected Plaintiffs to a working condition or enrollment condition that was not applied equally to other, similarly situated, employees and students;

223.    Defendants' conduct violated Plaintiffs' right to equal protection under the Fourteenth Amendment to the U. S. Constitution;

224.    Defendants acted because of this official policy, thereby violating Plaintiffs' right to equal protection.

225.    The equal protection guarantee of the Fourteenth Amendment requires that classifications used to impose differing treatment under a law be rationally related to a legitimate government interest and prohibits differing treatment of similarly situated individuals based on arbitrary and irrational classifications. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985).

226.    The classification of employees as vaccinated and unvaccinated is not based on a legitimate government interest, and it violates equal protection requirements. This twice-weekly testing mandate is discriminatory because it imposes a working condition on the unvaccinated employees who are similarly situated to the vaccinated employees by virtue of the admission by the Defendants and the CDC that both unvaccinated and vaccinated employees, when infected, pose a threat to the workplace. Despite this admission, only the unvaccinated employees are subject to the twice-weekly test mandate.

227.    This classification of similarly situated persons into different groups, i.e., vaccinated employees who may spread COVID-19, and unvaccinated employees who may spread COVID-19, is arbitrary and irrational. Current scientific understanding of the COVID-19 virus is that both vaccinated and unvaccinated people may contract and spread the virus.

Rules restricting the liberty of unvaccinated people because of a fallacious belief that they alone may spread the virus is a form of invidious discrimination. Therefore, the twice-weekly testing requirement for unvaccinated individuals violates the Equal Protection Clause of the Fourteenth Amendment and should be enjoined by this Court.

228.    Pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing their vaccine mandates, forced testing, and masking requirement.

## X.    SECOND CAUSE OF ACTION—Fifth Amendment – Substantive Due Process

229.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth hereat.

230.    "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891). A competent person has a liberty interest under the Due Process Clause in refusing unwanted medical treatment.  *Cruzan v. Dir., Mo. Dep't of Public Health*, 497 U.S. 261 (1990).  "[T]he right to refuse unwanted medical treatment is so rooted in our history, tradition, and practice as to require special protection . . ." *Washington v. Glucksberg*, 521 U.S. 702, 722 n.17 (1997).

231.    The substantive due process component of the U.S. Constitution forbids the government from infringing upon fundamental liberty interests regardless of the process provided unless the infringement survives review under strict scrutiny. See, e.g., *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 257-258 (1974); *Dunn v. Blumstein*, 405 U.S. 330, 339-341 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 638 (1969).  The Orders and restrictions at issue in this matter cannot be sustained even under the less-exacting standard that the action in question must be narrowly tailored to serve a compelling state interest. *Reno*

*v. Flores*, 507 U.S. 292, 301-302 (1993).  The United States Supreme Court has declared that "even in a pandemic, the Constitution cannot be put away and forgotten." See, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. ____ , 14 S.Ct. 63, 68 (2020)(per curiam).

232.    The Defendants' masking/testing/vaccination requirements violate the substantive due process rights of Plaintiffs because the requirements seek to abrogate the right to bodily integrity protected by the Fifth Amendment through the coercive measure of threatening to terminate the employment or to disenroll a student from classes if they do not agree to subject themselves to an unwanted medical procedure which is prohibited by Plaintiff's constitutionally protected religious beliefs. As a state actor, the Defendants are prohibited by the "unconstitutional conditions doctrine" from withholding benefits from an individual, such as employment, or an education, until and unless that individual agrees to waive their constitutionally protected rights as a condition of receiving those benefits. See Koontz v. St. Johns River Water Management Dist., 570 U.S. 595 (2013). "…[R]egardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them." Id. at 606.

233.    Defendants' actions in threatening termination or disenrollment and excluding unvaccinated Plaintiffs from working on-site or from attending classes in-person were coercive actions designed to compel Plaintiffs to waive their right to bodily integrity and to subject themselves to an unwanted medical procedure, in violation of the "unconstitutional conditions" doctrine. For these reasons, the court should enjoin the Defendants' masking/testing/vaccination requirements as violating the Fifth amendment.

234.    Pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing their vaccine mandates,

1    forced testing, and masking requirement.

2    **XI.    THIRD CAUSE OF ACTION—Violation of Right to Bodily Autonomy and**

3    **Bodily Integrity, under the Fifth Amendment**

4        235.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth

5    hereat.

6        236.    The Supreme Court has held time and again that a person has a constitutionally

7    protected liberty interest in bodily integrity and bodily autonomy, and in refusing unwanted

8    medical treatment, under the Fourteenth Amendment. *Rochin v. California*, 342 U.S. 165,169

9    (1952); *Cruzan by Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990)*; Washington*

10   *v. Glucksberg*, 521 U.S. 702, 720 (1997).

11       237.    The fundamental right of a person to bodily integrity, and the right to refuse

12   unwanted medical treatment, are specially protected, and are, objectively, deeply rooted in the

13   Nation's history and tradition. *Washington v. Glucksberg*, 521 U.S. 702, 702–03 (1997).

14       238.    Each and "[e]very violation of a person's bodily integrity is an invasion of his

15   or her liberty." *Washington v. Harper*, 494 U.S. 210, 237 (1990) (Stevens, J., concurring in

16   part). "The invasion is particularly intrusive if it creates a substantial risk of permanent injury

17   and premature death. Moreover, any such action is degrading if it overrides a competent

18   person's choice to reject a specific form of medical treatment." *Id*. (footnote omitted).

19       239.    The Supreme Court has explained that the right to refuse medical care derives

20   from the "well-established, traditional rights to bodily integrity and freedom from unwanted

21   touching." *Vacco v. Quill*, 521 U.S. 793, 807 (1997).

22       240.    As noted, the Supreme Court has held for the past 75 years that it "ha[s] [long]

23   assumed, and strongly suggested, that the Due Process Clause [of the Fifth Amendment or of

24   the Fourteenth Amendment] protects the [individual's] traditional right to refuse unwanted

25   life-saving medical treatment." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing

58

*Cruzan*, 497 U.S. at 278–79).

241.    It is a violation of such fundamental rights when the law is not necessary to further a compelling governmental interest and is not narrowly tailored to achieve that interest. *Mohamed v. Holder*, 266 F. Supp. 3d 868, 877 (E.D. Va. 2017).

242.    A "forcible injection … into a nonconsenting person's body represents a substantial interference with that person's liberty." *Harper*, 494 U.S. at 229.

243.    This aligns with the unconstitutional-conditions doctrine, under which the government may not condition employment "on a basis that infringes [an employee's] constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972); see also *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) ("[T]he unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them.").

244.    Unconstitutional conditions case law often references the existence of varying degrees of coercion. According to that body of law, Defendants cannot impair Plaintiffs' right to refuse medical care through forms of coercion and through this explicit mandate. See, e.g., *Koontz*, 570 U.S. 595 (2013) ("[U]nconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them"); *Memorial Hosp. v. Maricopa Cty.*, 415 U.S. 250 (1974) ("[An] overarching principle, known as the unconstitutional conditions doctrine … vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up").

245.    The decision to remain unvaccinated is a fundamental right to bodily integrity, and the right to refuse unwanted medical treatment, as a vaccine requires a needle to pierce the skin of a person's body, and, subsequently, a person's body is then injected with a medical product, which may or may not protect the person who has been vaccinated. An antigen test requires the invasion of a person's nasal cavity with a medical device, which would also

introduce a medical product into the person's body, which may or may not cause harm to that person.

246.     The requirement of a forced vaccine or frequent antigen tests for an employee to retain employment, and to continue to be employed in their respective employment, or for a student to be able to continue their education, falls under the fundamental right to bodily integrity and the right to refuse unwanted medical treatment.

247.     The Plaintiffs must make the gut-wrenching decision, to either be injected with a drug for which there are no studies extant concerning its long-term effects, submit to twice-weekly nasopharyngeal swab antigen testing, or to be suspended, and, then, officially removed from their service/employment, or barred from education. No meaningful choice has been afforded to these employees or students. A mandatory vaccination requirement or frequent invasive testing is an infringement on an employee's, and a student's, fundamental right to bodily integrity and the right to refuse medical treatment.

248.     As a direct result of exercising their constitutional and statutory rights, Plaintiffs and members of their putative class have been, or will be, subjected to disciplinary actions, including, but not limited to, loss of their employment and all pensions and benefits attached to said employment, both for them and for their families, as well as a denial of education for the students.

249.     Based upon the Defendants' violations and deprivation of fundamental constitutional rights, rooted in this Nation's history and tradition, the Plaintiffs are entitled to injunctive relief, as well as reasonable attorney's fees and costs.

250.     Through the above-mentioned acts, Defendants, acting as employers, have deprived Plaintiffs of their fundamental constitutional right to bodily autonomy, bodily integrity, and the right to refuse unwanted medical treatment, all in violation of the Fifth Amendment to the United States Constitution.

251.    The Defendants' vaccine and testing mandates violate the constitutional rights of employees', and students', bodily integrity and to refuse medical treatment.

252.    The Defendants' conduct has injured the Plaintiffs, through threat of discipline, job loss, and duress, or loss of their education. By these actions, Defendants have violated Plaintiff's constitutional rights that have been implicated through their decision not to comply with these new policies.

253.    Consequently, Defendants' vaccine mandate violates the Fifth Amendment to the Constitution and is unlawful.

254.    As a direct and proximate result of the Defendant's violation of the Fifth Amendment, Plaintiffs have suffered, are suffering, and will continue to suffer irreparable harm, including the loss of their fundamental constitutional rights, entitling them to declaratory and injunctive relief.

255.    Pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing their vaccine mandates, forced testing, and masking requirement.

**XII.    FOURTH CAUSE OF ACTION—Violation of Religious Liberty under the First Amendment Free Exercise Clause**

256.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth hereat.

257.    The U.S. Constitution's First Amendment Free Exercise Clause requires that the right of religious freedom be given the highest regard.

258.    The Free Exercise Clause provides that "Congress shall make no law respecting an establishment of religion, **or prohibiting the free exercise thereof**." U.S. Const. Amend I, emphasis added. Therefore, Defendants, as state actors, are prohibited from abridging Plaintiffs' rights to free exercise of religion.

259.     As an unalienable right, the government cannot substantially burden religious exercise without a compelling justification that is the least restrictive means of furthering a compelling governmental interest. 42 USC §§ 200bb(a)(3), 200bb-1(b)(2). In other words, strict scrutiny applies when there is a religious exemption request to the vaccine mandate that is denied, and the burden is on the government to show that the Vaccine Mandates are the "least restrictive means necessary."

260.     Religious freedom and religious liberties have been long held to be rights heavily protected by the United States Constitution.

261.     Defendants have deprived, and will continue to deprive, Plaintiffs of their First Amendment rights, and have burdened, and will continue to substantially burden, Plaintiffs' free exercise of religion.

262.     Plaintiffs' religious freedoms are being trampled. "The 'exercise of religion,' for purposes of the Free Exercise Clause involves not only belief and profession, but the performance of, or abstention from, physical acts that are engaged in for religious reasons. U.S. Constitution. Amend. 1. *Burwell v. Hobby Lobby Stores*, Inc., 573 U.S. 682 (2014).

263.     Diving into the ins and outs and nooks and crannies of an individual's sincerely held religious belief goes above and beyond the inquiry necessary to evaluate a least restrictive means inquiry.

264.     Specifically, Defendants have instituted a Vaccine Mandate that plainly and unconstitutionally targets religious practice through their so-called exemption procedure that fails the heightened scrutiny test under the Free Exercise Clause.

265.     Defendants' endorsement of the Vaccine Mandate also infringes upon Plaintiffs' First Amendment rights, and substantially burdens Plaintiffs' free exercise of religion because it demands Plaintiffs respond to an invasive questionnaire, reminiscent of the

Spanish Inquisition, without an objective basis giving rise to a genuine doubt as to the sincerity of their religious beliefs.

266.    The Defendants' vaccine mandate, and the failure to provide a meaningful "reasonable accommodation" for religious exception, is an attempt to undermine the sincerely held religious beliefs of Plaintiffs. The implementation of the twice-weekly antigen test requirement for employees and students seeking a religious exemption to the vaccination mandate is a retaliatory action designed to coerce Plaintiffs into going against their religious beliefs and become vaccinated. It is not supported by any compelling governmental interest justifying the trampling of the religious rights of Plaintiffs.

267.    It is clear that Christian employees and students, with deeply held religious beliefs, are being treated as second class citizens by CCD's, and are not allowed nor welcome to be employed by Defendants, or to attend classes at the Defendants' facilities.

268.    The compelling interest articulated in the vaccination mandate is to "control exposure and minimize the spread of COVID-19 in the workplace". See SOCCCD COVID-19 Prevention and Return to Work 05.06.21, p 3, L 8. Defendants have admitted that vaccination does not prevent a person from contracting and spreading the disease. *Id*. at p 26, L 1. To that end, it is indisputable that vaccination does not achieve this end, as many individuals who have been "fully vaccinated" have contracted and continue to contract COVID-19 from vaccinated persons.

269.    Defendants can offer no evidence as to the basis upon which there is no alternative to halting the spread of COVID-19.

270.    The offered mechanism, mass vaccination, has not worked, nor will it work, in achieving the interest it purports to satisfy.

271.    Plaintiffs have offered numerous, less restrictive, means to achieve the interest of stemming the spread of COVID-19.

272.     The Vaccine Mandate also seeks to stem the spread of COVID-19 for the interest of the health and safety of Defendants' workforce; however, if enforced, the safety and health of the employees of Defendant would be harmed, not protected, due to mass terminations and loss of ready employees.

273.     The Vaccine Mandates target Plaintiffs' sincerely held religious beliefs by prohibiting Plaintiffs from seeking and receiving exemptions and accommodations for their sincerely held religious beliefs against the COVID-19 vaccines, and CCD's actions are not the least restrictive means of achieving the Districts' interest.

274.     Plaintiffs have sincerely held religious beliefs that Scripture is the infallible, inerrant word of the Lord Jesus Christ, and they desire to know, and worship, Jesus Christ by exercising, and continuing to exercise, their belief in Christ and obeying His word, i.e., the Scripture. Their sincerely held religious belief compels them to abstain from receiving any of the currently available COVID-19 vaccines and tests.

275.     Accordingly, the vaccine mandates violate the Plaintiff's Free Exercise Clause rights, and this Court should find and declare the vaccine mandates unlawful, as they violate the First Amendment Free Exercise Clause, and this Court should enjoin the Defendants from implementing these unlawful mandates.

276.     Pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing their vaccine mandates, forced testing, and masking requirement.

## XIII.   FIFTH CAUSE OF ACTION—Violation of Liberty and Privacy Rights Under the Fifth Amendment

277.     Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth hereat.

278.     The Defendant CCD's have an official policy of a vaccination/testing/masking

mandate requiring students and employees to be vaccinated/ tested/masked as a condition of attending classes in-person and/or working on campus in a non-healthcare related capacity, and that, as a condition of being granted a religious belief exemption from the vaccination mandate, Plaintiffs must subject themselves to twice-weekly testing, and masking, without evidence of COVID-19 infection or a recent close contact with a known case of COVID-19;

279.    The policy was enacted and promulgated by Defendants who were board members, officers, or employees of Defendant Community College Districts;

280.    The policy requires Plaintiffs to disclose their personal health information to their employers and to the government, said disclosures being a violation of their privacy rights under the Fifth Amendment.

281.    The Mandates require Plaintiffs to undergo a medical procedure that they do not want, which is a violation of their liberty and privacy rights under the Fifth Amendment.

282.    The medical procedure will permanently alter their body and cannot be undone.

283.    Defendants intentionally subjected Plaintiffs to the policy;

284.    Defendants' conduct violated Plaintiffs' right to privacy under the Fifth amendment;

285.    Defendants acted because of this official policy, thereby violating Plaintiffs' right to privacy.

286.    Pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing their vaccine mandates, forced testing, and masking requirement.

**XIV.    SIXTH CAUSE OF ACTION—Fourth Amendment Violation, Unreasonable Seizure of the Individual**

287.    Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth hereat.

288.     The Supreme Court has recently reaffirmed a long-held stance that "the 'seizure' of a 'person'" may "take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)).

289.     The Supreme Court has also held that "a compelled intrusio[n] into the body," *Schmerber v. California,* 384 U.S. 757, 767–768 (1966), "[i]n light of our society's concern for the security of one's person…is [an] obvious…physical intrusion" when it "penetrat[es] beneath the skin." *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 616 (1989). Such physical intrusions "infringe[] an expectation of privacy that society is prepared to recognize as reasonable" under the Fourth Amendment, and said physical intrusions themselves "implicate[] privacy interests" and "concern[]…bodily integrity." *Id.* at 616-17.

290.     The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected [rights] even if he has no entitlement to that benefit." *U.S. v. Am. Lib. Ass'n, Inc.,* 539 U.S. 194, 210 (2003).  Therefore, even if a student "has no entitlement" to a college education, Defendants may not deny that education on the basis of a denial of the students' constitutional rights,

291.      Defendants' mandates constitute an unconstitutional seizure of a person under the Fourth Amendment, and "it in some way restrains the liberty of the person." *Torres*, 141 S. Ct. at 995 (quoting *Terry v. Ohio*, 392 U.S. at 19, n. 16.)

292.     The mandates forcibly and physically intrude into Plaintiffs when the vaccine penetrates the skin and is injected into the bloodstream, becoming a component of their body, and when they undergo an antigen test in which a medical device is inserted into their nasal cavity.

293.     This injection and insertion of a medical device involves an infringement upon a person's privacy, liberty, and bodily integrity. In light of society's concern for the security of

one's person, society recognizes this infringement of compelled intrusion as unreasonable, under the Fourth Amendment. See *Skinner*, 489 U.S. at 616.

294.     The Defendants are encouraging, endorsing, and participating in this seizure, through forcing this mandate upon their employees and students.

295.     Lastly, through the mandates, CCD's are setting unconstitutional conditions on their employees to remain employed, regardless of whether these employees have a legal right of employment. *See American Library Ass'n, Inc.*, 539 U.S. at 210; *Perry*, 408 U.S. at 597.

296.     Consequently, these mandates violate the Fourth Amendment, and should be enjoined.

297.     Pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing their vaccine mandates, forced testing, and masking requirement.

## XV.     SEVENTH CAUSE OF ACTION – Violation of Title VII of the Civil Rights Act of 1964

298.     Plaintiffs incorporate herein by reference the allegations contained in the foregoing paragraphs.

299.     United States Code section 2000e-2(a) states that "it shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

300.     Since the implementation of the vaccination mandates, CCDs have shown a

pattern and practice of not recognizing an employee or student's religious belief against mandatory vaccination, thereby creating conditions that have a discriminatory impact on plaintiffs and the public based on religion. This is a violation of the plaintiffs' civil rights.

301. Defendants unlawful, discriminatory practice creates or establishes operating methods and conditions that have the purpose or effect of denying them the benefits of, or otherwise subjecting Plaintiffs to, discrimination.

302. Defendants' pattern and practice results in repeated violations of the anti-discrimination mandates under United States Code ("USC") §2000e and violates the plaintiffs' rights to full and equal protection under the law.

303. For all the reasons described above, Defendants have violated and continue to violate USC §2000e.

304. Title VII of the Civil Rights Act of 1964 creates a private right of action for an aggrieved party. *See Fekete v. U.S. Steel Corp.*, 424 F.2d 331 (1970)

305. Defendants have refused to provide Plaintiffs with full and equal access to their facilities, programs, services, and activities as required by USC §2000e, et seq.

306. Because Defendants' discriminatory conduct is ongoing, declaratory and injunctive relief are appropriate remedies.

307. Plaintiffs also are entitled to reasonable attorneys' fees and costs incurred in bringing this action. Pursuant to the rights, procedures, and remedies set forth under in USC §2000e-5(k).

308. Pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing their vaccine mandates, forced testing, and masking requirement.

## XVI. EIGTH CAUSE OF ACTION – Deprivation of Civil Rights under Color of Law

309. Plaintiffs incorporate herein by reference the allegations contained in the

foregoing paragraphs.

310.    Title 42 of the USC §1983 states that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, Suit in equity, or other proper proceeding for redress…"

311.    To establish a claim pursuant to Section 1983, a plaintiff must "demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that alleged deprivation was committed by a person acting under the color of state law." *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

312.    The traditional definition of acting under the color of state law requires that the defendant have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. *West v. Atkins*, 487 U.S. 42, 49 (1988).

313.    Liability under Section 1983 "attaches only to those wrongdoers 'who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it.'" *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 191 (1988) (quoting *Monroe v. Pape*, 365 U.S. 167, 172 (1961)).

314.    The inquiry into the question of action under color of state law "is fact-specific." In the usual case, the Court asks whether the State provided a "mantle of authority that enhanced the power of the harm-causing individual actor." *Tarkanian*, 488 U.S. at 192.

315.    Section 1983 does not impose a state of mind requirement independent of the underlying basis for liability, but there must be a causal connection between the defendant's actions and the harm that results. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S.

274, 285-87 (1977).

316.     The U.S. Supreme Court has interpreted this causation element to require that the harm be the result of action on the part of the government entity that implemented or executed a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers, or the result of the entity's custom. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690-691 (1978).

317.     Defendant CCDs receive financial assistance from the State of California sufficient to invoke the coverage of 42 U.S.C. §1983. The California Community College system receives approximately $14.5 billion in contracts and grants, which include federal, state, local and private grants annually.[38]

318.     CCDs derive their authority from the state as they were created by the enactment of EC §70900. CCD's receive financial support from the state. All three of the CCD's are State Actors, as they are part of the California Community College system and they are bound to the rules and regulations that govern public educational programs in this state. The masking/testing/ vaccination mandates of each District was promulgated under the mantle of authority granted to the Community College Districts by the State.

319.     Defendants' masking/testing/vaccination mandates and the enforcement practices thereof have deprived Plaintiffs of their constitutionally protected civil rights of freedom of religion under the First amendment, procedural and substantive due process under the Fifth and Fourteenth Amendments, equal protection under the Fourteenth Amendment, and freedom from discrimination under Title VII of the Civil Rights act of 1964 and the Unruh Civil Rights Act.

320.     The actions of Defendants have caused Plaintiffs to suffer economic loss from

---

[38] Supra, https://lao.ca.gov/Education/EdBudget/Details/50

lost wages. Plaintiffs have suffered significant emotional distress from social stigma placed upon them by various members of the CCDs who have irrationally treated unvaccinated individuals as a sort of "Typhoid Mary" that may infect the vaccinated without ever displaying symptoms of being sick, despite numerous publications from the CDC stating that both vaccinated and unvaccinated individuals are at risk of contracting and spreading the illness. This invidious discrimination has led to the exclusion from campus of unvaccinated individuals who simply seek to exercise their constitutionally protected rights.

321.    In cases involving § 1983 claims, "the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs . . . ." 42 U.S.C. § 1988.

322.    Pursuant to 42 U.S.C. §1983, Plaintiffs are entitled to temporary, preliminary, and permanent injunctive relief restraining Defendants from enforcing their vaccine mandates, forced testing, and masking requirement.

## PRAYER FOR RELIEF

323.    Wherefore, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully pray for judgment in their favor, and ask this Court to enter judgment as follows:

## XVII.  PRAYER FOR RELIEF ON THE FIRST CAUSE OF ACTION

324.    That the Court issue a temporary restraining order, preliminary and permanent injunction, and writ of mandate restraining and preventing Defendants and their officers, agents, or any other persons acting with Defendants, or on Defendants' behalf, from implementing and enforcing the Vaccine Mandate and its effects at each Community College or District Property in any manner against any employee or student.

325.    That the Court issue a Declaration that the Vaccine Mandate of each Community College is invalid and unlawful

326.    That the Court issue a Declaration that the Vaccine Mandate of each

Community College is null and void as an *ultra vires* act;

327.    That the Court grant Plaintiff costs and attorneys' fees pursuant to Code of Civil Procedure section 1021.5 and any other applicable provisions, as allowed by law;

328.    That the Court grant such and other and further relief as this Court deems just and proper

329.    That the Court enjoin the Defendants from continuing its course of conduct, which violate the U.S. Constitution, under the Fifth Amendment.

## XVIII. PRAYER FOR RELIEF ON THE SECOND CAUSE OF ACTION

330.    That the Court issue a declaratory judgment that the mandates violate the substantive due process component of the Fifth Amendment to the U.S. Constitution and are invalid on their face.

331.    That the Court enjoin the Defendants from continuing its course of conduct, which violate the U.S. Constitution, under the Fifth Amendment.

## XIX.   PRAYER FOR RELIEF ON THE THIRD CAUSE OF ACTION

332.    That the Court issue a declaratory judgment that the mandates violate the bodily autonomy and bodily integrity component of the Fifth Amendment to the U.S. Constitution and are invalid on their face.

333.    That the Court enjoin the Defendants from continuing its course of conduct, which violates the U.S. Constitution, under the Fifth Amendment.

## XX.    PRAYER FOR RELIEF ON THE FOURTH CAUSE OF ACTION

334.    That the Court issue a declaratory judgment that the mandates violate the Free Exercise component of the First Amendment to the U.S. Constitution and are invalid on their face.

335.    That the Court ejoin the Defendants from continuing their course of conduct, which violates the U.S. Constitution, under the First Amendment.

336.    That the Court enjoin Defendants from their refusal to consider, evaluate, or accept Plaintiffs' requests for exemption and accommodation for their sincerely held religious beliefs.

337.    That the Court require Defendants to immediately grant Plaintiffs' requests for religious exemption and accommodation from the Districts' COVID-19 Vaccine Mandates and its effects.

## XXI.    PRAYER FOR RELIEF ON THE FIFTH CAUSE OF ACTION

338.    That the Court issue a declaratory judgment that the COVID-19 vaccine mandates violate the liberty and privacy rights of Plaintiffs under the Fifth Amendment.

339.    That the Court enjoin the Defendants from continuing their course of conduct, which violates the U.S. Constitution, under the Fifth Amendment.

## XXII.   PRAYER FOR RELIEF ON THE SIXTH CAUSE OF ACTION

340.    That the Court issue a declaratory judgment that the Defendants' COVID-19 vaccine mandates violate the unreasonable seizure of the individual rights under Fourth Amendment.

341.    That the Court enjoin the Defendants from continuing its course of conduct, which violates the U.S. Constitution, under the Fourth Amendment.

## XXIII.  PRAYER FOR RELIEF ON THE SEVENTH CAUSE OF ACTION

342.    That the Court declare that the Defendants' COVID-19 vaccine mandates violate Title VII of the Civil Rights Act of 1964;

343.    That the Court enjoin the Defendants from continuing its course of conduct, which violate Title VII of the Civil Rights Act of 1964.

344.    That the Court grant Plaintiff costs and attorneys' fees pursuant to U.S. Code §2000e-5(k) and any other applicable provisions, as allowed by law;

345.    That the Court grant such and other and further relief as this Court deems just

and proper;

## XXIV. PRAYER FOR RELIEF ON THE EIGHTH CAUSE OF ACTION

346.     That the Court issue a declaratory judgment that the Defendants' COVID-19 vaccine mandates violate the Unruh Civil Rights Act;

347.     That the Court enjoin the Defendants from continuing its course of conduct, which violate the Unruh Civil Rights Act.

348.     That the Court grant Plaintiff costs and attorneys' fees pursuant to U.S. Code ¬ß2000e-5(k) and any other applicable provisions, as allowed by law;

349.     That the Court grant such and other and further relief as this Court deems just and proper;

## XXV.  PRAYER FOR RELIEF ON THE NINTH CAUSE OF ACTION

350.     That the Court issue a temporary restraining order, preliminary and permanent injunction, and writ of mandate restraining and preventing Defendants and their officers, agents, or any other persons acting with Defendants, or on Defendants' behalf, from implementing and enforcing the Vaccine Mandate and its effects at each Community College or District Property in any manner against any employee or student.

351.     That the court issue a declaration that the Vaccine Mandate of each Community College is invalid and unlawful

352.     That the Court issue a declaration that the Vaccine Mandate of each Community College is null and void as an *ultra vires* act;

353.     That the Court grant Plaintiff costs and attorneys' fees pursuant to 42 U.S.C. §1988 and any other applicable provisions, as allowed by law;

354.     That the Court grant such and other and further relief as this Court deems just and proper

## XXVI. PRAYER FOR RELIEF ON ALL CAUSES OF ACTION

355. That the Court:

356. Declare that the Districts' COVID-19 Vaccine Mandates are illegal and unlawful in that they purport to remove federal civil rights and constitutional protections from Plaintiffs;

357. Declare the mandates unlawful;

358. Issue an order preliminarily and permanently enjoining the mandates in the California Community College System;

359. Issue an order preliminarily and permanently enjoining the Defendants from enforcing disciplinary measures, up to and including removal or termination of Plaintiffs from employment, and refusal to allow students from attending classes in person;

360. Issue an Order of reinstatement of any employee that was unlawfully and unconstitutionally terminated from their position as a result of their failure to comply with the unlawful and unconstitutional vaccine mandates;

361. Issue an Order of Reinstatement of any employee that was unlawfully and unconstitutionally coerced to retire from their position as a result of their failure to comply with the unlawful and unconstitutional vaccine mandates;

362. Issue an Order of Reinstatement of any student that was unlawfully and unconstitutionally barred from taking any in person classes as a result of their failure to comply with the unlawful and unconstitutional vaccine mandates;

363. For judgment in favor of Plaintiffs;

364. Award attorneys' fees and costs;

365. For costs of suit herein; and

366. For such other and further relief as the Court may deem just and proper.

**XXVII.    JURY DEMAND**

367. Plaintiffs demand trial by jury.

Respectfully Submitted,

Dated:  March 30, 2022

/s/ Gary Kreep
Gary G. Kreep
Counsel for Plaintiffs

COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit A

COMPLAINT

Transcript of the video "**Presidents' Welcome - Fall 2021 PD Week**" from SOCCCD Streamed live on Aug 16, 2021
https://www.youtube.com/watch?v=uPAxG6C1WXk

00:05
oh
00:23
not that anyone doesn't know
00:31
good afternoon
00:36
good afternoon
00:38
how's our sound level
00:40
can we go up a little bit there we go
00:42
now we're there good afternoon
00:46
um i know it is a uh somewhat
00:49
perfunctory thing to say uh it is good
00:52
to see you but in this case i mean
00:55
it is really really good to see you
00:57
that is a nice thing
01:02
we are glad to be together uh we're
01:04
gonna be together for almost two hours
01:06
today i'm looking forward to that and
01:09
instead of any one of us dominating that
01:11
time you're going to hear from a few
01:13
different people and maybe if we have
01:15
time at the end we're happy to take
01:16
questions or do whatever discussion you
01:19

they need and to make sure that they all
64:49
have that chance that opportunity to be
64:51
successful equally across all groups 25
64:55
plus hispanic veterans everybody has to
64:58
have that same opportunity
65:00
and finally this i will return to the
65:03
pandemic first i will talk about covert
65:05
i will talk about the pandemic at a town
65:07
hall but part of the reason we scheduled
65:09
that town hall for later this week was
65:11
so that i didn't have to do so today so
65:13
we could talk about bringing stuff to
65:14
the front burner but i do want to say
65:16
this about the pandemic to close today
65:19
because i think this is important in
65:20
terms of linking all this stuff together
65:21
at least it is in my head
65:25
i'm mad too
65:26
i'm mad at all the unvaccinated people
65:29
i completely share your feelings you
65:31
should not be ashamed of those that is
65:33
completely natural it is completely
65:35
natural to be mad at people who didn't
65:38

get vaccinated or to be mad at people
65:40
who even now
65:41
will be inside mass gatherings without
65:44
masks exposing each other to the virus
65:47
running up our numbers so that we can't
65:49
bring back all the students we said we'd
65:51
bring back and we had to change our
65:53
plans two weeks before the darn semester
65:55
starts i am mad at those people and i
65:57
have every right to be
65:59
but these people
66:01
these people have made bad decisions
66:05
because
66:06
if you look at the data they are often
66:08
at different educational levels than
66:10
people who've made the other decision
66:13
i know there's the political affiliation
66:15
too but i want you to look more closely
66:17
because what you'll really see
66:19
is that educational level ties to these
66:22
decisions more than anything else
66:24
because it is confusing out there
66:27
if i'm oh my goodness i stay off social
66:29

back because the experience is
91:24
self-reinforcing so come to campus
91:28
and see your colleagues your family the
91:29
people who love you and care about you
91:31
in 3d it'll mean a lot to you
91:33
for everyone else
91:34
please be careful please be safe
91:37
and have a great semester a great year
91:41
i look forward to all the amazing things
91:43
we're going to do this year as we bring
91:45
really important things to the front
91:46
burner and talk about kovid only a
91:49
little bit have a great year everybody
93:48
you

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit B

COMPLAINT

**From:** Gregory Smith
**Sent:** Friday, August 27, 2021 4:15 PM
**Subject:** PLEASE READ: COVID-19 Testing Procedures

Hello SDCCD Community,

**This email contains specific directions and instructions regarding the COVID-19 testing requirement. Please read this carefully.**

If you have not provided documentation you are fully vaccinated, you are required to be tested for COVID-19 each week while you are working for the District. This applies to all employees regardless of their work location, including those working 100% remotely.

If you are fully vaccinated and have not provided your documentation, you may do by following these links: Submit your vaccination confirmation or vaccination exemption form. Directions on completing the forms is available here: https://www.sdccd.edu/docs/HumanResources/risk/Vaccination%20Form%20FAQs.pdf

Fully vaccinated is defined as 14 days after the final dose in a COVID-19 vaccination series. Any vaccine approved for emergency use by the Centers for Disease Control or World Health Organization will be accepted by the District.

If you are not fully vaccinated, you may get tested at any available District-provided testing location or any other place offering COVID-19 testing using tests approved by the Centers for Disease Control. Testing is available free of charge to you whether you have insurance or not. There are places advertising COVID-19 testing for a fee, we recommend you do not use these sites. If an employee chooses to use a fee-based COVID-19 testing option, they will not be reimbursed.

**District-Provided COVID-19 Testing Schedule**

The District has contracted with Biocept to provide onsite testing at City College, Mesa College, Miramar College, and the District Office. Additional testing sites at one or more College of Continuing Education campuses may be added if we have sufficient student and employee need for testing to meet the minimum testing requirements from Biocept.

Any employee, student, or visitor may register and get tested at any testing site.

Onsite Testing Schedule

|  | City College | Mesa College | Miramar College | District Office |
|---|---|---|---|---|
| Monday |  | 7 AM – 3 PM |  |  |
| Tuesday |  | 11 AM – 6 PM | 7 AM – 2 PM |  |
| Wednesday | 8 AM – 2 PM |  | 12 PM – 7 PM | 8 AM – 4 PM |
| Thursday | 9 AM – 5 PM |  |  |  |
| Friday |  | 8 AM – 12 PM |  |  |

**Instructions to Register for Testing**

All employees will use the following web link or QR code to register for testing. Employees who are not required to be tested may also register and make an appointment to be tested, but are not required to do so.

## EMPLOYEE Self Registration Link and QR code

https://www.c4wrk.com/4FoCfU8hB9P2HofN7

You do not need to download an application or any software to register, make appointments, view your test results, or access any feature of the site. When you click on the web link or scan the QR code with your device, you will be directed to a site titled Cleared4, which is the platform used to manage the testing process.

You will be asked to enter a mobile telephone number and email address:

After providing your contact information, you will receive a text and an email with a link to complete your registration. We strongly recommend you bookmark this link as you will use this link each time you want to access your profile, schedule a testing appointment, or view your test results. When you first

click on the link, you will complete additional personal information and upload an image of your insurance card. If you do not have medical insurance, please fill out the attached statement, sign it, and upload an image of your completed statement.

Once you have completed your personal information, you may return to the homepage where you will see links to schedule a testing appointment or upload a test result from a different testing provider:

While you may upload a copy of your vaccination card to this site, you are not required to do so. We will continue to collect and maintain vaccination records through Human Resources as described above. Anytime you choose to have a COVID-19 test at a facility other than the sites offered by the District, you will need to upload your test result through this process. When you click on the "Upload Negative COVID-19 Test Proof" link, you will be able to attached an image of your test result. When attaching

your test result, please make sure your name, date of the test, and the result are clearly visible. If we cannot validate this information, you will not be cleared for work.

When you click on the "Book On-site Covid Test" link, you will be able to pick any District testing site and schedule a day and time for your test:

**Testing FAQs**

1. If I am not vaccinated and working 100% remote during the fall semester, am I required to be tested for COVID-19?
a. Yes, all employees who have not provided documentation showing they are vaccinated must be tested for COVID-19 weekly
2. Why are employees who are not working onsite required to be tested?
a. All employees are required to be ready to report to work onsite and complete work assignments which require in-person interactions with others when directed. To help prevent the spread of COVID-19 in our communities, all District employees must be vaccinated against COVID-19 or be tested for COVID-19 weekly.
3. Why are vaccinated employees and students exempt from the testing requirement?
a. Current public health guidance and data on COVID-19 infections shows unvaccinated individuals are a considerably higher risk of infection and transmission of COVID-19 than fully vaccinated individuals, including the Delta variant. While testing supplies are much more widely available than at previous times during the COVID-19 pandemic, there are finite test kits available and using those resources strategically provides the most effective protection for our communities.
4. Will vaccinated employees and students be required to be tested in the future?

a. As the rate of COVID-19 infections in our County and guidance from public health agencies evolves, the District's protocols may change to ensure we can continue to provide safe instructional and work environments.

5. Will employees and students be required to be tested for COVID-19 in the spring?

a. Decisions on the District's operating protocols for the spring semester will be made during the fall semester and communicated with as much advanced notice as possible.

6. Can I get a medical accommodation to exempt me from the COVID-19 testing requirement?

a. If you have a medical condition which impacts your ability to be tested for COVID-19, please contact the Risk Management Department to engage in an interactive process to determine the appropriate accommodations for your specific medical needs.
Email: sdccdriskmanagement@sdccd.edu; telephone: 619-388-6953

7. Can I get a religious accommodation to exempt me from the COVID-19 testing requirement?

a. In most cases an exemption from the COVID-19 testing requirement will not be approved based on a religious belief. A reasonable accommodation cannot result in a risk to the health and safety of others. Due to the potential for asymptomatic COVID-19 cases and spread from a person who does not know they have COVID-19, an exemption from testing based on a religious belief is unlikely to be a reasonable accommodation. However, any employee may request a religious accommodation and the District will engage in an interactive process to determine whether an accommodation can be provided based on the individual circumstances of the employee.

8. Am I required to be tested while I am on leave?

a. You are not required to be tested while on leave, but you must be tested prior to returning to work.

9. If I get tested a District site, how long will it take to get the results?

a. Results will be available within 48 hours. You will receive email and text notifications when your test results are available.

10. Which District test sites can I use for testing?

a. All employees can get tested at any District site.

11. Do I get paid for the time I use getting tested?

a. Yes, the testing requirement is a work direction from the District and must occur during an employee's paid time.

12. If I get tested at a different facility than a District site, how do I provide my test results?

a. Register for the Cleared4 site using the links and process provided above and submit your test result through the site.

13. If I get tested at a different facility and haven't received my results within the required timeframe, am I cleared to work?

a. No, if you test at an alternative location, you are not in compliance with this requirement until you upload your test results. Anyone choosing to test off site should do so at least three days before the due date to ensure they are in compliance.

14. How will I know if I have complied and I am cleared to work?

a. Human Resources will notify any employee who is not cleared to work for failing to comply with this requirement.

15. I am an Adjunct Faculty member and I only get paid for my teaching hours. Do I have to get tested during time I would normally be teaching?

a. No, adjunct teaching faculty may schedule testing time outside their teaching assignment to get tested and complete a timecard for their testing time.

16. I am a NANC employee, do I get paid for the time I spend getting tested?

a. Yes, NANC employees must get tested during their paid work time.

17. Can I choose to get tested on my off day if it is more convenient for me.
a. If you are paid for your work hours (Classified Professional, Adjunct Faculty, NANCE) you must get tested during your regular work hours. If you are a salaried employee (Contract Faculty, Exempt Professional, Supervisor, Manager) you may choose when you get tested as part of your regular job assignment.
18. What happens if I have a positive test?
a. You will be notified by Biocept immediately. The Risk Management Department and County Public Health Department will also be notified. The Risk Management Department will contact you directly with additional instructions regarding quarantine requirements. If you are asymptomatic and able to work remotely, you may continue to work remotely. If you are symptomatic and cannot work or your job duties cannot be performed remotely, you will be on leave until the requirements are met for you to return to work.
19. What happens if someone who works in the same area as me has a positive test?
a. The District will conduct contact tracing in coordination with the County Health Department to determine who has been exposed to a positive COVID-19 case and provide appropriate notifications and direction regarding quarantine and testing.
20. What happens if I do not comply with the testing requirement?
a. You will be placed on unpaid leave and may not perform any work until you provide a test result.
21. Who has access to my test results?
a. A small group of employees in Human Resources will monitor compliance with the testing requirement and the results, as part of their job duties. Test results are confidential personal health information and are maintained in a secure, HIPAA-compliant electronic system. Test results will only be shared with agencies with a legal right to the information, such as the County Health Department. No other employees of the District will have access to the records and they will not be part of any employee's personnel file.
22. I am fully vaccinated and would like to get tested, can I use a District site?
a. Yes, please complete the registration process as described above and schedule an appointment at your convenience.

Thank you,

Greg

Gregory Smith
Vice Chancellor, Human Resources
Office: 619-388-6589
Fax: 619-388-6897
gsmith@sdccd.edu

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit C

COMPLAINT

**BRIEFING ROOM**

# Remarks by President Biden on Fighting the COVID-19 Pandemic

**SEPTEMBER 09, 2021**  •  SPEECHES AND REMARKS

5:02 P.M. EDT

THE PRESIDENT:  Good evening, my fellow Americans.  I want to talk to you about where we are in the battle against COVID-19, the progress we've made, and the work we have left to do.

And it starts with understanding this: Even as the Delta variant 19 [sic] has — COVID-19 — has been hitting this country hard, we have the tools to combat the virus, if we can come together as a country and use those tools.

If we raise our vaccination rate, protect ourselves and others with masking and expanded testing, and identify people who are infected, we can and we will turn the tide on COVID-19.

It will take a lot of hard work, and it's going to take some time.  Many of us are frustrated with the nearly 80 million Americans who are still not vaccinated, even though the vaccine is safe, effective, and free.

You might be confused about what is true and what is false about COVID-19.  So before I outline the new steps to fight COVID-19 that I'm going to be announcing tonight, let me give you some clear information about where we stand.

First, we have cons- — we have made considerable progress in battling COVID-19.  When I became President, about 2 million Americans were fully vaccinated.  Today, over 175 million Americans have that protection.

Before I took office, we hadn't ordered enough vaccine for every American. Just weeks in office, we did. The week before I took office, on January 20th of this year, over 25,000 Americans died that week from COVID-19. Last week, that grim weekly toll was down 70 percent.

And in the three months before I took office, our economy was faltering, creating just 50,000 jobs a month. We're now averaging 700,000 new jobs a month in the past three months.

This progress is real. But while America is in much better shape than it was seven months ago when I took office, I need to tell you a second fact.

We're in a tough stretch, and it could last for a while. The highly contagious Delta variant that I began to warn America about back in July spread in late summer like it did in other countries before us.

While the vaccines provide strong protections for the vaccinated, we read about, we hear about, and we see the stories of hospitalized people, people on their death beds, among the unvaccinated over these past few weeks.

This is a pandemic of the unvaccinated. And it's caused by the fact that despite America having an unprecedented and successful vaccination program, despite the fact that for almost five months free vaccines have been available in 80,000 different locations, we still have nearly 80 million Americans
who have failed to get the shot.

And to make matters worse, there are elected officials actively working to undermine the fight against COVID-19. Instead of encouraging people to get vaccinated and mask up, they're ordering mobile morgues for the unvaccinated dying from COVID in their communities. This is totally unacceptable.

Third, if you wonder how all this adds up, here's the math: The vast majority of Americans are doing the right thing. Nearly three quarters of the eligible have gotten at least one shot, but one quarter has not gotten any. That's

nearly 80 million Americans not vaccinated. And in a country as large as ours, that's 25 percent minority. That 25 percent can cause a lot of damage — and they are.

The unvaccinated overcrowd our hospitals, are overrunning the emergency rooms and intensive care units, leaving no room for someone with a heart attack, or ~~pancreitis~~ [pancreatitis], or cancer.

And fourth, I want to emphasize that the vaccines provide very strong protection from severe illness from COVID-19. I know there's a lot of confusion and misinformation. But the world's leading scientists confirm that if you are fully vaccinated, your risk of severe illness from COVID-19 is very low.

In fact, based on available data from the summer, only one of out of every 160,000 fully vaccinated Americans was hospitalized for COVID per day.

These are the facts.

So here's where we stand: The path ahead, even with the Delta variant, is not nearly as bad as last winter. But what makes it incredibly more frustrating is that we have the tools to combat COVID-19, and a distinct minority of Americans –supported by a distinct minority of elected officials — are keeping us from turning the corner. These pandemic politics, as I refer to, are making people sick, causing unvaccinated people to die.

We cannot allow these actions to stand in the way of protecting the large majority of Americans who have done their part and want to get back to life as normal.

As your President, I'm announcing tonight a new plan to require more Americans to be vaccinated, to combat those blocking public health.

My plan also increases testing, protects our economy, and will make our kids safer in schools. It consists of six broad areas of action and many specific measures in each that — and each of those actions that you can read more about at WhiteHouse.gov. WhiteHouse.gov.

92

The measures — these are going to take time to have full impact.  But if we implement them, I believe and the scientists indicate, that in the months ahead we can reduce the number of unvaccinated Americans, decrease hospitalizations and deaths, and allow our children to go to school safely and keep our economy strong by keeping businesses open.

First, we must increase vaccinations among the unvaccinated with new vaccination requirements.  Of the nearly 80 million eligible Americans who have not gotten vaccinated, many said they were waiting for approval from the Food and Drug Administration — the FDA.  Well, last month, the FDA granted that approval.

So, the time for waiting is over.  This summer, we made progress through the combination of vaccine requirements and incentives, as well as the FDA approval.  Four million more people got their first shot in August than they did in July.

But we need to do more.  This is not about freedom or personal choice.  It's about protecting yourself and those around you — the people you work with, the people you care about, the people you love.

My job as President is to protect all Americans.

So, tonight, I'm announcing that the Department of Labor is developing an emergency rule to require all employers with 100 or more employees, that together employ over 80 million workers, to ensure their workforces are fully vaccinated or show a negative test at least once a week.

Some of the biggest companies are already requiring this: United Airlines, Disney, Tysons Food, and even Fox News.

The bottom line: We're going to protect vaccinated workers from unvaccinated co-workers.  We're going to reduce the spread of COVID-19 by increasing the share of the workforce that is vaccinated in businesses all across America.

93

My plan will extend the vaccination requirements that I previously issued in the healthcare field. Already, I've announced, we'll be requiring vaccinations that all nursing home workers who treat patients on Medicare and Medicaid, because I have that federal authority.

Tonight, I'm using that same authority to expand that to cover those who work in hospitals, home healthcare facilities, or other medical facilities –- a total of 17 million healthcare workers.

If you're seeking care at a health facility, you should be able to know that the people treating you are vaccinated. Simple. Straightforward. Period.

Next, I will sign an executive order that will now require all executive branch federal employees to be vaccinated — all. And I've signed another executive order that will require federal contractors to do the same.

If you want to work with the federal government and do business with us, get vaccinated. If you want to do business with the federal government, vaccinate your workforce.

And tonight, I'm removing one of the last remaining obstacles that make it difficult for you to get vaccinated.

The Department of Labor will require employers with 100 or more workers to give those workers paid time off to get vaccinated. No one should lose pay in order to get vaccinated or take a loved one to get vaccinated.

Today, in total, the vaccine requirements in my plan will affect about 100 million Americans –- two thirds of all workers.

And for other sectors, I issue this appeal: To those of you running large entertainment venues — from sports arenas to concert venues to movie theaters — please require folks to get vaccinated or show a negative test as a condition of entry.

And to the nation's family physicians, pediatricians, GPs — general practitioners –- you're the most trusted medical voice to your patients. You

94

may be the one person who can get someone to change their mind about being vaccinated.

Tonight, I'm asking each of you to reach out to your unvaccinated patients over the next two weeks and make a personal appeal to them to get the shot. America needs your personal involvement in this critical effort.

And my message to unvaccinated Americans is this: What more is there to wait for?  What more do you need to see?  We've made vaccinations free, safe, and convenient.

The vaccine has FDA approval.  Over 200 million Americans have gotten at least one shot.

We've been patient, but our patience is wearing thin.  And your refusal has cost all of us.  So, please, do the right thing.  But just don't take it from me; listen to the voices of unvaccinated Americans who are lying in hospital beds, taking their final breaths, saying, "If only I had gotten vaccinated."  "If only."

It's a tragedy.  Please don't let it become yours.

The second piece of my plan is continuing to protect the vaccinated.

For the vast majority of you who have gotten vaccinated, I understand your anger at those who haven't gotten vaccinated.  I understand the anxiety about getting a "breakthrough" case.

But as the science makes clear, if you're fully vaccinated, you're highly protected from severe illness, even if you get COVID-19.

In fact, recent data indicates there is only one confirmed positive case per 5,000 fully vaccinated Americans per day.

You're as safe as possible, and we're doing everything we can to keep it that way — keep it that way, keep you safe.

That's where boosters come in — the shots that give you even more

95

protection than after your second shot.

Now, I know there's been some confusion about boosters.  So, let me be clear: Last month, our top government doctors announced an initial plan for booster shots for vaccinated Americans.  They believe that a booster is likely to provide the highest level of protection yet.

Of course, the decision of which booster shots to give, when to start them, and who will give them, will be left completely to the scientists at the FDA and the Centers for Disease Control.

But while we wait, we've done our part.  We've bought enough boosters — enough booster shots — and the distribution system is ready to administer them.

As soon as they are authorized, those eligible will be able to get a booster right away in tens of thousands of site across the — sites across the country for most Americans, at your nearby drug store, and for free.

The third piece of my plan is keeping — and maybe the most important — is keeping our children safe and our schools open.  For any parent, it doesn't matter how low the risk of any illness or accident is when it comes to your child or grandchild.  Trust me, I know.

So, let me speak to you directly.  Let me speak to you directly to help ease some of your worries.

It comes down to two separate categories: children ages 12 and older who are eligible for a vaccine now, and children ages 11 and under who are not are yet eligible.

The safest thing for your child 12 and older is to get them vaccinated.  They get vaccinated for a lot of things.  That's it.  Get them vaccinated.

As with adults, almost all the serious COVID-19 cases we're seeing among adolescents are in unvaccinated 12- to 17-year-olds — an age group that lags behind in vaccination rates.

96

So, parents, please get your teenager vaccinated.

What about children under the age of 12 who can't get vaccinated yet?  Well, the best way for a parent to protect their child under the age of 12 starts at home.  Every parent, every teen sibling, every caregiver around them should be vaccinated.

Children have four times higher chance of getting hospitalized if they live in a state with low vaccination rates rather than the states with high vaccination rates.

Now, if you're a parent of a young child, you're wondering when will it be — when will it be — the vaccine available for them.  I strongly support an independent scientific review for vaccine uses for children under 12.  We can't take shortcuts with that scientific work.

But I've made it clear I will do everything within my power to support the FDA with any resource it needs to continue to do this as safely and as quickly as possible, and our nation's top doctors are committed to keeping the public at large updated on the process so parents can plan.

Now to the schools.  We know that if schools follow the science and implement the safety measures — like testing, masking, adequate ventilation systems that we provided the money for, social distancing, and vaccinations — then children can be safe from COVID-19 in schools.

Today, about 90 percent of school staff and teachers are vaccinated.  We should get that to 100 percent.  My administration has already acquired teachers at the schools run by the Defense Department — because I have the authority as President in the federal system — the Defense Department and the Interior Department — to get vaccinated.  That's authority I possess.

Tonight, I'm announcing that we'll require all of nearly 300,000 educators in the federal paid program, Head Start program, must be vaccinated as well to protect your youngest — our youngest — most precious Americans and give parents the comfort.

And tonight, I'm calling on all governors to require vaccination for all teachers and staff.  Some already have done so, but we need more to step up.

Vaccination requirements in schools are nothing new.  They work.  They're overwhelmingly supported by educators and their unions.  And to all school officials trying to do the right thing by our children: I'll always be on your side.

Let me be blunt.  My plan also takes on elected officials and states that are undermining you and these lifesaving actions.  Right now, local school officials are trying to keep children safe in a pandemic while their governor picks a fight with them and even threatens their salaries or their jobs.  Talk about bullying in schools.  If they'll not help — if these governors won't help us beat the pandemic, I'll use my power as President to get them out of the way.

The Department of Education has already begun to take legal action against states undermining protection that local school officials have ordered.  Any teacher or school official whose pay is withheld for doing the right thing, we will have that pay restored by the federal government 100 percent.  I promise you I will have your back.

The fourth piece of my plan is increasing testing and masking.  From the start, America has failed to do enough COVID-19 testing.  In order to better detect and control the Delta variant, I'm taking steps tonight to make testing more available, more affordable, and more convenient.  I'll use the Defense Production Act to increase production of rapid tests, including those that you can use at home.

While that production is ramping up, my administration has worked with top retailers, like Walmart, Amazon, and Kroger's, and tonight we're announcing that, no later than next week, each of these outlets will start to sell at-home rapid test kits at cost for the next three months.  This is an immediate price reduction for at-home test kits for up to 35 percent reduction.

We'll also expand — expand free testing at 10,000 pharmacies around the

country. And we'll commit — we're committing $2 billion to purchase nearly 300 million rapid tests for distribution to community health centers, food banks, schools, so that every American, no matter their income, can access free and convenient tests. This is important to everyone, particularly for a parent or a child — with a child not old enough to be vaccinated. You'll be able to test them at home and test those around them.

In addition to testing, we know masking helps stop the spread of COVID-19. That's why when I came into office, I required masks for all federal buildings and on federal lands, on airlines, and other modes of transportation.

Today — tonight, I'm announcing that the Transportation Safety Administration — the TSA — will double the fines on travelers that refuse to mask. If you break the rules, be prepared to pay.

And, by the way, show some respect. The anger you see on television toward flight attendants and others doing their job is wrong; it's ugly.

The fifth piece of my plan is protecting our economic recovery. Because of our vaccination program and the American Rescue Plan, which we passed early in my administration, we've had record job creation for a new administration, economic growth unmatched in 40 years. We cannot let unvaccinated do this progress — undo it, turn it back.

So tonight, I'm announcing additional steps to strengthen our economic recovery. We'll be expanding COVID-19 Economic Injury Disaster Loan programs. That's a program that's going to allow small businesses to borrow up to $2 million from the current $500,000 to keep going if COVID-19 impacts on their sales.

These low-interest, long-term loans require no repayment for two years and be can used to hire and retain workers, purchase inventory, or even pay down higher cost debt racked up since the pandemic began. I'll also be taking additional steps to help small businesses stay afloat during the pandemic.

Sixth, we're going to continue to improve the care of those who do get COVID-19. In early July, I announced the deployment of surge response

teams.  These are teams comprised of experts from the Department of Health and Human Services, the CDC, the Defense Department, and the Federal Emergency Management Agency — FEMA — to areas in the country that need help to stem the spread of COVID-19.

Since then, the federal government has deployed nearly 1,000 staff, including doctors, nurses, paramedics, into 18 states.  Today, I'm announcing that the Defense Department will double the number of military health teams that they'll deploy to help their fellow Americans in hospitals around the country.

Additionally, we're increasing the availability of new medicines recommended by real doctors, not conspir- — conspiracy theorists.  The monoclonal antibody treatments have been shown to reduce the risk of hospitalization by up to 70 percent for unvaccinated people at risk of developing sefe- — severe disease.

We've already distributed 1.4 million courses of these treatments to save lives and reduce the strain on hospitals.  Tonight, I'm announcing we will increase the average pace of shipment across the country of free monoclonal antibody treatments by another 50 percent.

Before I close, let me say this: Communities of color are disproportionately impacted by this virus.  And as we continue to battle COVID-19, we will ensure that equity continues to be at the center of our response.  We'll ensure that everyone is reached.  My first responsibility as President is to protect the American people and make sure we have enough vaccine for every American, including enough boosters for every American who's approved to get one.

We also know this virus transcends borders.  That's why, even as we execute this plan at home, we need to continue fighting the virus overseas, continue to be the arsenal of vaccines.

We're proud to have donated nearly 140 million vaccines over 90 countries, more than all other countries combined, including Europe, China, and Russia combined.  That's American leadership on a global stage, and that's just the beginning.

100

We've also now started to ship another 500 million COVID vaccines — Pfizer vaccines — purchased to donate to 100 lower-income countries in need of vaccines.  And I'll be announcing additional steps to help the rest of the world later this month.

As I recently released the key parts of my pandemic preparedness plan so that America isn't caught flat-footed when a new pandemic comes again — as it will — next month, I'm also going to release the plan in greater detail.

So let me close with this: We have so- — we've made so much progress during the past seven months of this pandemic.  The recent increases in vaccinations in August already are having an impact in some states where case counts are dropping in recent days.  Even so, we remain at a critical moment, a critical time.  We have the tools.  Now we just have to finish the job with truth, with science, with confidence, and together as one nation.

Look, we're the United States of America.  There's nothing — not a single thing — we're unable to do if we do it together.  So let's stay together.

God bless you all and all those who continue to serve on the frontlines of this pandemic.  And may God protect our troops.

Get vaccinated.

5:28 P.M. EDT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit D

COMPLAINT

## RESOLUTION OF THE BOARD OF TRUSTEES

**WHEREAS**, on March 12, 2020, the San Diego Community College District (District) Board of Trustees unanimously passed a Resolution declaring emergency conditions due to the novel coronavirus, SARS-COV-2 (COVID-19); and

**WHEREAS**, the District and its colleges have provided instruction and services primarily through distance education and remote education since March 2020, which has enabled the continuation of public education for many students, but has resulted in the displacement and exclusion of many students from communities with inadequate access to resources necessary to succeed in distance education; and

**WHEREAS**, the Centers for Disease Control (CDC), World Health Organization (WHO), and numerous federal, state, and local public health agencies and organizations have identified vaccination against COVID-19 by as many people as possible as a necessary measure to control and contain serious illness, hospitalization, and loss of life due to COVID-19; and

**WHEREAS**, validated data on COVID-19 infections clearly demonstrate individuals who have not been vaccinated are at much higher risk of infection, serious illness, hospitalization, and loss of life due to COVID-19 and the continued spread of COVID-19 has led to more transmissible and harmful variants, such as the Delta variant; and

**WHEREAS**, the District recognizes the urgency in resuming in-person instruction and services to mitigate any further learning loss and disengagement among communities most in need of the public education and support resources offered by the District; and

**WHEREAS**, President Joseph Biden announced on September 9, 2021, that all federal employees, employees of federal contractors, and health care workers will be required to be vaccinated, and all employers with 100 or more employees will be required to ensure workers are vaccinated or testing weekly for COVID-19 and called on all schools to adopt a vaccine requirement for all employees;

**NOW THEREFORE BE IT RESOLVED** by the Board of Trustees of the San Diego Community College District that consistent with the recommendations by President Joseph Biden, CDC, WHO, State of California, and the San Diego County Health and Human Services Agency, the Board directs the Chancellor or their designee(s) to take actions necessary to develop and implement a COVID-19 vaccine requirement for all District employees, students, and individuals accessing services and utilizing facilities at all District locations in accordance with federal and state law, including eligible exceptions; and,

**BE IT FURTHER RESOLVED**, the requirement shall be developed and implemented in accordance with the terms and conditions of any collectively bargained agreement, modified as necessary through the appropriate bargaining procedures as required by law, and in consultation with collective bargaining agents; and

**BE IT FURTHER RESOLVED**, the Chancellor or their designee(s) shall have the authority to amend the COVID-19 vaccination requirement as necessary based on the recommendations of appropriate federal, state, and local public health authorities, and the public health and safety conditions within the District and the communities it serves, subject to Board review and confirmation in accordance with District policies.

**Maria Nieto Senour, Ph.D.**
*President*

**Mary Graham**
*Executive Vice President*

**Geysil Arroyo**
*Vice President for Public Health Advocacy*

**Craig Milgrim**
*Vice President for Diversity, Equity, and Inclusion*

**Bernie Rhinerson**
*Vice President for Legislative Advocacy*

*Passed and adopted by the Board of Trustees of the San Diego Community College District in San Diego, California, this 23rd day of September, 2021.*

**Carlos O. Turner Cortez, Ph.D.**
*Chancellor*



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit E

COMPLAINT



**From:** Gregory Smith
**Sent:** Friday, September 24, 2021 1:52 PM

105

**Subject:** SDCCD Vaccination Requirement Update

Hello SDCCD Community,

This message provides updates on two important topics:

**Board of Trustees Resolution Regarding a COVID-19 Vaccination Requirement for Employees**

**CDC Approval of Booster Doses of the Pfizer Vaccine for Public Education Employees**

**Please read this message carefully for work direction that may apply to you.**

At last night's meeting of the Board of Trustees, the Board unanimously approved a resolution directing the Chancellor to implement a COVID-19 vaccination requirement for all employees. The requirement also applies to students and members of the public accessing onsite instruction and services throughout the District. This decision is the culmination of many months of discussion with stakeholders throughout the District, including collective bargaining representatives, Academic and Classified Senate representatives, Associated Student Government representatives, and managers, supervisors, and employees in instruction, student services, and a wide range of operational areas. In every discussion, the primary concern has been the health and safety of everyone working, attending, and receiving services throughout our District. Adding a requirement which limits access to attend and work at our Colleges and District is a difficult, but necessary, decision given the devastating impacts of COVID-19 on our communities and the urgency for resuming in-person instruction and services.

**COVID-19 Vaccination Requirement for Employees**

All employees of the San Diego Community College District will be required to be fully vaccinated against COVID-19 or have an approved exemption. **The timeline for employees who are not yet fully vaccinated to comply will be announced in a subsequent email.** All employees who are not fully vaccinated are strongly encouraged to begin the process as soon as possible. The District follows the definition of "fully vaccinated" provided by the Centers for Disease Control (CDC), which is 14 days after the final dose in an authorized vaccine series. All vaccines authorized by the CDC, Federal Drug Administration (FDA), and World Health Organization (WHO) are accepted by the District. In the United States, there are three vaccines currently available with full or emergency approval by the FDA: Pfizer, Moderna, and Johnson & Johnson. The Pfizer and Moderna vaccines are a two dose series and it takes five weeks to be fully vaccinated. The Johnson & Johnson vaccine is a single dose and it takes two weeks to be fully vaccinated. All three vaccines are available at no cost throughout San Diego County and the United States through county vaccination clinics, medical providers, and retail pharmacies.

If you have already provided documentation of your vaccination status and received a confirmation of your submission, you do not need to do anything further. **If you have not previously submitted your vaccination documentation, you must do so by Friday, October 8, 2021**.

Submitting Vaccination Documentation

If you are fully vaccinated against COVID-19, but have not provided documentation, you must submit a form stating

you are fully vaccinated; the date of your most recent vaccination dose; a copy of your vaccination record card, State of California SMART Health Card showing your vaccination record, email confirmation of vaccination, or other documentation showing you have been fully vaccinated; and authorization for the District to use information about your vaccination status for employment-related reasons. You may obtain your California SMART Health Card at https://myvaccinerecord.cdph.ca.gov/. Attached are detailed instructions on completing the vaccination confirmation form. PLEASE DO NOT SUBMIT THIS FORM UNTIL YOU HAVE RECEIVED YOUR FINAL VACCINE DOSE. If you are not fully vaccinated at this time, please submit this form after you receive your final dose (2nd dose of the Pfizer and Moderna vaccine or one dose of the Johnson & Johnson vaccine).

Requesting an Exemption from the Vaccine Requirement

As required by Federal and State law, the District will evaluate requests for an exemption from this requirement based on a medical condition or a sincerely-held religious belief. Exemptions will be considered on an individual basis. Employees approved for an exemption will go through an interactive process to determine whether a reasonable accommodation to the vaccination requirement can be made without posing a health and safety risk to others. Reasonable accommodations may include periodic COVID-19 testing, changes in work assignments, changes in work schedules, changes in work location, and other appropriate measures. Accommodations are evaluated on an individual basis within the specific reasons for an exemption, work performed, environment in which work is performed, and related relevant factors.

If you have previously submitted an exemption request based on a medical condition and received approval, you do not need to do anything further at this time. If additional information is needed, a Human Resources representative will contact you directly.

If you have previously submitted an exemption request based on a sincerely-held religious belief, you will need to submit an updated request providing additional information. Beginning Monday, September 27th, the revised religious exemption request form will be available in PeopleSoft within the "Employee Dashboard" and "My Forms" link. The prior exemption request form has been disabled and you will not be able to access it at this time. Specific instructions on completing the exemption request form will be provided in a subsequent email.

**If you have not previously submitted an exemption request based on a medical condition or sincerely-held religious belief, you must do so by October 8, 2021.**

**Employees who do not submit their vaccination documentation and are not approved for an exemption will be subject to discipline.**

**Booster Doses of the Pfizer Vaccine for Public Education Employees**

Earlier today (September 24, 2021), the CDC approved a 3rd dose of the Pfizer COVID-19 vaccine for individuals 65 or older, 18 or older and with underlying conditions putting them at higher risk, and individuals with high occupational risk of infection, including public education employees. The CDC had not changed the definition of "fully vaccinated" to require a booster dose of the Pfizer vaccine at this time. Based on the information available at this time, we believe all San Diego Community College District employees who received the Pfizer vaccine more than six months ago (currently, in March 2021) are eligible for a booster dose. CVS has announced it will begin accepting appointments for Pfizer booster doses immediately. Employees interested in a booster dose should contact vaccine providers directly

for information about availability and appointments. At this time, the District will not be providing vaccination onsite at District facilities for employees.

To reiterate, employees <u>are not</u> required to get a booster dose to comply with the District's vaccination requirement at this time.

Currently, booster doses for the Moderna and Johnson & Johnson vaccines are being studied and are not authorized by the CDC or FDA. Further information will be provided if additional booster doses are approved and if the CDC updates the definition of "fully vaccinated".

The District provides data on COVID-19 infections in California, San Diego County, and among employees and students on our COVID-19 information and resources website: https://www.sdccd.edu/about/departments-and-offices/human-resources/risk-management/covid-employees.aspx. Data are updated weekly.

## COVID-19 Resources for Employees | San Diego Community College District

www.sdccd.edu

The San Diego Community College District is committed to providing a safe working environment for each of our colleagues.

COVID-19 testing will continue to be available at the District Office, City College, Mesa College, Miramar College, and Educational Cultural Complex for any employee interested in getting tested. COVID-19 testing will continue to be required weekly for all employees who have not submitted documentation showing they are fully vaccinated. For a complete schedule of testing locations, days, and times and instructions for making an appointment, please visit the COVID-19 information website: https://www.sdccd.edu/about/departments-and-offices/human-resources/risk-management/covid-employees.aspx and select the COVID-19 TESTING PROCEDURES link.

Thank you for your prompt attention to this important matter.

Greg

Gregory Smith

Vice Chancellor, Human Resources

Office: 619-388-6589

Fax: 619-388-6897

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.109   Page 109 of 416

gsmith@sdccd.edu

---

**2 attachments**

 **Vaccination Confirmation Form Instructions.pdf**
506K

**SDCCD COVID Vaccine Requirement Resolution SIGNED.pdf**
259K

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit F

COMPLAINT

**MEMORANDUM OF UNDERSTANDING**
**BETWEEN THE**
**SOUTH ORANGE COUNTY COMMUNITY COLLEGE DISTRICT**
**AND ITS**
**CALIFORNIA SCHOOL EMPLOYEES ASSOCIATION**
**SOUTH ORANGE COUNTY COMMUNITY COLLEGE DISTRICT, Chapter 586 (CSEA)**

**November 17, 2021**

This Memorandum of Understanding (MOU) is entered into between the South Orange County Community College District and the California School Employees Association and its Chapter 586 ("CSEA"), and is expressly made pursuant to the Educational Employment Relations Act and the Collective Bargaining Agreement between the parties.

The South Orange County Community College District (District) Board of Trustees took action on September 27, 2021, to approve a COVID-19 vaccination mandate for all students, employees, and volunteers coming onto any District campus or worksite as of January 8, 2022, and delegated authority to the Chancellor to take any and all actions necessary to develop and implement the vaccination mandate.

The vaccination requirement is a condition of employment and will remain in effect unless it is deemed by the District that it is no longer necessary during the present public health emergency and as determined by objective criteria such as the local, State, or federal declarations or proclamations of emergency or other criteria such as the incidence rate of COVID-19 in the community. This MOU will be revisited once such emergencies conclude or the risk factors are no longer present.

The District and CSEA agree as follows regarding the effects of the District Board of Trustees decision to mandate the COVID-19 vaccine:

**I.     Vaccination Assistance**

1. The District will provide all unit members time to become fully vaccinated and provide proof of vaccination in Workday on or before January 7, 2022. Proof of vaccination means uploading the QR code from a state or county agency or a letter from a medical provider verifying that the employee has been fully vaccinated according to CDC guidelines, or as otherwise defined in the August 11, 2021 MOU.

2. The District will send at least one (1) reminder email during the Fall 2021, reminding unit members of the deadline to provide proof of vaccinated status.

**II.    Accommodations or Exemptions**

3. Unit members who request a disability/medical accommodation, or sincerely held religious belief exemption, must complete the District process and provide sufficient information to permit an initial determination, including any necessary form(s) at the following webpage: **https://www.shawhrconsulting.com/southorangecounty/**

   a. Unit members must complete the initial form and submit required supporting documentation for their request for exemption and/or reasonable accommodations by November 18, 2021. The District will support unit members who are having difficulty obtaining documentation from their medical provider.

b. Unit members who request an exemption or accommodation must participate in good faith, and must complete the process in full. This includes, but is not limited to, providing all required documentation/information and obtaining District approval in order to qualify.

c. Unit members who obtain an exemption or accommodation may be subject to other safety measures beyond what is required for vaccinated individuals, including but not limited to: asymptomatic (public health surveillance) testing and symptomatic testing; physical/social distancing; avoiding large gatherings; wearing acceptable facial coverings and/or other personal protective equipment; frequent handwashing and cleaning; practicing respiratory etiquette; and/or exclusion from the physical worksite when warranted.

d. Unit members who are denied a requested exemption and/or reasonable accommodation shall be required to become fully vaccinated within six (6) weeks from the date of the issuance of the denial letter.  Should the six (6) week grace period to become fully vaccinated cross over the January 8, 2022 deadline for vaccination, the unit member shall be subject to testing two times per week from January 8, 2022 until the date of full vaccination.

4. Unit members who are unvaccinated and qualify for a disability/medical accommodation or sincerely held religious belief exemption must undergo twice weekly testing, available on campus at both Saddleback College and Irvine Valley College. Unit members must submit their test results electronically using a secure District designated method as directed by Human Resources.

a. Unit members who qualify for a disability/medical exemption or a sincerely held religious belief exemption who participate in twice weekly testing may be excused for up to one (1) hour of paid time per week to get tested. Testing shall be scheduled by the employees in consultation with their supervisor.

b. District-provided weekly testing at Saddleback College and Irvine Valley College will be available at no cost to the unit member.

## III.   After January 7, 2022

5. As a condition of employment, unit members who have not qualified for a disability/medical accommodation or sincerely held religious belief exemption, must become fully vaccinated as defined by the Centers for Disease Control on or prior to January 7, 2022. Unit members who were denied an exemption and/or reasonable accommodations shall be provided sufficient time to become fully vaccinated per section 3.d.

6. Unit members who are not vaccinated and do not qualify for a disability/medical accommodation or sincerely held religious belief exemption will have the following options to continue their regular assignment:

a. Unit members may request to use paid leave, if available;

b. Unit members may request consideration for leave without pay for the period not exceeding the Spring 2022 term;

c. Unit members may request any combination of a and b. The determination and

112

107          approval to exercise these options shall not be arbitrary or capricious;
108
109          d. Unit members requesting (b) or (c) above are advised that this may adversely
110             affect benefits such as CalSTRS/CalPERS, and health benefits if leave is longer
111             than 90 days.
112
113          The District reserves the right to hire substitutes to fill positions for employees who are
114          approved for paid or unpaid leave.
115
116       7. Unit members who requested a disability/medical exemption, which the District was
117          unable to accommodate after having exhausted the interactive process, shall have the
118          right to exhaust all available paid and unpaid leaves provided under the CBA, after which
119          the unit member may be placed on the 39-month reemployment list.
120
121   **IV.   Non-Compliance with Required Testing (related to approved exemptions)**
122
123       8. Unit members who are approved for an accommodation/exemption are required to test
124          at least two times per week; the first on Monday or Tuesday and the second at least two
125          days after the first and on Wednesday, Thursday or Friday.  Failure to test as directed
126          shall result in discipline. A failure to test is defined as any employee that is not out on
127          any approved leaves and yet fails to test as required.
128
129              a. Unit members who miss one test shall be issued a warning and corrective
130                 directive.
131
132              b. Permanent unit members who miss two (2) tests shall be issued a "Notice of
133                 Intent to Discipline" based on those causes included at Article 15.2 of the CSEA
134                 CBA, with the intent of suspension without pay after a Skelly hearing and the
135                 termination of their employment.
136
137              c. Probationary unit members who miss two (2) tests shall be immediately
138                 terminated, pursuant to Article 15.3 of the CSEA CBA.
139
140       9. The District will send at least one (1) reminder email during the Spring 2022, notifying
141          unit members of the deadline to either renew an accommodation/exemption or provide
142          proof of vaccinated status.
143
144       10. Permanent unit members who choose to remain unvaccinated and do not qualify for an
145           accommodation/exemption after June 30, 2022, shall be issued a "Notice of Intent to
146           Discipline" based on those causes included at Article 15.2 of the CSEA CBA, with the
147           intent of suspension without pay after a Skelly hearing and the termination of their
148           employment. Unit members shall be afforded an option to take an unpaid leave of
149           absence in lieu of termination, for a period not to exceed two (2) months, from June 30,
150           2022 through August 31, 2022 to become compliant. Proof of vaccination must be
151           received on or before 5pm on August 31, 2022. If proof of vaccination is not received by
152           5pm on August 31, 2022, the unit member will be deemed to have resigned from District
153           employment.
154
155              a. Probationary unit members who choose to remain unvaccinated and do not
156                 qualify for an accommodation/exemption after June 30, 2022 shall be notified that
157                 their employment has been terminated pursuant to Article 15.3 of the CSEA CBA.
158
159              b. Unit members may be reinstated following notice of intent to discipline, and before

160        issuance of a notice of discipline, if the unit member provides verified
161        documentation to establish evidence of being fully vaccinated prior to June 30,
162        2022.
163
164   **V.    Extension of Supplemental Leave**
165
166        11. The District will be voluntarily extending the 80 hours of supplemental paid sick leave
167            that was initially guaranteed through SB 95 and has since expired.  This 80 hours of
168            supplemental sick leave has been voluntarily extended by the District for unit members
169            through January 31, 2022 with specific terms and conditions.  To be eligible for this
170            additional 80 hours of consecutive leave, a unit member must not have exhausted this
171            leave previously **AND** must meet one of the following conditions for use:
172
173            a. Has tested positive for COVID-19 and/or exposed to COVID-19 and is required
174               to quarantine (evidence required);
175
176            b. Has a child, or household member, or dependent who tested positive for COVID-
177               19 or has been exposed to COVID-19 and is required to quarantine by a local
178               school or agency (evidence required).
179
180            c. The unit member is unable to work due to COVID-19 vaccine-related side effects.
181               Evidence will be required if leave exceeds 3 days.
182
183   This MOU is intended to address and settle the impacts and effects of the District's COVID-19
184   vaccination mandate, as described herein. Execution of this MOU does not create a precedent for
185   any purpose except as described herein, nor establish any past practice.
186
187   **South Orange County Community**          **California School Employees**
188   **College District**                       **Association and its Chapter 586**
189
190   *C. Vyskocil*
191   C. Vyskocil (Nov 17, 2021 16:33 PST)        Scott Greene (Nov 17, 2021 16:53 PST)
192   Dr. Cindy Vyskocil                          Scott Ferguson Greene
193   Vice Chancellor of Human Resources          President, CSEA Chapter 586
194    Nov 17, 2021                                Nov 17, 2021
195   _____                     _____
196   Date                                        Date
197
198
199   Kim Widdes (Nov 17, 2021 16:43 PST)          Matthew S Phutisatayakul (Nov 17, 2021 16:54 PST)
200   Kim Widdes                                  Matthew Phutisatayakul
201   Executive Director, Human Resources         Labor Relations Representative, CSEA
202    Nov 17, 2021                                Nov 17, 2021
203   _____                     _____
204   Date                                        Date

# CSEA Final Vaccine Mandate MOU 2021-11-17

Final Audit Report · 2021-11-18

| | |
|---|---|
| Created: | 2021-11-18 |
| By: | Joshua Taylor (jtaylor@ericksonlaw.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAwgeJNeLZGjfMiG7LMiwzeL98WKXdbWAw |

## "CSEA Final Vaccine Mandate MOU 2021-11-17" History

Document created by Joshua Taylor (jtaylor@ericksonlaw.com)
2021-11-18 - 0:25:53 AM GMT- IP address: 98.186.149.84

Document emailed to C. Vyskocil (cvyskocil@socccd.edu) for signature
2021-11-18 - 0:28:52 AM GMT

Document emailed to Kim Widdes (kwiddes@socccd.edu) for signature
2021-11-18 - 0:28:53 AM GMT

Document emailed to Matthew S Phutisatayakul (mphutisatayakul@csea.com) for signature
2021-11-18 - 0:28:53 AM GMT

Document emailed to Scott Greene (sgreene6@saddleback.edu) for signature
2021-11-18 - 0:28:53 AM GMT

Email viewed by C. Vyskocil (cvyskocil@socccd.edu)
2021-11-18 - 0:29:49 AM GMT- IP address: 110.238.215.76

Document e-signed by C. Vyskocil (cvyskocil@socccd.edu)
Signature Date: 2021-11-18 - 0:33:55 AM GMT - Time Source: server- IP address: 207.233.74.5

Email viewed by Kim Widdes (kwiddes@socccd.edu)
2021-11-18 - 0:37:08 AM GMT- IP address: 209.129.85.50

Document e-signed by Kim Widdes (kwiddes@socccd.edu)
Signature Date: 2021-11-18 - 0:43:39 AM GMT - Time Source: server- IP address: 207.233.74.5

Email viewed by Matthew S Phutisatayakul (mphutisatayakul@csea.com)
2021-11-18 - 0:52:49 AM GMT- IP address: 76.169.48.146

Email viewed by Scott Greene (sgreene6@saddleback.edu)
2021-11-18 - 0:52:59 AM GMT- IP address: 119.13.201.71

 Adobe Sign

Document e-signed by Scott Greene (sgreene6@saddleback.edu)
Signature Date: 2021-11-18 - 0:53:33 AM GMT - Time Source: server- IP address: 66.214.171.79

Document e-signed by Matthew S Phutisatayakul (mphutisatayakul@csea.com)
Signature Date: 2021-11-18 - 0:54:34 AM GMT - Time Source: server- IP address: 76.169.48.146

Agreement completed.
2021-11-18 - 0:54:34 AM GMT

**Adobe Sign**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit G

COMPLAINT

**From:** SOCCCD Communications <Communications@socccd.edu>
**Sent:** Sunday, January 2, 2022 1:19 PM
**To:** SOCCCD Communications <Communications@socccd.edu>
**Subject:** SOCCCD Message - 2022 COVID Update from Chancellor Burke

Greetings Faculty and Staff:

I hope that you found some time to rest and recuperate over the last
two weeks after a long year of ups and downs—highs and
lows. The 2021 year definitely presented its fair share of challenges, and despite our
optimism about COVID becoming a distant memory, we worked together the entire
year to address COVID masks, testing, vaccines, and variants in the workplace. We
also learned how to work in the office with new safety measures, host hybrid in-
person/virtual board meetings, and continued to offer excellent services to students
and the greater SOCCCD community.

As with 2021, the new year is shaping up to be another one that will require our
flexibility, durability, and willingness to work together and support each other. With
that being said—with the support of the Board of Trustees, vice chancellors, and
college presidents—**I am delaying the in-person return-to-work for many until
February 7, 2022.**

The Omicron and Delta variants of COVID have contributed to high transmission
rates in Orange County. Bringing all employees back to work now could increase the
number of positive cases on our campuses and worsen the public health crisis
challenging our community. Furthermore, our understanding about
the transmissibility and severity of the Omicron variant is still evolving; thus, I believe
this delay is a prudent decision.

We will continue to monitor the transmission rates from the Orange County Health
Care Agency and work with them to return safely with continued sound practices in
place for vaccinations, testing, and indoor masking.

Please note that some employees may be required to continue to work onsite if the
function of their role cannot be conducted remotely, including courses where
student learning outcomes require in-person meetings and to provide in-person
student support services, ongoing facilities care and maintenance, campus safety,
and some District Services operations.

The spring semester will still begin on January 18, 2022, with some in-person classes and many virtual learning opportunities. The goal of this decision is to reduce the number of students and employees on our campuses, not to eliminate all in-person learning and services.

Those employees working in positions required for the essential operation of our campuses or District Services, including our Health and Wellness Centers, Facilities and Maintenance Operations, Information
Technology, Police, and the Warehouse, should report to work as scheduled on January 4.

Those who may be supporting laboratory or activity classes or who provide student support services or District services should watch for communication from their supervisors.

Employees whose return to onsite work is delayed, should plan on working remotely during normal hours of operation beginning on January 4. For questions about working remotely or other COVID-related concerns, please refer to the guidelines linked below:

Return to Work Guidelines – *Please note that these guidelines will be updated shortly to reflect recent changes made by Cal-OSHA. A communication will be sent to all employees once the guidelines have been updated.*

Community Resource Guide for Employees

In addition, please continue to communicate directly with your supervisor on work-related matters, including if your assignment requires onsite or remote work through February 7, 2022.

Happy New Year. We continue to hope to see you in-person at our colleges early in 2022.

Chancellor Kathleen F. Burke, Ed.D.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit H

COMPLAINT

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮

---------- Forwarded message ---------
From: **Carlos DelaLama** <cdelalam@sdccd.edu>
Date: Wed, Jan 12, 2022 at 2:11 PM
Subject: FW: SDCCD Spring Operations Update PLEASE READ
To: sdcity.math.dept@gmail.com <sdcity.math.dept@gmail.com>

## *Carlos de la Lama*

## *Department of Mathematics, Chair*

## *San Diego City College*

## *cdelalam@sdccd.edu*

## *619-388-3362*

**From:** Gregory Smith <gsmith@sdccd.edu>
**Date:** Tuesday, January 11, 2022 at 5:55 PM
**Subject:** SDCCD Spring Operations Update PLEASE READ

Hello SDCCD Community,

This email provides critical updates to our operations as we prepare for the spring semester.

Below you will find important information regarding:

1) **Remote work assignments through January 28, 2022**

2) **Resuming the phased-in return to onsite activities in February 2022**

3) **Full return to onsite activities in March 2022**

4) **Vaccination status and access to onsite activities for the spring semester**

As announced in Chancellor Turner Cortez's email on January 2, 2022 the District has reverted to primarily remote operations for most employees through January 18, 2022. Over the past three weeks, COVID-19 cases have continued to rise at an alarming rate throughout San Diego County and the state of California. There is positive news, however, as hospitalization and mortality rates are much lower than during previous periods with a large number of individuals contracting the coronavirus. According to data from the California Department of Public Health, the current rate of COVID cases in the county is 187.4 per 100,000 residents, compared to a peak rate of 110 cases per 100,000 residents in January 2021. At this time, the 14 day average number of patients hospitalized with COVID-19 is 638, compared to 1,692 average patients hospitalized in January 2021. Most importantly, the current mortality rate is 0.1 per 100,000 residents, compared to 1.3 per 100,000 in January 2021.

The data and research increasingly demonstrate the omicron variant is much more transmissible, including among individuals who are fully vaccinated against COVID-19, but the severity of illness is much lower. While this is encouraging, the District continues to pursue a health and safety strategy focused first on preventing any spread of COVID-19 and resuming in-person activities with strong mitigation measures in place. We

appreciate the contributions, input, and participation of every District student, employee, and stakeholder in creating a safe and healthy educational environment as we navigate the impacts of the omicron variant.

**Remote Work Assignments**

With cases continuing to rise and many public health researchers predicting we will continue to experience increasing case rates for the next two to four weeks, **the current remote work operations are extended through January 28, 2022**. This means most District employees will work remotely through the 28th.

· Employees whose job duties must be performed onsite will continue to work onsite, with strict face covering and physical distancing protocols

· Employees can be required to come onsite to perform specific duties which cannot be adequately performed remotely

· Employees required to work onsite will be notified by their supervisor and/or Cabinet-level executive manager

· Fall classes at the College of Continuing Education will continue to meet on campus unless otherwise directed by the appropriate Dean

· Employees working remotely <u>are not</u> required to be tested for COVID-19

· Employees working onsite who are not fully vaccinated are required to be tested each week

· All employees may voluntarily be tested at any District-provided testing location. Please make an appointment prior to arriving to decrease crowding and wait times and to ensure timely results

Procedures for testing are available on the District's employee COVID resources webpage: https://www.sdccd.edu/about/departments-and-offices/human-resources/risk-management/covid-employees.aspx

**Resuming Onsite Work and Activities**

With the start of spring instruction at the credit colleges **on January 31, 2022, the District will return to the requirement for most employees to work onsite at least three days per week** as was done in November and December 2021. Courses scheduled to be in-person will proceed as planned, based on enrollment. Currently, the majority of enrollments are in online courses, so there will likely be fewer in-person classes that initially planned. All employees working onsite must strictly follow the District's face covering requirements and maintain physical distancing whenever possible. All employees are encouraged to speak with their supervisors and managers regarding their specific schedule and assignment.

**Full Return to Onsite Work and Activities**

With the rate of COVID-19 cases in our county expected to decline sharply over the month of February, **all employees should plan for a full return to onsite work and activities beginning Monday, February 28th**. Online courses will remain online and are not impacted by the District's return to onsite work and activities. Each College and District Division will plan their full return and specific details will be provided through the appropriate managers and supervisors.

We must all remain flexible to respond to changes in our local public health conditions, so this timeline may be adjusted as necessary to protect our health and safety.

**Vaccination Status and Access to Onsite Activities**

During the fall semester, the District was able to provide students with exemptions to the vaccination requirement with accommodations which included in-person instruction and services. Due to the much higher rate of COVID transmission occurring in our region, in-person instruction will be limited primarily to students who have been fully vaccinated. Limiting access to our programs is a difficult decision given the open access educational services we are committed to providing our communities. However, the District does not have the physical environment and resources to effectively accommodate in-person instruction for students who have not been vaccinated at this time. A limited number of specific programs and courses, which are primarily outdoors and in large venues, will proceed with limited accommodations. Please speak with your Dean or

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.123   Page 123 of 416

Vice President of Instruction for further details.

We fully appreciate the complexities created by hybrid operations and changes to months of planning for the spring semester. Thank you for your continued flexibility and participation in planning, adjusting plans, and continuing to serve our communities through multiple modalities. We encourage everyone to get vaccinated and booster doses as soon as you are eligible, continue wearing face coverings in all public settings, maintaining physical distancing whenever possible, and getting tested for COVID whenever you are experiencing symptoms or suspect you have been exposed to the coronavirus.

Thank you,

Greg

Gregory Smith

Vice Chancellor, Human Resources

Office: 619-388-6589

Fax: 619-388-6897

gsmith@sdccd.edu



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit I

COMPLAINT



**GROSSMONT-CUYAMACA**
COMMUNITY COLLEGE DISTRICT

### Resolution 21-024
### COVID-19 Vaccination Requirement

On motion of Member **Adams**, seconded by Member **Justeson**, the following resolution is adopted:

**WHEREAS**, the Grossmont-Cuyamaca Community College District (the District) and its colleges have provided instruction and services primarily through remote operations since March 2020, which has enabled the continuation of public education for many students, but has resulted in the displacement and exclusion of many students from communities with inadequate access to resources necessary to succeed in distance education; and

**WHEREAS, the Centers for Disease Control (CDC), World Health Organization (WHO),** and numerous federal, state, and local public health agencies and organizations have identified vaccination against COVID-19 by as many people as possible as a necessary measure to control and contain serious illness, hospitalization, and loss of life due to COVID-19; and

**WHEREAS**, validated data on COVID-19 infections clearly demonstrate individuals who have not been vaccinated are at much higher risk of infection, serious illness, hospitalization, and loss of life due to COVID-19 and the continued spread of COVID- 19 has led to more transmissible and harmful variants, such as the Delta variant; and

**WHEREAS**, the District recognizes the importance of resuming in-person instruction and services to mitigate any further learning loss and disengagement among communities most in need of the public education and support resources offered by the District; and

**WHEREAS**, President Joseph Biden announced on September 9, 2021, that all federal employees, employees of federal contractors, and health care workers will be required to be vaccinated, and all employers with 100 or more employees will be required to ensure workers are vaccinated for COVID-19 and called on all schools to adopt a vaccine requirement for all employees;

**NOW THEREFORE BE IT RESOLVED** by the Board of Trustees of the Grossmont-Cuyamaca Community College District that consistent with the recommendations by President Joseph Biden, CDC, WHO, State of California, and the San Diego County Health and Human Services Agency, the Board directs the Chancellor or their designee(s) to take actions necessary to develop and implement a COVID-19 vaccine requirement for all District employees, students, and individuals accessing services and utilizing facilities at all District locations in accordance with federal and state law, including a testing alternative for eligible exemptions; and

**BE IT FURTHER RESOLVED**, the requirement shall be developed and implemented in accordance with the terms and conditions of any collectively bargained agreement, modified as



**GROSSMONT-CUYAMACA**
COMMUNITY COLLEGE DISTRICT

necessary through the appropriate bargaining procedures as required by law, and in consultation with collective bargaining agents; and

**BE IT FURTHER RESOLVED**, the Chancellor or their designee(s) shall have the authority to amend the COVID-19 vaccination requirement as necessary based on the recommendations of appropriate federal, state, and local public health authorities, and the public health and safety conditions within the District and the communities it serves, subject to Board review and confirmation in accordance with District policies.

**PASSED AND ADOPTED** by the Governing Board of the Grossmont-Cuyamaca Community College District of San Diego County, California, this 9th day of November 2021 by the vote:

AYES:  Adams, Justeson, Monroe, Schorr, Blevins (advisory vote), Macogay (advisory vote)

NOES:  Cartwright

ABSENT:  None

I, Debbie Justeson, Clerk of the Governing Board, do hereby certify that the foregoing is a full, true and correct copy of a resolution duly passed and adopted by said Board at the regularly called and conducted meeting held on said date.

Clerk of the Governing Board

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit J



# EMPLOYEE RELIGIOUS EXEMPTION FROM VACCINATION REQUEST
## SPRING 2022

Grossmont-Cuyamaca Community College District is committed to the safety and well-being of its employees and students.  To promote a safe and healthful workplace, the District is requiring that employees receive a COVID-19 vaccination in order to be physically present on District premises.

Employees with sincerely held religious beliefs, practices, or observances that conflict with the requirement for COVID-19 vaccinations may petition for a religious exemption to the District's COVID-19 Vaccination requirement.

| EMPLOYEE INFORMATION | | |
|---|---|---|
| Name:  Judy George | EmployeeID:  210902 | College:  ☐ Cuyamaca  ☒ Grossmont |
| Email:  Judy.george@gcccd.edu | Phone Number:  619-518-4845 | |

**QUESTIONS (Please answer in your own words):**

1. Please describe the nature of your objection to the COVID-19 vaccination requirement.

The US Constitution affords me the right to practice my Christian religion, I am a devout Christian. Jesus Christ is my King and Savior. Accepting to take these specific available vaccines that have been in one way or another been developed and/or produced with the unholy use of aborted children's cell lines goes deeply against my belief of honoring, praising and obeying God and His Will as The only Giver and Taker of life. Accepting taking this drug directly opposes my steadfast belief (Exodus 20:13, Deuteronomy 5:17) 'You shall not kill'. This is against my sincerely held religious beliefs.

2. Would complying with the COVID-19 vaccination requirement substantially burden your religious exercise or conflict with your sincerely held religious beliefs, practices, or observances? If so, please explain how.

Accepting the covid 19 vaccine to enter my body would violate and is in direct conflict with my sincerely held religious beliefs. I believe receiving any covid 19 vaccine would be participating in the sin of abortion, thereby resulting in my spiritual death. While neither death is desirable, the Church has since antiquity declared that spiritual death is magnitudes less desirable than physical death because spiritual death results in the eternal suffering of our souls, as is declared in Revelation 21:8

3. How long have you held the religious belief underlying your objection?

As long as I can remember.

4. Please describe whether, as an adult, you have received any vaccines against any other diseases (such as a flu vaccine or a tetanus vaccine) and, if so, what vaccine you most recently received and when, to the best of your recollection.

I do not receive vaccines.

5. If you do not have a religious objection to the use of all vaccines, please explain why your objection is limited to particular vaccines.

N/A

6. If there are any other medications or products that you do not use because of the religious belief underlying your objection, please identify them.

> I do not partake in any medications I know to contain aborted baby cells, whether in research, development, and or implantation.

7. Please provide any additional information that you think may be helpful in reviewing your request.

> Please see the Holy Bible and attached letter from Pastor Brian.

**By signing this form, I acknowledge and agree to the following:**

☒ I understand that providing false information may result in disciplinary action.

☒ If I am exposed or contract COVID-19, I will be required to quarantine or isolate. I also acknowledge that I may be required to submit COVID-19 testing results.

☒ If this exemption is approved, I acknowledge that I will be required to social distance while on campus based on the district and Cal/OSHA guidelines **and** wear a mask at all times while on campus.

_[signature]_                                              11-25-21_____
Employee Signature                                    Date

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit K

COMPLAINT

**From:** Judy George <Judy.George@gcccd.edu>
**Sent:** Friday, December 3, 2021 5:27:23 PM
**To:** Shawn Hicks <Shawn.Hicks@gcccd.edu>; Cheryl Detwiler <Cheryl.Detwiler@gcccd.edu>
**Cc:** Aimee Gallagher <aimee.gallagher@gcccd.edu>
**Subject:** Re: Interactive Meeting Request - JG

I can do December 7th, 10-10:30 :)
Thank you!
Judy

Sent from my iPhone. Please forgive tenseness and typos.

---

**From:** Shawn Hicks <Shawn.Hicks@gcccd.edu>
**Sent:** Friday, December 3, 2021 4:35:58 PM
**To:** Cheryl Detwiler <Cheryl.Detwiler@gcccd.edu>; Judy George <Judy.George@gcccd.edu>
**Cc:** Aimee Gallagher <aimee.gallagher@gcccd.edu>
**Subject:** Re: Interactive Meeting Request - JG

Any of those times work for me.

Thank you,
Shawn

---

**From:** Cheryl Detwiler <Cheryl.Detwiler@gcccd.edu>
**Sent:** Friday, December 3, 2021 4:22 PM
**To:** Judy George <Judy.George@gcccd.edu>; Shawn Hicks <Shawn.Hicks@gcccd.edu>
**Cc:** Cheryl Detwiler <Cheryl.Detwiler@gcccd.edu>; Aimee Gallagher <aimee.gallagher@gcccd.edu>
**Subject:** Interactive Meeting Request - JG

Dear Judy and Shawn,


This is a follow up to the email sent earlier this week regarding the need for an Interactive meeting.  We are hoping to schedule Judy's Interactive Meeting as soon as possible.  Based on Shawn's Outlook calendar it appears that the below dates and times may work for our meeting.  If none of these dates work with your schedules please identify dates and times between December 6 – 14 that may work.  Otherwise please let me know if you can be available for any of the below dates and times and if you have a preference:


Tuesday, December 7th: 10 – 10:30 a.m. OR 4:30 – 5 p.m.

Wednesday, December 8th: 11:30 a.m. – 12 noon OR 1:30 – 2 p.m.

*Cheryl Detwiler, PHR*

Human Resources Coordinator

Grossmont-Cuyamaca Community College District

P: (619) 644-7571

F: (619) 644-7919

Cheryl.detwiler@gcccd.edu

For COVID-19 Resources: https://intranet.gcccd.edu/human-resources/covid-19-resources.html

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit L

COMPLAINT

**Date:** 2022-02-17 14:06

**From:** judy george <judylynn.george@gmail.com>

**To:** Daniel Gutowski <president@sdccdspaa.org>

---------- Forwarded message ---------
From: **Judy George** <Judy.George@gcccd.edu>
Date: Tue, Jan 4, 2022 at 7:30 AM
Subject: Fwd: Appeal to accommodation denial
To: judylynn.george@gmail.com <judylynn.george@gmail.com>

---

**From:** Judy George
**Sent:** Tuesday, January 4, 2022 6:44:43 AM
**To:** Aimee Gallagher <aimee.gallagher@gcccd.edu>; Lynn Neault <lynn.neault@gcccd.edu>
**Cc:** Shawn Hicks <Shawn.Hicks@gcccd.edu>; Diana Vance <Diana.Vance@gcccd.edu>; Cheryl Detwiler
<Cheryl.Detwiler@gcccd.edu>; Brad Monroe <Brad.Monroe@gcccd.edu>; Linda Cartwright
<linda.cartwright@gcccd.edu>; Debbie Justeson <debbie.justeson@gcccd.edu>; Julie Schorr
<julie.schorr@gcccd.edu>; Elena Adams <Elena.Adams@gcccd.edu>; Benjamin Blevins
<benjamin_blevins@gcccd.edu>; gary@ggkmail.us <gary@ggkmail.us>; Legalservices@aaeteachers.org
<Legalservices@aaeteachers.org>
**Subject:** Appeal to accommodation denial

Ms. Gallagher:

Before making a decision regarding my career (20 + years at Grossmont College) and livelihood, I am
invoking my right to engage in an interactive accommodation/appeal process that is genuinely based on
a fair case by case assessment, as HR indicated it would be. These assessments must be conducted in
good faith to genuinely accommodate my religious exemption.

Keep in mind, the district sent out their policy to all employees of GCCCD which read:

**Employees are reminded that discrimination and harassment related to the Coronavirus
are prohibited under policy and law. No person should be subject to bias, harassment, or
discrimination related to the virus. Please contact Human Resources immediately on any
reports of bias, harassment, or discrimination. In addition, it is our responsibility not to
retaliate against any person who raises health or safety concerns.**

Since no details were provided in the accommodation denial letter below, I have no idea what part of my
accommodation request was problematic regarding the stated issues of: **a)** The committee finds that
remote work is not a reasonable accommodation based on the nature of your specific position and job
duties. **b)** An accommodation to work on-site unvaccinated is DENIED because the risk of transmission
is too high based on your specific position, location, and job duties.

**Adjustments in my Accommodation Request:**

135

Since discussing my accommodation request in the December 7th, 30 minute "interactive" meeting, I will take it upon myself to weekly (or more) COVID test at Kaiser as well as provide my own masks. I can take the test to demonstrate I do not have COVID. When I test negative, I cannot be a risk of transmitting any COVID to anyone. Therefore, when I return to campus, I will be a zero risk of transmission. This will alleviate any financial responsibility or undue hardship on the district.

Please exercise your fiduciary duty and engage in a re-assessment of this accommodation request. I am aware of other requests that have been approved and therefore there appears to be an inconsistent practice in which these requests are being processed, appraised, and approved or denied.

Title VII, according to the EEOC states,

"Religious harassment in violation of Title VII occurs when employees are: (1) required or coerced to abandon, alter, or adopt a religious practice as a condition of employment (this type of "quid pro quo" harassment may also give rise to a disparate treatment or denial of accommodation claim in some circumstances); or (2) subjected to unwelcome statements or conduct that is based on religion and is so severe or pervasive that the individual being harassed reasonably finds the work environment to be hostile or abusive, and there is a basis for holding the employer liable."

Under the Americans with Disabilities Act (ADA), various businesses, including schools, are considered places of public accommodation.  (42 U.S.C.A. § 12181 (7)(F).)  Title III of the ADA "provides that [n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."

COVID-19 is now covered by Title III, which defines as "discrimination" three COVID-19-related categories. (42 U.S.C. § 12182(2).)

COVID-19-related discrimination includes "the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability . . . from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary." (42 U.S.C. § 12182(2).)  A few examples of possible eligibility criteria relevant to COVID-19 discrimination analysis include denying entry to individuals based upon criteria related to COVID-19 (e.g., positive tests, other disabilities, symptoms) or requiring some type of documentation to allow entry (e.g., certificates of health, "COVID-19 passports").

COVID-19-related discrimination applies to persons merely perceived or regarded as having a disability, i.e., it applies to persons perceived as being contagious or infectious with COVID-19, regardless of whether they are contagious or infectious. The "regarded as" provision of the ADA does not require the individual to establish a substantial limitation of any major life activities. Instead, "[a]n individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment, whether or not the impairment limits or is perceived to limit a major life activity.  (42 U.S.C. § 12102(3).)

The "regarded as" provision is Congress's way of "acknowledg[ing] that society's accumulated myths and fears about disability and disease are as handicapping as the physical limitations that flow from actual impairment." (Sch. Bd. of Nassau Cty., Fla. v. Arline, 480 U. S. 273, 284 (1987 [hereinafter "Arline"].)  Myths and fears of the unvaccinated have been promoted by persons with no expertise in such matters, notably the districts of various colleges and schools.

136

To be entitled to protection under the ADA under the "regarded as" provision, any person need only establish "that he or she has been subjected to [a discriminatory action] because of [a] . . . perceived physical . . . impairment." (42 U.S.C. § 12102(3)(A).)  The "regarded as" prong covers impairments that "might not diminish a person's physical or mental capabilities but could nevertheless substantially limit the person's ability to work or to participate in public accommodations because of the negative reaction of others to the impairment."  (Arline, supra, 480 U. S. at p. 283, emphasis added.)  Thus, in Arline, a schoolteacher with a history of tuberculosis, an infectious disease, was properly regarded as having a disability merely because of her school district's unfounded fears.

Anyone without proof of vaccination must be regarded as disabled within the meaning of the ADA, because of the public's unfounded fear that a person who has not been vaccinated for COVID-19 nor tested for it may have COVID-19 and therefore is contagious.

The fact that an unvaccinated person could accept a vaccine and thus remove themselves from the category of the unvaccinated cannot be used to deny such persons the protection of the ADA.  That is because "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as — (I) medication, . . . [or] (III) reasonable accommodations or auxiliary aids or services."  (42 US 12102(4)(E) (I).)

A person who is perceived as presenting a risk of COVID-19 contagion cannot be denied equal access to public accommodations unless such person poses a direct threat to the health and safety of others.  (Onishea v. Hopper, 171 F.3d 1289, 1296-97 (11th Cir, 1999.)  In determining whether a person poses a direct threat, a place of public accommodation may not impose discriminatory "eligibility criteria" that screen out or that tend to screen out persons considered disabled because of mere perceptions that they are contagious.  (42 U.S.C. § 12182(2).)

Denying equal access and accommodations to someone based merely on their vaccination status or lack of an immediate test therefore violates the ADA.  Such eligibility criteria improperly screen out persons based on mere supposition that they are contagious.  In contrast, eligibility criteria that utilizes observable physical symptoms – coughing, sneezing, running nose, red eyes, elevated fever – i.e., criteria based on circumstantial evidence that the person is contagious, would not be an ADA violation.

**Information I would like provided to me as an Employee:**

    **1.**    Who was on this committee (names and job titles), who appointed them and why? Were the supervisors listed in this email included in any discussions?

    **2.**    What medical expertise do the committee members possess?

    **3.**    Please provide data demonstrating how a negative covid test makes for an unsafe work environment related to my specific job duties.

> "An accommodation to work on-site unvaccinated is DENIED because the risk of transmission is too high based on your specific position, location, and job duties."

    **4.**    With regard to statement: "...risk of transmission is too high...", where is the **evidence-based** data for this assertion?

    1.    Please share the **empirical data clearly demonstrating that non-vaccinated people are a greater health risk, or risk of transmission, than vaccinated people**. If there is no empirical evidence to substantiate this claim, then no one can attempt to implement policies based on un-

137

provable assertions and presumptions. No one can simply declare a situation to be "an unacceptable risk" without vetted data (from multiple peer reviewed sources) that supports those claims. If the data exists, please share it with me.

1.Regarding the offer to use "paid or unpaid leave until June 30, 2022". Is that when the mandate runs out? Or is that when the District plans to terminate unvaccinated employees? Please elaborate. What would the options then be?

**6.** As I hope you are aware, the manufactures of all 3 shots acknowledged that the only outcome anyone can anticipate is **a reduction in the severity of 1 or more symptoms of COVID**. Being fully vaccinated will **not prevent anyone catching it**, and it will **not prevent anyone from spreading it**. There is a plethora of examples of fully vaccinated employees getting COVID this semester. AND spreading it to unvaccinated employees.

**7.** Furthermore, if GCCCD is subjecting me, a healthy person, exhibiting no signs of illness or contagion, to punitive treatment, differently than other employees simply because I have asserted the federally protected right to refuse the vaccine, this could be seen as an attempt to coerce me into taking the vaccine against my will, which is a violation of federal law.

1. For the final statement: <u>... decline accommodation... choose not to be vaccinated, you may be subject to discipline.</u>

   a. What would 'declining the accommodation' mean? Please elaborate.
   b. May be disciplined? What does this mean?
   c. What action would bring about discipline and under what category in terms of my job description and contract? Please elaborate and fully explain these final comments so that this can be fully understood. What would the grounds for discipline be and what would specific examples of 'discipline' be?

I look forward to being involved in a truly collaborative and interactive process that is fair and non-discriminatory.

Sincerely,
Judy George

Dear Judy:

The Religious Exemption Accommodation Committee has reviewed your request for accommodation. The following is the committee's determination:

·     The committee finds that remote work is not a reasonable accommodation based on the nature of your specific position and job duties.

·     An accommodation to work on-site unvaccinated is DENIED because the risk of transmission is too high based on your specific position, location, and job duties.

138

·     An accommodation to use accrued paid leave, or unpaid leave, through June 30, 2022, is GRANTED. You may use leave to absent yourself from work while the District has a vaccination requirement, and you remain unvaccinated.

·     In reaching its decision, the Committee considered your specific position, location and job duties; whether you work alone, in a group or your work involves frequent interaction with others; whether you have close contact with co-workers, students or others; the number of employees who are seeking similar accommodations and the cumulative burden on the District; the risk of spreading the coronavirus; ensuring that employees remain healthy and able to provide services to students; ensuring that students remain healthy; avoiding an outbreak on campus which could lead to a shutdown depriving students from attending in-person instruction.

If you prefer, you may still be vaccinated instead of relying on the above accommodation. If you decide to vaccinate, you must submit **proof of full vaccination status by uploading your vaccine information into Work Day by Monday, January 31, 2022.** If you decline the accommodation offered and choose not to be vaccinated, you may be subject to discipline.

      Please notify the District of your decision by January 8, 2022.

Best,

Aimee Gallagher

Interim Vice Chancellor, Human Resources

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit M

COMPLAINT



## EMPLOYEE RELIGIOUS EXEMPTION FROM VACCINATION REQUEST

Grossmont-Cuyamaca Community College District is committed to the safety and well-being of its employees and students. To promote a safe and healthful workplace, the District is requiring that employees receive a COVID-19 vaccination in order to be physically present on District premises.

Employees with sincerely held religious beliefs, practices, or observances that conflict with the requirement for COVID-19 vaccinations may petition for a religious exemption to the District's COVID-19 Vaccination requirement.

| EMPLOYEE INFORMATION | | | | | |
|---|---|---|---|---|---|
| Name: Patricia Sparks | | College: | ☐ Cuyamaca ☑ Grossmont ☐ District | | |
| Email: patty.sparks@gcccd.edu | | Phone Number: 6198737810 | | Employee ID: | 0022430 |

QUESTIONS (Please answer in your own words):

1. Please describe the nature of your objection to the COVID-19 vaccination requirement.

Taking the covid vaccine is a violation of my sincerely-held religious beliefs. The Lord Jesus Christ bought and purchased my salvation with his sacrifice on the cross, and I am called to offer my own body as a living sacrifice to my Creator. As such, it is against my sincerely-held religious beliefs to defile my body, my temple, with the covid vaccine.

2. Would complying with the COVID-19 vaccination requirement substantially burden your religious exercise or conflict with your sincerely held religious beliefs, practices, or observances? If so, please explain how.

See my response to question 1.

3. How long have you held the religious belief underlying your objection?

Please help me understand how the length of time holding this belief has any impact on my sincerity. What matters is what I believe currently, and this is my sincerely-held belief. My religious beliefs do not need to be consistent, logical, agreeable or even comprehensible to merit Title VII protection against religious discriminatio.

4. Please describe whether, as an adult, you have received any vaccines against any other diseases (such as a flu vaccine or a tetanus vaccine) and, if so, what vaccine you most recently received and when, to the best of your recollection.

While I may have had vaccines in the past, that has no bearing on my current conviction to honor my God-directed prohibition on the Covid vaccine. My religious beliefs do not need to be consistent, logical, agreeable or even comprehensible to merit Title VII protection against religious discrimination.

5. If you do not have a religious objection to the use of all vaccines, please explain why your objection is limited to particular vaccines.

Is this District planning on requiring other vaccines as a condition of employment? If so, please let me know so I can pray about it and ask the Holy Spirit to counsel me and direct my steps in that matter as well. At this moment, I can without hesitation state that my sincerely-held religious beliefs would be violated by my taking the covid vaccine against my God-given conscience.

6. If there are any other medications or products that you do not use because of the religious belief underlying your objection, please identify them.

Please help me understand how this question has any bearing on my own God-required direction to not take the covid vaccine. Is this District planning on my requiring taking other medications as a condition of continued employment? Please let me know of this as soon as possible to I can pray about it for God's direction in my life.

7. Please provide any additional information that you think may be helpful in reviewing your request.

See attached document - Attachment A.

**By signing this form, I acknowledge and agree to the following:**

☒ I understand that providing false information may result in disciplinary action.

☒ I am not requesting any additional accommodation beyond the exemption from Vaccination. I understand that if any additional accommodations are needed, I must make that request separately through Human Resources.

| **Cheryl Detwiler** | **Aimee Gallagher** |
|---|---|
| Human Resources Coordinator | Interim Vice Chancellor of Human Resources |
| (619) 644-7571 | 619-644-7649 |
| *Cheryl.detwiler@gcccd.edu* | *Aimee.gallagher@gcccd.edu* |

☒ If I am exposed or contract COVID-19, I will be required to quarantine or isolate. I also acknowledge that I may be required to submit COVID-19 testing results.

☒ If this exemption is approved, I acknowledge that I will be required to social distance while on campus based on the district and Cal/OSHA guidelines and wear a mask at all times while on campus.

*Patricia Sparks*                    November 30, 2021
Employee Signature                    Date

*Questions may be directed to Interim Vice Chancellor of Human Resources Aimee Gallagher aimee.gallagher@gcccd.edu.*

*Once completed please upload this form to workday.*

Attachment A.

Patricia Sparks
Religious Exemption

1. Title VII of the US Civil Rights Act protects me from being discriminated against at the workplace based on my age, race, gender, ethnicity or religion. (Title IV protects students in educational settings; Title VI applies to institutions receiving funds.)
2. I have a legal federal religious exemption to any activities or "requirements" that violate my sincerely-held religious, ethical or moral beliefs.
3. My beliefs are my beliefs, not those of my church, spiritual leader, church doctrine or religious scholars.
4. 4. My beliefs do not need to be "logical, consistent, agreeable or comprehensible."
5. I do not need to "defend my faith" - I only need to express it. I do not need to make someone understand it.
6. My beliefs are something I think or know to be true; they do not have to established as facts. A fact is not the same as a belief.  My beliefs are protected by law, even if they are not supported by facts.
7. According to the law, "my beliefs are easily established" and "generally not in dispute."  The District should generally accept that my religious beliefs are sincere.
8. Once I notify the District of my legal federal religious exemption, the District is required to provide a reasonable accommodation to my job so I do not have to compromise or violate my religious beliefs.
9. An accommodation is an adjustment to my working conditions, location, hours, etc., so I can continue to work without discrimination and without violating my beliefs.
10. A reasonable accommodation is fair, suitable, appropriate, sensible and not discriminatory.
11. Unpaid leave or "voluntary resignation" is not a reasonable accommodation to my job.
12. A reasonable accommodation would be to continue working just as I have been doing over the last several months according to the accommodation the District imposed upon me.
13. The only way the District does not have to offer me a reasonable accommodation is if:
    a. It poses a significant hardship in terms of money or resources or inability of the institution to conduct its business; or
    b. If I pose a threat to the health and safety of others.
        i. The District has to demonstrate either a significant hardship, or that I am a threat.
        ii. Generalized statements are not sufficient.
        iii. The District needs to demonstrate with verifiable evidence that either a hardship or a threat exists.
        iv. The fact that I have been working over the last several months without posing a hardship or threat means I have already established that this is a situation that can be reasonably accommodated.

14. If the District denies my exemption or refuses to offer a reasonable accommodation, I have the right to appeal that decision.

15. Case law establishes that I have a property right to my job. My job cannot be taken from me without due process of law. That includes the right to appeal a decision by the District.

16. Title VII allows the District to make a "limited inquiry" into the facts and circumstances of my religious beliefs.

17. The District is in violation of Title VII by requesting "unnecessary or excessive corroborating" materials or evidence.

18. If I am placed on unpaid leave, I will immediately file for unemployment. Unemployment for lost wages, not just a lost job.

19. I am notifying you that I am also submitting a formal complaint with the California Department of Fair Employment and Housing.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit N

COMPLAINT

**From:** Patty Sparks
**Sent:** Thursday, January 27, 2022 3:19 PM
**To:** Aimee Gallagher <aimee.gallagher@gcccd.edu>
**Cc:** Kathleen Flynn <Kathleen.Flynn@gcccd.edu>; Colleen Parsons <Colleen.Parsons@gcccd.edu>
**Subject:** RE: Religious Exemption Outcome

I assume I will not be receiving the answer to my questions below.

Can you please either provide the information or tell me you are not going to send the information?

Patty

**From:** Patty Sparks
**Sent:** Tuesday, January 25, 2022 9:07 AM
**To:** Aimee Gallagher <aimee.gallagher@gcccd.edu>
**Cc:** Kathleen Flynn <Kathleen.Flynn@gcccd.edu>; Colleen Parsons <Colleen.Parsons@gcccd.edu>
**Subject:** Religious Exemption Outcome

The burden is on the District to provide its reasoning on why I am too high risk to return to campus. What agency or organization proves that I am a higher risk than anyone else? Please provide this information – I cannot make a decision to your unreasonable demands until I see why the District is determined to force vaccinations.

Patty

**From:** Patty Sparks
**Sent:** Friday, January 21, 2022 11:55 AM
**To:** Aimee Gallagher <aimee.gallagher@gcccd.edu>
**Subject:** RE: Religious Exemption Outcome

Please provide what your definition is of risk of transmission and what "too high" is and please provide your data.

Patty

**From:** Aimee Gallagher <aimee.gallagher@gcccd.edu>
**Sent:** Friday, January 21, 2022 9:19 AM
**To:** Patty Sparks <Patty.Sparks@gcccd.edu>
**Cc:** Bill McGreevy <bill.mcgreevy@gcccd.edu>; Denise Whisenhunt <denise.whisenhunt@gcccd.edu>
**Subject:** Religious Exemption Outcome
**Importance:** High

Dear Patty:

As discussed in our meeting, information from the meeting was provided to your President. After review and discussion, the following determination has been made:

- Remote work is not a reasonable accommodation and is DENIED based on the nature of your specific position and job duties.

    · An accommodation to work on-site unvaccinated is DENIED because the risk of transmission is too high based on your specific position, location and job duties. Specific duties include front desk location; greeting visitors; attendance at in person meetings; assisting with mail delivery and first point of contact for employees submitting forms.

147

- An accommodation to use accrued vacation and/or personal necessity leave, or unpaid leave, through June 30, 2022 is GRANTED. You may use leave to absent yourself from work while the District has a

  vaccination requirement and you remain unvaccinated.  Please notify the District if you will elect to use specified leave.

In reaching its decision, your specific position, location and job duties; whether you work alone, in a group or your work involves frequent interaction with others; whether you have close contact with co-workers, students or others; the number of employees who are seeking similar accommodations and the cumulative burden on the District; the risk of spreading the coronavirus; ensuring that employees remain healthy and able to provide services to students; ensuring that students remain healthy; avoiding an outbreak on campus which could lead to a shutdown depriving students from attending in-person instruction were considered.

If you prefer, you may still be vaccinated instead of relying on the above accommodation.  If you decide to vaccinate, please contact me so that I can work with you and your supervisor on the details and dates of your vaccination appointments**.**  If you decline the accommodation offered and choose not to be vaccinated, the District will initiate termination proceedings.

Please notify the District of your decision by January 28, 2022.

Best,

**Aimee Gallagher, JD**

Interim Vice Chancellor of Human Resources

8800 Grossmont College Drive

El Cajon, CA  92020

aimee.gallagher@gcccd.edu

148

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit O

To SDCCD HR and Management:

The following is my letter requesting consideration for a religious exemption to the COVID-19 vaccine based on my sincerely held belief, and that was mandated as per the approval of our SDCCD board of trustees at the 9/23 meeting.

The reasons for my request are as follows.

My personal religious belief that abortion is an abomination to God and His Will, where by His loving Nature He is the only Giver and Taker of life, from where all life proceeds, through Him and from Him.  Accepting to take these specific available vaccines that have been in one way or another been developed and/or produced with the unholy use of aborted children's cell lines goes deeply against my belief of honoring, praising and obeying God and His Will as THE only Giver and Taker of life.

Accepting taking this drug directly opposes my steadfast belief (Exodus 20:13, Deuteronomy 5:17) 'You shall not kill'.  As my Christian faith has taught me through all my years of Catholic learning going back all the way to my years in parochial school, through high school and beyond, it is through our conscience that God expresses His Will to absolutely everyone us.  And in this case for myself, I cannot act in a way that is against His commandments.   It is for this same reason that I haven't used any over the counter medications or prescription drugs, in some cases, for decades.  It has become my practice to research any medicine that I may be recommended or prescribed to take to ensure that I am consistent in my religious beliefs and actions.

Thus, my personal religious conviction compels me to abstain from any cooperation, direct or indirect, to abortion, which my conscience dictates that the killing of innocents is unholy and goes against God Himself.[1]

My religion is Catholic. The Catholic teachings tell us "vaccination is not, as a rule, a moral obligation and that, therefore, it must be voluntary."[2] Thus, through these teachings, God is instructing us that no one must be forced to take a COVID-19 vaccine, or any other drug through manipulation or coercion.  Scripture teaches that I must keep my body as pure as possible, for our bodies are not our own.  (1 Corinthians 6: 19-20) ' Your body, you know, is the temple of the Holy Spirit, who is in you since you received him from God. You are not your own property; you have been bought and paid for. That is why you should use your body for the glory of God.'

I also am a member of the Catholic organization the Confraternity of Our Lady of Fatima (see attachment below) under the guidance of Bishop Athanasius Schneider who, on this issue of conscience, has come down against any use of the available abortion-derived vaccines because it would be sinful to cooperate, even indirectly, in the crime of abortion.[3]

I must stress, however, that even if I were not Catholic, my personal religious belief would be the same. I cannot have anything to do with vaccines that are connected in any way to the unholy act of abortion. It would constitute an overwhelming crisis of conscience to be forced to be injected with any such vaccine.[4]

For these reasons, therefore, I request that SDCCD accommodate my sincerely held personal religious belief that I cannot take any of the currently available COVID-19 vaccines because of their connection to what I believe to be the grave sin of abortion, which I cannot condone and in which I cannot in any way participate.

Dated: 9/30/2021



_____

---

[1] Included but not limited to the following vaccines:

Johnson & Johnson/Janssen: Fetal cell cultures are used to produce and manufacture the J&J COVID-19 vaccine and the final formulation of this vaccine includes residual amounts of the fetal host cell proteins (≤0.15 mcg) and/or host cell DNA (≤3 ng).

Pfizer/BioNTech: The HEK-293 abortion-related cell line was used in research related to the development of the Pfizer COVID-19 vaccine.

Moderna/NIAID: Aborted fetal cell lines were used in both the development and testing of Moderna's COVID-19 vaccine.

[2] See "Note on the morality of using some anti-Covid-19 vaccines," CONGREGATION FOR THE DOCTRINE OF THE FAITH, December 21, 2020: https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20201221_nota-vaccini-anticovid_en.html (accessed August 17, 2021).

[3] See https://www.livefatima.io/ The crime of abortion is so monstrous that any kind of concatenation with this crime, even a very remote one, is immoral and cannot be accepted under any circumstances by a Catholic once he has become fully aware of it. One who uses these vaccines must realize that his body is benefitting from the "fruits" (although steps removed through a series of chemical processes) of one of mankind's greatest crimes. Any link to the abortion process, even the most remote and implicit, will cast a shadow over a person's duty to bear unwavering witness to the truth that abortion must be utterly rejected. The ends cannot justify the means.

See also affidavit of membership in the Confraternity of Our Lady of Fatima.

[4] As the Equal Employment Opportunity Commission's Guidance on the protection of sincere religious beliefs states, it does not matter whether one's sincere religious belief happens to correspond to that of any denomination or that it might even contradict the teaching of one's denomination. What matters is that one has a sincere religious belief, which I do, concerning the immorality of recourse to abortion-derived vaccines. To quote the EEOC's Guidance document in the Code of Federal Regulations:

The fact that no religious group espouses such beliefs or the fact that the religious group to which the individual professes to belong may not accept such belief will not determine whether the belief is a religious belief of the employee or prospective employee....

Also, I am aware that the United States Supreme Court has held that "[W]e reject the notion that to claim the protection of the Free Exercise Clause, one must be responding to the commands of a particular religious organization." Frazee v. Illinois Dep't of Emp. Sec., 489 U.S. 829, 834, 109 S. Ct. 1514, 1517–18, 103 L. Ed. 2d 914 (1989)(emphasis added). In other words, it is the law of the land that my personal religious belief against vaccination does not have to be supported by any particular religious organization, not even the Church to which I belong. I do not have to show that any particular religion positively forbids me to take a COVID-19 vaccine. My personal religious belief forbids me.



# Affidavit of Membership in the Confraternity of Our Lady of Fatima

This is to certify that

## Carlos de la Lama

Is a perpetual member of the Confraternity of Our Lady of Fatima in good standing and as such holds to the following deeply held religious belief that

*the crime of abortion is so monstrous that any kind of concatenation with this crime, even a very remote one, such as vaccines that use aborted fetal cells for the testing or production, is immoral and cannot be accepted under any circumstances by a Catholic.*

I sign this in perpetuity for all existing and future members and hold that any copies of my signature for this affidavit are as valid as this original.

+Bishop Athanasius Schneider

117 Hollywood Blvd | Steubenville, OH 43952 | Email – info@livefatima.io

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit P

Risk Management,
I am formally exercise my right to have a review process to appeal this decision.  Please confirm receipt of my request for a review.  Thank you for your time.


--

*Carlos de la Lama*
*Department of Mathematics, Chair*
*San Diego City College*
*cdelalam@sdccd.edu*
*619-388-3362*


**From:** SDCCD Risk Management <sdccdriskmanagement@sdccd.edu> **Date:** Tuesday, October 26, 2021 at 12:17 PM **To:** Carlos DelaLama <cdelalam@sdccd.edu> **Subject:** Religious Exemption -- Notice of Denial and Right of Appeal

Dear colleague:
Your request for a religious exemption from the COVID-19 vaccination requirement has been denied. The reason for the denial is summarized as follows:
The information you submitted does not demonstrate that you have a sincerely held religious belief that prevents you from being vaccinated.
If you disagree with this decision, you have the right to request a review by the Religious Exemption Review Committee, which consists of the Vice Chancellor Human Resources, the District Risk Manager, and the Director of Legal Services & EEO.  However, you must request the review within five (5) calendar days of this notice or your right to committee review will be waived. You may request committee review via reply email.
Sincerely,


**SDCCD I Human Resources I Risk Management**
3375 Camino del Rio South, Ste 385
San Diego, CA 92108-3883
(619) 388-6953



http://hr.sdccd.edu/risk/riskindex.cfm

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit Q

COMPLAINT

To Whom It May Concern:

Attached is my filled exemption accommodation questionnaire.

Please advise if you need any additional information. Thank you for your time and consideration.

--
**Carlos de la Lama**
**Department of Mathematics, Chair**
**San Diego City College**
*cdelalam@sdccd.edu*
**619-388-3362**


**From:** SDCCD Risk Management <sdccdriskmanagement@sdccd.edu>  **Date:** Thursday, October 28, 2021 at 4:42 PM  **To:** Carlos DelaLama <cdelalam@sdccd.edu>  **Subject:** Religious Exemption – Appeal Granted

Dear colleague:

The Religious Exemption Review Committee has reviewed your request and granted your appeal. Your request for a religious exemption from the COVID-19 vaccination requirement is approved. Please note that this approval may be revoked at any time should there be a change in District policies and procedures, legal requirements, the threat of COVID-19, or based upon information acquired at a later time or other change in circumstances.

The District will now determine whether it can accommodate your exemption. This involves making a determination regarding options for you to perform the essential functions of your position without being vaccinated. In most cases, allowing an unvaccinated employee to work on-site at District facilities will present an unacceptable threat to the health and safety of others; however, this determination will be made on an individual basis based upon the nature of your position and your duties and available mitigation strategies, if any.

Please complete the attached questionnaire at your earliest convenience and send it back via reply email.  We will also obtain information from your direct supervisor and, if needed, your up-line manager.  If additional information is needed, we will either request it from you in writing or schedule a meeting to discuss with you in more detail. We will advise you in writing when a determination has been made regarding your accommodation.  Please be patient as this is a very challenging time for everyone involved in our efforts to protect our students, employees and community from the treat of COVID-19.

We look forward to working with you throughout this process.

Sincerely,


**SDCCD I Human Resources I Risk Management**
3375 Camino del Rio South, Ste 385
San Diego, CA 92108-3883
(619) 388-6953



http://hr.sdccd.edu/risk/riskindex.cfm

CONFIDENTIALITY NOTICE: Th s commun cat on and  ts attachments may conta n non pub c, conf dent a  or  ega y pr v eged  nformat on. The
un awfu  ntercept on, use or d sc osure of such  nformat on  s proh b ted. If you are not the  ntended rec p ent, or have rece ved th s
commun cat on  n error, p ease not fy the sender  mmed ate y by rep y ema  and de ete a   cop es of th s commun cat on and attachments
w thout read ng or sav ng them.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit R

COMPLAINT



# SAN DIEGO COMMUNITY COLLEGE DISTRICT

**CITY COLLEGE • MESA COLLEGE • MIRAMAR COLLEGE • COLLEGE OF CONTINUING EDUCATION**

## VACCINATION EXEMPTION
## ACCOMMODATION QUESTIONNAIRE

Name: **Carlos de la Lama** [print]

Job Classification: **Certificated**

Assignment/location: **City College**

Supervisor: **Dean Leticia Lopez**

**Employee Section** (Please attach additional sheets if necessary)

Please describe the nature of your work and your duties in your current assignment:

I have a .4 FTEF department chair release time where I have been attending all scheduled meetings via zoom, I teach .6 FTEF of my contract load also online, as well as an overload assignment with required synchronous meeting.  My current spring schedule is the same as my fall'21 schedule.  My chair release time includes scheduling all the department's schedules, running all the department meetings, submit all department text requisitions, develop and run through the curriculum through the process develop dept Master and program review.

Please describe your typical work environment (e.g. outdoors, cubicle, desk in an open office, front counter, classroom, office, driving a vehicle, etc.)

My current work environment is from home due to pandemic circumstances.  My on campus work environment is a single occupancy office where I have done during non covid times both face to face student office hours as well as online zoom office hours.  My office is inside a suite that has a conference room where I give office hours from that conference room.

Please describe the level of interaction your typically have with others while working onsite (select all that apply):

- o Frequent direct contact with students and/or the public while performing my job
- o Frequent direct contact with employees outside my work unit while performing my job
- ⊗ Infrequent direct contact with people outside my work unit while performing my job
- o Frequent direct contact with employees in my work unit while performing my job
- ⊗ Infrequent direct contact with employees in my work unit while performing my job
- o I have never worked onsite

Please explain which of your duties can be performed remotely and which cannot:

Because of my regular online pre-pandemic schedules I was only in contact with my on-campus students during class time, which for the past 14+ years have been on a two-time per week basis.  The bulk of my work was performed in my office.  And in these pandemic times, all all my work has been performed online.

Please describe any mitigating measures that you believe can be implemented, specific to you and your assigned work location, to decrease the chance of COVID-19 transmission due to your

presence in District facilities (for example, arriving earlier and leaving earlier than others; using a designated entrance to enter/exit; alternative work location assignment, etc.):

I have been getting Covid testing at City College every week, receiving a negative results, I have not posed any threat any time I have been on campus

I do not see any obstacle in keeping this pattern.  If I were to test positive, I would quarantine as is required for any employee vaccinated or otherwise.

Because of where I park my car, in the MS bldg, I use the service entrance to enter and exit the building. Only non-custodial employees that have

a submaster key to the bldg, which are less than a handful, use that entrance.  So, my contact with anyone is sparse at best.

Please provide any additional information you would like to be considered:

I do not believe I have anything at this time additionally to add.  But given that something comes to mind, I will communicate this with my supervisor.

_____

_____

_____

Signed: _____        Dated:   ___11/1/2021_____

## **Supervisor Section**

Please provide any additional context to the employee's statement regarding duties, remote work, and mitigating measures that should be considered:

_____

_____

_____

_____

_____

How difficult would it be to accommodate the employee's request? Please explain why and any resources that would be needed or helpful to provide an accommodation:

_____

_____

_____

_____

_____

Please provide any additional information you would like to be considered:

_____

_____

_____

_____

_____

Signed: _____        Dated: _____

## **Upline Manager Section**

Manager Comments:

_____
_____
_____
_____
_____
_____
_____
_____
_____

    __ I Agree with the Accommodation
    __ I Do Not Agree with the Accommodation


Signed: _____   Dated: _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit S

English

Print

# CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

## Employment Discrimination, Harassment, Retaliation

This document is not your proof of submission. Complete the submission process within 30 days to initiate DFEH review. After 30 days, all information provided will be erased from the DFEH website.

### de la Lama / San Diego Community College District

## COMPLAINANT INFORMATION

Name: **Carlos de la Lama**
Address: **1357 Serena Circle Unit 1**
City/State/Zip: **Chula Vista, 91910**
Telephone:
Mobile
Email: **cdelalam@sdccd.edu**

## COMPLAINANT DEMOGRAPHIC INFORMATION

THIS INFORMATION IS OPTIONAL AND IS ONLY USED FOR STATISTICAL PURPOSES
Birthdate: **8/6/1964**
Ethnicity: **Hispanic or Latino**
Gender: **Male**
Language: **English**
Marital status: **Divorced**
National Origin: **Mexican**
Race: **White**
Religion: **Christianity**
Sexual Orientation: **Straight or Heterosexual**

## RESPONDENT AND CO-RESPONDENT(S)

| Name | Address | Telephone | Mobile | Email |
|---|---|---|---|---|
| **San Diego Community College District** | **3375 Camino Del Rio South San Diego, CA 92108** | **(619) 388-6589** | | |

## DATES OF HARM

First Date of Harm: **10/26/2021**
Most Recent Date of Harm: **10/28/2021**
Is the harm continuing?: **Yes**

# I ALLEGE THAT I EXPERIENCED DISCRIMINATION:

English

**Because of my actual or perceived:**
Religious Creed - Includes dress and grooming practices
**As a result I was:**
Denied accommodation for religious beliefs

## Briefly describe what you believe to be the reason(s) for the discrimination, harassment, or retaliation. (Optional)

The nature of the discrimination is the initial denial of granting my federal civil rights to a religious exemption from being vaccinated with the Covid 19 vaccines. After having to file and appeal to this initial decision, and after being put on legal notice of discrimination by a lawyer that a group of over 120 employees contracted, the employer approved the appeal, but has not made a decision on granting our legal accommodations, thus still threatening with being put on leave without pay, if we do not comply to the mandate by their December 1 deadline.

## Following is a list of uploaded document(s)

| Document Name | Update Date/Time |
|---|---|
| **Religious Exemption Notice of Denial** | **11/18/2021 19:41** |
| **Request for accommodations email** | **11/18/2021 19:41** |
| **SDCCD-Letter-10-26-21** | **11/18/2021 19:41** |
| **C de la Lama Vaccination Exemption Accommodation Questionnaire** | **11/18/2021 19:41** |

Do you need special acommodations? **No**
Do you need a language Interpreter? **No**

## Appointment

Contact phone number: **6192461770**
Appointment date: **3/16/2022**
Appointment hour: **3PM-4PM**
Appointment status: **New**

NOT A LEGALLY BINDING DOCUMENT. This document does not constitute proof of filing of a Employment form with the DFEH. For additional information, please visit www.dfeh.ca.gov or contact the DFEH at 800-884-1684.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit T

**From:** Dora Meza <dora.meza@att.net>
**Sent:** Sunday, March 6, 2022 3:41 PM
**To:** Jess Perez <jperez87867@gmail.com>; Mary Kate Planeta <planetamk87@gmail.com>; Patty Sparks <pattywk4@yahoo.com>
**Cc:** Daniel Gutowski <president@sdccdspaa.org>; Carlos de la Lama Gaussguru <sdcity.math.dept@gmail.com>; judy george <judylynn.george@gmail.com>; Kat Bonkowski <planngwaccuracy@yahoo.com>; Gary Kreep <Gary@ggkmail.us>
**Subject:** Re: Community College Complaint-Lead Plain iffs

For San Diego Community College District Employees, we are unable to provide actual copy because we had to utilized our employee portal to complete the following form:

InstructionsFormAttachments

**VACCINATION_EXEMPLTION_FORM**

        *Subject DMEZA Dora Meza

        Priority [3-Standard ∨]                Due Date

        **Status**  Initial

**Vaccination Exemption Request**

I am requesting an exemption from the requirement to be fully vaccinated. I affirm I am telling the truth and I understand a false statement may be considered dishonesty and result in disciplinary action.

I understand that any permissions or accommodations that may be granted to me at this time are temporary and may be modified or revoked as considerations related to COV D-19 and related District policies, procedures and protocols change.

[ ]I have a medical condition that prevents me from being vaccinated at this time

The Risk Management Department will contact employees requesting medical exemptions and accommodations. Please provide your email address below.

167

Gmail - Community College Complaint-Lead Plaintiffs  https://mail.google.com/mail/u/2/?ik=72a8f91129&view=pt&search...

Case 3:22-cv-00424-L-BLM  Document 1  Filed 03/30/22  PageID.168  Page 168 of 416

Email Address:

[ ]I have a sincerely held religious belief that prevents me from being vaccinated at this time

Please attach a document explaining in detail how your sincerely held religious belief prevents you from being vaccinated.

---

**Gary Kreep** <Gary@ggkmail.us>  Wed, Mar 9, 2022 at 4:10 PM

--

*Carlos de la Lama*

**From:** SDCCD Risk Management <sdccdriskmanagement@sdccd.edu>
**Date:** Thursday, January 27, 2022 at 12:10 PM
**To:** Carlos DelaLama <cdelalam@sdccd.edu>
**Cc:** SDCCD Risk Management <sdccdriskmanagement@sdccd.edu>, Leticia Lopez <llopez@sdccd.edu>
**Subject:** Exemption Accommodation Approved

168

Dear Mr. DelaLama:

The Exemption Accommodation Committee has reviewed your request for accommodation and has granted your request, subject to the following:

Your accommodaion is granted through the end of the Spring 2022 semester. This is based on your course assignments, which are fully remote during the Spring 2022 semester.

Accommodations beyond the Spring 2022 semester, if any, will be reevaluated as needed based on then current course assignments, District policies, and other applicable conditions. The granting of an accommodation for the current period does not guarantee any accommodation in the future.

You will perform your duties remotely, including office hours and department meetings.

You will not access any District facili ies in-person. If it is not possible to par icipate in work-related activities remotely (e.g., Flex programs), you will not participate.

Please accept the accommodation, including  he specified conditions, via "reply all" email stating as follows: "I accept the accommodations stated in the email below, including the specified conditions."

Sincerely,

Risk Management

San Diego Community College District

V 619 388 6953   F 619 388 6898

sdccdriskmanagement@sdccd edu



Exhibit U

COMPLAINT

**From:** Gregory Smith
**Sent:** Thursday, June 10, 2021 7:12 PM
**To:** Dora Meza; Dan Gutowski; Aimee Gallagher
**Subject:** RE: Phased-in Reopening Update

Hi Dora,

We were nearly complete with our HR process for vaccination documentation and exemption requests, then the revised Cal OSHA regulations were approved last Thursday, only to be rescinded yesterday. Depending on what their final requirements are, we may need to make some modifications. I hope to have a detailed email out by Friday, June 18th with the procedures.

I have been attending meetings with the Vice Presidents of Student Services and Vice Chancellor Topham on the process for students to schedule and attend in-person appointments. I do not expect staff will be checking vaccination status as students come onsite. I expect we'll have a process for students to submit that documentation electronically before they make an appointment. It may not come from me, but I expect a communication on the process will be sent out once it is finalized. I know it's difficult to plan with several key details undecided. The dynamic nature of this situation and the impact of various public health agencies making decisions that affect us is demanding our patience.

Thank you,

Greg

Gregory Smith
Vice Chancellor, Human Resources
Office: 619-388-6589
Fax: 619-388-6897
gsmith@sdccd.edu

*This email and any files transmitted with it are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via reply email and destroy all copies of the original message.*

**From:** Dora Meza <dmeza@sdccd.edu>
**Sent:** Wednesday, June 9, 2021 9:44 AM
**To:** Gregory Smith <gsmith@sdccd.edu>; Dan Gutowski <dgutowsk@sdccd.edu>; Aimee Gallagher <agallagh@sdccd.edu>
**Subject:** Re: Phased-in Reopening Update

Hi Gregory,

I wanted to follow up on the progress of the return to onsite guidelines; for those who maybe eligible for COVID vaccine exemption. As you maybe aware most campuses are hoping to

welcome the public back on a **July 1**; for some of the student services offices. Admissions, Records, Veterans, Financial Aid , Counseling & EOPS. We will operate in hybrid in the fall. However since the expectation is that 30% will need to come in to serve the public I want to make sure we afford staff impacted with reasonable time to satisfy the exemption.

The second part to this, would be if we could also clarify whether the staff will be expected to require the public to present proof of vaccination or exemption? The question came up since we traditionally serve the public and many of our visitors may have minors with them.


Sincerely,

Dora A. Meza
Student Services Supervisor, I
San Diego City College
Enrollment Services, A-241
Click Here, to submit & process forms


---

**From:** Dora Meza
**Sent:** Monday, May 24, 2021 1:03:06 PM
**To:** Gregory Smith
**Subject:** Re: Phased-in Reopening Update

Thank you, in my 20+ years working within DO; I have never recalled such an environment in which people genuinely expect individuals to have to disclose HIPPA protected information. I just shake my head, from the name calling I have been seeing, to people going as far as asking for us to limit the number of individual in a restroom or card them. Just WOW!

Sincerely,

Dora A. Meza
Student Services Supervisor, I
San Diego City College
Enrollment Services, A-241
Click Here, to submit & process forms

**From:** Gregory Smith
**Sent:** Monday, May 24, 2021 12:56:55 PM
**To:** Dora Meza
**Subject:** RE: Phased-in Reopening Update

Hi Dora,

Thank you for the feedback. I was trying to draw attention to the most important parts of the message for the people who might just skim it. I will be sending out a more detailed message on the process for exemptions and accommodations that I hope will eliminate any confusion. I will also send out an update when the FDA announces a full authorization for any of the vaccines.

Greg

Gregory Smith
Vice Chancellor, Human Resources
Office: 619-388-6589
Fax: 619-388-6897
gsmith@sdccd.edu

*This email and any files transmitted with it are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via reply email and destroy all copies of the original message.*

**From:** Dora Meza <dmeza@sdccd.edu>
**Sent:** Monday, May 24, 2021 12:42 PM
**To:** Gregory Smith <gsmith@sdccd.edu>
**Subject:** Re: Phased-in Reopening Update

Hi Gregory,

Is there a reason why you bold out that employee are required to be vaccinated if they are working on campus in fall but then add or have an approved exemption? I have been in several meetings where individuals have assumed the vaccination is required simply because they focus on the bold language in the communication. Yet the reality is that no vaccine is FDA approved, if anything we should make sure everyone understands, and policy & policing isn't expected.
Dora Meza
Student Services Supervisor I

On May 24, 2021, at 12:29 PM, Gregory Smith <gsmith@sdccd.edu> wrote:

Hello SDCCD Community,

On Tuesday, May 18th, Chancellor Carroll announced the District's phased-in return to onsite activities will begin July 1st. We have received many questions about the vaccination requirement and requests for additional details. This is a brief update to answer the most pressing questions. We understand this does not address all the questions you have; further details will be shared over the coming weeks to provide specific steps for verifying vaccination, requesting exemptions and accommodations, and other important information.

The vaccination requirement is for students and employees returning to onsite activities beginning July 1st. **No one will lose their job because they are not vaccinated** as the District begins the phased-in reopening process in the fall semester.

Employees in several areas have been performing essential job duties onsite that could not be completed remotely throughout the COVID pandemic. Employees that have been required to work onsite for essential duties will continue to work onsite as they have during the pandemic and will not be required to be vaccinated. **We strongly encourage all employees who are able to get vaccinated**. All employees have leave time available for vaccination appointments and related illness without using accrued sick leave through December 31, 2021.

Employees who have agreed to return to onsite instruction, student services, and work beginning July 1st **will be required to be vaccinated** or have an approved exemption and a reasonable accommodation which allows onsite work. Employees who have not been vaccinated will only be allowed to work onsite when performing essential duties that cannot be performed remotely, unless an exemption has been granted and a reasonable accommodation can be made that ensures safety.

There are two vaccination exemptions that will be considered: medical reasons and sincerely held religious beliefs. No other form of exemption, including personal preference, will be considered.

Throughout the fall semester, **all individuals onsite at a District facility will be required to wear face coverings**. While the Centers for Disease Control (CDC) and state and local public health agency requirements regarding face coverings for fully vaccinated individuals may change over the summer and fall, this District will continue to require face coverings because we will continue to have some unvaccinated individuals onsite. This requirement will help provide a safe working environment for everyone and help prevent the spread of COVID-19 as we increase onsite activities.

Physical distancing requirements will be maintained following CDC and state and local public health guidance. Managers and supervisors may use a combination of methods to maintain physical distance in workspaces including flexible remote and onsite work schedules, staggering onsite and remote work schedules among employees, and reconfiguring desks and reassigning workspaces where current configurations do not provide sufficient space.

**<u>HVAC systems in all facilities throughout the District have been upgraded to meet the air filtration standard recommended by the CDC</u>** (MERV 13) to remove air particles carrying the coronavirus. All facilities are being cleaned with products approved for eliminating particles carrying the coronavirus. All employees will have access to sanitation supplies in their work area while working onsite.

Many people are excited for the opportunity to return to onsite work and activities. Many people are also concerned about the potential health risks of working onsite. Phasing-in onsite activities with a vaccination requirement, continued use of face coverings and physical distancing protocols, and enhanced cleaning and air filtration will enable the District to provide more classes and services onsite in a safe, responsible manner.

Thank you,

Greg

Gregory Smith
Vice Chancellor, Human Resources
Office: 619-388-6589
Fax: 619-388-6897
gsmith@sdccd.edu

<image001.png>

*This email and any files transmitted with it are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via reply email and destroy all copies of the original message.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit V

COMPLAINT

**From:** hrprd@sdccd.edu <hrprd@sdccd.edu>
**Sent:** Thursday, July 1, 2021 2:37 PM
**To:** Dora Meza
**Subject:** Form VACEXEMPT has been Approved

Form VACEXEMPT has been approved.  Details are shown below:

Subject: DMEZA Dora Meza
Due Date: 2021-09-20
Requester: DMEZA

Please contact the Human Resources Division with any questions.

(This message was automatically generated by Form and Approval Builder on 2021-07-01 at 14.37.50.000000.  Please do not reply to this email.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit W

COMPLAINT

**From:** Gregory Smith
**Sent:** Friday, August 20, 2021 3:10 PM
**Subject:** PLEASE READ: Fall Semester Health and Safety Protocols - UPDATE

Hello SDCCD Community,

This email provides more specific information on the health and safety protocol announcements made in Chancellor Turner Cortez's "CORONAVIRUS/COVID-19: UPDATE #23" email on Tuesday, August 10th.

Below you will find important information regarding:
1. **Phased-in Reopening During the Fall Semester**
2. **Current COVID-19 Data Informing District Protocols**
3. **COVID-19 Vaccination and Testing Protocols for Employees and Students**
4. **Instruction and Student Services Operations for the Fall Semester**
5. **Planning for Spring 2022**

**Please read this entire email carefully.**

Since the District was forced to suspend in-person instruction and services in March 2020, the extraordinary efforts of Faculty, Classified Professionals, Supervisors, and Managers have allowed us to continue successfully serving many of our students and community members. Our students have been resilient, creative, and determined as they have figured out ways to continue their education online and remotely. While many students have been able to make the transition successfully, too many of our students have been overwhelmed by the physical and mental health impacts of COVID-19, job loss and financial insecurity, child and adult care needs, housing and food insecurity, and inadequate access to the technology resources necessary to participate and succeed in an online and remote educational environment. The negative impacts have not been experienced equally across our communities and our most vulnerable students have suffered much worse outcomes in too many instances.

Our efforts to reopen the District safely are directly and specifically focused on serving the students and communities most negatively impacted by COVID-19 and most in need of our onsite, in-person instruction and services. The California Community College system and the San Diego Community College District are unique in our mission to offer everyone an opportunity to pursue and complete their higher education goals and transform their quality of life. Striving to reopen our District safely, while we continue to deal with the evolving COVID-19 pandemic, is an ambitious and complex endeavor. It is what our communities need and a challenge we can meet.

**Summary of Key Health and Safety Protocols and Phased-In Reopening Timelines**

For quick review, here are the health and safety protocols for the San Diego Community College District during the fall semester. Further details are covered in the subsequent sections of this email.

- **All students must be vaccinated or have a negative COVID-19 test** within the prior seven (7) days to attend in-person instructional activities or appointments for services.
- **All employees must be vaccinated or have a negative COVID-19 test** within the prior seven (7) days, regardless of work location, including remote work assignments.

- All employees, students, and visitors to a District facility must self-screen for COVID-19 symptoms and stay away from any District facility if they reasonably suspect they are experiencing COVID-19 symptoms.
- **All individuals must wear face coverings** while indoors, while outdoors and unable to maintain at least six (6) feet of distance from others, while riding in vehicles with others, and as further explained in the District's COVID Prevention Plan (see page 10), regardless of vaccination status.
- In-person services to students, prospective students, and the public reasonably expected to last 15 minutes or more will be conducted by appointment, including verification of vaccination or a negative COVID-19 test within the prior seven (7) days. In-person reception and services reasonably expected to be provided in less than 15 minutes may be provided without an appointment and without verification of vaccination or a negative COVID-19 test.
- The District will provide face coverings to any individual who does not have an acceptable face covering while onsite.
- The District will provide a N-95 face mask to anyone who requests one and provide employees access to training on proper use of N-95 masks.
- Beginning August 16th, employees may be required to return to in-person work assignments up to two (2) days per week.
- Beginning September 7th, employees may be required to return to in-person work assignments up to four (4) days per week.
- Beginning September 20th, employees may be required to return to in-person work assignments up to full-time.
- Workplace flexibilities, including modified days, hours, onsite, remote work assignments may continue to be used during the fall semester as a safety measure to decrease the number of people present in workspaces, classrooms, and other facilities and provide greater physical distancing.

As we continue welcoming students and prospective students back to our campuses, it is important to remember that no one safety measure is 100% effective at preventing the spread of COVID-19. It is the consistent use of a combination of measures that keeps us all safe. Getting vaccinated, testing regularly, wearing face coverings, maintaining physical distance, upgrading air filtration systems, avoiding unnecessary extended close contacts, staying away when we do not feel well, sanitizing and disinfecting more frequently, washing our hands and practicing good hygiene...all of these proactive measures working together will ensure we have safe and healthy work and education environments. Please join us in a community of compassion and mutual respect and keep yourself and others safe by following these protocols.

## Phased-In Reopening During the Fall Semester

On July 1st, we announced a return-to-onsite work timeline and health and safety protocols for the fall semester. In the seven weeks since then, the Delta variant has resulted in a significant increase in the COVID-19 infection rate around the world and in San Diego County. While our county is benefitting from relatively high vaccination rates among eligible adults as compared to other regions of the United States, the sudden and dramatic rise in COVID-19 infections requires us to amend our protocols with key protections for all employees, students, and visitors to our campuses.

Many courses planned for in-person and hybrid instruction in the fall are proceeding as planned. With the incredible efforts of our Educational Services, IT, and Marketing professionals, over 86% of the students (more than 8,300 individuals) who have enrolled in these courses have provided and been cleared with valid vaccination documentation and approved medical exemptions.

Onsite Student Services are resuming in a limited capacity at each of the colleges. Over the course of the semester, we expect to be able to gradually increase the available services and number of students we can serve. Each college is creating and updating plans to adapt the ways we meet and receive current and prospective students, schedule and conduct appointments for services, and engage with each other in-person with multiple layers of health and safety protections in place.

As our local public health conditions change, our plans will evolve, we will learn and adapt, and we will continue to pursue a safe and full reopening of our District.

**Current COVID-19 Data Informing District Protocols**

Throughout the spring, COVID-19 cases in San Diego County declined dramatically, allowing us to accelerate our phased-in reopening plans. As the state initiated its reopening plan on June 15th and the Centers for Disease Control (CDC) announced fully vaccinated individuals could remove their face coverings and gather without physical distancing, the Delta variant was spreading across the country. Over the course of July, we have observed case rates increase from fewer than two per 100,000 residents to over 50. However, unlike previous periods of rapid spread of COVID-19, the current spread is occurring overwhelmingly among individuals who are not vaccinated.

In the last week of July (25th through the 31st), there were 55.7 average daily cases of COVID-19 among unvaccinated individuals in San Diego County. During that same time, the case rate among fully vaccinated individuals was 6.0. From July 19th through August 17th, there were 28,686 COVID-19 cases in the county, 89% (25,606) of those cases were among individuals who are not vaccinated.

Currently, more than 2.1 million residents have received at least one dose of a COVID vaccine in the county and just over 700,000 residents are unvaccinated. Over the last 30 days there have been 3,080 cases among 2.1 million vaccinated residents and 25,606 cases among 700,000 unvaccinated residents. That is 14 cases per 10,000 vaccinated residents and 3.6 cases per 100 unvaccinated residents.

The data in our county are clear, the risk of COVID-19 infection is exponentially higher for our unvaccinated employees, students, and community members. As a result, our health and safety protocols are being adjusted to provide protections where they are needed most.

State and local COVID-19 case data, along with cases among the District's employees and students, are updated weekly on our website: https://www.sdccd.edu/about/departments-and-offices/human-resources/risk-management/covid-employees.aspx.

**COVID-19 Vaccination and Testing Protocols for Employees**

With the Delta variant impacting our unvaccinated populations so significantly, as announced by Chancellor Turner Cortez, **the District will require all employees who have not provided proof of vaccination to be tested for COVID-19 weekly effective August 30th**. If you have not provided your vaccination confirmation or vaccination exemption form, please do so promptly. More information

about completing this process is available
here: https://www.sdccd.edu/docs/HumanResources/risk/Vaccination%20Form%20FAQs.pdf

This requirement applies to all employees, regardless of the reason they are unvaccinated and their
work location. This means employees teaching and working remotely must be tested for COVID-19
weekly.

This follows District policies for TB testing, background checks, sexual harassment training, and other
requirements that apply to everyone regardless of work location We must all be ready to report to work
onsite if needed and this requirement will ensure we can do so safely. With emergency provisions for
remote Brown Act meetings ending in September, some participatory governance meetings will be
required to resume onsite and in-person. As we phase-in more in-person services, fewer work
assignments will be able to be performed remotely. By getting vaccinated or testing for COVID-19
regularly, we are serving the best interests of the health and safety of our community.

**Employees who have not provided documentation showing they are fully vaccinated are directed to
be tested for COVID-19 weekly. Testing must occur during an employee's paid work time**.

Supervisors may direct when Classified Professionals, NANCE, and other employees in hourly pay
positions are released from their regular duties to get tested, so long as it occurs during their regularly
scheduled work shift. Employees are not authorized to earn overtime to get tested for this requirement.
Supervisors may authorize overtime when needed for employees to complete work that could not be
conducted during regular work shifts due to attending a testing appointment.

Faculty, exempt Professionals, Supervisors, and Managers must schedule testing appointments to avoid
interfering with their work assignments to the extent possible. For example, a manager should not
schedule a testing appointment in conflict with a meeting they are typically required or expected to
attend and faculty should not schedule testing appointments during synchronous class sessions.

**Beginning August 30th, the District will provide onsite COVID-19 testing at no cost to employees during
regular business hours** at City College, Mesa College, and Miramar College. If possible, the District will
provide onsite COVID-19 testing at or near the District Office, District Service Center, and District Police
Department. Where possible, the District will provide onsite COVID-19 testing at Continuing Education
facilities. Our ability to provide onsite testing at a specific location depends on meeting a minimum
number of testing appointments, so some sites will not have onsite testing available.

Specific details on testing locations, days and hours, procedures for making a testing appointment, and
guidance related to the testing requirement are being finalized and will be communicated in a follow up
message the week of August 23rd.

Employees may choose to be tested at any available COVID-19 testing location to comply with this
requirement. While COVID-19 testing is covered by medical insurance or federal funding in most
cases, **employees who choose to be tested at an alternative site will not be reimbursed for any tests
costs they incur**. San Diego County has numerous free public testing sites located throughout the
county. A full schedule of testing locations, days and hours of operation, and walk up or drive up
services is available
online: https://www.sandiegocounty.gov/content/sdc/hhsa/programs/phs/community_epidemiology/d
c/2019-nCoV/testing/testing-schedule.html

Specific directions on how employees who are tested at an alternative testing location will provide documentation they have been tested will be provided in a follow up message next week. Employees who are not fully vaccinated or have not provided documentation of vaccination need to be tested the week of August 23rd to be compliance when this requirement becomes effective on August 30th.

**Employees required to be tested weekly who fail to comply with this requirement will be placed on unpaid administrative leave until they have been tested.** Human Resources will monitor compliance with this requirement and notify employees, managers, and supervisors as needed when an employee will be placed on unpaid leave.

**At this time, fully vaccinated employees who have submitted their valid documentation, are not required to be tested for COVID-19.** Any employee may choose to participate in testing provided by the District voluntarily at no cost.

**COVID-19 Vaccination and Testing Protocols for Students and the Public**

**All students participating in onsite instruction and individuals attending student services appointments must be vaccinated or tested for COVID-19 within the prior seven (7) days.** Students have been notified of this requirement by Educational Services, which is effective August 23rd.

Faculty teaching in-person and hybrid courses will be notified when students are not cleared to participate in in-person instructional activities. Students will receive notifications and reminders each week of this requirement and will be notified when they are not cleared for in-person instruction. Additional details on how Faculty, Classified Professionals, and others who need to know a student's clearance status will be provided in a follow up communication.

**At this time, fully vaccinated students who have submitted their valid documentation, are not required to be tested for COVID-19.** Any student may choose to participate in testing provided by the District voluntarily.

**Student Services Operations for the Fall Semester**

During the fall semester, services to students will be conducted remotely or via appointment with vaccination clearance or a negative COVID-19 test within the prior seven (7) days. Services and information that may be provided briefly (reasonably expected to require less than 15 minutes) will be provided at welcome stations following the District's health and safety protocols. Services that require more than 15 minutes will be conducted by appointment with confirmation of vaccination or a recent negative COVID-19 test.

**Procedures for confirming an individual's vaccination or testing clearance will be provided in a follow up communication**.

Each College is currently planning for phased-in onsite services for students and the public, including general and program-specific counseling services. The Colleges will coordinate the availability of in-person services for consistency. Reopening plans are reviewed and approved by the District's Risk Management Department for compliance with the health and safety protocols and the COVID Prevention Plan.

**Planning for Spring 2022**

Our goal is to fully resume onsite activities in the spring 2022 semester. The fall semester will be an important time for everyone to participate in the planning. Announcements on spring 2022 operations will be made with as much advanced notice as possible, including whether the vaccination and testing requirements will continue.

Earlier this week the U.S. Department of Health and Human Services announced vaccine booster doses will be available in the fall. The District will monitor this development and provide further information on how this will impact our definition of "fully vaccinated" and the COVID-19 testing requirement.

Please look for follow up messages next week with more specific details about the District's onsite testing program.

Thank you,

Greg


Gregory Smith
Vice Chancellor, Human Resources
Office: 619-388-6589
Fax: 619-388-6897
gsmith@sdccd.edu


*This email and any files transmitted with it are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via reply email and destroy all copies of the original message.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit X

COMPLAINT

**From:** Carlos Cortez
**Sent:** Wednesday, September 29, 2021 8:36 AM
**To:** Dora Meza
**Subject:** Re: Response to Public Comment

Dora-

Thank you for the recommendation. I will be sure to take it back to the leader ship team for consideration.

Get Outlook for iOS

---

**From:** Dora Meza <dmeza@sdccd.edu>
**Sent:** Wednesday, September 29, 2021 7:59:03 AM
**To:** Carlos Cortez <ccortez@sdccd.edu>
**Subject:** RE: Response to Public Comment

Hi Carlos,

I respectfully request that the mandate be expanded to include fully vaccinated employees; in order to be consistent with purpose which is to protect our community. The science shows that fully vaccinated individuals can get and spread delta. Considering the positive test at Mesa and the increase social events in which large number of SDCCD employees have gathered without a mask, simply because they do not know they are infected.

PS: Although I think the mandate in its current form targets those who are in protected classes, I have tested weekly regardless of the side effects as required by District.

Dora

**From:** Carlos Cortez <ccortez@sdccd.edu>
**Sent:** Tuesday, September 28, 2021 5:26 PM
**Subject:** Response to Public Comment

Colleauge:

Thank you for offering public comment at the Thursday, September 23rd meeting of the Board of Trustees.

The vaccination requirement for employees was implemented this past summer. At last week's meeting, the Board of Trustees has authorized me as chancellor to implement consequences for employees who chose not comply. I appreciate your concerns regarding the vaccination requirement. The District values the safety of employees and students. We are acting therefore to protect our community. The vaccination requirement will remain in place.

Regards,
Carlos

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit Y

COMPLAINT



**From:** Ljubisa Kostic
**Sent:** Wednesday, November 3, 2021 3:39 PM
**To:** Dora Meza
**Cc:** Dan Gutowski; Aimee Gallagher
**Subject:** Re: Response Religious Exemption -- Notice of Denial and Right of Appeal

Hi Dora,

We have your appeal in the queue, and a decision will be provided to you this week. We
appreciate your patience as we work through a large volume of requests.

Kind regards,

*Ljubiša Kostić*
Director, Legal Services and Equal Employment Opportunity
San Diego Community College District
V 619-388-6591   F 619-388-6898

> On Nov 3, 2021, at 9:47 AM, Dora Meza <dmeza@sdccd.edu> wrote:
>
> Hi Ljubisa,
>
> I have not received any additional details such as dates or instructions for the appeal tribunals. If you are not the point of contact, could you forward my email to who I would be directing my questions to. Thanks
>
> Dora
>
> ---
>
> **From:** Ljubisa Kostic <lkostic@sdccd.edu>
> **Sent:** Friday, October 15, 2021 7:40 PM
> **To:** Dora Meza <dmeza@sdccd.edu>
> **Cc:** Dan Gutowski <dgutowsk@sdccd.edu>; Aimee Gallagher <agallagh@sdccd.edu>
> **Subject:** RE: Response Religious Exemption -- Notice of Denial and Right of Appeal
>
> Dora,
>
> With regard to the first exemption that you submitted when vaccination was non-mandatory, which was temporarily granted, you were provided an accommodation. No additional information was required at that time. However, per the communications from the VCHR, the District is requiring resubmission now that it has a vaccination requirement, and we appreciate your resubmission.  The District will engage in an interactive process with those employees whose exemptions are granted, but will not be doing so with employees whose exemptions are denied.
>
> Kind regards,

*Ljubiša Kostić*

Director, Legal Services and Equal Employment Opportunity

3375 Camino del Rio South, Room 385

San Diego, CA 92108

V 619-388-6591   F 619-388-6898

lkostic@sdccd.edu


<image001.png>

This email and any files transmitted with it are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via reply email and destroy all copies of the original message.

---

**From:** Dora Meza <dmeza@sdccd.edu>
**Sent:** Wednesday, October 13, 2021 3:41 PM
**To:** Ljubisa Kostic <lkostic@sdccd.edu>
**Cc:** Dan Gutowski <dgutowsk@sdccd.edu>; Aimee Gallagher <agallagh@sdccd.edu>
**Subject:** RE: Response Religious Exemption -- Notice of Denial and Right of Appeal


Hi Ljubisa,

Respectfully, in a nonbiased process. The moment there is a work requirement that conflicts with the employees religious beliefs, we have the right to submit a request for accommodation. Within the scope of my original approved religious exemption dated July 1, 2021; I was never afforded the opportunity to a formal interactive process similar to that of disability.


As you previously mentioned this approval, would have allowed me the opportunity to describe and discuss my accommodation needs. This would have allow my supervisor, managers and risk management the opportunity to examine whether there would be a need for a work or site adjustments or simply recognize that my accommodation could be reasonably supported and not an undue hardship to my employer.

190

The districts failure to afford me the opportunity to engage in an interactive accommodation request as established by Title VII of the Civil Rights Acts of 1964, in support my original request. As a result of this failure my most recent submission, subsequently resulted in a denial. Can you provide me with a copy of the established interactive processes that was in place for religious exemptions prior to or as of July 1 ,2021, when my exemption was originally approved.

Dora

---

**From:** Ljubisa Kostic <lkostic@sdccd.edu>
**Sent:** Wednesday, October 13, 2021 2:54 PM
**To:** Dora Meza <dmeza@sdccd.edu>
**Cc:** Dan Gutowski <dgutowsk@sdccd.edu>; Aimee Gallagher <agallagh@sdccd.edu>
**Subject:** RE: Response Religious Exemption -- Notice of Denial and Right of Appeal

Hi Dora,

An employee is not entitled to an accommodation unless an exemption is granted. It is similar to establishing a disability before an accommodation is required. I will retain your document in the event the committee overturns the denial of your request.

Kind regards,

*Ljubiša Kostić*

Director, Legal Services and Equal Employment Opportunity

3375 Camino del Rio South, Room 385

San Diego, CA 92108

V 619-388-6591   F 619-388-6898

lkostic@sdccd.edu

This email and any files transmitted with it are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via reply email and destroy all copies of the original message.

---

**From:** Dora Meza <dmeza@sdccd.edu>
**Sent:** Wednesday, October 13, 2021 2:51 PM
**To:** Ljubisa Kostic <lkostic@sdccd.edu>
**Cc:** Dan Gutowski <dgutowsk@sdccd.edu>; Aimee Gallagher <agallagh@sdccd.edu>
**Subject:** RE: Response Religious Exemption -- Notice of Denial and Right of Appeal

Hi Ljubisa,

Being that the current exemption process fails to allow the employee to inform the employee of an accommodation need here is my formal notice to SDCCD.

Dora Meza

Acting Student Services Supervisor II,

Enrollment Services-Admissions, Records, Veterans Office

San Diego City College

Click Here, to submit & process forms

<image002.png>
<image003.png>

---

**From:** Ljubisa Kostic <lkostic@sdccd.edu>
**Sent:** Wednesday, October 13, 2021 2:18 PM
**To:** Dora Meza <dmeza@sdccd.edu>
**Cc:** Dan Gutowski <dgutowsk@sdccd.edu>; Aimee Gallagher <agallagh@sdccd.edu>
**Subject:** RE: Response Religious Exemption -- Notice of Denial and Right of Appeal

Hi Dora,

Thank you for your quick response. The committee will review your submission and render a decision. If additional information is needed, you will be advised in writing.

Kind regards,

*Ljubiša Kostić*

Director, Legal Services and Equal Employment Opportunity

3375 Camino del Rio South, Room 385

San Diego, CA 92108

V 619-388-6591   F 619-388-6898

lkostic@sdccd.edu

<image001.png>

This email and any files transmitted with it are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via reply email and destroy all copies of the original message.

---

**From:** Dora Meza <dmeza@sdccd.edu>
**Sent:** Wednesday, October 13, 2021 12:56 PM
**To:** Ljubisa Kostic <lkostic@sdccd.edu>
**Cc:** Dan Gutowski <dgutowsk@sdccd.edu>; Aimee Gallagher <agallagh@sdccd.edu>
**Subject:** RE:Response Religious Exemption -- Notice of Denial and Right of Appeal

I would like to formally submit my disagreement to the decision made. In order to prepare I would am requesting a list of questions and details on the measurement currently and previously used by district to meet the criteria:

"Determine sincerely held religious belief that prevents me from being vaccinated with COVID VACCINE"

Respectfully,

Dora Meza

---

**From:** Ljubisa Kostic <lkostic@sdccd.edu>
**Sent:** Wednesday, October 13, 2021 12:49 PM
**To:** Dora Meza <dmeza@sdccd.edu>
**Subject:** Religious Exemption -- Notice of Denial and Right of Appeal

Dear colleague:

Your request for a religious exemption from the COVID-19 vaccination requirement has been denied. The reason for the denial is summarized as follows:

The information you submitted does not demonstrate that you have a sincerely held religious belief that prevents you from being vaccinated.

If you disagree with this decision, you have the right to request a review by the Religious Exemption Review Committee, which consists of the Vice Chancellor Human Resources, the District Risk Manager, and the Director of Legal Services & EEO.  However, you must request the review within five (5) calendar days of this notice or your right to committee review will be waived. You may request committee review via reply email.

Sincerely,

*Ljubiša Kostić*

Director, Legal Services and Equal Employment Opportunity

3375 Camino del Rio South, Room 385

San Diego, CA 92108

V 619-388-6591   F 619-388-6898

lkostic@sdccd.edu

This email and any files transmitted with it are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via reply email and destroy all copies of the original message.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit Z

COMPLAINT



## Fw: Religious Exemption – Appeal Granted

1 message



**From:** SDCCD Risk Management
**Sent:** Friday, November 5, 2021 3:02 PM
**To:** Dora Meza
**Subject:** Religious Exemption – Appeal Granted

Dear colleague:

The Religious Exemption Review Committee has reviewed your request and granted your appeal. Your request for a religious exemption from the COVID-19 vaccination requirement is approved. Please note that this approval may be revoked at any time should there be a change in District policies and procedures, legal requirements, the threat of COVID-19, or based upon information acquired at a later time or other change in circumstances.

The District will now determine whether it can accommodate your exemption. This involves making a

determination regarding options for you to perform the essential functions of your position without being vaccinated. In most cases, allowing an unvaccinated employee to work on-site at District facilities will present an unacceptable threat to the health and safety of others; however, this determination will be made on an individual basis based upon the nature of your position and your duties and available mitigation strategies, if any.

Please complete the attached questionnaire at your earliest convenience and send it back via reply email.  We will also obtain information from your direct supervisor and, if needed, your up-line manager. If additional information is needed, we will either request it from you in writing or schedule a meeting to discuss with you in more detail. We will advise you in writing when a determination has been made regarding your accommodation.  Please be patient as this is a very challenging time for everyone involved in our efforts to protect our students, employees and community from the treat of COVID-19.

We look forward to working with you throughout this process.

Sincerely,

**SDCCD I Human Resources I Risk Management**
3375 Camino del Rio South, Ste 385
San Diego, CA 92108-3883
(619) 388-6953



http://hr.sdccd.edu/risk/riskindex.cfm

CONFIDENTIALITY NOTICE: This communication and its attachments may contain non-public, confidential or legally privileged information. The unlawful interception, use or disclosure of such information is prohibited. If you are not the intended recipient, or have received this communication in error, please notify the sender immediately by reply email and delete all copies of this communication and attachments without reading or saving them.

**Vaccination Exemption Accommodation Questionnaire (002).pdf**
139K

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit AA

COMPLAINT



# SAN DIEGO COMMUNITY COLLEGE DISTRICT

### CITY COLLEGE • MESA COLLEGE • MIRAMAR COLLEGE • COLLEGE OF CONTINUING EDUCATION

## VACCINATION EXEMPTION
## ACCOMMODATION QUESTIONNAIRE

Name: _____ [print]
Job Classification: _____
Assignment/location: _____
Supervisor: _____

**Employee Section** (Please attach additional sheets if necessary)

Please describe the nature of your work and your duties in your current assignment:

Responsible for coordinating the activities of all personnel in student services for both day and eveningshifts and for establishing policies and procedures for the entire college student services operation of Enrollment Services which consist of Admissions, Records & Veterans. Develop and administer foreign student admissions programs. Recommend and monitor budget expenditures for Enrollment Services. Supervise the maintenance of permanent student records. Develop procedures, forms, and facilities for the admission of students and transmittal of records; coordinate admissions activities with college department heads in counseling, accounting, data processing, and instructional services. Plan and direct the admissions and student records activities for a college, including special programs or for the districtwide central student records function; coordinate activities with satellite campuses

Please describe your typical work environment (e.g. outdoors, cubicle, desk in an open office, front counter, classroom, office, driving a vehicle, etc.)

In March 2020, the campus transitioned to remote services,. Enrollment services was tasked to utilize various software available to convert in-person support services to remote enviorment. Google Voice- relaced in office phone, Zoom replaced the need for in-person interaction,/meetings JIRA- replaced the need for in-person submission of forms, department emails replaced in-person inquiry, PeopleSoft in-person supports all elements of admissions, enrollment, residency, veterans, personel managment, DocSign-secure method of transmissing documents that require to be authenticated. Both in my Acting role and in my traditional role of SSSI . I have continued to perform all aspects of my duties remotely/safetly in person. I have a private office and opperate remotely several days away.

Please describe the level of interaction your typically have with others while working onsite (select all that apply):
- o  Frequent direct contact with students and/or the public while performing my job
- o  Frequent direct contact with employees outside my work unit while performing my job
- o  Infrequent direct contact with people outside my work unit while performing my job
- o  Frequent direct contact with employees in my work unit while performing my job
- o  Infrequent direct contact with employees in my work unit while performing my job
- o  I have never worked onsite

Please explain which of your duties can be performed remotely and which cannot:

I successfully have performed all  duties remotely; with the use of technology implemented in 2020. I can continue if necessary to perform my duties remotely. I volunteered in July to return to in-person because we were told their was a high volume of students requiring in-person. support. Since operating partially remotely and in-person, the office only sees about 3-10 visitors and most are asking to be directed to another department on campus. 100% of my duties can be performed online as I did for 15 months. I am available to trouble shoot and suppot students via email, zoom & phone. I still assist with the trouble shooting and correcting of records for staff, faculty administrators via zoom, email, TEAMS, & phone

Please describe any mitigating measures that you believe can be implemented, specific to you and your assigned work location, to decrease the chance of COVID-19 transmission due to your

presence in District facilities (for example, arriving earlier and leaving earlier than others; using a designated entrance to enter/exit; alternative work location assignment, etc.):

As a condition to return to campus as a volunteer and later a condition to receive pay; I'm subject to intrusive medical procedures without cause. The district previously implemented a self assessment process, similuar to that of CA SB1038 (TB) in which individuals where ask to monitor their symptoms and if they either displayed or where esxposed to a positive COVID individual to test and quarentine. Due to the disinformation being disiminated through out the district . I undergo weekly test, because I am not vaccinated, which district falsely lables me a danger because of my medical status. . Vaccinated individuals can contract and transmit the virus, yet not required to test. No evidence has been provided that my presence on the campus has resulted on a positive covid or increased the chance of transmitting COVID, I have continuously tested NEGATIVE. However I am willing to return to work remotely if necessary.

Please provide any additional information you would like to be considered:

My request ot either continue working as I have or to return to remote "alternative work site" will not cause an unde hardship to my employer since I have been successfully did remote for 15 months and on campus for 15 weeks. I am including the copy of all my negative test  results , which clearly demonstrate there was no need for the intrusive medical procedure since I tested NEGATIVE. I should not be forced to choose between my sincerely held religious beliefs and my ability to continue doing my job

_____

Signed: _____     Dated: _____

**<u>Supervisor Section</u>**

Please provide any additional context to the employee's statement regarding duties, remote work, and mitigating measures that should be considered:

_____
_____
_____
_____
_____

How difficult would it be to accommodate the employee's request? Please explain why and any resources that would be needed or helpful to provide an accommodation:

_____
_____
_____
_____
_____

Please provide any additional information you would like to be considered:

_____
_____
_____
_____
_____

Signed: _____     Dated: _____

## __Upline Manager Section__

Manager Comments:

_____
_____
_____
_____
_____
_____
_____
_____

  __ I Agree with the Accommodation
  __ I Do Not Agree with the Accommodation


Signed: _____   Dated: _____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit BB

COMPLAINT



# M Gmail

## Fw: Exemption Accommodation Approved

**From:** SDCCD Risk Management
**Sent:** Monday, February 7, 2022 9:35 AM
**To:** Dora Meza
**Cc:** Marciano Perez; SDCCD Risk Management
**Subject:** Exemption Accommodation Approved

Dear Ms. Meza:

The Exemption Accommodation Committee has reviewed your request for accommodation and has granted your request, subject to the following:

- Wear a mask at all times in accordance with District guidelines.
- Whenever practicable, maintain at least six feet of distance from others.
- Use best efforts to minimize or eliminate prolonged close contact with others that would potentially result in exposure (less than six feet of distance for 15 minutes or more).

- Self-screen for COVID-19 symptoms and absent yourself from work as necessary to comply with District guidelines.
- Test for COVID-19 on a weekly basis and report the results to the District in accordance with existing procedures, which may be updated from time to time.
- This approval may be reevaluated as needed based on changes in conditions and District policies. The granting of an accommodation for the current period does not guarantee any accommodation in the future.

**Please accept the accommodation, including the specified conditions, via reply email. You may simply state: "I accept the accommodations stated in the email below, including the specified conditions."**

Sincerely,



Risk Management

San Diego Community College District

V 619-388-6953   F 619-388-6898

sdccdriskmanagement@sdccd.edu



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit CC



Group B
Request for Reasonable Accommodation
for Vaccine Exemption
for a Personal Medical Condition

**Employee to Complete:**

Name: Jess Perez

Job Title: Sr. Administrative Assistant      Dept: Saddleback College Kinesiology & Athletics Division

Health Care Provider's Name: Dr. Eric Benner      License #: A10705

Health Care Provider's Phone #: (949) 364-6000      Fax #: (949) 364-1204

**Employee's Health Care Provider to Complete:**
*Please note, the employer has indicated this supplemental medical questionnaire must be completed by a licensed medical provider (MD, DO, PA, NP) or an individual prescribing under that physician's medical license.*

October 18, 2021

TO:        Employee's Health Care Provider
FROM:    Shaw HR Consulting, on behalf of South Orange County Community College District
RE:        **Supplemental Medical Questionnaire Request: Personal Medical Provider**

Please allow this memorandum to serve as an introduction.  South Orange County Community College District is requiring that all employees be fully vaccinated with a COVID-19 vaccine.  In response to this requirement, your patient informed their employer, South Orange County Community College District, that they are medically unable to receive the COVID-19 vaccines.

South Orange County Community College District has implemented the following safety protocols for all of its employees working in its buildings / facilities: all locations are following current CDC guidelines for cleaning and disinfecting, high availability of sanitizers and personal protective equipment, face masks will continue to be required indoors for all employees regardless of vaccination status, appropriate distancing and barriers are provided in alignment with current Cal/OSHA and California Department of Public Health (CDPH) standards, as well as upgraded HVAC filtration.

In response to your patient's request for a vaccine exemption, we need your assistance to continue to evaluate their request.

**To this end, and to support your patient's request for a COVID-19 related accommodation, please review and complete the attached supplemental medical questionnaire by 5:00 p.m. on November 18, 2021**. The completed questionnaire can be returned to my attention via fax at (805) 464-3535 or via email at SouthOrangeCounty@shawhrconsulting.com.  Please note that as part of this process, we are only seeking confirmation of their medical inability to be vaccinated, the duration of such and if they can be in the physical workplace unvaccinated. Please do not provide any information pertaining to medical condition, diagnosis, or treatment. We are not requesting, nor can we receive, private or protected medical information on your patient.

The authority that allows us to request and receive the information being requested in the attached questionnaire are the following two California Laws:

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com

South Orange County Community College District                    Letter of Introduction &
COVID-19 Related Accommodation Requests              Supplemental Medical Questionnaire Request
                                                                        Page 3 of 6



Group B
Request for Reasonable Accommodation
for Vaccine Exemption
for a Personal Medical Condition

- **California Confidentiality of Medical Information Act** (CA Civil Code Sec. 56.10.8(b)): South Orange County Community College District can receive information from a Health Care Provider that:
  - "(B) Describes functional limitations of the patient that may entitle the patient to leave from work for medical reasons or limit the patient's fitness to perform their present employment, provided that no statement of medical cause is included in the information disclosed."

- **California Code of Regulations** (CCR) (tit 2 § 11069(d)): Your patient must:
  - "The applicant or employee shall cooperate in good faith with the employer or other covered entity, including providing reasonable medical documentation where the disability or the need for accommodation is not obvious and is requested by the employer or other covered entity…"

Thank you for your assistance in this matter.  If you have any questions, please do not hesitate to contact me directly at  SouthOrangeCounty@shawhrconsulting.com and once again, please submit the completed questionnaire back to my attention by **5:00 p.m. on November 18, 2021** via email at SouthOrangeCounty@shawhrconsulting.com, or via fax at (805) 464.3535.

Sincerely,

Rebecca Wicks, Senior Consultant
Human Resources & Disability Compliance
Shaw HR Consulting, Inc.

Enc.:    Supplemental Medical Questionnaire Request – Vaccine Exemption

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com

South Orange County Community College District
COVID-19 Related Accommodation Requests

Letter of Introduction &
Supplemental Medical Questionnaire Request
Page 4 of 6

208



Group B
Request for Reasonable Accommodation
for Vaccine Exemption
for a Personal Medical Condition

Patient Name: **Jess Perez**
**SUPPLEMENTAL MEDICAL QUESTIONNAIRE**

**Your employer has indicated this supplemental medical questionnaire must be completed by a licensed medical provider (MD, DO, PA, NP) or an individual prescribing under that physician's medical license.**

I have reviewed the Supplemental Questionnaire Memorandum for the above named patient and can provide the following clarification:

**(Check boxes and insert text as appropriate)**
1. Is your patient medically restricted from receiving the COVID-19 vaccines?
   - ☐ NO, my patient is not medically restricted from receiving the COVID-19 vaccines (please skip to the end of this questionnaire and sign and date)
   - ☒ YES, my patient is medically restricted from receiving the COVID-19 vaccines.  Please explain:
     a. What is the duration of the restriction from being administered a COVID-19 vaccine?
        - ☒ PERMANENT, it is not medically expected that my patient will ever be able to receive a COVID-19 vaccine.
        - ☐ TEMPORARY, it is anticipated that my patient will be cleared to receive a COVID-19 vaccine on or about _____ (date)
        - ☐ UNKNOWN, I am unable to comment on my patient's ability to be administered a COVID-19 vaccine in the future.

2. **PHYSICAL WORKPLACE ACCOMMODATION:** If you have indicated that your patient CANNOT be administered a COVID-19 vaccination, would the following be sufficient to support them to return to work in the physical workplace, safely and as an unvaccinated worker:
   - All workplace safety requirements per the CDC, Cal/OSHA and California Department of Public Health (CDPH)
   - Face coverings are required for all staff – regardless of vaccination status
   - Hand sanitizer stations are set up throughout the buildings
   - Restrooms are regularly cleaned
   - Additional PPE equipment allowed and/or can be provided as needed (e.g. face shield, gloves, additional social distancing and/or barriers installed, N-95 masks, etc.)

   a. Are the above measures sufficient to support your patient to work in the physical workplace, unvaccinated?
      - ☒ YES, my unvaccinated patient can return to the physical workplace with the above safety measures in place and ☒ without additional PPE equipment OR ☐ with the following additional PPE equipment made available to my patient:

      _____
      _____

      - ☐ NO, the above measures are insufficient to protect the health and safety of my unvaccinated patient in the physical workplace. My patient has the following work restrictions / limitations that I don't believe can be accommodated in the physical workplace. (please be specific)

      _____
      _____
      _____
      _____

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com

South Orange County Community College District
COVID-19 Related Accommodation Requests

Letter of Introduction &
Supplemental Medical Questionnaire Request
Page 5 of 6



Group B
Request for Reasonable Accommodation
for Vaccine Exemption
for a Personal Medical Condition

Patient Name: Jess Perez

**SUPPLEMENTAL MEDICAL QUESTIONNAIRE**

3.  **DURATION OF RESTRICTIONS / ACCOMMODATIONS:** If you have listed work restrictions / functional limitations for your unvaccinated patient, how long do you anticipate that these work restrictions / functional limitations will be in place?

☐ Work Restrictions / Functional Limitations are **TEMPORARY through** _____ **(date)**
☐ Work Restrictions / Functional Limitations are **PERMANENT**
☐ Work Restrictions / Functional Limitations are for an **UNKNOWN** duration for the following reason(s) (please explain why you cannot estimate the duration)

_____

_____

_____

4.  **ADDITIONAL RESTRICTIONS / CLARIFICATIONS**:   Please use the space below to include any additional information that you believe would be helpful to the interactive process for this employee. **Please do not list any information pertaining to medical condition or diagnosis.**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


_____    _____11/23/21_____
Health Care Provider's Original Signature        Date

Eric Benner                          A107675
Health Care Provider's Name Printed           License Number

Health Care Provider's Phone #: ___949-364-6000___

**RETURN A COPY OF THIS FORM VIA FAX OR EMAIL TO:**

**Shaw HR Consulting, Inc. / Attn.: Rebecca Wicks / Fax#: 805.464.3535 OR
via email at SouthOrangeCounty@shawhrconsulting.com
This form must be received by 5:00 p.m. on November 18, 2021 to be considered.**

South Orange County Community College District
COVID-19 Related Accommodation Requests

Letter of Introduction &
Supplemental Medical Questionnaire Request
Page 6 of 6

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com

**MISSION HERITAGE MEDICAL GROUP INTERNAL MEDICINE PLAZA**
26800 CROWN VALLEY PKWY STE 305
MISSION VIEJO CA 92691-6337
Phone: 949-364-6000
Fax: 949-364-3213



October 19, 2021

Jess Rey Perez
749 Mt Whitney Cir
Corona CA 92879

To Whom It May Concern:

Due to several serious medical conditions Mr. Jess Perez is medically exempt from the Covid 19 vaccine.

If you have any questions or concerns, please don't hesitate to call.

Sincerely,

Eric Olson Benner, MD

## Email Notification for Covid-19 Test Result

From: Orange County Drive Through Covid Testing Clinic Irvine CA (info@orangecountycovidclinic.com)

To: 

Date: Tuesday, November 9, 2021, 11:44 AM PST

Hi **Jess Perez**

Here is your test report of your Rapid Antibody:

**Patient Name**
Jess Perez

**Booking Number**
1600420211109

**Please click here to determine if your test results are negative or positive.**
VIEW REPORT

You are receiving this message because you were administered a COVID-19 rapid antibody test at the Newport Center Urgent Care.
The CDCs information on the development of antibodies and immunity are as follows:

- Antibodies IgM/IgG usually start developing within 1 to 3 weeks after infection.The duration of time that IgM and IgG antibodies remain detectable is unknown.
- Some persons do not develop detectable IgG or IgM antibodies following infection. Thus, the absence of detectable IgM or IgG antibodies does not necessarily rule out that they could have previously been infected.
- A positive antibody test is presumed to mean a person has been infected with SARS-CoV-2, the virus that causes COVID-19, at some point in the past. It does not mean they are currently infected, nor does it rule out ACTIVE infection, therefore, antibody test results should not be used to diagnose someone with an active infection.

It is your responsibility to report this result to your Primary Care Provider and follow up with your PCP for medical advice or other concerns. Please adhere to CDC guidelines regardless of your test result.
Please review the link below and follow the isolation guidelines outlined by the CDC to prevent the further spread of COVID-19 in our community.
https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/isolation.html

Confidentiality Notice: The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation to the contents of this information is strictly prohibited and may be unlawful. If you have received this email in error, please notify the sender by return email, and delete this email from your in-box.



**ORANGE COUNTY**
COVID CLINIC
https://orangecountycovidclinic.com
16300 Sand Canyon Ave. Located in the parking lot of Hoag Hospital Irvine
Phone: 949.518.9877



**ORANGE COUNTY**
COVID CLINIC

| Encounter - Office Visit Date of service: 11/09/21 |
|---|

| PATIENT | | **FACILITY:** Orange County Covid Clinic Center |
|---|---|---|
| Jess Perez | | **CLIA ID #:** 05D1081757 |
| DOB | 04/01/1969 | **Phone:** (949) 518-9877 |
| AGE | 52 yrs | **Address:** 16300 Sand Canyon Ave. |
| SEX | Male | Irvine, CA 92618 |
| | | Located in the parking lot of Hoag Hospital Irvine |
| | | https://orangecountycovidclinic.com |

| COVID TEST TYPE | RESULT | DATE | TIME |
|---|---|---|---|
| Rapid Antibody (IgG) | PRESENT | 11-09-21 | 11:44 AM |
| Rapid Antibody (IgM) | NOT PRESENT | 11-09-21 | 11:44 AM |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit DD

COMPLAINT



October 19, 2021

TO:        Employee of South Orange County Community College District
FROM:      Rebecca Wicks, Shaw HR Consulting, on behalf of South Orange County
           Community College District
RE:        **Letter of Introduction and Request for Verification on COVID-19 Vaccine
           Exemption Request**

Please allow this letter to serve as an introduction. My name is Rebecca Wicks, and I am a third-party consultant providing compliance services to employers and employees in California. Your employer, South Orange County Community College District has hired Shaw HR Consulting to ensure that COVID-19 related accommodation options are explored to best support you.

To support your request for a COVID-19 vaccine exemption due to a sincerely held religious belief, we will need additional information. Your employer is committed to protecting its employee's religious rights as well as protecting the health and wellbeing of students, employees, and the communities it serves.

At this time and before additional decisions can be made regarding your exemption request, your employer needs additional information from you. As such, please review the attached "Information on COVID-19 Vaccines" and complete the attached "Religious Verification Form" that is enclosed with this letter. **Please submit this completed form to my attention no later than 5:00pm on November 18, 2021.**

Once the "Religious Verification Form" is received by my office, you will be notified of the next steps in your interactive process. As you review the above, please do not hesitate to contact me with any questions you may have. I can be reached directly at SouthOrangeCounty@shawhrconsulting.com.

Sincerely,

RWicks

Rebecca Wicks, Senior Consultant
Human Resources & Disability Compliance
Shaw HR Consulting, Inc.

Enc.:    Religious Accommodation Verification Form
         Religious Belief Exception Education Resources
         Information on COVID-19 Vaccines
         Key Things to Know About COVID-19 Vaccines
         Myths and Facts about COVID-19 Vaccines
         Vaccine Development and Fetal Cell Lines

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com



**SOUTH ORANGE COUNTY COMMUNITY COLLEGE DISTRICT**
**RELIGIOUS ACCOMMODATION VERIFICATION FORM FOR COVID-19 VACCINATION**

Printed Name: _Jess Perez_

Department: _Kinesiology and Athletics_

☑ I have a sincerely held religious belief, practice, or observance that conflicts with my ability to receive a COVID-19 vaccination

I have received and reviewed the following documents provided to me:

☑ Yes ☐ No   "Religious Belief Exception Educational Resources"
☑ Yes ☐ No   "Information on COVID-19 Vaccines"
☑ Yes ☐ No   "Key Things to Know About COVID-19 Vaccines"
☑ Yes ☐ No   "Myths and Facts about COVID-19 Vaccines"
☑ Yes ☐ No   "Vaccine Development and Fetal Cell Lines"

1.  Please describe your religious beliefs and practices that pertain to your request for exemption:

I believe in God, Jesus the Son of God and His Holy Spirit and all of the scriptures written in the Holy Bible.

According to the Holy Scriptures my body belongs to God and is the temple for the Holy Spirit and my

soul and my body belong to God. Based upon The Holy Scriptures, my deeply held religious beliefs and

personal moral and ethical convictions I cannot knowingly, willingly and consciously violate my religious

beliefs or my body which is God's temple by injecting any "Covid19 Vaccine" into my body due to

unknown risk factors associated with the Covid19 shots and uncertain potential bodily harm or adverse

reactions that a Covid19 injection may cause.  I will not compromise my deeply held religious beliefs.

I am choosing to follow and obey God and His commands.

_John 1:12  ESV_  "But to all who did receive Him, who believed in His name, He gave the right to become

children of God"

_John 14:23  ESV_  ""Jesus answered him, "If anyone loves Me, he will keep My word, and My Father will love him, and We will come to him and make Our home with him.""

_Ephesians 1:13 – 14_  "And you also were included in Christ when you heard the message of truth, the gospel of your salvation. When you believed, you were marked in Him with a seal, the promised Holy Spirit, who is a deposit guaranteeing our inheritance until the redemption of those who are God's possession—to the praise of His glory."

_Phillipians 2:12-13_  "Therefore, my beloved, as you have always obeyed, so now, not only as in my presence but much more in my absence, work out your own salvation with fear and trembling, for it is God who works in you to will and to act in order to fulfill His good purpose."

Group C
Request for Accommodation
for Vaccine Exemption
for a Sincerely Held Religious Belief

**Psalm 1:1-6 ESV** *"Blessed is the man who walks not in the counsel of the wicked, nor stands in the way of sinners, nor sits in the seat of scoffers; but his delight is in the law of the LORD, and on his law he meditates day and night. He is like a tree planted by streams of water that yields its fruit in its season, and its leaf does not wither. In all that he does, he prospers. The wicked are not so, but are like chaff that the wind drives away. Therefore the wicked will not stand in the judgment, nor sinners in the congregation of the righteous; ..."*

**I Corinthians 3:16 – 17 NLT** *"Don't you realize that all of you together are the temple of God and that the Spirit of God lives in you?  God will destroy anyone who destroys this temple. For God's temple is holy, and you are that temple."*

**I Corinthians 6:19-20 NIV** *"Do you not know that your bodies are temples of the Holy Spirit, who is in you, whom you have received from God? You are not your own; you were bought at a price. Therefore honor God with your bodies."*

**2 Corinthians 5:10 NIV** *"For we must all appear before the judgment seat of Christ, so that each of us may receive what is due us for the things done while in the body, whether good or bad."*

**2 Corinthians 7:1 ESV** *"Since we have these promises, beloved, let us cleanse ourselves from every defilement of body and spirit, bringing holiness to completion in the fear of God."*

a.  When did you embrace the belief, observance, or practice described above?

I made a conscious decision as a young adult 30 years ago to give my life over to God, to receive Jesus Christ as my Lord and Savior.  I have been continuously following God and adhering to His Holy Scriptures found in the Holy Bible for the last 30 years, the majority of my life time. I am not willing to waiver or compromise my faith, or any of my religious beliefs to receive any Covid19 injection.

b.  When have you adhered to the belief, observance, or practice in other contexts?

I have adhered to my religious belief in God, Jesus the Christ, The Holy Spirit and His Holy Word for the last 30 years in all areas of my life including but not limited to my daily lifestyle choices, what I eat, what I wear, how and when I pray to God, in my participation and volunteer work at my church and in my local community, in making financial decisions, medical procedures that I choose, medications that I decide to take, in how I choose my friends, in how I relate to my family members, friends and people in general,  in my marriage to my wife, and  how I lead my own family.



c.  Where have you adhered to the belief, observance or practice?

In every place I go.  God lives within me, so I observe and practice my beliefs in everything

I do and everywhere I go including but not limited to while I am at my home, at

Recreational activities, at work, at play, when I am driving a vehicle, when at a restaurant

When I am shopping at a store, while performing my civic duties such as voting or performing
Jury Duty, even while I am in the restroom.  Everywhere!

d.  How have you adhered to the belief, observance, or practice?

By actively living out the principles and teachings of God's written Word, The Holy Bible.

I do my best to adhere to, observe and practice all of God's good instructions for living in

this world by specifically following the teachings of Jesus and His Holy Scriptures using

His word as my guide for how I should live life and conduct myself in areas of my life.

2.  Explain in your own words why you are requesting this religious exemption:

According to God's Word, The Holy Bible, my body and my soul was purchased by Jesus the Christ
when He made a decision to die for my sins upon the cross of Calvary.  By accepting Jesus into my

heart/soul, I have become a new creation, a Born Again Christian, and because He purchased me

with His blood, I belong to God, and I am His prized possession.  Therefore I must live my life according

to the laws of God and not the laws of men or of the world.  So whenever there is a conflict between

the laws of men, the world and the Laws of God, then I must do what God's word directs me to do.

Because I belong to God, and His Spirit lives within me, my body is His temple on this earth.

Therefore I cannot make a conscious decision to inject an unknown or foreign substance into God's

Holy Temple, my body, as this would defile God's temple, especially because all Covid19 shots

Contain unnatural chemicals, genetic materials, and because **From Information on Covid-19 Vaccines**

**Document provided by Shaw HR Consulting page 2; "Were the Pfizer and Moderna COVID-19 vaccines**

**Developed using fetal cell lines: " fetal cells wereused for "proof of concept" (to demonstrate how**

**a cell could take up mRNA and produce the SARS-CoV-2 spikeprotein) or to characterize the**

**SARS-CoV-2 spike protein.", and because "such a cell line was used to test the efficacy of both**

**vaccines."**

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com



Based on my sincerely held religious beliefs and personal convictions, I respectfully request a religious accommodation pursuant to Title VII of the 1964 Civil Rights Act. As a citizen of the United States of America I am invoking my * US Constitutional Right under the 1st Amendment to freely exercise and practice my Freedom of Religion.

Also, I am under Duress as I am being threatened with the potential loss of my current employment with the South Orange County Community College District and Saddleback College, because I am being forced to choose to receive a medical procedure against my will or to lose my job if I do not receive a Covid19 vaccine by 1/8/22.

3. Describe the religious principle(s) that guide your objection to vaccination:

Under one of my most deeply held religious beliefs found in the Holy Scriptures is the deep belief that My body is the God's Temple and I will not defile my body any Covid19 vaccine, for it is written:

*1 Corinthians 6:19* " Do you not know that your bodies are temples of the Holy Spirit, who is in you,

Whom you have received from God? You are not your own; you were bought at a price.

Therefore honor God with your bodies."

*James 4:17 KJV* "Therefore to him that knoweth to do good, and doeth it not, to him it is sin

4. Indicate whether your religious objections are to all vaccinations, and if not, the religious basis that prohibits particular vaccinations:

The Holy Spirit that lives in me guides me along with God's Holy Scriptures to make decisions

For any medical procedures on a case by case assessment. God's word prohibits me from

Participating in any medical procedure such as a vaccination or injection of any kind that could

Potentially harm my body.

*1 John 3:24*, New International Version "*24* The one who keeps God's commands lives in him, and

He in them. And this is how we know that He lives in us: We know it by the Spirit He gave us."

*James 4:17 KJV* "Therefore to him that knoweth to do good, and doeth it not, to him it is sin"

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com



Group C
Request for Accommodation
for Vaccine Exemption
for a Sincerely Held Religious Belief

5.  I attest that my request for an exemption based upon my sincerely held religious belief is consistent with what is contained in my recent medical records.  ☒ Yes ☐ No

If your answer is NO, please explain:

_____

_____

_____

_____

_____

_____

_____

_____

_____ *(initial)* I understand, submitting this verification form is not a guarantee of approval. South Orange County Community College District will consider my preferred accommodation and other possible accommodations that would resolve the conflict between my religious belief(s), practice(s), or observance(s) and will select and implement the accommodation that it deems effective.

My signature below indicates that the information I have provided in this form accurately reflects my sincerely held religious belief(s), practice(s), or observance(s) and its conflict with my ability to receive a COVID-19 vaccination. I also understand that in evaluating my request, South Orange County Community College District will explore possible reasonable accommodations for me unless making such accommodations would impose undue hardship on the conduct of South Orange County Community College District' business.

_____          11-17-21
Employee's Signature                                  Date

**RETURN A COPY OF THIS FORM TO:**
**Shaw HR Consulting, Inc. / Attn: Rebecca Wicks / Via Fax: (805) 464-3535, OR Via email:**
SouthOrangeCounty@shawhrconsulting.com
This form must be received by 5:00 p.m. on November 18, 2021 to be considered.

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit EE



28000 MARGUERITE PARKWAY, MISSION VIEJO, CA 92692-3635 • 949.582.4999 • FAX 949.364.2726 • WWW.SOCCCD.EDU

SADDLEBACK COLLEGE • IRVINE VALLEY COLLEGE • ADVANCED TECHNOLOGY & EDUCATION PARK

December 3, 2021

Jess Perez
749 Mt. Whitney Circle
Corona, CA 92879

This letter is to inform you that the South Orange County Community College District has approved your request for a medical/religious exemption based upon a medical condition or a sincerely held religious belief or practice. This approval exempts you from having to become fully vaccinated by January 7, 2022. In lieu of vaccination, the District will be offering an accommodation subject to the following requirements, which must be strictly adhered to:

**You will be required to take a COVID-19 test at least two times per week - Monday and Wednesday or Monday and Thursday and sign the attached accommodation agreement. Failure to sign and submit the attached agreement invalidates this approval.**

You will need to meet with your supervisor or dean and establish the dates and times that you will be tested at the college's health services center at no cost. You will be given 30 minutes of paid time for each test and the testing shall occur during your regularly scheduled work hours (except for those working a night shift). Part-time faculty will receive one hour of paid administrative leave per week for testing. As exempt employees, FT faculty and management team do not receive any additional pay for testing.

Once the dates and times for testing have been agreed upon by you and your supervisor, you will be required to sign-up for testing times/days each week as soon as the sign-up option becomes available. Your testing requirement will commence:

**Monday, January 8, 2022** and will be on-going until further notice or until such time as you become fully vaccinated. If you have any questions related to the testing requirement, please contact Cindy Barron in Human Resources.

BOARD OF TRUSTEES: CAROLYN INMON, BARBARA J. JAY, TIMOTHY JEMAL, MARCIA MILCHIKER,
T.J. PRENDERGAST III, TERRI WHITT RYDELL, JAMES R. WRIGHT • KATHLEEN F. BURKE, ED.D., CHANCELLOR
AN EQUAL OPPORTUNITY EMPLOYER



28000 MARGUERITE PARKWAY, MISSION VIEJO, CA 92692-3635 • 949.582.4999 • FAX 949.364.2726 • WWW.SOCCCD.EDU

SADDLEBACK COLLEGE • IRVINE VALLEY COLLEGE • ADVANCED TECHNOLOGY & EDUCATION PARK

Page 2 – J. Perez

The District is not responsible for ensuring that you test as required. You are solely responsible for fulfilling your obligation to test twice per week. A single failure to test will result in a **Letter of Correction** being issued to you.  A second failure to test (at any time), will result in discipline up to and including termination of employment.

Please be advised that the District expects your full cooperation with these requirements. Thank you for assisting the District with keeping our workforce as safe as possible.

Respectfully,

Dr. Cindy Vyskocil
Vice Chancellor, Human Resources

Enc.:   Vaccine Exemption Accommodations Agreement

BOARD OF TRUSTEES: CAROLYN INMON, BARBARA J. JAY, TIMOTHY JEMAL, MARCIA MILCHIKER,
T.J. PRENDERGAST III, TERRI WHITT RYDELL, JAMES R. WRIGHT • KATHLEEN F. BURKE, ED.D., CHANCELLOR
AN EQUAL OPPORTUNITY EMPLOYER



28000 MARGUERITE PARKWAY, MISSION VIEJO, CA 92692-3635 • 949.582.4999 • FAX 949.364.2726 • WWW.SOCCCD.EDU

SADDLEBACK COLLEGE • IRVINE VALLEY COLLEGE • ADVANCED TECHNOLOGY & EDUCATION PARK

### SOUTH ORANGE COUNTY COMMUNITY COLLEGE DISTRICT
### INTERACTIVE PROCESS:
### VACCINE EXEMPTION ACCOMMODATION AGREEMENT

*f MEDICAL:*

#### Please check the box and sign below:

V, C. ☒ Being unvaccinated, I agree that I am able to work safely and fully considering my inability to receive a COVID-19 vaccine.  I understand by signing this Agreement I will:

- Wear an approved face covering in the workplace until such time the South Orange County Community College District determines unvaccinated employees may remove face coverings, and
- Submit to COVID-19 required testing as indicated in the approval letter
- Submit to other safety measures as determined necessary by the South Orange County Community College District

I also agree to notify Cindy Barron at cbarron@socccd.edu immediately if my ability to receive a COVID-19 vaccine changes or if I require different or additional workplace accommodations. I and the South Orange County Community College District both understand the interactive process is an ongoing obligation and should I have additional accommodation needs or if there are any changes to my current  accommodation plan, the parties will reengage and additional interactive process activities will occur.

I, JESS PEREZ, AM SIGNING THIS AGREEMENT AGAINST MY WILL, UNDER DURESS, AS I AM BEING CONSTRAINED BY FORCE.

_____     12/15/21
Jess Perez                                      Date

_____     _____
HR Signature                                    Date

BOARD OF TRUSTEES: CAROLYN INMON, BARBARA J. JAY, TIMOTHY JEMAL, MARCIA MILCHIKER,
T.J. PRENDERGAST III, TERRI WHITT RYDELL, JAMES R. WRIGHT • KATHLEEN F. BURKE, ED.D., CHANCELLOR

AN EQUAL OPPORTUNITY EMPLOYER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit FF



28000 MARGUERITE PARKWAY, MISSION VIEJO, CA 92692-3635 • 949.582.4999 • FAX 949.364.2726 • WWW.SOCCCD.EDU

SADDLEBACK COLLEGE • IRVINE VALLEY COLLEGE • ADVANCED TECHNOLOGY & EDUCATION PARK

December 8, 2021

Jess Perez
749 Mt. Whitney Circle
Corona, CA 92879

This letter is to inform you that the South Orange County Community College District has approved your request for a medical/religious exemption based upon a medical condition or a sincerely held religious belief or practice. This approval exempts you from having to become fully vaccinated by January 7, 2022. In lieu of vaccination, the District will be offering an accommodation subject to the following requirements, which must be strictly adhered to:

**You will be required to take a COVID-19 test at least two times per week - Monday and Wednesday or Monday and Thursday and sign the attached accommodation agreement. Failure to sign and submit the attached agreement invalidates this approval.**

You will need to meet with your supervisor or dean and establish the dates and times that you will be tested at the college's health services center at no cost. You will be given 30 minutes of paid time for each test and the testing shall occur during your regularly scheduled work hours (except for those working a night shift). Part-time faculty will receive one hour of paid administrative leave per week for testing. As exempt employees, FT faculty and management team do not receive any additional pay for testing.

Once the dates and times for testing have been agreed upon by you and your supervisor, you will be required to sign-up for testing times/days each week as soon as the sign-up option becomes available. Your testing requirement will commence:

**Monday, January 8, 2022** and will be on-going until further notice or until such time as you become fully vaccinated. If you have any questions related to the testing requirement, please contact Cindy Barron in Human Resources.

BOARD OF TRUSTEES: CAROLYN INMON, BARBARA J. JAY, TIMOTHY JEMAL, MARCIA MILCHIKER, T.J. PRENDERGAST III, TERRI WHITT RYDELL, JAMES R. WRIGHT • KATHLEEN F. BURKE, ED.D., CHANCELLOR
AN EQUAL OPPORTUNITY EMPLOYER



28000 MARGUERITE PARKWAY, MISSION VIEJO, CA 92692-3635 • 949.582.4999 • FAX 949.364.2726 • WWW.SOCCCD.EDU

SADDLEBACK COLLEGE • IRVINE VALLEY COLLEGE • ADVANCED TECHNOLOGY & EDUCATION PARK

Page 2 – Jess Perez

The District is not responsible for ensuring that you test as required. You are solely responsible for fulfilling your obligation to test twice per week. A single failure to test will result in a **Letter of Correction** being issued to you.  A second failure to test (at any time), will result in discipline up to and including termination of employment.

Please be advised that the District expects your full cooperation with these requirements. Thank you for assisting the District with keeping our workforce as safe as possible.

Respectfully,

Dr. Cindy Vyskocil
Vice Chancellor, Human Resources

Enc.:  Vaccine Exemption Accommodations Agreement

BOARD OF TRUSTEES: CAROLYN INMON, BARBARA J. JAY, TIMOTHY JEMAL, MARCIA MILCHIKER,
T.J. PRENDERGAST III, TERRI WHITT RYDELL, JAMES R. WRIGHT • KATHLEEN F. BURKE, ED.D., CHANCELLOR
AN EQUAL OPPORTUNITY EMPLOYER



28000 MARGUERITE PARKWAY, MISSION VIEJO, CA 92692-3635 • 949.582.4999 • FAX 949.364.2726 • WWW.SOCCCD.EDU

SADDLEBACK COLLEGE • IRVINE VALLEY COLLEGE • ADVANCED TECHNOLOGY & EDUCATION PARK

*RELIGIOUS :*

## SOUTH ORANGE COUNTY COMMUNITY COLLEGE DISTRICT
## INTERACTIVE PROCESS:
## VACCINE EXEMPTION ACCOMMODATION AGREEMENT

### Please check the box and sign below:

*J.C.*

☒ Being unvaccinated, I agree that I am able to work safely and fully considering my inability to receive a COVID-19 vaccine. I understand by signing this Agreement I will:

- Wear an approved face covering in the workplace until such time the South Orange County Community College District determines unvaccinated employees may remove face coverings, and
- Submit to COVID-19 required testing as indicated in the approval letter
- Submit to other safety measures as determined necessary by the South Orange County Community College District

I also agree to notify Cindy Barron at cbarron@socccd.edu immediately if my ability to receive a COVID-19 vaccine changes or if I require different or additional workplace accommodations. I and the South Orange County Community College District both understand the interactive process is an ongoing obligation and should I have additional accommodation needs or if there are any changes to my current accommodation plan, the parties will reengage and additional interactive process activities will occur.

*I, JESS PEREZ, AM SIGNING THIS AGREEMENT AGAINST MY WILL, UNDER DURESS, AS I AM BEING CONSTRAINED BY FORCE.*

_____   Date _12/15/21_

Jess Perez                          Date

_____   _____

HR Signature                        Date

BOARD OF TRUSTEES: CAROLYN INMON, BARBARA J. JAY, TIMOTHY JEMAL, MARCIA MILCHIKER,
T.J. PRENDERGAST III, TERRI WHITT RYDELL, JAMES R. WRIGHT • KATHLEEN F. BURKE, ED.D., CHANCELLOR
AN EQUAL OPPORTUNITY EMPLOYER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit GG

**Interactive Process Agreement**

Cindy Vyskocil <cvyskocil@socccd.edu>

Thu 12/16/2021 2:28 PM

To: Jess Perez <jperez@saddleback.edu>

Cc: Cindy Barron <cbarron@socccd.edu>

Jess

Thank you for submitting your signed Interactive Process Agreement. On your signed agreement you handwrote the following:

**I, Jess Perez, am signing this agreement against my will, under duress, as I am being constrained by force.**

First and foremost, I need to remind you that you are an adult over the age of 21 and you have exercised your free will to sign an agreement instead of exercising the other options that exists for you.  These options include: 1) using paid and unpaid leave; 2) choosing to work for an employer who does not require employees to become vaccinated; and 3) cecoming fully vaccinated.

The District faces an overwhelming responsibility to keep 2,500 employees and 30,000 students safe during an on going public health crisis. We also understand that such requirements to mandate twice weekly testing in lieu of vaccination may cause some individuals to choose their sincerely held religious beliefs over complying with the District's safety protocols for unvaccinated individuals.  As a District, we simply must make the best decisions possible based upon science, CDC guidance, and state protocols to keep our employees and students as safe as possible.  I am advising you via this email that you are an adult over the age of 21 and therefore should never sign something against your will.  We understand that these are difficult times and require difficult decisions both on the part of the District and individual employees.

This email will be placed with your e emption file as a record that you were advised that you should never sign a document against your will and that you exercised your free will when deciding to agree to the testing requirement. Though this District appreciates all of the work that you do for our Athletics Department, we also understand that you maintain the absolute right to choose an employer that does not have such a high burden to keep so many people safe.  As you have signed the document

freely and without force, you are also free to withdraw your agreement to the testing terms at any time.

Respectfully,

Cindy

**Dr. Cindy Vyskocil**
Vice Chancellor, Human Resources
South Orange County Community College District
Ph: 949-582-4698
Email: cvyskocil@socccd.edu

*Pronouns: She, Her, Hers*

231

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit HH



## Health Services Consent Form

1 message





**From:** Jess Perez <jperez87867@gmail.com>
**Sent:** Monday, January 24, 2022 5:19 PM
**To:** Gary Kreep <Gary@ggkmail.us>; Daniel Gutowski <president@sdccdspaa.org>
**Subject:** Fwd: Fw: Health Services Consent Form

---

**From:** Jess Perez <jperez@saddleback.edu>
**Sent:** Monday, January 24, 2022 5:17 PM
**To:** Cindy Vyskocil <cvyskocil@socccd.edu>
**Cc:** Daniel Clauss <dclauss@saddleback.edu>; Scott Greene <sgreene6@saddleback.edu>; Matthew Phutisatayakul <mphutisatayakul@csea.com>; Melissa Klimowicz <mklimowicz@saddleback.edu>
**Subject:** Re: Health Services Consent Form

Hello Cindy,

Attached is another Saddleback College Health Center, Confidentiality Consent for Treatment , Acknowledgement of Noice of Privacy Practices form.

I have signed the form again and dated the form with today's date, 1/24/22. Let it be known that I feel you are discriminating against me and that I have signed this form under protest, under duress, and under threat of being terminated from my employment.

I will submitting the signed form to the Covid19 testing trailer representative tomorrow morning when I arrive to be tested.

Jess

---

**From:** Cindy Vyskocil <cvyskocil@socccd.edu>
**Sent:** Thursday, January 20, 2022 5:14 PM
**To:** Jess Perez <jperez@saddleback.edu>
**Cc:** Daniel Clauss <dclauss@saddleback.edu>; Scott Greene <sgreene6@saddleback.edu>; Matthew Phutisatayakul <mphutisatayakul@csea.com>; Melissa Klimowicz <mklimowicz@saddleback.edu>
**Subject:** RE: Health Services Consent Form

Jess –

There is no reason for me to add anything to my initial email to you. If you do not sign the consent form in a manner that is acceptable to the Health Center (a Health Care Agency), you will not be tested by them due to their legal requirements. This will be deemed a failed test.

At this point, the decisions you make are totally up to you. All I can relay are the consequences that may come with some of your decisions.

Have a good evening.

Cindy

**Cindy Vyskocil, Ed.D.**
Vice Chancellor, Human Resources
South Orange County Community College District
(949) 582-4698

---

**From:** Jess Perez <jperez@saddleback.edu>
**Sent:** Thursday, January 20, 2022 4:58 PM
**To:** Cindy Vyskocil <cvyskocil@socccd.edu>
**Cc:** Daniel Clauss <dclauss@saddleback.edu>; Scott Greene <sgreene6@saddleback.edu>; Matthew Phutisatayakul <mphutisatayakul@csea.com>; Melissa Klimowicz <mklimowicz@saddleback.edu>
**Subject:** Fw: Health Services Consent Form

Hello Cindy,

Thank you for attaching the CSEA MOU - Covid19 Vaccine Mandate 11/17/21. I had already

read through the entire MOU and I have complied with all testing requirements since my return to work the week of 1/9/22 .

There is no language in the Covid19 MOU that states that employees who are required to test will also be required to sign additional documentation for testing, nor is there language in the MOU that states that signing any testing consent form is a condition of employment, or subject to disciplinary action, if not signed, or if not signed according to your standards.

I have complied with the requirement to test two times per week as scheduled with my Administrator, Dan Clauss, and I have not failed to test since my return to work the week of 1/9/22 per the written language in this same section of the MOU, "IV. Non-Compliance with Required Testing (related to approved exemptions)", # 8. "A failure to test is defined as any employee that is not out on any approved leaves and yet fails to test as required.  I also have evidence of each completed BinaxNow Covid19 Rapid Antigen test that I have taken with negative results each time.

I also have not missed any required tests per the language in section "IV. Non-Compliance with Required Testing (related to approved exemptions), line item # 8.a.   "Unit members who miss one test shall be issued a warning and corrective directive".

Health Services did not contact me directly nor did they ask me to return to sign another a new form.  What did happen is that Jeanie Caldwell Harris from the Health Center contacted my Dean, Dan Clauss, who then had a conversation with me about the matter.  Again, no representative from the Health Center ever contacted me regarding this matter.

Furthermore, although under protest and duress, I did in fact sign the SADDLEBACK COLLEGE STUDENT HEALTH CENTER Confidentiality Consent for Treatment Acknowledgement of Notice of Privacy Practices clearly states, "Your signature below indicates you are aware of the following policies and procedures regarding patient confidentiality, informed consent, consent for care using Telehealth, consent for treatment by a physician, registered nurse, clinical psychologist, or psychology intern therapist under the direct supervision of a licensed clinical psychologist. Additionally, your consent agrees to Medi-Cal and Family Pact billing and notice of privacy practices."

The health center document is not a consent for asymptomatic or symptomatic Testing of Covid 19 but rather it is a consent for Confidentiality Consent for Treatment and Acknowledgement of Notice of Privacy Practices.  I also do not agree with the language of the document that you are requiring employees to sign as there is absolutely no language whatsoever in the document regarding Covid19 Testing as agreed upon in the CSEA MOU for Covid19.

Regarding your statement,

 "**What this means:**
This means that the next time you are required to test in order to comply with your testing agreement in support of your exemption and are not tested due to your inability to sign the consent form in a manner that Health Services will accept, it will be considered a **FAILED** test."

I believe you are adding additional language, constraints and conditions of employment that are not written in the Covid19 MOU and were not agreed to by the CSEA and the SOCCCD.

Regarding your statement,

"So, until you make the decision to sign the consent form without your opinion attached, the Health Services Center **will not** provide testing services to you."

This sounds like you are giving me an ultimatum and making a threat against me. If the Health Center refuses to continue to test me for Covid19 results as per the CSEA MOU then I will consider this to be a breach of contract by the SOCCCD and it's representatives and violation of the effective MOU by the SOCCCD and it's representatives.

According to previous communications distributed by SOCCCCD HR Department, this Covid19 exemption and testing process is supposed to be an interactive process between your office and it's employees. I do not feel that this has been a fair interactive process and I feel that I am being treated unfairly. I feel like you are discriminating against me even though I have complied with all processes of this mandate, and I now feel, again, that I am being threatened with termination even though I have in fact signed all documentation and followed all rules of the MOU through this entire process.

I have copied on this email my Dean, Dan Clauss, as well as Scott Greene, Melissa Klimowicz, and Matthew Phutisatayakul from CSEA. So maybe one of our CSEA Representatives can address this matter within this email communication.

Jess

---

**From:** Cindy Vyskocil <cvyskocil@socccd.edu>
**Sent:** Thursday, January 20, 2022 2:37 PM
**To:** Jess Perez <jperez@saddleback.edu>
**Subject:** Health Services Consent Form

Jess –

Health Services made the error of testing you this morning which was in violation of their legal requirements. The Health Services consent form you were required to sign in order to test, cannot be signed under "protest or duress" because if that language appears on the consent form, Health Services cannot and will not provide you services.

My understanding is that Health Services asked you to come back and sign a new form but you refused (which is your right to do). So, until you make the decision to sign the consent form without your opinion attached, the Health Services Center **will not** provide testing services to you.

**What this means:**
This means that the next time you are required to test in order to comply with your testing agreement in support of your exemption and are not tested due to your inability to sign the consent form in a manner that Health Services will accept, it will be considered a **FAILED** test.

236

I have attached the CSEA/SOCCCD MOU above so you can better understand the consequences of a 1st failed test and then a 2nd failed test. Essentially, after a 2nd failed test, the employee will be placed on leave and issued an intent to discipline and the District will begin the process of terminating employment.

Please let me know if you have any questions.

Respectfully,

Cindy

**Cindy Vyskocil, Ed.D.**
Vice Chancellor, Human Resources
South Orange County Community College District
(949) 582-4698

 **20220124171228633.pdf**
113K

237

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit II

COMPLAINT



Group C
Request for Accommodation
for Vaccine Exemption
for a Sincerely Held Religious Belief

October 19, 2021

TO:         Employee of South Orange County Community College District
FROM:       Rebecca Wicks, Shaw HR Consulting, on behalf of South Orange County
            Community College District
RE:         **Letter of Introduction and Request for Verification on COVID-19 Vaccine
            Exemption Request**

Please allow this letter to serve as an introduction. My name is Rebecca Wicks, and I am a third-party consultant providing compliance services to employers and employees in California. Your employer, South Orange County Community College District has hired Shaw HR Consulting to ensure that COVID-19 related accommodation options are explored to best support you.

To support your request for a COVID-19 vaccine exemption due to a sincerely held religious belief, we will need additional information. Your employer is committed to protecting its employee's religious rights as well as protecting the health and wellbeing of students, employees, and the communities it serves.

At this time and before additional decisions can be made regarding your exemption request, your employer needs additional information from you.  As such, please review the attached "Information on COVID-19 Vaccines" and complete the attached "Religious Verification Form" that is enclosed with this letter. **Please submit this completed form to my attention no later than  5:00pm on November 18, 2021.**

Once the "Religious Verification Form" is received by my office, you will be notified of the next steps in your interactive process.  As you review the above, please do not hesitate to contact me with any questions you may have. I can be reached directly at SouthOrangeCounty@shawhrconsulting.com.


Sincerely,

Rebecca Wicks, Senior Consultant
Human Resources & Disability Compliance
Shaw HR Consulting, Inc.

Enc.:    Religious Accommodation Verification Form
         Religious Belief Exception Education Resources
         Information on COVID-19 Vaccines
         Key Things to Know About COVID-19 Vaccines
         Myths and Facts about COVID-19 Vaccines
         Vaccine Development and Fetal Cell Lines

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com



Group C
Request for Accommodation
for Vaccine Exemption
for a Sincerely Held Religious Belief

**SOUTH ORANGE COUNTY COMMUNITY COLLEGE DISTRICT**
**RELIGIOUS ACCOMMODATION VERIFICATION FORM FOR COVID-19 VACCINATION**

Printed Name: Paul W. Bonkowski

Department: Maintenance & Operations

☑ I have a sincerely held religious belief, practice, or observance that conflicts with my ability to receive a COVID-19 vaccination

I have received and reviewed the following documents provided to me:

☑ Yes ☐ No   "Religious Belief Exception Educational Resources"
☑ Yes ☐ No   "Information on COVID-19 Vaccines"
☑ Yes ☐ No   "Key Things to Know About COVID-19 Vaccines"
☑ Yes ☐ No   "Myths and Facts about COVID-19 Vaccines"
☑ Yes ☐ No   "Vaccine Development and Fetal Cell Lines"

1.  Please describe your religious beliefs and practices that pertain to your request for exemption:

Jesus Christ died on the cross for the sins of the World, that God, (Father), will send the Holy Spirit to be our helper: "But when the Father sends the Advocate as my representative-that is, the Holy Spirit-he will teach you everything and will remind you of everything I have told you." (John 14:26). the Holy Spirit will lead us and guide us through the trials and tribulations of this World: "By this we know that we abide in Him and He in us, because He has given us of His Spirit." (1 John 4:13).

a.  When did you embrace the belief, observance, or practice described above?
When I was 11-and-one-half years old.

b.  When have you adhered to the belief, observance, or practice in other contexts?
All the time. I especially pray for Wisdom and Direction in my Life. In fact, Christ says to pray about everything: But when you pray, go away by yourself, shut the door behind you, and pray to your Father in private." (Matthew 6:6); and, "Seek his will in all you do, and he will show you which path to take." (Proverbs 3:6).

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com



Group C
Request for Accommodation
for Vaccine Exemption
for a Sincerely Held Religious Belief

c.   Where have you adhered to the belief, observance or practice?

Example: Health decisions
_____
_____
_____
_____
_____
_____

d.   How have you adhered to the belief, observance, or practice?

Through the following scriptures: "Seek his will in all you do,
and he will show you which path to take." (Proverbs 3:6).
_____

Also: "My child, listen to me and do as I say, and you will have
a long good life." (Proverbs 4:10).
_____
_____
_____

2.   Explain in your own words why you are requesting this religious exemption:

I am notifying you of my legal, federal religious exemption according to
_____
Title VII of the U.S. Civil Rights Act of 1964. The Covid_19 vaccine is in
direct conflict with my sincerely held religious belief - I was knitted together
_____
before being placed in my mother's womb: "I knew you before I formed you
in your mother's womb." (Jeremiah 1:5); and, designed with a God given
_____
immune system: "Don't be impressed with your own wisdom. Instead, fear
the Lord and turn away from evil. then you will have healing for your body and
_____
strength for your bones." (Proverbs 3:7-8).
_____
_____
_____
_____
_____
_____
_____
_____

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com



Group C
Request for Accommodation
for Vaccine Exemption
for a Sincerely Held Religious Belief

3.  Describe the religious principle(s) that guide your objection to vaccination:

"Seek his will in all you do, and he will show you which path to take." (Proverbs 3:6);
and, "My child, don't lose sight of common sense and discernment. Hang on to them,
for they will refresh your soul." (Proverbs 3:21)

4.  Indicate whether your religious objections are to all vaccinations, and if not, the religious basis that prohibits particular vaccinations:

All medical choices are made after prayer. Christ has guided me concerning this one. I
can't speak for Christ, (my Lord and Savior), for things that have yet to come. In fact,
(Proverbs 4:10), states: "My child, listen to me and do as I say, and you will have a long
good life." Also: "Don't worry about tomorrow, for tomorrow will bring its own worries.
Today's trouble is enough for today." (Matthew 6:34). Is the District planning to require
other vaccinations as a term of employment? If they are, please let me know and I will
pray about those when the time comes.

5.  I attest that my request for an exemption based upon my sincerely held religious belief is consistent with what is contained in my recent medical records.  ☐ Yes ☐ No

    If your answer is NO, please explain:

I attest that my request for a religious exemption based on my sinserely held religious
beliefs is truthful and accurate. My medical records have no bearing concerning my
sincerely held religious beliefs.

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com



Group C
Request for Accommodation
for Vaccine Exemption
for a Sincerely Held Religious Belief

___PWB___ *(initial)* I understand, submitting this verification form is not a guarantee of approval. South Orange County Community College District will consider my preferred accommodation and other possible accommodations that would resolve the conflict between my religious belief(s), practice(s), or observance(s) and will select and implement the accommodation that it deems effective.

My signature below indicates that the information I have provided in this form accurately reflects my sincerely held religious belief(s), practice(s), or observance(s) and its conflict with my ability to receive a COVID-19 vaccination.  I also understand that in evaluating my request, South Orange County Community College District will explore possible reasonable accommodations for me unless making such accommodations would impose undue hardship on the conduct of South Orange County Community College District' business.

Paul W. Bonkowski

17 November, 2021

Employee's Signature                                Date

**RETURN A COPY OF THIS FORM TO:**
**Shaw HR Consulting, Inc. / Attn: Rebecca Wicks / Via Fax: (805) 464-3535, OR Via email:**
**SouthOrangeCounty@shawhrconsulting.com**
**This form must be received by 5:00 p.m. on November 18, 2021 to be considered.**

Office 805.498.9400
Fax 805.464.3535

107 N. Reino Road #414
Newbury Park, CA 91320

shawhrconsulting.com

# Religious Belief Exception Educational Resources

If you have requested, or plan to request an exception to South Orange County Community College District's vaccination requirement based on a religious objection, we would like to share the following information with you.

The resources are organized by issue.  Note that the FDA has approved the Pfizer-BioNTech COVID-19 Vaccine for individuals ages 16 and older. Visit the FDA website for more information: https://www.fda.gov/

While your request is pending, and if your request is granted, you must comply with non-pharmaceutical interventions (e.g., masking, testing, quarantining) as set forth in the Policy, Section III.A.2 and FAQ 16.

## FAITH BASED EDUCATIONAL RESOURCES

### AMERICAN BAPTIST CHURCHES USA
American Baptist Churches USA (ABCUSA) is proud to be a founding member of the national volunteer COVID-19 Community Corps, which encourages people to get a COVID-19 vaccination as soon as it is available to them.  You can read ABCUSA's COVID-19 Information and Resources here: http://www.abc-usa.org/coronavirus/, and you can read more about the COVID-19 Community Corps here: https://wecandothis.hhs.gov/covidcommunitycorps

### AUTONOMOUS ORTHODOX
(Sinai, Finland, Estonia, Japan, China, Ukrainian Orthodox Church of the USA, Ohrid).
The National Council of Churches (NCC) is a diverse covenant community of 38 member communions and over 35 million individuals in 100,000 congregations, including Orthodox traditions.  NCC encourages churches to help their members get vaccinated against COVID-19.  You can read the NCC's Resources on COVID-19 for Churches here: http://nationalcouncilofchurches.us/resources-on-covid-19-for-churches/

### BUDDHISM
The Dalai Lama urges people to "have courage" and be vaccinated. You can see a video of His Holiness getting vaccinated and speaking about it https://www.youtube.com/watch?app=desktop&v=51ypzc5hqpc
Ven. Master Hsing Yun and Hsi Lai Temple (Buddha's Light International Organization) held a community COVID-19 vaccination clinic on April 6, 2021: http://www.hsilai.org/en/news/2021/04062021A.php
The chief high priest of Theravada Buddhism in Malaysia has advised all religious organizations to encourage their adherents to register for the COVID-19 vaccination and advise their adherents to show up at their vaccination appointments promptly so that the country can achieve herd immunity: https://www.thestar.com.my/news/nation/2021/05/25/buddhist-high-priest-advises-all-religious-bodies-to-encourage-adherents-to-get-covid-19-jabs

### CATHOLICISM
The Pope and senior clergy encourage everyone to get vaccinated in this video: https://www.youtube.com/watch?app=desktop&v=zY5rwTnJF0U
The Vatican's Congregation for the Doctrine of the Faith, at the order of the Sovereign Pontiff Francis, stated that "it is morally acceptable to receive Covid-19 vaccines that have used cell lines from aborted fetuses in their research and production process." https://www.vatican.va/roman_curia/congregations/cfaith/documents/rc_con_cfaith_doc_20201221_nota-vaccini-anticovid_en.html

## CHURCH OF CHRIST, SCIENTIST

The Christian Science Monitor published a Christian Science perspective on vaccines that states, "If we were to encounter a situation where vaccination was required, our compliance with the law wouldn't need to compromise our reliance upon God.  New vaccines may have the prospect of altering the landscape of disease, but they can't lead the way up and out of the material sense of life that is always producing new forms of disease.  To find true and lasting health, we need to see that life is actually in and of Spirit, not material at all."  https://www.csmonitor.com/Commentary/A-Christian-Science-Perspective/2021/0128/Vaccines-immunity-and-the-pathway-to-health

## CHURCH OF LATTER DAY SAINTS/MORMONISM

The First Presidency of The Church of Jesus Christ of Latter-day Saints has stated that "the Church urges its members, employees and missionaries to be good global citizens and help quell the pandemic by safeguarding themselves and others through immunization."  You can read the statement here:  https://newsroom.churchofjesuschrist.org/article/church-leaders-covid-19-vaccine

## CHRISTIAN

The First Presidency of The Church of Jesus Christ of Latter-day Saints has stated that "the Church urges its members, employees and missionaries to be good global citizens and help quell the pandemic by safeguarding themselves and others through immunization."  You can read the statement here:  https://newsroom.churchofjesuschrist.org/article/church-leaders-covid-19-vaccine

## DISCIPLES OF CHRIST

The Disciples of Christ provides information and resources about how to locate a vaccination site and how to promote and support vaccination efforts.  You can read an article on Disciples and COVID-19 here: https://disciples.org/dns/disciples-and-covid-19/

## EASTERN ORTHODOX

The Orthodox Observer published a statement signed by Archbishop Elpidophoros, Chairman, Greek Orthodox Archdiocese of America; Metropolitan Joseph, Vice-Chairman, Antiochian Orthodox Christian Archdiocese of North America; Archbishop Michael, Treasurer, Orthodox Church in America; Metropolitan Gregory, Secretary, American Carpatho-Russian Orthodox Diocese of the USA; Bishop Irinej, Serbian Orthodox Church in North, Central and South America; Metropolitan Nicolae, Romanian Orthodox Metropolia of the Americas; Metropolitan Joseph, Bulgarian Eastern Orthodox Diocese of the USA, Canada, and Australia; Bishop Saba
Georgian Apostolic Orthodox Church in North America; Metropolitan Tikhon, Orthodox Church in America: "[W]e affirm and assure you that it is neither wrong nor sinful to seek medical attention and advice. . . .  We therefore encourage all of you – the clergy and lay faithful of our Church – to consult your physicians in order to determine the appropriate course of action for you . . . .  If we work together – in a spirit of sincere compassion and care for one another – we will soon be able to gather together as a full community in our churches once again."  https://www.goarch.org/-/vaccine-statement?inheritRedirect=true
The National Council of Churches (NCC) encourages churches to help their members get vaccinated against COVID-19.  The NCC is a diverse covenant community of 38 member communions and over 35 million individuals in 100,000 congregations, including Orthodox traditions.  You can read the NCC's COVID-19 vaccine resources at: http://nationalcouncilofchurches.us/resources-on-covid-19-for-churches/
The second-most senior Orthodox bishop in the Moscow Patriarchate, Metropolitan Hilarion of Volokolamsk, urged all people of Russia to get vaccinated against COVID-19, saying their refusal to do so is akin to committing a sin:  Read more at: https://international.la-croix.com/news/religion/russian-orthodox-leader-says-refusing-vaccine-is-a-sin/14631

Religious Belief Exception Educational Resources

**EPISCOPAL**

The Episcopal Church strongly encourages everyone to get vaccinated against COVID-19 using any approved vaccine.  You can read the Episcopal Church Toolkit for COVID-19 Vaccine Distribution here: https://www.episcopalchurch.org/ministries/office-government-relations/covid-vaccine-toolkit/

**EVANGELICAL CHRISTIANITY**

The Reverend Walter Kim, President of the National Association of Evangelicals, which includes more than 45,000 churches from 40 denominations and serves a constituency of millions, has encouraged people to be vaccinated.

You can watch his video here: https://wecandothis.hhs.gov/trusted-voices-covid-19-vaccine-acceptance-reverend-walter-kim

You can read his article here: https://www.northjersey.com/story/opinion/2021/01/15/faith-community-can-host-covid-19-vaccine-sites-across-u-s/4167153001/

**HUMANISM**

Kate Uesugi, the Communications Coordinator at the American Humanist Association, published an article in the magazine "The Humanist" on August 24, 2021, titled, "Why We Should End Religious Exemptions for Vaccines."  https://thehumanist.com/commentary/why-we-should-end-religious-exemptions-for-vaccines/

Andrew Copson, President of Humanists International, released a statement on February 12, 2021, urging the world to make vaccines available to everyone equitably and encouraging people to be vaccinated.  https://humanists.international/2021/02/humanists-internationals-statement-on-vaccines/

Anthony Cruz Pantojas, co-chair of the Latinx Humanist Alliance, an affiliate of the American Humanist Association, stated in an interview that, "It is almost an ethical or moral obligation, I would say, for freethinkers, humanists, heretics, and so forth [to support vaccination]."  https://ifyc.org/article/humanist-perspective-vaccination-ethical-obligation

The Humanist Society of New Mexico has resumed in-person meetings and "everyone who attends an in-person meeting must be fully immunized against COVID-19, and be able to show a vaccine record card if requested.  https://hs-nm.org/calendar/meetings/

**ISLAM**

The National Muslim Task Force on COVID-19 and the National Black Muslim COVID Coalition recommend "taking COVID-19 vaccines as directed by your physician or healthcare provider based on your risk and local public health authority guidance."  https://isna.net/wp-content/uploads/2020/04/Press-Release-NMCTF-COVID-Vaccines-12.22.2020.pdf

American Muslim Health Professionals has videos and other information on its website affirming that the vaccine is halal and encouraging people to be vaccinated: https://amhp.us/vaccine/

The Grand Mufti of Saudi Arabia, Sheikh Abdulaziz al-Sheikh, who received the Pfizer Covid-19 vaccine, termed the vaccine "a blessing from Allah" and advised all citizens to get the vaccination. https://en.dailypakistan.com.pk/04-Jan-2021/a-blessing-from-allah-saudi-arabia-s-grand-mufti-receives-coronavirus-vaccine-video

The secretary general of the Egyptian Dar al-Iftaa announced that the COVID-19 vaccine is halal and that taking the vaccines is a religious duty for all people living in Egypt.  https://www.loc.gov/item/global-legal-monitor/2021-01-22/egypt-and-united-arab-emirates-covid-19-vaccine-ruled-permissible-under-islamic-law/

The Fatwa Council of the United Arab Emirates issued a fatwa granting permission for the use of coronavirus vaccines in compliance with Sharia law.  https://www.khaleejtimes.com/coronavirus-pandemic/uae-covid-19-vaccine-fatwa-council-chief-gets-the-jab

Religious Belief Exception Educational Resources

**JAINISM**

In Southern California amid the pandemic, members of the Jain community have administered COVID-19 vaccines, as described in this LA Times article: https://www.latimes.com/california/story/2021-05-02/jain-studies-finding-foothold-in-higher-education

**JEHOVAH'S WITNESSES**

According to JW.org, the official website of Jehovah's Witnesses, "Jehovah's Witnesses are not opposed to vaccination. We view vaccination as a personal decision for each Christian to make. Many of Jehovah's Witnesses choose to get vaccinated."  You can read the full article here: https://www.jw.org/en/jehovahs-witnesses/faq/jw-vaccines-immunization/

**JUDAISM**

Nessah Synagogue (founded by Rabbi David Shofet; his father, Iran's Chief Rabbi Hakham Yedidia Shofet, and the Iranian Jews of Los Angeles and Beverly Hills), which upholds the traditions and customs of Iranian Jews according to Orthodox, Sephardic Halacha, "strongly encourages anyone who is capable of being vaccinated and has not yet done so, to please get vaccinated as soon as possible." https://www.nessah.org

Chief Rabbi Lau stated that "halachah (Jewish law) mandates that we inoculate against the virus" https://www.algemeiner.com/2021/02/26/get-vaccinated-now-the-torah-commands-it/ and told rabbis in the diaspora to encourage vaccination https://www.jpost.com/israel-news/chief-rabbi-lau-to-diaspora-rabbis-you-must-vaccinate-dangerous-not-to-652477

Senior rabbis called on Israeli Haredim to be Vaccinated.  https://www.ynetnews.com/article/Sk1XcZ63w

The Orthodox Union said "We salute our shuls and communities for their efforts in vaccine education and facilitation of appointments and vaccine access." https://www.ou.org/covid19/ and https://www.ou.org/assets/Pesach-Guidance-5781b.pdf

The Rabbinical Council of America wrote that "the Torah obligation to preserve our lives and the lives of others requires us to vaccinate for COVID-19 as soon as a vaccine becomes available." https://rabbis.org/wp-content/uploads/2020/12/Guidance-re-Vaccines.pdf

The United Synagogue of Conservative Judaism's Rabbinical Assembly ruled that "COVID-19 vaccines approved by government health agencies under emergency processes are considered to be refuot b'dukot, established treatments. With proper medical guidance, Jews are obligated to be vaccinated against COVID-19." https://www.rabbinicalassembly.org/sites/default/files/2021-01/Vaccination%20and%20Ethical%20Questions%20Posed%20by%20COVID-19%20Vaccines%20-%20Final.pdf

**ORIENTAL ORTHODOX**

(Armenian Church of America, Coptic Orthodox Archdiocese of America, Ethiopian, Eritrean, Malankara Orthodox Syrian Church, Syrian Orthodox Church of Antioch)

The National Council of Churches (NCC) -- is a diverse covenant community of 38 member communions and over 35 million individuals in 100,000 congregations, including Orthodox traditions -- encourages churches to help their members get vaccinated against COVID-19.  You can read the NCC's Resources on COVID-19 for Churches here: http://nationalcouncilofchurches.us/resources-on-covid-19-for-churches/

**PRESBYTERIAN**

The Rev. Dr. Diane Moffett, president and executive director of the Presbyterian Mission Agency, says, "I believe being vaccinated is an important step in ending the suffering of so many in our nation and world."  (Please see article here: https://www.presbyterianmission.org/story/pcusa-leadership-takes-part-in-covid-19-vaccination-effort/)  The article describes the vaccination of the Rev. Dr. Moffitt and the Rev. Dr. J. Herbert Nelson, II, the Stated Clerk of the General Assembly of the Presbyterian Church (U.S.A.).

Religious Belief Exception Educational Resources

**PROTESTANT**
(including AME, AMEZ, Alliance of Baptists, American Baptist Churches USA, Amish, Anglican, Assemblies of God, Assyrian Church of the East, Church of the Brethren, CME, Community of Christ, Congregational, Disciples of Christ, Ecumenical Catholic Communion, Episcopal, Hungarian Reformed, Korean Presbyterian Church Abroad, Lutheran, Mar Thoma, Mennonite, Moravian Church in America, National Baptist Convention, Presbyterian, Quaker, Pentecostal, Presbyterian, Reformed Church in America, Southern Baptist Convention, Unitarian-Universalist, United Church of Christ, United Methodist (not a complete list))
The National Council of Churches (NCC) is a diverse covenant community of 38 member communions and over 35 million individuals in 100,000 congregations, including Protestant traditions.  NCC encourages churches to help their members get vaccinated against COVID-19.  You can read the NCC's Resources on COVID-19 for Churches here: http://nationalcouncilofchurches.us/resources-on-covid-19-for-churches/

**SEVENTH-DAY ADVENTISTS**
The official website of the Seventh-day Adventist World Church states: "The Seventh-day Adventist Church places strong emphasis on health and well-being.  The Adventist health emphasis is based on biblical revelation, the inspired writing of E. G. White (co-founder of the Church), and on peer-reviewed scientific literature.  As such, we encourage responsible immunization/vaccination, and have no religious or faith-based reason not to encourage our adherents to responsibly participate in protective and preventive immunization programs.  We value the health and safety of the population, which includes the maintenance of 'herd immunity.'"  You can read that here: https://www.adventist.org/guidelines/immunization/?_ga=2.216490078.930293552.1630361315-574889890.1630361315.

The Seventh-day Adventist Church states specifically with respect to the COVID-19 vaccine: "As we witness the global magnitude of the pandemic, the deaths, disability, and long-term COVID-19 effects that are emerging in all age groups, we are encouraging our members to consider responsible immunization and the promotion and facilitation of the development of what is commonly termed herd immunity . . . ." You can read the full article here: https://adventist.news/news/covid-19-vaccines-addressing-concerns-offering-counsel?_ga=2.124083273.2134040195.1630084325-1679064913.1630084325

**SIKHISM (INCLUDING SIKH DHARMA INTERNATIONAL)**
The Sikh Coalition has stated that it is committed to "helping every Sikh in the United States understand the importance of getting vaccinated against COVID-19."  You can read the statement here: https://www.sikhcoalition.org/our-work/empowering-the-community/covid-19-vaccination-information/

# VACCINE RELATED EDUCATIONAL RESOURCES

**ANIMAL PRODUCTS**
Moderna nor the Johnson & Johnson (Janssen) vaccines contain animal products. You can read more about the ingredients in the vaccines at these websites:
- https://www.11alive.com/article/news/verify/animal-products-covid-19-vaccine/85-0fdc6b3c-7259-4fa0-9524-a40b28d895f7
- https://www.johnmuirhealth.com/patients-and-visitors/coronavirus/covid-vaccine-program/covid-vaccine-safety.html#vegan-vaccine
- Pfizer fact sheet (including list of ingredients): https://www.fda.gov/media/144414/download
- Moderna fact sheet (including list of ingredients): https://www.fda.gov/media/144638/download

Religious Belief Exception Educational Resources

- Johnson & Johnson (Janssen) fact sheet (including list of ingredients): https://www.fda.gov/media/146305/download

**INFERTILITY**

There is currently no evidence that any vaccines, including COVID-19 vaccines, cause female or male fertility problems. Accordingly, American College of Obstetricians and Gynecologists (ACOG) recommends that all eligible individuals, including those who are pregnant or lactating, be vaccinated.  See University of California – Policy SARS-CoV-2 (COVID-19) Vaccination Program, FAQ No. 8 (pages 10-11).

**MICROCHIP CONCERNS**

We have confirmed that the COVID-19 vaccines do not contain microchips.  According to the Centers for Disease Control and Prevention (CDC), "COVID-19 vaccines do not contain microchips.  Vaccines are developed to fight against disease and are not administered to track your movement." You can read more here: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html?s_cid=10506:covid%20vaccine%20change%20your%20dna:sem.ga:p:RG:GM:gen:PTN:FY21 (scroll to "Do COVID-19 vaccines contain microchips?").

**THIMEROSAL**

We have confirmed that none of the three brands of the COVID-19 vaccine available in the United States includes thimerosal:

- https://www2.cdc.gov/vaccines/ed/covid19/pfizer/20030.asp
- https://www2.cdc.gov/vaccines/ed/covid19/moderna/10030.asp
- https://www2.cdc.gov/vaccines/ed/covid19/janssen/20030.asp

**VACCINE APPROVAL**

The United States Federal Drug Administration (FDA) approved the Pfizer COVID-19 Vaccine.  You can read more about the FDA's approval here:

https://www.fda.gov/news-events/press-announcements/fda-approves-first-covid-19-vaccine

**VACCINES AND DNA**

We have confirmed that none of the three brands of the COVID-19 vaccine available in the United States alters DNA: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html?s_cid=10506:covid%20vaccine%20change%20your%20dna:sem.ga:p:RG:GM:gen:PTN:FY21

**ALREADY HAD COVID-19**

The CDC advises that "you should be vaccinated regardless of whether you already had COVID-19."  You can read the CDC guidance here: https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html#:~:text=Yes%2C%20you%20should%20be,had%20COVID%2D19

Religious Belief Exception Educational Resources

**INFORMATION ON COVID-19 VACCINES**

**What You Need to Know**
https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html

- COVID-19 vaccines are effective at helping protect against severe disease and death from variants of the virus that causes COVID-19 currently circulating, including the Delta variant.
- Everyone aged 12 years and older should get a COVID-19 as soon as possible.
- Vaccines are free
- Studies show that COVID-19 vaccines are effective at keeping you from getting COVID-19. Getting a COVID-19 vaccine will also help keep you from getting seriously ill even if you do get COVID-19. Learn more about the benefits of getting vaccinated.
- Population immunity, also known as herd immunity or community immunity, that enough people in a community are protected from getting a disease because they've already had the disease or because they've been vaccinated
- Population immunity makes it hard for a disease to spread from person to person. It even protects those who cannot be vaccinated, like newborns or people who are allergic to a vaccine. The percentage of people who need to have protection to achieve population immunity varies by disease.

**Variants and Vaccines**
https://www.cdc.gov/coronavirus/2019-ncov/vaccines/keythingstoknow.html

- FDA-authorized COVID-19 vaccines help protect against Delta and other known variants.
- These vaccines are effective at keeping people from getting COVID-19, getting very sick, and dying.
- To maximize protection from the Delta variant and prevent possibly spreading it to others, you should wear a mask indoors in public if you are in an area of substantial or high transmission even if you are fully vaccinated.
- We don't know how effective the vaccines will be against new variants that may arise.

**Myths, Facts & Common Questions**

***Do COVID-19 vaccines contain microchips?***
No. COVID-19 vaccines do not contain microchips. Vaccines are developed to fight against disease and are not administered to track your movement. Vaccines work by stimulating your immune system to produce antibodies, exactly like it would if you were exposed to the disease. After getting vaccinated, you develop immunity to that disease, without having to get the disease first.  Learn more about the ingredients in the COVID-19 vaccinations authorized for use in the United States.  https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html

***Is it safe for me to get a COVID-19 vaccine if I would like to have a baby one day?***
Yes. COVID-19 vaccination is recommended for everyone 12 years of age or older, including people who are trying to get pregnant now or might become pregnant in the future, as well as their partners.  Currently no evidence shows that any vaccines, including COVID-19 vaccines, cause fertility problems (problems trying to get pregnant) in women or men. Learn more about COVID-19 vaccines and people who would like to have a baby. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html

***Will a COVID-19 vaccine alter my DNA?***
No. COVID-19 vaccines do not change or interact with your DNA in any way. Both mRNA and viral vector COVID-19 vaccines deliver instructions (genetic material) to our cells to start building protection against the virus that causes COVID-19. However, the material never enters the nucleus of the cell, which is where our DNA is kept.  Learn more about mRNA and viral vector COVID-19 vaccines. https://www.cdc.gov/coronavirus/2019-ncov/vaccines/facts.html

INFORMATION ON COVID-19 VACCINES

***If I have already had COVID-19 and recovered, do I still need to get vaccinated with a COVID-19 vaccine?***
Yes, you should be vaccinated regardless of whether you already had COVID-19 because:
- Research has not yet shown how long you are protected from getting COVID-19 again after you recover from COVID-19.
- Vaccination helps protect you even if you've already had COVID-19.

Evidence is emerging that people **get better protection by being fully vaccinated** compared with having had COVID-19. One study showed that unvaccinated people who already had COVID-19 are more than 2 times as likely than fully vaccinated people to get COVID-19 again.  If you were treated for COVID-19 with monoclonal antibodies or convalescent plasma, you should wait 90 days before getting a COVID-19 vaccine. Talk to your doctor if you are unsure what treatments you received or if you have more questions about getting a COVID-19 vaccine.

If you or your child has a history of multisystem inflammatory syndrome in adults or children (MIS-A or MIS-C), consider delaying vaccination until you or your child have recovered from being sick and for 90 days after the date of diagnosis of MIS-A or MIS-C. Learn more about the clinical considerations for people with a history of multisystem MIS-C or MIS-A.  Experts are still learning more about how long vaccines protect against COVID-19. CDC will keep the public informed as new evidence becomes available.   https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html

***What are the Ingredients in the COVID-19 Vaccines?***
Vaccine ingredients vary by manufacturer. None of the vaccines contain eggs, gelatin, latex, or preservatives. All COVID-19 vaccines are free from metals such as iron, nickel, cobalt, lithium, and rare earth alloys. They are also free from manufactured products such as microelectronics, electrodes, carbon nanotubes, or nanowire semiconductors.  https://www.cdc.gov/coronavirus/2019-ncov/vaccines/faq.html

To learn more about the ingredients in authorized COVID-19 vaccines, see

- Pfizer-BioNTech COVID-19 Vaccine Overview and Safety
- Moderna COVID-19 Vaccine Overview and Safety
- Johnson & Johnson's Janssen COVID-19 Vaccine Overview and Safety
- Ingredients Included in COVID-19 Vaccines

***Were the Pfizer and Moderna COVID-19 vaccines developed using fetal cell lines?***
The mRNA COVID-19 vaccines produced by Pfizer and Moderna do not require the use of any fetal cell cultures in order to manufacture (produce) the vaccine. Early in the development of mRNA vaccine technology, fetal cells were used for "proof of concept" (to demonstrate how a cell could take up mRNA and produce the SARS-CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein. The Pfizer and Moderna vaccines were found to be ethically uncontroversial by the pro-life policy organization the Charlotte Lozier Institute. Further, the Secretariat of Pro-Life Activities, a committee within the United States Conference of Catholic Bishops, has stated: "neither Pfizer nor Moderna used an abortion-derived cell line in the development or production of the vaccine. However, such a cell line was used to test the efficacy of both vaccines. Thus, while neither vaccine is completely free from any use of abortion-derived cell lines, in these two cases the use is very remote from the initial evil of the abortion…one may receive any of the clinically recommended vaccines in good conscience with the assurance that reception of such vaccines does not involve immoral cooperation in abortion."
http://publichealth.lacounty.gov/media/coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf

**Was the Johnson & Johnson (Janssen Pharmaceuticals) COVID-19 vaccine developed using fetal cell lines?**
The non-replicating viral vector vaccine produced by Johnson & Johnson did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine. The Catholic Church and the Southern Baptist Ethics & Religious Liberty Commission have both stated that receiving a COVID-19 vaccine that required fetal cell lines for production or manufacture is morally acceptable. The U.S. Conference of Catholic Bishops goes further and has stated: "receiving a COVID-19 vaccine ought to be understood as an act of charity toward the other members of our community. In this way, being vaccinated safely against COVID-19 should be considered an act of love of our

INFORMATION ON COVID-19 VACCINES

neighbor and part of our moral responsibility for the common good...Given the urgency of this crisis, the lack of available alternative vaccines, and the fact that the connection between an abortion that occurred decades ago and receiving a vaccine produced today is remote, inoculation with the new COVID-19 vaccines in these circumstances can be morally justified."

On March 2nd, 2021, the U.S. Conference of Catholic Bishops issued a statement which addressed the use of Johnson & Johnson's COVID-19 vaccine. The Bishops stated: "if one can choose among equally safe and effective COVID-19 vaccines, the vaccine with the least connection to abortion-derived cell lines should be chosen. Therefore, if one has the ability to choose a vaccine, Pfizer or Moderna's vaccines should be chosen over Johnson & Johnson's...While we should continue to insist that pharmaceutical companies stop using abortion-derived cell lines, given the world-wide suffering that this pandemic is causing, we affirm again that being vaccinated can be an act of charity that serves the common good." The Catholic Church has stated, "Those who, however, for reasons of conscience, refuse vaccine produced with cell lines from aborted fetuses, must do their utmost to avoid, by other prophylactic means and appropriate behavior, becoming vehicles for the transmission of the infectious agent. In particular, they must avoid any risk to the health of those who cannot be vaccinated for medical or other reasons, and who are the most vulnerable."

http://publichealth.lacounty.gov/media/coronavirus/docs/vaccine/VaccineDevelopment_FetalCellLines.pdf

INFORMATION ON COVID-19 VACCINES

 Centers for Disease Control and Prevention



## COVID-19

# Key Things to Know About COVID-19 Vaccines

Updated Aug. 19, 2021        Print



## What You Need to Know

- **COVID-19 vaccines are effective at helping protect against severe disease and death from variants** of the virus that causes COVID-19 currently circulating, including the Delta variant.
- If you are fully vaccinated you can resume many activities that you did before the pandemic, but you should wear a mask indoors in public if you are in an area of substantial or high transmission to maximize protection from the Delta variant and possibly spreading it to others.
- You may have side effects after vaccination. These are normal and should go away in a few days.
- Learn how to find a COVID-19 vaccine so you can get it as soon as you can.

## What We Are Still Learning

- How well the vaccines protect people with weakened immune systems, including people who take medicines that suppress the immune system
- How long COVID-19 vaccines protect people
- How many people have to be vaccinated against COVID-19 before the population can be considered protected (population immunity)
- How effective the vaccines are against new variants of the virus that causes COVID-19

# Availability of Vaccines

## What we know

Vaccines are widely accessible in the United States. Everyone aged 12 years and older should get a COVID-19 vaccination as soon as possible.

Vaccines are widely accessible in the United States and are **available for everyone at no cost.** Learn more about how COVID-19 vaccines get to you.

Many doctors' offices, retail pharmacies, hospitals, and clinics offer COVID-19 vaccinations. Parents, check with your child's healthcare provider about whether they offer COVID-19 vaccination.

**Find a COVID-19 Vaccine:** Search vaccines.gov, text your ZIP code to 438829, or call 1-800-232-0233 to find locations near you.

# Cost of Vaccines

## Fast, Easy, Free, and Nearby COVID-19 Vaccination

The federal government is providing the vaccine **free of charge** to all people living in the United States, regardless of their immigration or health insurance status.

COVID-19 Vaccines Are Free

# Effectiveness

## What we know

COVID-19 vaccines are effective at protecting you from COVID-19, especially severe illness and death. COVID-19 vaccines reduce the risk of people spreading the virus that causes COVID-19. If you are fully vaccinated, you can resume activities that you did before the pandemic. Learn more about what you can do when you have been fully vaccinated.

Studies show that COVID-19 vaccines are effective at keeping you from getting COVID-19. Getting a COVID-19 vaccine will also help keep you from getting seriously ill even if you do get COVID-19. Learn more about the benefits of getting vaccinated.

COVID-19 vaccines teach our immune systems how to recognize and fight the virus that causes COVID-19. It typically takes 2 weeks after vaccination for the body to build protection (immunity) against the virus that causes COVID-19. That means it is possible a person could still get COVID-19 before or just after vaccination and then get sick because the vaccine did not have enough time to build protection. People are considered fully vaccinated 2 weeks after their second dose of the Pfizer-BioNTech or Moderna COVID-19 vaccines, or 2 weeks after the single-dose Johnson & Johnson's Janssen COVID-19 vaccine.



People with moderately to severely compromised immune systems should receive an additional dose of mRNA COVID-19 vaccine after the initial 2 doses.

## What we are still learning

We are still learning how well COVID-19 vaccines protect people with weakened immune systems, including people who take medicines that suppress the immune system. We're also still learning how long COVID-19 vaccines protect people.

If you have a medical condition or are taking medicines that weaken your immune system, you should talk to your healthcare provider. You may need to keep taking all precautions to prevent COVID-19 disease.

# Safety

## What we know

COVID-19 vaccines are safe and effective. Vaccines cannot give you COVID-19. You may have side effects after vaccination. These are normal and should go away in a few days.

Millions of people in the United States have received COVID-19 vaccines, and these vaccines have undergone the most intensive safety monitoring in U.S. history. This monitoring includes using both established and new safety monitoring systems to make sure that COVID-19 vaccines are safe. COVID-19 vaccines cannot give you COVID-19. Learn more to bust

systems to make sure that COVID-19 vaccines are safe. COVID-19 vaccines cannot give you COVID-19. Learn more to bust myths and learn the facts about COVID-19 vaccines.

CDC has developed a new tool, **v-safe**, to help us quickly find any safety issues with COVID-19 vaccines. V-safe is a smartphone-based, after-vaccination health checker for people who receive COVID-19 vaccines. Learn how the federal government is working to ensure the safety of COVID-19 vaccines.

## You may have side effects after vaccination, but these are normal

After COVID-19 vaccination, you may have some side effects. These are normal signs that your body is building protection. The side effects from COVID-19 vaccination, such as tiredness, headache, or chills, may affect your ability to do daily activities, but they should go away in a few days. Learn more about what to expect after getting vaccinated.

# Population Immunity

## What we know

Population immunity, also known as herd immunity or community immunity,  means that enough people in a community are protected from getting a disease because they've already had the disease or because they've been vaccinated.

Population immunity makes it hard for a disease to spread from person to person. It even protects those who cannot be vaccinated, like newborns or people who are allergic to a vaccine. The percentage of people who need to have protection to achieve population immunity varies by disease.

## What we are still learning

We are still learning **how many people** have to be vaccinated against COVID-19 before the population can be considered protected.

As we know more, CDC will continue to update our recommendations for both vaccinated and unvaccinated people.

# Variants and Vaccines

- FDA-authorized COVID-19 vaccines help protect against Delta and other known variants.
- These vaccines are effective at keeping people from getting COVID-19, getting very sick, and dying.
- To maximize protection from the Delta variant and prevent possibly spreading it to others, you should wear a mask indoors in public if you are in an area of substantial or high transmission even if you are fully vaccinated.
- We don't know how effective the vaccines will be against new variants that may arise.

# New Variants

## What we know

COVID-19 vaccines are effective against severe disease and death from variants of the virus that causes COVID-19 currently circulating in the United States, including the Delta variant.

- Infections happen in only a small proportion of people who are fully vaccinated, even with the Delta variant. When these infections occur among vaccinated people, they tend to be mild.
- If you are fully vaccinated and become infected with the Delta variant, you might be able to spread the virus to others.
- People with weakened immune systems, including people who take immunosuppressive medications, may not be protected even if fully vaccinated.



## For Healthcare and Public Health

Clinical and Professional Resources: Toolkits and resources for healthcare workers and public health professionals.

## Related Pages

> When You've Been Fully Vaccinated

> Myths and Facts about COVID-19 Vaccines

> Frequently Asked Questions about COVID-19 Vaccination

> Benefits of Getting a COVID-19 Vaccine

Last Updated Aug. 19, 2021





## COVID-19

# Myths and Facts about COVID-19 Vaccines

Updated Sept. 7, 2021        Print

**How do I know which COVID-19 vaccine information sources are accurate?**

Accurate vaccine information is critical and can help stop common myths and rumors.

It can be difficult to know which sources of information you can trust. Before considering vaccine information on the Internet, check that the information comes from a credible source and is updated on a regular basis. Learn more about finding credible vaccine information.

# Bust Common Myths and Learn the Facts

## Are all events reported to the Vaccine Adverse Event Reporting System (VAERS) caused by vaccination?

No.



VAERS data alone cannot determine if the reported adverse event was caused by a COVID-19 vaccination. Anyone can report events to VAERS, even if it is not clear whether a vaccine caused the problem. Some VAERS reports may contain information that is incomplete, inaccurate, coincidental, or unverifiable. These adverse events are studied by vaccine safety experts who look for unusually high numbers of health problems, or a pattern of problems, after people receive a particular vaccine.

Recently, the number of deaths reported to VAERS following COVID-19 vaccination has been misinterpreted and misreported as if this number means deaths that were proven to be caused by vaccination. Reports of adverse events to VAERS following vaccination, including deaths, do not necessarily mean that a vaccine caused a health problem.

Learn more about VAERS.

## Is the mRNA vaccine considered a vaccine?

**Yes.** mRNA vaccines, such as Pfizer-BioNTech and Moderna, work differently than other types of vaccines, but they still trigger an immune response inside your body. This type of vaccine is new, but research and development on it has been under way for decades.

The mRNA vaccines do not contain any live virus. Instead, they work by teaching our cells to make a harmless piece of a "spike protein," which is found on the surface of the virus that causes COVID-19. After making the protein piece, cells display it on their surface. Our immune system then recognizes that it does not belong there and responds to get rid of it. When an immune response begins, antibodies are produced, creating the same response that happens in a natural infection.



In contrast to mRNA vaccines, many other vaccines use a piece of, or weakened version of, the germ that the vaccine protects against. This is how the measles and flu vaccines work. When a weakened or small part of the virus is introduced to your body, you make antibodies to help protect against future infection.

 

Learn more about how mRNA COVID-19 vaccines work.

## Do COVID-19 vaccines contain microchips?

**No.** COVID-19 vaccines do not contain microchips. Vaccines are developed to fight against disease and are not administered to track your movement. Vaccines work by stimulating your immune system to produce antibodies, exactly like it would if you were exposed to the disease. After getting vaccinated, you develop immunity to that disease, without having to get the disease first.

Learn more about the ingredients in the COVID-19 vaccinations authorized for use in the United States.

Learn more about how mRNA COVID-19 vaccines work.



## Can receiving a COVID-19 vaccine cause you to be magnetic?

**No.** Receiving a COVID-19 vaccine will not make you magnetic, including at the site of vaccination which is usually your arm. COVID-19 vaccines do not contain ingredients that can produce an electromagnetic field at the site of your injection. All COVID-19 vaccines are free from metals.

Learn more about the ingredients in the COVID-19 vaccinations authorized for use in the United States.



## Do any of the COVID-19 vaccines authorized for use in the United States shed or release any of their components?

**No.** Vaccine shedding is the term used to describe the release or discharge of any of the vaccine components in or outside of the body. Vaccine shedding can only occur when a vaccine contains a weakened version of the virus. None of the vaccines authorized for use in the U.S. contain a live virus. mRNA and viral vector vaccines are the two types of currently authorized COVID-19 vaccines available.

Learn more about mRNA and viral vector COVID-19 vaccines.



## Is it safe for me to get a COVID-19 vaccine if I would like to have a baby one day?

**Yes.** COVID-19 vaccination is recommended for everyone 12 years of age or older, including people who are trying to get pregnant now or might become pregnant in the future, as well as their partners.

Currently no evidence shows that any vaccines, including COVID-19 vaccines, cause fertility problems (problems trying to get pregnant) in women or men. Learn more about COVID-19 vaccines and people who would like to have a baby.



## Will a COVID-19 vaccine alter my DNA?

**No.** COVID-19 vaccines do not change or interact with your DNA in any way. Both mRNA and viral vector COVID-19 vaccines deliver instructions (genetic material) to our cells to start building protection against the virus that causes COVID-19. However, the material never enters the nucleus of the cell, which is where our DNA is kept.

Learn more about mRNA and viral vector COVID-19 vaccines.



## Will getting a COVID-19 vaccine cause me to test positive for COVID-19 on a viral test?

**No.** None of the authorized and recommended COVID-19 vaccines cause you to test positive on viral tests, which are used to see if you have a **current infection**.

If your body develops an immune response to vaccination, which is the goal, you may test positive on some antibody tests. Antibody tests indicate you had a **previous infection** and that you may have some level of protection against the virus.

Learn more about the possibility of COVID-19 illness after vaccination



# Other Myths and Facts

### Can CDC mandate that I get a COVID-19 vaccine?                    ⌄

**No.** The federal government does not mandate (require) vaccination for people. Additionally, CDC does not maintain or monitor a person's vaccination records. Whether a state or local government or employer, for example, can require or mandate COVID-19 vaccination is a matter of state or other applicable law ⧉ .



## Can a COVID-19 vaccine make me sick with COVID-19?    ⌄

**No.** None of the authorized COVID-19 vaccines in the United States contain the live virus that causes COVID-19. This means that a COVID-19 vaccine **cannot** make you sick with COVID-19.

COVID-19 vaccines teach our immune systems how to recognize and fight the virus that causes COVID-19. Sometimes this process can cause symptoms, such as fever. These symptoms are normal and are signs that the body is building protection against the virus that causes COVID-19. Learn more about how COVID-19 vaccines work.



## Can being near someone who received a COVID-19 vaccine affect my menstrual cycle?    ⌄

**No.** Your menstrual cycle cannot be affected by being near someone who received a COVID-19 vaccine.

Many things can affect menstrual cycles, including stress, changes in your schedule, problems with sleep, and changes in diet or exercise. Infections may also affect menstrual cycles.



## Related Pages

› Frequently Asked Questions about Vaccination

› Key Things to Know about COVID-19 Vaccines

Last Updated Sept. 7, 2021

# Los Angeles County
# COVID-19 VACCINE AND FETAL CELL LINES

In various stages of vaccine development and manufacturing, some of the COVID-19 vaccines used cells originally isolated from fetal tissue (often referred to as fetal cells), some of which were originally derived from an aborted fetus. The use of fetal cell lines is a very sensitive and important topic within some faith communities and among individuals with concerns about the ethics of using materials derived in this way.

It is crucial for everyone to have all of the appropriate information to make a fully informed decision regarding COVID-19 vaccination. For those with questions or concerns about the use of fetal cell lines in vaccine development, please view the information presented in this handout and keep the following considerations in mind when making your vaccine decision:

- For us to break the chain of disease transmission and protect our community from COVID-19, we will need the vast majority of the public to get vaccinated against the virus.
- Vaccinating not only protects you, but may also protect your family, friends, and those in our community most vulnerable to severe disease from COVID-19.
- The risks and benefits of COVID-19 vaccination will vary from person to person, and individuals may want to consider discussing this with their own healthcare provider.
- Several religious and bioethics groups have reviewed and commented on the ethical considerations of receiving the current COVID-19 vaccines. Many of those considerations are cited below.
- While vaccine supply remains limited, you may not be given a choice on which COVID-19 vaccine you can receive.
- Individuals may want to consider having a personal conversation with their faith leader or someone experienced in bioethics.

## Why are fetal cells used to make vaccines?

Historical fetal cell lines were derived in the 1960's and 1970's from two elective abortions and have been used to create vaccines for diseases such as hepatitis A, rubella, and rabies. Abortions from which fetal cells were obtained were elective and were not done for the purpose of vaccine development.

The fetal cell lines being used to produce some of the potential COVID-19 vaccines are from two sources:

- HEK-293: A kidney cell line that was isolated from a fetus in 1973 (undisclosed origin, from either a spontaneous miscarriage or an elective abortion)
- PER.C6: A retinal cell line that was isolated from an aborted fetus in 1985

Any vaccine that relies on these historic cell lines will not require nor solicit new abortions.

To develop and manufacture some vaccines, pharmaceutical companies prefer human cell lines over other cells because 1) viruses need cells to grow and the viruses tend to grow better in cells from humans than animals (because they infect humans), 2) fetal cells can be used longer than other cell types, and 3) fetal cells can be maintained at low temperatures, allowing scientists to continuing using cell lines from decades ago. While fetal cell lines may be used to develop or manufacture COVID-19 vaccines, the vaccines themselves **do not contain any aborted fetal cells**. A comprehensive list of COVID-19 vaccines in development and any connection to abortion-derived cell lines is available here.

---



# Los Angeles County
# COVID-19 VACCINE AND FETAL CELL LINES

## Were the Pfizer and Moderna COVID-19 vaccines developed using fetal cell lines?

The mRNA COVID-19 vaccines produced by Pfizer and Moderna **do not require the use of any fetal cell cultures in order to manufacture (produce) the vaccine.**

Early in the development of mRNA vaccine technology, fetal cells were used for "proof of concept" (to demonstrate how a cell could take up mRNA and produce the SARS-CoV-2 spike protein) or to characterize the SARS-CoV-2 spike protein.

The Pfizer and Moderna vaccines were found to be **ethically uncontroversial** by the pro-life policy organization the Charlotte Lozier Institute. Further, the Secretariat of Pro-Life Activities, a committee within the United States Conference of Catholic Bishops, has stated: "neither Pfizer nor Moderna used an abortion-derived cell line in the development or production of the vaccine. However, such a cell line was used to test the efficacy of both vaccines. Thus, while neither vaccine is completely free from any use of abortion-derived cell lines, in these two cases the use is very remote from the initial evil of the abortion…one may receive any of the clinically recommended vaccines in good conscience with the assurance that reception of such vaccines does not involve immoral cooperation in abortion."

## Was the Johnson & Johnson (Janssen Pharmaceuticals) COVID-19 vaccine developed using fetal cell lines?

The non-replicating viral vector vaccine produced by Johnson & Johnson **did require the use of fetal cell cultures, specifically PER.C6, in order to produce and manufacture the vaccine**. The Catholic Church and the Southern Baptist Ethics & Religious Liberty Commission have both stated that **receiving a COVID-19 vaccine that required fetal cell lines for production or manufacture is morally acceptable**. The U.S. Conference of Catholic Bishops goes further and has stated: "receiving a COVID-19 vaccine ought to be understood as an act of charity toward the other members of our community. In this way, being vaccinated safely against COVID-19 should be considered an act of love of our neighbor and part of our moral responsibility for the common good…Given the urgency of this crisis, the lack of available alternative vaccines, and the fact that the connection between an abortion that occurred decades ago and receiving a vaccine produced today is remote, inoculation with the new COVID-19 vaccines in these circumstances can be morally justified."

On March 2nd, 2021, the U.S. Conference of Catholic Bishops issued a statement which addressed the use of Johnson & Johnson's COVID-19 vaccine. The Bishops stated: "if one can choose among equally safe and effective COVID-19 vaccines, the vaccine with the least connection to abortion-derived cell lines should be chosen. Therefore, if one has the ability to choose a vaccine, Pfizer or Moderna's vaccines should be chosen over Johnson & Johnson's…While we should continue to insist that pharmaceutical companies stop using abortion-derived cell lines, given the world-wide suffering that this pandemic is causing, we affirm again that being vaccinated can be an act of charity that serves the common good."

The Catholic Church has stated, "Those who, however, for reasons of conscience, refuse vaccine produced with cell lines from aborted fetuses, must do their utmost to avoid, by other prophylactic means and

---



# Los Angeles County
# COVID-19 VACCINE AND FETAL CELL LINES

appropriate behavior, becoming vehicles for the transmission of the infectious agent. In particular, they must avoid any risk to the health of those who cannot be vaccinated for medical or other reasons, and who are the most vulnerable."

## Where can I find more information?

Some religious groups and bioethics institutes that oppose the use of aborted fetal cells in the development or manufacturing of vaccines have noted that individuals may ethically receive these vaccines when there are no ethically derived alternatives.

For more information from these groups on this issue, check out the following links:
- National Catholic Bioethics Center
- Pontifical Academy of Life Statement
- United States Conference of Catholic Bishops
- The Vatican – Congregation for the Doctrine of the Faith
- The North Dakota Catholic Conference
- Charlotte Lozier Institute
- The Pillar – The ultimate Catholic coronavirus vaccine morality explainer

*Reproduced from the North Dakota Health* handout
*with permission from the North Dakota Department of Health.*

---



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit JJ

**From:** Cindy Vyskocil <cvyskocil@socccd.edu>
**Sent:** Thursday, December 02, 2021 5:34 PM
**To:** Paul Bonkowski <pbonkowski@saddleback.edu>
**Cc:** Cindy Barron <cbarron@socccd.edu>
**Subject:** Formal Notice From Human Resources


Paul –


You have been conditionally approved for an exemption, however, you will be required to sign the agreement to test twice per week.  There is no accommodation for an employee who decides not to get vaccinated and who also does not want to test twice per week. So, here are your three options:


      1) Sign the agreement and test twice per week on site at no expense to you;
      2) Begin using your vacation and then unpaid leave beginning January 10, 2022 with the understanding that your health benefits will be ended after 90 days of being on unpaid leave (but knowing your job will only be protected until June 30, 2022); or
      3) Withdraw your request for a religious exemption and provide proof of full vaccination (via a QR Code not a vaccine card) on or before January 7, 2022.


You have 5 work days (beginning tomorrow) to decide what you would like to do.  If the District does not receive your signed agreement at the end of the 5 day period, it will be assumed that you are not agreeing to the conditions of the exemption and your conditional approval for an exemption will be formally withdrawn by the District.


If you would like to come in to meet with me about your three options (listed above) please let me know and I would be happy to meet with you.

Respectfully,

Cindy

**Cindy Vyskocil, Ed.D.**

Vice Chancellor, Human Resources

South Orange County Community College District

(949) 582-4698

*Pronouns: She, Her, Hers*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit KK

COMPLAINT

On Friday, December 3, 2021, 5:11 PM, Cindy Vyskocil <cvyskocil@socccd.edu> wrote:

Paul –

My apologies, you have been conditionally approved for an exemption.  Your conditional approval is attached above and has been signed by me.  To be officially approved, you must **sign and return the attached agreement (the 3rd page attached above) within 5 days**.  And, once you sign the agreement you will be eligible to test twice weekly in lieu of becoming fully vaccinated.  You will have 5 days starting Monday to get the signed agreement returned to Human Resources.  If we do not receive the signed agreement within 5 days, the District will assume you will not be signing and your conditional approval for an exemption will be rescinded.  If your exemption is rescinded for failure to agree to the testing in lieu of vaccination, options 2 and 3 below become your only options as outlined below:

> 1) Sign the agreement and test twice per week on site at no expense to you;
>
> 2) Begin using your vacation and then unpaid leave beginning January 10, 2022 with the understanding that your health benefits will be ended after 90 days of being on unpaid leave (but knowing your job will only be protected until June 30, 2022); or
>
> 3) Withdraw your request for a religious exemption and provide proof of full vaccination (via a QR Code not a vaccine card) on or before January 7, 2022.

As stated in the previous email that was sent to you yesterday (by me) there is only the option to test in lieu of becoming fully vaccinated. So, if you are unable or unwilling to test, you may begin using your sick leave and then unpaid leave beginning January 10, 2022.  Should your unpaid leave extend beyond 90 calendar days, your advised that health benefits will be terminated and your CalPERS service credit adversely impacted.

You may refer to the CSEA MOU for what happens after June 30, 2022 should an employee remain unvaccinated and without an approved exemption.

Respectfully,

Cindy

**Dr. Cindy Vyskocil**

Vice Chancellor, Human Resources

South Orange County Community College District

Ph: 949-582-4698

Email: cvyskocil@socccd.edu

*Pronouns: She, Her, Hers*

**From:** Kat Bonkowski <planngwaccuracy@yahoo.com>
**Sent:** Friday, December 3, 2021 4:10 PM
**To:** Cindy Vyskocil <cvyskocil@socccd.edu>
**Subject:** Sign Agreement ???

Salutations Dr. Vyskocil, Cindy

I do not know what this "agreement" even is? Could you email me the "agreement" you, (District), wants me to sign?


Respectfully,


Paul W. Bonkowski

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit LL

COMPLAINT

On Wednesday, December 8, 2021, 1:12 PM, Cindy Vyskocil <cvyskocil@socccd.edu> wrote:

Paul –


Thank you for your email, I hope my responses to your questions will be helpful to you.  My responses are contained within the attachment and are in RED.


Best,


Cindy

**Dr. Cindy Vyskocil**

Vice Chancellor, Human Resources

South Orange County Community College District

Ph: 949-582-4698

Email: cvyskocil@socccd.edu


*Pronouns: She, Her, Hers*


**From:** Kat Bonkowski <planngwaccuracy@yahoo.com>
**Sent:** Wednesday, December 8, 2021 12:13 PM
**To:** Paul Bonkowski <pbonkowski@saddleback.edu>; Debra Garcia <dgarcia114@socccd.edu>; Cindy Vyskocil <cvyskocil@socccd.edu>
**Cc:** Cindy Barron <cbarron@socccd.edu>; Robert Hartman <rhartman@saddleback.edu>
**Subject:** Re: Would Like To Meet With You

Salutations Dr. Vyskocil:

Please find attached my questions and response. I hope this will be the last few questions I need answers too.

Thank you.

Respectfully,

Paul W. Bonkowski

On Tuesday, December 7, 2021, 04:11:21 PM PST, Cindy Vyskocil <cvyskocil@socccd.edu> wrote:

Paul –

Thank you for meeting with me this afternoon and thank you for your email.  In summary, here is the bottom line:

The District respects your right to request an exemption to the vaccine mandate based upon a sincerely held religious belief.  And, in fact, the District has approved your request for an exemption based upon your sincerely held belief.  As an approved employee who is exempt from getting fully vaccinated (in other words...in lieu of the vaccination) the District is requiring all exempted employees to test twice per week and sign an agreement that outlines these requirements.  You have further stated that your sincerely held belief not only prevents you from getting vaccinated

but also prevents you from being tested twice weekly.  Since the District is requiring twice weekly testing for exempt employees, we understand if you decide that you would rather go on leave without pay beginning January 10, 2022 instead of agreeing to test.  However, I would like to point out that in the email version of the Reasonable Accommodation you submitted to the District prior to the meeting, you state in that document the following:

***If multiple symptoms related to COVID-19 as described by the CDC are present, I will remain home; see my doctor and get a test***

This statement tells the District that you are willing to test but that you simply choose not to.

When you asked what additional safety requirements (besides testing twice per week) you might have to adhere to, I stated, there are a few outlined in the MOU that was recently signed between CSEA and the District but I also stated that I could not predict the future so I would be unable to tell you what other safety precautions might be necessary going forward as safety concerns change as new variants of the virus arrive in California.

It is the District's legal right and our enormous responsibility to determine what safety precautions are necessary to protect the health and safety of our students and our staff.  We make those decisions based upon current science, recommendations from the CDC, state requirements, OSHA requirements, and county health measures and we make these decisions in the best interest of our employees and students to keep folks as safe as possible as we attempt to bring 30,000 students and 2,500 employees back onsite after almost two years of remote work for the majority of our workforce.

As to the list of accommodations you outlined in writing that you would prefer to adhere to instead of testing, I stated in the meeting that you (and every other District employee) are **ALREADY** required to follow all of these safety protocols and they can be found in the ***Return to Work Guidelines*** that can be found on the District website. These safety protocols are for all employees and are in addition to the twice per week testing that is being required of employees approved for an exemption.  And...it is expected that all of these safety protocols will remain in place for all employees (vaccinated or unvaccinated) for the foreseeable future.  The only item on your list that was not correct as a currently approved requirement is that we require all employees to wear a face mask indoors at <u>all times</u> unless an employee is in private office and your document suggested that you were willing to wear a face mask indoors only when other people are present which is a current violation of District protocols.

Finally, I did not "skirt" around any issue.  Instead, I answered every question you asked clearly and directly (that is when you were not busy rudely interrupting me).  If you have any additional questions, I am happy to have you come back in for an additional meeting but at this point I feel like I continue to repeat myself both in writing and in-person since you continue to ask questions that HR has already answered multiple times.

As to requiring that you sign an agreement to test twice weekly.  All employees who are approved for an accommodation/exemption of any type (COVID-19 related or not), are required to sign a document that outlines what the District and employee are agreeing to.  You may choose not to sign the agreement, and if you choose not to sign the agreement, the District will then place you on unpaid leave beginning January 10, 2022.

At the conclusion of the meeting, you asked for additional time to consider whether you want to sign the required agreement.  I asked how much time you felt was reasonable and you chose **<u>Monday, December 20, 2022 at 9:00 AM</u>**.  So, you have until that date and time to submit your signed agreement.

The one thing you seemed to have left off of your email to me was an acknowledgement of how many times you interrupted me and would not allow me to complete my thoughts.  I would expect that should we meet again, you would afford me the same courtesy I aforded you as to being able to make a statement or ask a question without interruption.

Respectfully,

Cindy

**Dr. Cindy Vyskocil**

Vice Chancellor, Human Resources

South Orange County Community College District

Ph: 949-582-4698

Email: cvyskocil@socccd.edu

*Pronouns: She, Her, Hers*

**From:** Paul Bonkowski <pbonkowski@saddleback.edu>
**Sent:** Tuesday, December 7, 2021 2:44 PM
**To:** Cindy Vyskocil <cvyskocil@socccd.edu>; Kat Bonkowski <planngwaccuracy@yahoo.com>; Debra Garcia <dgarcia114@socccd.edu>
**Cc:** Cindy Barron <cbarron@socccd.edu>; Melissa Klimowicz <mklimowicz@saddleback.edu>; Robert Hartman <rhartman@saddleback.edu>
**Subject:** RE: Would Like To Meet With You

Dr. Vykocil & Cindy Barron:

I want to thank you for your time and for meeting with me today. I want to also thank you for your candid answers and your further explanation of the strong stance District is taking on safety; even if it's flawed. I was also happy to hear that you/District is in favor of upholding Freedom of religion; even though, you skirted answering my question on why District is taking such a hard stance against me exercising my freedom of practicing my religious beliefs. I understand, that's when you launched into the District's rights to keep its population of student body and staff  "safe."

I may also have further questions and I hope we can keep an open dialogue between us.?

By the way – I do have a question:

Do visitors/parents, contractors and high school kids and vendors all have to show "proof" of vaccination; or, be tested before entering campus?

I am also thankful that my accommodations are in alignment with current standard District guidelines, (as you stated in our meeting); and, the fact that means District has accepted them – except indoor masks issue that was clarified; and, of course my religious exemption to testing; as well as, a few other conditions which – as I said in our meeting that I would have to pray about; and, as you suggested, (Dr. Vyskocil), that perhaps I need to seek legal counsel on Districts "rights" to keep it's 30,000 student body, (My words/Fact: split between (3) campuses and not all attending campus at the same time or even on the same days; and the 2,500 employees, (teachers, staff, managers, administrators), which also covers (3) campuses and who are all never on campus at the same time).

Also, thanks for the clarification that only unvaccinated people with exemptions need to be tested – very useful information. Perhaps the greatest thing I learned from you today was that District is assuming someone got exposed over the weekend to Covid_19 or some 50+ other variants and now must be tested because they now pose a health risk to the multitude of people on campus. Which is the same reasoning District is having us test twice because District assumes on Wednesday that those same said persons got exposed again; or, for the "first" time and may be caring the infectious disease of Covid_19 or one of its 50+ other variants.

The last clarifying item that I found incredibly useful was your direct reference to the CSEA/District Vaccine Mandate MOU, (which has yet to be ratified by the membership, 7 Dec. 2021).  This item of:

"Submit to other safety measures as determined necessary by the South Orange County Community College District."

I said this is vague and opened ended and that I can't see anyone, let alone myself, agreeing to this added accommodation because I can't possibly know what District may come-up with that might be in direct conflict with my highly held religious beliefs. You said, 'Paul, look at the MOU for that." I replied: 'Cindy, that is not a comprehensive list and the possibilities could be endless.'

I even asked you a question about does the MOU legally bind every union member regardless of exemption status: You said: "Yes" I than followed that up with: "Than why are you making us sign it? Are you/District going to make every union member sign the MOU?" You got a little upset/frustrated and said: "Paul, I am not going to play these games with you. The agreement is only for those who are unable to get vaccinated."

Again, I want to point out that the testing requirement is in the MOU so why have anyone using an exemption sign the agreement if its already in a legally binding MOU? Also, A number of my accommodations happen to be listed in the MOU; except, testing. Again, why do we need to sign this agreement if its already in the, (unratified as of 7 Dec., 2021), MOU?

I also want to thank Rob Hartman for taking his time away from a busy work schedule to be an "observer" of the process. I am truly grateful and in your gratitude.

Respectfully,

Paul W. Bonkowski

**From:** Cindy Vyskocil <cvyskocil@socccd.edu>
**Sent:** Monday, December 06, 2021 4:02 PM
**To:** Kat Bonkowski <planngwaccuracy@yahoo.com>; Paul Bonkowski <pbonkowski@saddleback.edu>; Debra Garcia <dgarcia114@socccd.edu>
**Cc:** Cindy Barron <cbarron@socccd.edu>; Melissa Klimowicz <mklimowicz@saddleback.edu>
**Subject:** RE: Would Like To Meet With You

Thanks for the update.  See you tomorrow at 1:30.

Cindy

**Dr. Cindy Vyskocil**

Vice Chancellor, Human Resources

South Orange County Community College District

Ph: 949-582-4698

Email: cvyskocil@socccd.edu


*Pronouns: She, Her, Hers*


**From:** Kat Bonkowski <planngwaccuracy@yahoo.com>
**Sent:** Monday, December 6, 2021 3:52 PM
**To:** Cindy Vyskocil <cvyskocil@socccd.edu>; Paul Bonkowski <pbonkowski@saddleback.edu>; Debra Garcia <dgarcia114@socccd.edu>
**Cc:** Cindy Barron <cbarron@socccd.edu>; Melissa Klimowicz <mklimowicz@saddleback.edu>
**Subject:** RE: Would Like To Meet With You


All:


I just reached out to another on the list CSEA provided for me and so now I have a person to be an objective observer on my behalf.


Thx


Paul W. Bonkowski


Sent from Mail for Windows

**From:** Cindy Vyskocil
**Sent:** Monday, December 6, 2021 3:30 PM
**To:** Kat Bonkowski; Paul Bonkowski; Debra Garcia
**Cc:** Cindy Barron
**Subject:** RE: Would Like To Meet With You

Paul –

CSEA will be designating a representative to appear with you tomorrow at 1:30 for the meeting here in Human Resources.

Best,

Cindy

**Dr. Cindy Vyskocil**

Vice Chancellor, Human Resources

South Orange County Community College District

Ph: 949-582-4698

Email: cvyskocil@socccd.edu

*Pronouns: She, Her, Hers*

**From:** Kat Bonkowski <planngwaccuracy@yahoo.com>
**Sent:** Monday, December 6, 2021 3:21 PM
**To:** Paul Bonkowski <pbonkowski@saddleback.edu>; Cindy Vyskocil <cvyskocil@socccd.edu>; Debra Garcia <dgarcia114@socccd.edu>

**Cc:** Cindy Barron <cbarron@socccd.edu>
**Subject:** Re: Would Like To Meet With You


Hi all:


So, I just contacted my union rep and they have told me they can't make it. So, who exactly is supposed to be there as my "union" rep.? You said in a previous email that you contacted my union rep and they said they'd be there.


Thx


Paul W. Bonkowski


On Monday, December 6, 2021, 01:40:32 PM PST, Debra Garcia <dgarcia114@socccd.edu> wrote:


Perfect!

Debbie


*Debra Garcia*

Executive Assistant – HR

South Orange County Community College District

949.582.4698

dgarcia114@socccd.edu

**From:** Paul Bonkowski <pbonkowski@saddleback.edu>
**Sent:** Monday, December 6, 2021 1:36 PM
**To:** Debra Garcia <dgarcia114@socccd.edu>; Kat Bonkowski
<planngwaccuracy@yahoo.com>; Cindy Vyskocil <cvyskocil@socccd.edu>
**Cc:** Cindy Barron <cbarron@socccd.edu>
**Subject:** RE: Would Like To Meet With You


Thx !


See you/them than.


Paul


**From:** Debra Garcia <dgarcia114@socccd.edu>
**Sent:** Monday, December 06, 2021 1:35 PM
**To:** Paul Bonkowski <pbonkowski@saddleback.edu>; Kat Bonkowski
<planngwaccuracy@yahoo.com>; Cindy Vyskocil <cvyskocil@socccd.edu>
**Cc:** Cindy Barron <cbarron@socccd.edu>
**Subject:** RE: Would Like To Meet With You


Hi Mr. Bonkowski,

The meeting was originally set for 2 p.m. and was revised to 1:30.  See below.




Let me know if your calendar invitation doesn't reflect the time change.

Best,

Debbie

*Debra Garcia*

Executive Assistant – HR

South Orange County Community College District

949.582.4698

dgarcia114@socccd.edu

**From:** Paul Bonkowski <pbonkowski@saddleback.edu>
**Sent:** Monday, December 6, 2021 1:22 PM
**To:** Debra Garcia <dgarcia114@socccd.edu>; Kat Bonkowski <planngwaccuracy@yahoo.com>; Cindy Vyskocil <cvyskocil@socccd.edu>
**Cc:** Cindy Barron <cbarron@socccd.edu>
**Subject:** RE: Would Like To Meet With You

Hi Debra:

Can you confirm the time of the meeting for tomorrow -  somehow I have two different calendar times – one is for 1pm – and other says 2pm.

Thx

Paul W. Bonkowski

**From:** Debra Garcia <dgarcia114@socccd.edu>
**Sent:** Monday, December 06, 2021 9:22 AM
**To:** Kat Bonkowski <planngwaccuracy@yahoo.com>; Cindy Vyskocil <cvyskocil@socccd.edu>; Paul Bonkowski <pbonkowski@saddleback.edu>
**Cc:** Cindy Barron <cbarron@socccd.edu>
**Subject:** RE: Would Like To Meet With You

Thank you,

Debbie


*Debra Garcia*

Executive Assistant – HR

South Orange County Community College District

949.582.4698

dgarcia114@socccd.edu


**From:** Kat Bonkowski <planngwaccuracy@yahoo.com>
**Sent:** Monday, December 6, 2021 9:19 AM
**To:** Debra Garcia <dgarcia114@socccd.edu>; Cindy Vyskocil <cvyskocil@socccd.edu>; Paul Bonkowski <pbonkowski@saddleback.edu>
**Cc:** Cindy Barron <cbarron@socccd.edu>
**Subject:** Re: Would Like To Meet With You


Salutations Debra:


Let me see when my union observer can meet & I will get back to you.


Thx


Paul W. Bonkowski

Sent from Yahoo Mail for iPhone

On Monday, December 6, 2021, 7:53 AM, Debra Garcia <dgarcia114@socccd.edu> wrote:

Good Morning Mr. Bonkowski,

Can you send me your availability to meet on Tuesday afternoon?

Dr. Vyskocil is also available at 11:30 tomorrow morning.

Thank you,

Debbie


*Debra Garcia*

Executive Assistant – HR

South Orange County Community College District

949.582.4698

dgarcia114@socccd.edu


**From:** Cindy Vyskocil <cvyskocil@socccd.edu>
**Sent:** Sunday, December 5, 2021 12:53 PM
**To:** Kat Bonkowski <planngwaccuracy@yahoo.com>; Paul Bonkowski
<pbonkowski@saddleback.edu>
**Cc:** Debra Garcia <dgarcia114@socccd.edu>; Cindy Barron <cbarron@socccd.edu>
**Subject:** Re: Would Like To Meet With You


Paul -


I am happy to meet with you and will have Debbie Garcia schedule a meeting for Tuesday. I will
have Cindy Barron in attendance as well. However, unless your "observer" is a union
representative, they will not be permitted to attend the meeting. You are, however, welcome to
(and entitled to) have a CSEA representative with you at the meeting if you would like.


I look forward to meeting with you and a union representative on Tuesday.


Respectfully,

Cindy

Dr. Cindy Vyskocil

Vice Chancellor, Human Resources

South Orange County Community College District

Sent from my iPhone


On Dec 4, 2021, at 2:41 PM, Kat Bonkowski <planngwaccuracy@yahoo.com> wrote:


Salutations Dr. Vyskocil:


I would like to meet with you to discuss the "agreement" and my accommodations, (attached below). I will also have another individual with me to observe the process.


Respectfully,


Paul W. Bonkowski

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit MM

COMPLAINT

# COVID-19 Exemption Request



**Mary Kate Planeta**
raised this on                          Hide details
Sep/08/2021 9:35 AM

**First Name**

Mary

**Last Name**

Planeta

**Student ID**

5550055492

**College/CCE**

City College, Mesa College, Miramar College

**College**

San Diego Miramar College

**I hereby certify and declare the following:**

I have a sincerely held religious belief that prevents me from taking the COVID-19 vaccination.

**By signing this form, I acknowledge and agree to the following:**

289          Scanned with CamScanner

I have been informed that I am required to submit proof of vaccination against COVID-19 to attend in-person classes and on-campus activities and services., I have chosen to not to be immunized at this time for religious/medical reasons. I understand the vaccine's benefits and the risks of not being immunized., I understand that if I am exposed or contract COVID-19, I will be required to quarantine or isolate per CDC and county health guidelines., I understand that providing false information in this certification is a violation of the Student Code of Conduct, as defined in Board of Trustees Policy BP 3100 and that said violation may result in disciplinary action up to and including dismissal.

## Student Signature

Mary Kate Planeta

   Scanned with CamScanner

6:23    5G

# Activity



**Automatic response**    Sep/09/2021 10:47 AM

Your request status has changed to In Review.



**Automatic response**    Sep/09/2021 10:50 AM

Your request status has changed to Process.



**Automatic response**    Sep/09/2021 10:51 AM

Your request status has changed to Done with resolution Done.

Add a comment

# Status

DONE

🔔 Notifications on

🔒 mysdccd.atlassian.net

AA

Scanned with CamScanner

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit NN

COMPLAINT

 Gmail

**Mary Kate Planeta <planetamk87@gmail.com>**

## Immunization Records
4 messages

**Mary Kate Planeta** <planetamk87@gmail.com>                              Mon, Nov 8, 2021 at 11:44 AM
To: mkjartan@sdccd.edu

Good morning,

I plan on taking your class for the spring semester and would like more information on the policy for the immunization records. I currently have a religious exemption in place for COVID. however, I believe I was told that I need the Hep B series and a TB shot. please advise if there is anything else I need to do and if I have enough time to complete the hep B series.

Respectfully,
Mary Kate

**Mary Kate Planeta** <planetamk87@gmail.com>                              Mon, Nov 8, 2021 at 1:23 PM
To: Mary Kjartanson <mkjartan@sdccd.edu>

Thank you for this information. I believe the Hep B is a series of 3 shots over 6 months. Is this something that I can be in the process of?

Sent from my iPhone

> On Nov 8, 2021, at 1:16 PM, Mary Kjartanson <mkjartan@sdccd.edu> wrote:


Hi Mary Kate,


We do not accept COVID-19 exemptions. The EMT students are participating in clinical and ambulance rotations. The following immunizations are a course requirement:


Must show proof of current American Heart Association (AHA) or American Red Cross (ARC) BLS CPR card on first class meeting. AHA BLS CPR instruction is available in EMGM 50A, class numbers: 86357, 86358, 86378, and 86379. EMT course completion certification requires successful completion of EMGM 105A and EMGM 106. The student must concurrently register in the corequisite EMGM 106 class 84017, 84022, 84025, 84026, & 84264. The student must submit a comprehensive immunization record demonstrating proof of the following vaccinations: **Hepatitis B (series of 3), Rebeola, Rubella, & Mumps (series of 2), Varicella (series of 2), 2021-2022 seasonal flu, & Tdap (within 10-years). A Tb test must be administered within 4 weeks of course start. All students must submit completed COVID-19 vaccination records to SDCCD and the EMGM 105A class instructor.** Contact Miramar Health Center at https://sdmiramar.edu/ services/health center for immunization assistance & information. A clinical component to this class is a requirement of successful course completion. Clinical

rotations will be performed outside of class hours. Materials, books, equipment, supplies, and uniform required. Uniforms and course materials are available for purchase at the Miramar bookstore, https://sdmiramar.edu/services/bookstore . The class delivery mode is hybrid. The class meets are every Monday/Wednesday in-person 12:45-4:25 and via web 1.5 hours. The NREMT-EMT Psychomotor Exam is on Friday, 5/27 (0845-1500). Class meeting dates and times may be modified to meet training hour mandates for EMT curriculum.

---

## Bookstore | San Diego Miramar College

sdmiramar.edu

Miramar College

---

Best,


Mary


**Mary Kjartanson R.N.**

Miramar College EMT Program Director

mkjartan@sdccd.edu

Office: R-108C

Miramar EMT Program Website

www.SanDiegoMiramarEMT.com

---

**From:** Mary Kate Planeta <planetamk87@gmail.com>
**Sent:** Monday, November 8, 2021 11:44:59 AM
**To:** Mary Kjartanson
**Subject:** Immunization Records

[EXTERNAL Email: Do not click any links or open attachments if you do not trust the sender and know the content is safe.]

[Quoted text hidden]

---

**Mary Kate Planeta** <planetamk87@gmail.com>                                    Tue, Nov 9, 2021 at 11:55 AM
To: arjonval@sdccd.edu



**Mary Kate Planeta <planetamk87@gmail.com>**

---

## SDCCD - Updated Student Vaccination Requirements for Spring 2022
1 message

---

**studentsrvcs@sdccd.edu** <studentsrvcs@sdccd.edu>                                Thu, Jan 6, 2022 at 1:20 PM
To: planetamk87@gmail.com



January 05, 2022

**Updated Student Vaccination Requirements for Spring 2022**

Dear Students,

As we continue to manage the COVID-19 pandemic, vaccination remains the most effective protection against the virus. With the introduction of the Omicron variant and increasing number of COVID-19 cases statewide, the San Diego Community College District is updating the safety and health requirements for in-person classes.

Effective Spring 2022, in-person instruction will be limited to students who have **been fully vaccinated** per CDC guidelines against COVID-19. Students who are unvaccinated or have previously been exempted from the District's vaccination requirement based on their medical status or religious beliefs will be limited to enrolling in online courses.

Currently enrolled students with a previously approved exemption will be dropped from their Spring 2022 in-person classes and are encouraged to get vaccinated or enroll in online classes.  Please refer to the online class schedule at https://www.sdccd.edu/students/class-search/search.html.

As always, you can stay informed about SDCCD's COVID-19 protocols and view the latest information at https://www.sdccd.edu/students/COVID19.

We appreciate your understanding and cooperation as we do our best to limit the spread of the virus. Thank you for taking these steps to keep our community safe.

San Diego Community College District

 Gmail

**Mary Kate Planeta <planetamk87@gmail.com>**

---

## Update
3 messages

---

**Mary Kate Planeta** <planetamk87@gmail.com>                    Fri, Jan 14, 2022 at 9:03 AM
To: Dora Meza <dmeza@sdccd.edu>

Good morning,

I just wanted to reach out for an update. I wrote the VP of student services on Tuesday and have not heard back, it says we should a within 48 hours.
Before yesterday, 29cfr1910.501 in OSHA didnt mandate the vaccine, it stated that the minimum the business needed to do was masks and weekly testing and had a section about exemptions.
I'm sure you heard that the government announced this unconstitutional yesterday and left it up to the business except for healthcare. Quoting the CDC that "The Biden administration is essentially asking vaccinated Americans to help save the unvaccinated from themselves." This leaves room for the argument that unvaccinated individuals are not doing any damage on campus and that it is a personal choice and risk they are willing to take.
Thank you again for hearing me out on Tuesday.

Respectfully,
Mary Kate


Sent from my iPhone

---

**Dora Meza** <dmeza@sdccd.edu>                    Fri, Jan 14, 2022 at 3:05 PM
To: Mary Kate Planeta <planetamk87@gmail.com>

Hi Mary,


Keep an eye out on your enrollment. It is my understanding that if the course required for completion, is not offered online students are receiving a special exemption. If you do not get dropped you are good.


Sincerely,


Dora A. Meza

Student Services Supervisor, I

San Diego City College

Enrollment Services, A-241

---

**Mary Kate Planeta** <planetamk87@gmail.com>                                                    Wed, Jan 19, 2022 at 4:29 AM
To: Dora Meza <dmeza@sdccd.edu>

Hello,

I have received this message today! Please advise

Sent from my iPhone

Begin forwarded message:

> **From:** studentsrvcs@sdccd.edu
> **Date:** January 18, 2022 at 9:59:15 PM PST
> **To:** planetamk87@gmail.com
> **Subject: SDCCD - No Longer Eligible for Classes**

   

January 18, 2022

**CITY COLLEGE**                          Dear Mary,

**Complete Listing of:**

**Online Student Services**        As we continue to manage the COVID-19 pandemic, vaccination remains the most effective protection
                                   against the virus.  The health and safety of our students, employees and community are our top
                                   priority.

**Admissions and Records**         Students were recently notified of the new COVID-19 vaccination requirements for Spring 2022 in-
                                   person classes. Students with a previously approved exemption who are enrolled in Spring classes
Admissions Website                 with in-person instruction (on campus or partially online) will be dropped from their course.  Students
                                   with an approved exemption that prevents them from taking the vaccine have full access to all online
(619) 887-4989                     classes and online services.

Admissions:

cityadmissions@sdccd.edu           According to our records, you are no longer eligible to enroll in the following course(s):

Residency:

cityres@sdccd.edu                  | Class | Title | Class # | Type |
                                   |-------|-------|---------|------|
Records:

cityrecords@sdccd.edu             | BIOL  210A | Intro to the Biol. Sciences I | 83733 | ONCAMPUS |

Veteran Affairs:                  | CHEM  200 | General Chemistry I Lecture | 83427 | ONCAMPUS |

cityva@sdccd.edu                  | CHEM 200L | General Chemistry I Laboratory | 85231 | ONCAMPUS |

PHYS 126   General Physics II          80569        PT-ONLINE

**Counseling Office**

Counseling Website

CityCounseling@sdccd.edu

(619) 894-6118

**You will be dropped from your courses on Friday, January 21st.** If you have recently received the COVID-19 vaccination, please be sure to submit your vaccination record through Cleared4. Vaccination records must be uploaded by end of day Thursday, January 20th.

You will be offered a full credit of enrollment and mandatory fees related to the course(s) listed above. This credit may be used to enroll in online classes, please visit https://www.sdccd.edu/students/class-search/search.html. Otherwise, refunds will be processed after the add/drop period.

**Financial Aid Office**

Financial Aid Website

cityaid@sdccd.edu

Live Support via Zoom

Vaccination is the most powerful tool we have to stop this pandemic, prevent more dangerous strains from developing, and expedite a return to normalcy.

As always, you can stay informed about SDCCD's COVID-19 protocols and view the latest information at https://www.sdccd.edu/students/COVID19.

**EOPS Office**

EOPS Website

cityeops@sdccd.edu

(619) 388-3209

We understand this has been a difficult time for many of us. We appreciate the efforts of our students and employees to protect the San Diego community.

Sincerely,

San Diego Community College District

**DSPS Office**

DSPS Website

citydsps@sdccd.edu

(619) 388-3994

**CalWORKS**

CalWORKS Office

cwkfd@sdccd.edu

(619) 388-3797

**MIRAMAR COLLEGE**

**Complete List of Online Student Services**

**Safe Return to Campus**

**Admissions and Records**

Admissions Website

# ![M] Gmail

**Mary Kate Planeta <planetamk87@gmail.com>**

## SDCCD - No Longer Eligible for Classes

**Dora Meza** <dmeza@sdccd.edu>                                    Wed, Jan 19, 2022 at 8:24 AM
To: Mary Kate Planeta <planetamk87@gmail.com>

The courses are at Miramar College, I would reach out to the following:

College President

Dr. Wesley Lundburg **wlungburg@sdccd.edu**

Executive Assistant to the President: **Malia Kunst**

mkunst@sdccd.edu

Vice President of Student Services:

Adrian Gonzales *agonzales@sdccd.edu*

Sincerely,

Dora A. Meza

Student Services Supervisor, I

San Diego City College

Enrollment Services, A-241

Click Here, to submit & process forms



 Gmail

**Mary Kate Planeta <planetamk87@gmail.com>**

## COVID exemption removal for Spring 2022
11 messages

**Mary Kate Planeta** <planetamk87@gmail.com>                    Tue, Jan 11, 2022 at 6:18 PM
To: Mperez@sdccd.edu

Good Evening,

I would like to explain my current situation now that my religious exemption is no longer valid.
-In 2019 I moved to California to pursue an education. I waited a year to apply to SD City college because I wanted to receive in-state tuition and gain residency.
-I began my first semester in Fall 2020, in which I was working over 50 hours a week with 2 jobs. I had to withdraw from one out of two of my classes due to the workload.
-In Spring 2021 I contracted COVID and ended up having to obtain an excused withdrawal because I could not catch up on 2 out of 3 classes while working full time. During this semester I applied for a Sallie Mae loan so I could transition to becoming a full time student without distraction.
-I received these funds for the fall semester and successfully completed my first semester as a full time student.

I applied for and received a religious exemption and I was a part of EOPS which allowed me to register for the spring semester early. Most of the remaining classes I need to transfer to a 4 year university are not offered online. The degree I am pursuing is Behavioral Neuroscience at USD. The classes I still need are listed below, along with what they transfer to USD:

Psyc255---> elective for USD but required for AA transfer
Phys126 ---> Phys137
Chem 200---> Chem151
Chem 201---> Chem152
Bio210A---> Bio 240/242

Initially I added Psyc255 in person because I have had the instructor prior, and now the online classes are closed. Phys126 and Bio210a are only offered in person. And Chem 200 online has a waitlist status. I did not have an issue taking classes online, although I am not getting the experience needed to eventually apply for a graduate program. However, now this is not even an option.

I am trying to explain how significantly this sudden change, less than a month before classes start, has disrupted my life.
-To responsibly transition into becoming a full time student I have taken my time and attempted to work, to pay for my living expenses.
-When I realized the difficulty in working full time and trying to complete a degree, I fought to keep a good credit score so I do not have to have a cosigner for funding, and I have fought to get an exemption to the vaccine, which is necessary if a mandate is going to be instated.
-I do not want to receive a loan for online classes that i do not need for my degree, and to obtain this loan for the spring semester I need to be enrolled. I have taken a huge risk in trying to obtain a degree with funding and not pursuing employment so I can complete my degree.

I have attached my unlawful discrimination complaint regarding the email I received on 01/06/2022. This is regarding removing my religious exemption to attend in person classes. I have also attached my class schedule, unofficial transcript and the AA and BN requirements. Please reconsider removing my exemption and allow me to move toward completing my degree, or please offer these classes online. Thank you for your time.

Respectfully,
Mary Kate Planeta
5550055492

---

**4 attachments**

 **AA in Arts Psyc transfer.pdf**
427K

300

# UNLAWFUL DISCRIMINATION COMPLAINT FORM

(To be filed with the community college district involved in your allegations)

**Name:** Planeta                                    Mary

Last                                    First

**Address:** 886 Slate Street        San Marcos              CA          92078

Street or P.O. Box                  City                State      Zip

**Phone:** 6025106685              planetamk87@gmail.com

Home/Cell                          Email

**I am a:** [X] Student    [ ] Employee    [ ] Other: _____

**I wish to complain against the following individual(s):**

**Name(s):** San Diego Community College District

**District:** SDCCD              **College:** San Diego City College

[ ] Student    [ ] Employee    [X] Other: _____

**Date of most recent incident or alleged discrimination:** 01/06/2022

*(Non-employment complaints must be filed within one year of the date of the alleged unlawful discrimination. Employment complaints must be filed within 180 days of the date of the alleged unlawful discrimination.)*

**I allege discrimination based on the following protected categories:**

| | | | |
|---|---|---|---|
| [ ] | Age | [ ] | Military/Veteran Status |
| [ ] | Ancestry | [ ] | National Origin |
| [ ] | Color | [ ] | Physical/Mental Disability |
| [ ] | Ethnic Group | [ ] | Race |
| [ ] | Gender Expression | [✔] | Religion |
| [ ] | Gender Identification | [ ] | Retaliation |
| [ ] | Immigration Status | [ ] | Sex/Gender |
| [ ] | Marital Status | [ ] | Sexual Orientation |
| [✔] | Medical Condition | [ ] | Other Protected Class (Explain): |

**What would you like the District to do in response to your complaint?**

I would like my religous exemption reinstated and the ability to attend in-person classes so I can transfer to a 4 year university and complete my degree. Title IV of the Civil Rights Act of 1964 authorizes the Attorney General to address certain equal protection violations based on sex, among other bases, in public schools and institutions of higher education.

Rev. 6/01/2021

**Clearly state your complaint. Describe each incident of alleged discrimination separately.**

**For each incident provide the following information:**

**1) date(s) the discriminatory action occurred;**

**2) name(s) of individual(s) who participated in discriminatory conduct;**

**3) location of incident;**

**4) what happened;**

**5) witnesses (if any);**

**6) why you believe the conduct was motivated by your protected classification;**

**7) if applicable, explain why you believe you were retaliated against for filing a complaint or asserting your right to be free from discrimination on any of the above grounds.**

*(Attach additional pages as necessary.)*

I was granted a religious exemption in Fall 2022 to attend in person classes. This is the last semester that I need to transfer. The First Amendment to the U.S. Constitution says that everyone in the United States has the right to practice his or her own religion, or no religion at all. Taking a vaccine developed using abortion-derived cells, goes against my belief system. I received an updated student vaccination requirement for spring 2022 stating that my exemption is no longer valid and my in person classes are being dropped.

I believe that I am also being medically discriminated against. The Health Insurance Portability and Accountability Act of 1996 (HIPAA) is a federal law that required the creation of national standards to protect sensitive patient health information from being disclosed without the patient's consent or knowledge. Requiring a submission of your vaccination status goes against this law.

When ones vaccines are not on record, they are given titer and immunity testing. A titer lab report can identify the different levels of antibodies in a persons bloodstream. I contracted COVID in April of 2021. Recovering from COVID19 has exposed me to the virus and because of this exposure to the virus, there is an immunity developed that is equivalent to receiving a vaccine. A vaccine helps our bodies develop immunity to the virus that causes COVID-19 without us having to get the illness.

According to the Good Manufaturing Practice (GMP), it can take up to 15 years of research and development for a vaccine or pharmaceutical to launch. Mandating a vaccine goes against current good manufacturing practices

**I certify that this information is correct to the best of my knowledge.**

| | |
|---|---|
| _[signature]_ | 01/11/2022 |
| *Signature of Complainant* | *Date* |

**Name of individual documenting verbal complaint:** _____

| | | |
|---|---|---|
| *Title* | *Phone* | *Email* |

**OFFICE USE ONLY**

**Date complaint received:** _____

| | |
|---|---|
| *Received by* | *Title* |

Please send the **original** signed copy of this form to the following address:

**San Diego Community College District**
**Attention: Legal Services & EEO**
**3375 Camino del Rio South, Suite 385**
**San Diego, CA 92108-3883**

**Or**

**SDCCD Legal Services-EEO  at: sdccdlegalservices-eeo@sdccd.edu**

Should you have any questions, comments, and/or concerns, please contact the Legal Services and Equal Employment Opportunity (EEO) office at (619) 388-6591.

Rev. 6/01/2021





**Unlawful Discrimination Complaint - Form.pdf**
233K

**X_SR_TSRPT.pdf**
32K

---

**Mary Kate Planeta** <planetamk87@gmail.com>                    Wed, Jan 19, 2022 at 10:36 AM
To: dvansaan@sdccd.edu

[Quoted text hidden]

---

**3 attachments**

**image0.jpeg**
17K

**Unlawful Discrimination Complaint - Form.pdf**
233K

**X_SR_TSRPT.pdf**
32K

---

**Marciano Perez** <mperez@sdccd.edu>                           Wed, Jan 19, 2022 at 10:45 AM
To: Mary Kate Planeta <planetamk87@gmail.com>

Mary

I am in receipt of your emails.  Thank you for your email and please know that someone from our District
team will be reaching out to address the complaint.

Best regards,


Marciano




**Marciano Perez, Jr.**
Vice President of Student Services
Student Services A 222
Office: 6199883944

Pronouns: he, him, his
www.sdcity.edu



1313 Park Boulevard, San Diego, CA 92101-4787

*San Diego City College has as its highest priority student learning and achievement. The college provides lower division and general education courses that lead to certificates, associate degrees or transfer to a four-year college or university; career technical education programs that meet specific industry needs, upgrade the employment skills of students and fulfill licensing requirements of the state of California as well as contribute to the economic development of our region; basic skills instruction to assist all students in meeting their educational goals; and essential student support services for all students.*


**From:** Mary Kate Planeta <planetamk87@gmail.com>
**Sent:** Wednesday, January 19, 2022 4:38 AM
**To:** Marciano Perez <mperez@sdccd.edu>
**Subject:** Fwd: COVID exemption removal for Spring 2022


[EXTERNAL Email: Do not click any links or open attachments if you do not trust the sender and know the content is safe.]

[Quoted text hidden]

**Mary Kate Planeta** <planetamk87@gmail.com>                    Wed, Jan 19, 2022 at 11:15 AM
To: Marciano Perez <mperez@sdccd.edu>

Thank you for your response. What should I do in the meantime while my classes may be dropped?

Sent from my iPhone

On Jan 19, 2022, at 10:45 AM, Marciano Perez <mperez@sdccd.edu> wrote:

[Quoted text hidden]

---

**Mary Kate Planeta** <planetamk87@gmail.com>                    Wed, Jan 19, 2022 at 2:58 PM
To: Marciano Perez <mperez@sdccd.edu>

Can we please set up either a zoom meeting or a meeting in person to discuss my options?

Sent from my iPhone

On Jan 19, 2022, at 11:16 AM, Mary Kate Planeta <planetamk87@gmail.com> wrote:

Thank you for your response. What should I do in the meantime while my classes may be dropped?
[Quoted text hidden]

---

**Mary Kate Planeta** <planetamk87@gmail.com>                    Thu, Jan 20, 2022 at 10:31 AM
To: dvansaan@sdccd.edu

Can I please schedule a zoom meeting or an in person meeting with Mr Perez. This is urgent as my classes will be dropped tomorrow.

Sent from my iPhone

On Jan 19, 2022, at 10:36 AM, Mary Kate Planeta <planetamk87@gmail.com> wrote:

[Quoted text hidden]

---

**3 attachments**

image0.jpeg
17K



**Mary Kate Planeta <planetamk87@gmail.com>**

---

## Notice: You have been dropped from your in-person classes for Non-Vaccination
1 message

---

**studentsrvcs@sdccd.edu** <studentsrvcs@sdccd.edu>                                      Fri, Jan 21, 2022 at 9:33 PM
To: planetamk87@gmail.com

**CITY COLLEGE**

**Complete Listing of:**

**Online Student Services**



**Admissions and Records**

**Admissions Website**

(619) 887-4989

Admissions:

cityadmissions@sdccd.edu

Residency:

cityres@sdccd.edu

Records:

cityrecords@sdccd.edu

Veteran Affairs:

cityva@sdccd.edu

**Counseling Office**

**Counseling Website**

CityCounseling@sdccd.edu

(619) 894-6118

**Financial Aid Office**

**Financial Aid Website**

cityaid@sdccd.edu

Live Support via Zoom

**EOPS Office**

January 21, 2022

Dear Mary,

The San Diego Community College District (SDCCD) requires all students to be fully vaccinated if attending any class with an in-person component.

Our records show that you have not met COVID-19 vaccination requirements and were dropped from the following Spring 2022 class(es).

If you already paid for your classes, your payment has been credited to your student account.

| Course | Course Title | Type | Class Nbr |
|---|---|---|---|
| CHEM 200 | General Chemistry I Lecture | ONCAMPUS | 83427 |
| BIOL 210A | Intro to the Biol. Sciences I | ONCAMPUS | 83733 |
| CHEM 200L | General Chemistry I Laboratory | ONCAMPUS | 85231 |

The decision to enforce the COVID-19 vaccination requirement was not made lightly. Careful consideration was given to ensuring student success and maintaining the health and safety of the general San Diego Community.

You may register again provided space is available, and the add deadline has not passed. Please check the online class schedule at https://www.sdccd.edu/students/class-search/search.html. Payment is due at the time of enrollment.

https://mail.google.com/mail/u/0/?ik=77976004f9&view=pt&search=all&permthid=thread-f%3A1722631686249447994&simpl=msg-f%3A1722631686249447994          1/2

EOPS Website

cityeops@sdccd.edu

(619) 388-3209

For more information, please visit: https://www.sdccd.edu/students/covid19

Thank you,

**DSPS Office**

DSPS Website

citydsps@sdccd.edu

(619) 388-3994

San Diego Community College District

**CalWORKS**

CalWORKS Office

cwkfd@sdccd.edu

(619) 388-3797

--------------

San Diego Community College District | 3375 Camino Del Rio South | San Diego, CA 92108

sdccd.edu/students  |  sdccd.edu | my.sdccd.edu

S87 - 4949714 - 5550055492 - 2022-01-21T20:31:25-08:00 - planetamk87@gmail.com

 Gmail

**Mary Kate Planeta <planetamk87@gmail.com>**

---

## COVID19 exemption removal
2 messages

---

**Mary Kate Planeta** <planetamk87@gmail.com>                               Fri, Jan 21, 2022 at 4:56 PM
To: garroyo@sdccd.edu, mgrahamsdccd@cox.net, brhinerson@sdccd.edu, msenour@sdccd.edu, cmilgrim@sdccd.edu

Good Afternoon,

I am writing today in regards to my religious exemption being removed for the Spring 2022 semester. I received an email saying that my in person classes were being dropped 1/6/22 less than a month before classes begin. I immediately sent the chancellor an email without response.

After calling multiple numbers, as I did not know who to contact, I finally reached Dora Meza in City College Admissions (my home college) and set up a zoom call. She advised me to reach out to the VP of student services at City, and through some correspondence with Dora, I was told that there may be a special exemption made because the classes I need to transfer are not offered online and this is my last semester before I transfer. During this process I filed a Civil Rights complaint.

I received notice on 1/18/22 that my classes would be dropped  if I did not submit proof of vaccination by 1/20/22. I reached out to Dora and she directed me to contact Administration at Miramar because 2/3 of my classes were at Miramar without response. I finally received a message back yesterday from the VP of student services at City college, Mariano Perez that said he had received my emails and someone from the district will reach out to me.

Today my classes were dropped and a hold was put on my loan through sallie mae that prevented disbursement. I spoke to the head of the SCE program I am enrolled in, who mentioned she would help me get into some biotech classes that would satisfy my scholarship and financial aid requirements. While I am so appreciative of her assistance, I did not transfer from full time employment and take out a student loan to pay off student loans that do not apply to my major. I would like to give a brief statement about my situation, provide the BN requirements, AA requirements, my transcript and dropped classes (that are not offered online or waitlisted), and attach my civil rights complaint to give you an idea of the impact this is having on my life.

-In 2019 I moved to California to pursue an education. I waited a year to apply to SD City college because I wanted to receive in-state tuition and gain residency.
-I began my first semester in Fall 2020, in which I was working over 50 hours a week with 2 jobs. I had to withdraw from one out of two of my classes due to the workload.
-In Spring 2021 I contracted COVID and ended up having to obtain an excused withdrawal because I could not catch up on 2 out of 3 classes while working full time. During this semester I applied for a Sallie Mae loan so I could transition to becoming a full time student without distraction.
-I received these funds for the fall semester and successfully completed my first semester as a full time student.

I applied for and received a religious exemption and I was a part of EOPS which allowed me to register for the spring semester early. Most of the remaining classes I need to transfer to a 4 year university are not offered online. The degree I am pursuing is Behavioral Neuroscience at USD. The classes I still need are listed below, along with what they transfer to USD:

Phys126 ---> Phys137
Chem 200---> Chem151
Chem 201---> Chem152
Bio210A---> Bio 240/242

I am pursuing an Associates of Arts Degree: Liberal Arts and Sciences: Scientific Studies Biological Science Specialization. To acquire the classes still needed to transfer. Phys126 and Bio210a are only offered in person. And Chem 200 online had a waitlist status by the time that I received the COVID update. I did not have an issue taking classes online, although I am not getting the experience needed to eventually apply for a graduate program. However, now this is not even an option.

I am trying to explain how significantly this sudden change, less than a month before classes start, has disrupted my life.

-To responsibly transition into becoming a full time student I have taken my time and attempted to work, to pay for my living expenses.
-When I realized the difficulty in working full time and trying to complete a degree, I fought to keep a good credit score so I do not have to have a cosigner for funding, and I have fought to get an exemption to the vaccine,
(under 29Cfr1910.501 : 0SHA-Fed gov mandate doesn't require people to be fully vaxed & allows for exemptions. The Supreme Court Ruling blocked the nationwide vaccine and testing mandate last week and the CDC has released a statement that says prior infection is as effective as vaccination.)
-I do not want to receive a loan for online classes that I do not need for my degree, and to obtain this loan for the spring semester I need to be enrolled. I have taken a huge risk in trying to obtain a degree with funding and not pursuing employment so I can complete my degree.

It has been very difficult trying to get all of this figured out. Please contact me as soon as possible in regards to my situation

Respectfully,
Mary Kate Planeta
student ID # 5550055492
Behavioral Neuroscience BN USD

---

Transcript:Dropped Classes:AA requirements:Civil rights complaint.pdf
443K

---

**Mail Delivery Subsystem** <mailer-daemon@googlemail.com>                    Fri, Jan 21, 2022 at 4:57 PM
To: planetamk87@gmail.com



## Address not found

Your message wasn't delivered to **mgrahamsdccd@cox.net** because the address couldn't be found, or is unable to receive mail.

The response from the remote server was:

550 5.1.1 <mgrahamsdccd@cox.net> Recipient address rejected: User does not exist.

Final-Recipient: rfc822; mgrahamsdccd@cox.net
Action: failed
Status: 5.1.1
Remote-MTA: dns; cxr.mx.a.cloudfilter.net. (35.162.106.154, the server for the domain cox.net.)
Diagnostic-Code: smtp; 550 5.1.1 <mgrahamsdccd@cox.net> Recipient address rejected: User does not exist.
Last-Attempt-Date: Fri, 21 Jan 2022 16:57:07 -0800 (PST)

---------- Forwarded message ----------
From: Mary Kate Planeta <planetamk87@gmail.com>      310
To: garroyo@sdccd.edu, mgrahamsdccd@cox.net, brhinerson@sdccd.edu, msenour@sdccd.edu, cmilgrim@sdccd.edu

 Gmail

**Mary Kate Planeta <planetamk87@gmail.com>**

---

**SD Mesa**
1 message

---

**Raquel Aparicio** <raparicio@sdccd.edu>                      Thu, Jan 27, 2022 at 8:06 AM
To: "planetamk87@gmail.com" <planetamk87@gmail.com>

Hi Mary,


Hope you are well. I spoke with you yesterday, as you had questions in regards to getting your first Covid-19 dose in order to be able to register for on-campus courses that begin next week Monday. I reached out to the Supervisors of Admissions at Miramar College and City College. They mentioned that all of their courses that you are interested in, BIOL, PHYS and CHEM will be on the campus and not remote, and as such, you won't be able to attend those courses until you are fully vaccinated.


I am sorry that I do not have better news for you.


You are always welcome to reach their admissions offices at:

City: CityAdmissions@sdccd.edu

Miramar: miraadm@sdccd.edu


Have a good day!


*Raquel Aparicio*

*Admissions Supervisor*



**Dreamers Welcomed** | **Black Lives Matter** | **PRIDE** | Hispanic Serving Institution | **Military Friendly**

**SAN DIEGO COMMUNITY COLLEGE DISTRICT**

3375 Camino del Rio South
San Diego, California 92108-3883
619-388-6500

CITY COLLEGE | MESA COLLEGE | MIRAMAR COLLEGE | COLLEGE OF CONTINUING EDUCATION

*Educational Services*

January 26, 2022

Mary Planeta
planetamk87@gmail.com

Dear Mary Planeta:

Thank you for following up regarding your request for an accommodation on the basis of your religious exemption from vaccination. We understand that the policies necessitated by the COVID-19 pandemic, and most recently the spike due to the Omicron variant, have a significant impact on our students and their educational pursuits.

All decisions related to the vaccination requirement, including the exemption and accommodation process, have been carefully considered. The SDCCD has done its best to balance the health and safety of its students and employees with the ability to meet student needs. Pursuant to SDCCD's current COVID-19 policy, students who have a religious exemption cannot be accommodated with in-person instruction; and the only available accommodation is to offer online courses when available. Unfortunately, SDCCD is unable to offer all of its courses online, and this results in the inability to offer certain courses to unvaccinated students at the present time.

SDCCD's decision regarding your request for an accommodation is based on the policy described above. An appeal of an accommodation decision is not available when, as here, it is based on the direct application of SDCCD's current COVID-19 policy.

[If you believe that SDCCD's vaccination policy constitutes an infringement of your rights as a student, you may file a complaint with the U.S. Department of Education, Office for Civil Rights. Additional information is available at: https://www2.ed.gov/about/offices/list/ocr/docs/howto.html.

Sincerely,

Susan Topham, Ed.D.
Vice Chancellor, Educational Services



# SAN DIEGO COMMUNITY COLLEGE DISTRICT

*3375 Camino del Rio South*
*San Diego, California 92108-3883*
*619-388-6500*

CITY COLLEGE | MESA COLLEGE | MIRAMAR COLLEGE | COLLEGE OF CONTINUING EDUCATION

*Human  Resources*
*Legal Services and EEO 619-388-6591*
*Fax 619-388-6898*

January 26, 2022


**Via Email: planetamk87@gmail.com**

Mary Kate Planeta

> **Re:**   **Title 5 Complaint – Administrative Determination**
> **Date Filed:** Received January 12, 2022; Dated January 11, 2022

Dear Ms. Planeta:

A determination has been made regarding your Title 5 complaint dated January 11, 2022, and received by the San Diego Community College District (SDCCD) on January 12, 2022, alleging discrimination based on Religion and Medical Condition. The information provided does not establish unlawful discrimination, therefore, based on a preponderance of evidence discrimination did not occur as alleged. A public institution of higher education may lawfully request and maintain information regarding the immunization status of students. Additionally, the SDCCD has requested this information of all students, regardless of any religion and/or medical condition.

If you disagree with this Administrative Determination of your Title 5 Complaint, you may appeal the findings to the San Diego Community College District Board of Trustees ("Board").  Any appeal should be submitted in writing to the Board of Trustees' office, 3375 Camino del Rio South, San Diego, CA 92108, within 15 days from receipt of this letter, and in any event no later than *February 15, 2022*. The Board may issue a Final District Decision on the matter within 45 days after receiving an appeal.  If the Board fails to issue a decision within 45 days, the original decision in the Administrative Determination will be deemed to be affirmed and shall become the Final District Decision in the matter.

You also have the right to file a written appeal with the California Community College Chancellor's Office within 30 days from the date the Board issues a final District decision, or permits the Administrative Determination to become final by taking no action within 45 days.  The appeal must be accompanied by a copy of the final District decision of the Board or evidence showing the date on which the complainant filed an appeal with the Board, accompanied with a statement under penalty of perjury that no response was received from the Board within the 45 days from that date.

**Mary Kate Planeta**
**January 26, 2022**
**Page Two**

In addition, you may file a complaint with the United States Department of Education, Office for Civil Rights (OCR), where the complaint is within the jurisdiction of that agency.  For additional information, please visit OCR's website at: https://www2.ed.gov/about/offices/list/ocr/complaintprocess.html.

If you have any questions regarding the above, or if I may be of further assistance, please contact me at 619-388-6591.

Sincerely,

*Johanna Palkowitz*

Johanna Palkowitz
Equal Opportunity and Diversity Officer
SAN DIEGO COMMUNITY COLLEGE DISTRICT

cc:     Division of Legal Affairs, California Community Colleges, Chancellor's Office
        Carlos O. Turner Cortez, Ph.D., Chancellor, San Diego Community College District
        Gregory Smith, Vice Chancellor Human Resources, San Diego Community College District

 Gmail

**Mary Kate Planeta <planetamk87@gmail.com>**

---

## Title 5 Complaint

**Johanna Palkowitz** <jpalkowi@sdccd.edu>                         Thu, Jan 27, 2022 at 10:44 AM
To: Mary Kate Planeta <planetamk87@gmail.com>

Dear Ms. Planeta,

The San Diego Community College District (SDCCD) policies necessitated by the COVID-19 pandemic, and most recently the spike due to the Omicron variant, have had a significant impact on our students and their educational pursuits.

All decisions related to the vaccination requirement, including the exemption and accommodation process, have been carefully considered. The SDCCD has done its best to balance the health and safety of its students and employees with the ability to meet student needs. Pursuant to SDCCD's current COVID-19 policy, students who have a religious exemption cannot be accommodated with in-person instruction; and the only available accommodation is to offer online courses when available.

Unfortunately, SDCCD is unable to offer all of its courses online, and this results in the inability to offer certain courses to unvaccinated students at the present time.

SDCCD's decision regarding your request for an accommodation is based on the policy described above. An appeal of an accommodation decision is not available when, as here, it is based on the direct application of SDCCD's current COVID-19 policy.

While we understand that there are individual circumstances involved, your Complaint is based on the facially accurate application of SDCCD policies and procedures related to COVID-19, which SDCCD believes to be lawful. If you disagree with SDCCD's vaccination policy and you feel that it constitutes an infringement of your rights as a student, you may file a complaint with the U.S. Department of Education, Office for Civil Rights. Additional information is available at: https://www2.ed.gov/about/offices/list/ocr/docs/howto.html.

Sincerely,

Johanna Palkowitz

(She, Her, Hers)

Equal Opportunity & Diversity Officer



   

 Gmail

**Mary Kate Planeta <planetamk87@gmail.com>**

## Response to Public Comment

**Carlos Cortez** <ccortez@sdccd.edu>                          Tue, Feb 1, 2022 at 5:53 PM
To: "planetamk87@gmail.com" <planetamk87@gmail.com>

Dear Ms. Planeta:

Thank you for following up regarding your request for an accommodation on the basis of your religious exemption from vaccination. We understand that the policies necessitated by the COVID-19 pandemic, and most recently the spike due to the Omicron variant, significantly impact our students and their educational pursuits. All decisions related to the vaccination requirement, including the exemption and accommodation process, have been carefully considered. The SDCCD has done its best to balance the health and safety of its students and employees with the ability to meet student needs. According to SDCCD's current COVID-19 policy, students who have a religious exemption cannot be accommodated with in-person instruction; and the only available accommodation is to offer online courses when available. Unfortunately, SDCCD is unable to offer all of its courses online, resulting in the inability to offer certain courses to unvaccinated students at the present time. SDCCD's decision regarding your accommodation request is based on the policy described above. An appeal of an accommodation decision is not available when, as here, it is based on the direct application of SDCCD's current COVID-19 policy.

If you believe that SDCCD's vaccination policy constitutes an infringement of your rights as a student, you may file a complaint with the U.S. Department of Education, Office for Civil Rights. Additional information is available at: https://www2.ed.gov/about/offices/list/ocr/docs/howto.html.

316

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit OO

COMPLAINT

 Gmail

**Mary Kate Planeta <planetamk87@gmail.com>**

## Covid-19 update
1 message

**Mary Kate Planeta** <planetamk87@gmail.com>                                 Mon, Jan 10, 2022 at 9:18 AM
To: dmeza@sdccd.edu

Good Afternoon,

I received an email stating my exemption is no longer valid for in person classes in Spring 2022. I just spoke with Lana at admissions and she forwarded me your information. I have provided all of my concerns below.

My concerns regarding this new update are as follows:
◦ I have a religious exemption to receiving vaccines.
◦ I have recovered from COVID19 in April 2021.
◦ I am part of EOPS which allowed me to register for classes early. There are classes that are not offered online, and the classes that are offered are now closed. Due to this I am unable to complete my associates degree for transfer.
◦ I also have student loans and financial aid that I am supposed to receive for this upcoming semester, as long as I am registered for the classes needed to graduate.

Recovering from COVID19 has exposed me to the virus and because of this exposure to the virus, there is an immunity developed that is equivalent to receiving a vaccine. A vaccine helps our bodies develop immunity to the virus that causes COVID-19 without us having to get the illness.
The First Amendment to the U.S. Constitution says that everyone in the United States has the right to practice his or her own religion, or no religion at all. Taking a vaccine developed using abortion-derived cells, goes against my belief system. The inability to progress toward our future is contributing to the publics mental health crisis. This inconsistency and change at a moments notice makes planning impossible. There is potential to lose funding now that the classes I need are unavailable.

Please reconsider removing my exemption for the spring 2022 semester.

Respectfully,
Mary Kate Planeta
5550055492

Sent from my iPhone

 Gmail

**Mary Kate Planeta <planetamk87@gmail.com>**

## concern over spring vaccine requirement
6 messages

**Dora Meza** <dmeza@sdccd.edu>                                      Mon, Jan 10, 2022 at 10:24 AM
To: "planetamk87@gmail.com" <planetamk87@gmail.com>

Hi Mary,


I am the supervisor overseeing Enrollment Services. I understand you contacted one of our staff members concern over an email you received. I would like to get more details. I can call you or schedule a zoom meeting. Im available tomorrow 9-3, let me know if this works for you and the preference.


Sincerely,


Dora A. Meza

Student Services Supervisor, I

San Diego City College

Enrollment Services, A-241

Click Here, to submit & process forms



**Mary Kate Planeta** <planetamk87@gmail.com>                          Mon, Jan 10, 2022 at 10:36 AM
To: Dora Meza <dmeza@sdccd.edu>

Thank you for your quick response, I am in BIO277D tomorrow-Friday from 9a-3p. Is there availability today?

Sent from my iPhone

    On Jan 10, 2022, at 10:24 AM, Dora Meza <dmeza@sdccd.edu> wrote:

    [Quoted text hidden]

319

**Dora Meza** <dmeza@sdccd.edu>                                        Mon, Jan 10, 2022 at 10:43 AM
To: Mary Kate Planeta <planetamk87@gmail.com>

Unfortunately I am in back to back meetings, all day. I did get a chance to read your email. How about tomorrow after class?

Sincerely,

Dora A. Meza

Student Services Supervisor, I

San Diego City College

Enrollment Services, A-241

Click Here, to submit & process forms



---

**From:** Mary Kate Planeta <planetamk87@gmail.com>
**Sent:** Monday, January 10, 2022 10:36:43 AM
**To:** Dora Meza
**Subject:** Re: concern over spring vaccine requirement

[EXTERNAL Email: Do not click any links or open attachments if you do not trust the sender and know the content is safe.]

[Quoted text hidden]

**10 attachments**


**OutlookEmoji-15966570276228388fdb6-83df-4e1c-8be0-11c88e84b46d.png**
8K


**OutlookEmoji-159665704491825c472b6-ac85-4ba8-8bd7-a04727f8079b.png**
10K

**OutlookEmoji-15966570276224b51a812-803e-45df-948b-1ff275a60b9d.png**
8K




**OutlookEmoji-1596657044918da38de6d-ac1b-401c-95d9-409b922f0d53.png**
10K


**OutlookEmoji-15966570276229fd5a935-0b01-4b58-b6ad-aa0673be8bea.png**
8K


**OutlookEmoji-15966570449188d33742b-a3e7-4fb5-8941-ff887cfa0b20.png**
10K


**OutlookEmoji-1596657027622b619bd10-882c-4891-ba35-9bd78bb1e55e.png**
8K


**OutlookEmoji-1596657044918a1029898-959f-445c-bb68-50dc1fb18589.png**
10K


**OutlookEmoji-159665702762281307d52-e9bb-460a-9e60-741ed5eb069d.png**
8K


**OutlookEmoji-1596657044918d8126cb3-b02e-46a3-8cfa-fb4eec07f5a0.png**
10K

---

**Mary Kate Planeta** <planetamk87@gmail.com>                    Mon, Jan 10, 2022 at 10:46 AM
To: Dora Meza <dmeza@sdccd.edu>

That's perfect, I can do zoom if that works

Sent from my iPhone

On Jan 10, 2022, at 10:43 AM, Dora Meza <dmeza@sdccd.edu> wrote:

[Quoted text hidden]

---

**Dora Meza** <dmeza@sdccd.edu>                    Mon, Jan 10, 2022 at 11:16 AM
To: Mary Kate Planeta <planetamk87@gmail.com>

Dora Meza is inviting you to a scheduled Zoom meeting.

Topic: Mary-exemption
Time: Jan 11, 2022 04:00 PM Pacific Time (US and Canada)

Join Zoom Meeting
https://zoom.us/j/99436467237?pwd=cENWVjdRZzNpWVdzcFdNc1dDMmo4UT09

Meeting ID: 994 3646 7237
Passcode: 693382
One tap mobile
+16699009128,,99436467237#,,,,*693382# US (San Jose)
+13462487799,,99436467237#,,,,*693382# US (Houston)

Dial by your location
        +1 669 900 9128 US (San Jose)
        +1 346 248 7799 US (Houston)
        +1 253 215 8782 US (Tacoma)
        +1 301 715 8592 US (Washington DC)
        +1 312 626 6799 US (Chicago)
        +1 646 558 8656 US (New York)
Meeting ID: 994 3646 7237
Passcode: 693382
Find your local number: https://zoom.us/u/abAk1fKWma

Sincerely,

Dora A. Meza

Student Services Supervisor, I

San Diego City College

Enrollment Services, A-241

Click Here, to submit & process forms



322

**From:** Mary Kate Planeta <planetamk87@gmail.com>
**Sent:** Monday, January 10, 2022 10:46:37 AM
[Quoted text hidden]

[Quoted text hidden]

---

**4 attachments**

 **OutlookEmoji-1596657027622c01d6c8c-6d59-4e19-9a7e-61ea5eae1565.png**
8K

 **OutlookEmoji-15966570449183ac56b86-d4a6-484e-aebd-47482515ee3a.png**
10K

 **OutlookEmoji-159665702762287fcbad9-14e2-42e1-81b7-074a730d01c2.png**
8K

 **OutlookEmoji-15966570449181e6c0161-f963-4891-b9ad-6d268849332c.png**
10K

---

**Mary Kate Planeta** <planetamk87@gmail.com>                    Tue, Jan 11, 2022 at 4:04 PM
To: Dora Meza <dmeza@sdccd.edu>

Good Afternoon,

I just wanted to confirm that we were still meeting today at 4pm

Respectfully,
Mary Kate Planeta

Sent from my iPhone

> On Jan 10, 2022, at 11:16 AM, Dora Meza <dmeza@sdccd.edu> wrote:

[Quoted text hidden]



# Office of Representative Darrell Issa

# Digital Privacy Release Form

Complete the form below to request help with a Federal Agency. When complete, click Submit to send to our office for assistance.

Fields marked with * are required

**Please Provide Applicable Identifying Information**

**Agency Involved**
Department of Education

**Prefix**    **First Name**    **MI**    **Last Name**
            Mary            K      Planeta

**Social Security Number**    **DOB**    **Email Address**    **Phone Number**
***-**-****    **/**/****    planetamk87@gmail.com    6025106685

**Street Address Line 1**    **Street Address Line 2**    **City**    **State**    **Zip Code**
886 SLATE ST            San Marcos    CA    92078

**Agency Case Number**    **Mortgage Loan Number Rank**    **Military Rank**
N/A            N/A            N/A

**Have you contacted any other elected official regarding this case?**
No

**If Yes, Officials Name?**

**Please explain the problem and the resolution/outcome you are seeking:**

I received a religious exemption in Fall 2022. This was removed 3 weeks before the spring semester. The only classes I needed to transfer were not offered online. My educational plan was to complete an AA for transfer by the end of this semester, enlist in the coast guard reserves as an officer and transfer to USD in their B.S. Behavioral Neuroscience program. Because I transitioned from full time employment to a full time student, I am receiving a loan for living expenses and I have a scholarship. However, I need to be enrolled to received both. I was unable to get in touch with administration because all services were remote during this time. Due to my circumstances, I decided to schedule vaccination and was told I would not be fully vaccinated in time for classes to begin. Because of the timeline of this, I had to enroll in classes that will not transfer or I would be put in a financial situation that did not allow me to find full time employment that cover my living expenses and I was offered no options or resources. I would like this district to be exposed for the situation they are putting students in, to the media. I would like to file a civil rights lawsuit that recoups the loan, legal fees and lack of income produced due to the gap between an enlisted and officer pay, and now being a semester behind. Or the option to enroll in these classes in the next two 8 week short courses now that the semester has begun. I have uploaded the correspondence between day 1 of being denied my exemption. My dad owns an ambulance company that I was planning to work for over the summer for wild land fire. I was immediately denied entry to the EMT program due to vaccination status (even with a religious exemption) in early November and enrolled in the remaining classes needed to transfer to 4 year university. I have included the emails that were exchanged and responded to in regards to the classes being dropped. I initially had a zoom call with the head of admissions advising me to file a civil rights complaint, directing me to https://www.unitedforcivilrights.org/, and guiding me to which admin I should contact. I attended to Board of Trustees meeting on January 27th and was told the Chancellor would reach out to me. I also filed a complaint with the department of education

## Constituent Authorization

To be able to assist you, we must have a signed privacy release form that clearly outlines your problem and the remedy you are seeking. By checking the box below you are giving our office permission to look into the matter on your behalf. Please make sure to attach below any relevant identifying information and supporting documents which relate to your inquiry.

☒ I hereby request the assistance of the Office of Representative Darrell Issa to resolve the matter described below. I authorize the Office of Representative Darrell Issa to receive any information that they might need to provide this assistance. The information I have provided to the Office of Representative Darrell Issa is true and accurate to the best of my knowledge and belief. The assistance I have requested from the Office of Representative Darrell Issa is in no way an attempt to evade or violate any federal, state, or local law.

**Date/Time**

2/2/2022 1:56:58 PM

**\* Signature**

**Mary Planeta**

 **Gmail**

**Mary Kate Planeta <planetamk87@gmail.com>**

## Confirmation of Submittal
1 message

**DoNotReply** <noreply@dfeh.ca.gov>                                      Wed, Feb 2, 2022 at 11:14 AM
To: "planetamk87@gmail.com" <planetamk87@gmail.com>

Case Number: 202202-16022602

Thank you for contacting the California Department of Fair Employment and Housing (DFEH). This email confirms that you have submitted an Intake Form. A DFEH representative will call you on your scheduled appointment date and time 5/24/2022 8AM-9AM to conduct a telephone intake interview. Please allow approximately one hour for the interview. The information discussed during the interview will assist us in determining whether a complaint will be accepted for investigation.

The Department's authority only extends to violations of the Fair Employment and Housing Act, Unruh Civil Rights Act, Ralph Civil Rights Act and Disabled Persons Act. Other labor and employment laws are enforced by other agencies. If the Department is unable to assist you, we will attempt to refer you to other agencies that may be able to address your concerns.

The information provided to the Department is subject to the Department's privacy policy and the California Public Records Act, Government Code section 6250 et seq.

Sincerely, Department of Fair Employment and Housing

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit PP

Acting Director of Enrollment Services

San Diego City College

Enrollment Services, A-241

Click Here, to submit & process forms



---

**From:** Gregory Smith
**Sent:** Thursday, October 7, 2021 6:13 PM
**Subject:** SDCCD Vaccination Requirement Timeline

Hello SDCCD Community,

This message provides updates on four items:

1. **COVID-19 Vaccination Requirement Timeline**
2. **COVID-19 Vaccination Leave and Workers' Compensation Coverage**
3. **COVID-19 Vaccination Exemption Request Update**
4. **Onsite COVID-19 Testing Procedures Update**

Thank you for your patience while we worked through the appropriate collective bargaining processes related to the District's COVID-19 vaccination requirement. Developing a timeline for all employees to comply with the vaccination requirement has been guided by two priorities: 1) providing as much time as possible for each department and division to plan instructional schedules and work assignments as we resume in-person instruction and services in the spring; and 2) providing employees with sufficient time to consult with their families, medical providers, faith leaders, and others about the decision to get vaccinated and complete the vaccination process.

As a reminder, the District follows the Centers for Disease Control (CDC) definition of "fully vaccinated", which is 14 days after the final vaccine dose in a single or two dose series. Vaccines with full or emergency authorization from the Food and Drug Administration (FDA), CDC, or World Health Organization (WHO) are accepted by the District to meet this requirement.

The District provides data on COVID-19 infections in California, San Diego County, and among employees and students on our COVID-19 information and resources website: https://www.sdccd.edu/about/departments-and-offices/human-resources/risk-management/covid-employees.aspx. Data are updated weekly.

**COVID-19 Vaccination Requirement Timeline**

**All employees must receive the final dose of an authorized COVID-19 vaccine by December 1, 2021.** The only exceptions to this requirement will be employees approved for a medical- or religious-based exemption and provided a reasonable accommodation to the vaccination requirement. This requirement applies to all employees regardless of work location, including those working and teaching remotely.

To meet the requirement to be vaccinated by December 1st, all employees are directed to:

328

1. Submit a medical- or religious-based exemption request by Friday, October 8th (if applicable)
2. Receive the first dose of a two-dose vaccine by Monday, November 1st
3. Receive the second dose of a two-dose vaccine or a single dose vaccine by Wednesday, December 1st
4. Upload a completed vaccination record into PeopleSoft by Wednesday, December 1st. The record must show your name and dates of each vaccine dose received.

Employees who fail to upload a completed vaccination record by December 1st or have an approved exemption will be subject to discipline for failure to comply with a District policy. Employees will be provided due process in accordance with the applicable collective bargaining agreement and District policies.

**Paid Leave for Vaccination and Workers' Compensation Coverage**

The District is providing paid leave for all employees for up to two appointments to receive a COVID-19 vaccine through December 31, 2021. Employees may receive up to four hours of paid leave to attend a vaccination appointment and up to eight hours of paid leave for illness related to receiving a COVID-19 vaccine. Several people have asked about workers' compensation coverage for injury or illness due to receiving the COVID-19 vaccine as a work requirement. Now that the District has implemented a vaccination requirement, any employee who suffers an injury or illness due to receiving the vaccine may file a workers' compensation claim. You may review information about the workers' compensation program and access forms here: https://www.sdccd.edu/about/departments-and-offices/human-resources/risk-management/workcomp.aspx.

Submitting Vaccination Documentation

Once fully vaccinated against COVID-19, you must submit a form stating you are fully vaccinated; the date of your most recent vaccination dose; a copy of your vaccination record card, State of California SMART Health Card showing your vaccination record, email confirmation of vaccination, or other documentation showing you have been fully vaccinated; and authorization for the District to use information about your vaccination status for employment-related reasons. You may obtain your California SMART Health Card at https://myvaccinerecord.cdph.ca.gov/. Attached are detailed instructions on completing the vaccination confirmation form. PLEASE DO NOT SUBMIT THIS FORM UNTIL YOU HAVE RECEIVED YOUR FINAL VACCINE DOSE.

**COVID-19 Vaccination Exemption Request Update**

Requesting an Exemption from the Vaccine Requirement

As required by Federal and State law, the District will evaluate requests for an exemption from this requirement based on a medical condition or a sincerely-held religious belief. Exemptions will be considered on an individual basis. Employees approved for an exemption will go through an interactive process to determine whether a reasonable accommodation to the vaccination requirement can be made without posing a health and safety risk to others. Reasonable accommodations may include periodic COVID-19 testing, changes in work assignments, changes in work schedules, changes in work location, and other appropriate measures. Accommodations are evaluated on an individual basis within the specific reasons for an exemption, work performed, environment in which work is performed, and related relevant factors.

If you have previously submitted an exemption request based on a medical condition and received approval, you do not need to do anything further at this time. If additional information is needed, a Human Resources representative will contact you directly.

If you have submitted an exemption request based on a sincerely-held religious belief before September 27th, you will need to submit an updated request providing additional information. Attached are detailed instructions for submitting an Exemption Request in PeopleSoft. Please read the directions closely to

ensure your request is submitted properly. When you complete the form, you must select either an exemption based on a medical condition that prevents you from being vaccinated or an exemption based on a sincerely-held religious belief.

Employees who select the medical exemption option will be contacted to initiate an interactive process to determine whether a qualifying medical reason to be exempted exists and to provide reasonable accommodations to being vaccinated. The interactive accommodation process will address related health and safety concerns for the individual employee and others in shared work and instructional spaces.

Employees who select the religious exemption option must attach a document explaining in specific details their sincerely-held religious belief and why the belief prevents them from receiving the COVID-19 vaccine. The request and attached supporting information will be evaluated within the guidelines provided by federal and state agencies enforcing religious accommodation regulations. Employees will be notified of the approval or denial of their request with sufficient time to comply with the vaccination requirement where necessary. When a religious exemption is approved, the employee will be contacted to begin an interactive accommodation process to determine whether a reasonable accommodation can be made based on the specific circumstances of the job duties, work location, work schedule, interactions with others, and related factors. The primary consideration will be ensuring there is no direct threat to the health and safety of others. If a reasonable accommodation cannot be made, the employee will be required to be fully vaccinated.

If you would like assistance with submitting the exemption request form or the vaccination confirmation form, please contact employmentoffice@sdccd.edu.

If you submitted an exemption request on or after September 27th, your request is being reviewed and processed in the order it was received. All requests submitted by October 8th will receive a determination by October 22nd. Employees who are denied an exemption will have an opportunity to request an appeal, if desired. Details on how to request an appeal will be provided with the notification of the initial denial. If you already received a denial response without instructions to appeal the determination, you will receive a follow-up communication soon.

**Onsite COVID-19 Testing Procedures Update**

The District continues to offer COVID-19 testing for all employees and students at each College and the District Office. In most cases, test results are available in 24 hours. We have experienced isolated delays in test result reporting due to software issues from the testing provider. The delays are in communicating the results, not in processing the test. The testing lab has procedures for notifying individuals of a positive COVID-19 test through multiple means, including telephone calls to the individual and District HR staff assigned to manage the testing process. If you have not received communication about your test result within 48 hours, it is likely due to a software issue and your test was negative. If you have questions about a delayed test result, please contact us at sdccdriskmanagement@sdccd.edu.

Employees may be tested at any District location. Here is the testing schedule and specific location information:

|           | City College | Mesa College | Miramar College | Educational Cultural Complex | District Office |
|-----------|--------------|--------------|-----------------|------------------------------|-----------------|
| Monday    |              | 7 AM – 3 PM  |                 |                              |                 |
| Tuesday   |              | 10 AM – 6 PM | 6 AM – 1 PM     | 10 AM – 6 PM                 |                 |
| Wednesday | 8 AM – 2 PM  |              | 12 PM – 7 PM    |                              | 8 AM – 4 PM     |
| Thursday  | 9 AM – 5 PM  |              |                 |                              |                 |
| Friday    |              | 8 AM – 12 PM |                 |                              |                 |

Testing Site Locations:

City College: Building M, room 205/206
Mesa College: Parking Lot 1, corner of Chasewood Way and Mesa College Circle
Miramar College: Building K1, room 107

330

Educational Cultural Complex: Room B101

**Vaccination Awareness Information Session**

Employees interested in getting more information about the COVID-19 vaccines are encouraged to join a Town Hall event on Thursday, October 28th from 10:30 AM to 12:00 PM. The Town Hall will feature Dr. Keith Norris, M.D., Ph.D., Professor of Medicine, UCLA Division of General Internal Medicine and Health Services. You can find more information and register here: https://www.sdccd.edu/about/departments-and-offices/communications-and-public-relations/newscenter/articles/2021/vaccination-awareness-town-hall-event.aspx.

Gregory Smith
Vice Chancellor, Human Resources
Office: 619-388-6589
Fax: 619-388-6897
gsmith@sdccd.edu



*This email and any files transmitted with it are for the sole use of the intended recipient(s) and may contain privileged or otherwise confidential information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, or believe that you may have received this communication in error, please advise the sender via reply email and destroy all copies of the original message.*



**2 attachments**

**Vaccination Confirmation Form Instructions.pdf**
506K

**Vaccination Exemption Form Instructions 09272021.pdf**
387K

331

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit QQ

COMPLAINT

### Recipient's Funding Certification and Agreement
### for the Institutional Portion of the Higher Education Emergency Relief Fund
### Formula Grants Authorized by Section 18004(a)(1) of the Coronavirus Aid, Relief, and
### Economic Security (CARES) Act

Sections 18004(a)(1) and 18004(c) of the CARES Act, Pub. L. No. 116-136 (March 27, 2020), authorizes the Secretary of Education ("Secretary") to allocate a maximum institutional portion of the formula grant funds in the amount of $_____ (up to 50 percent of the amount authorized under Section 18004(a)(1) of the CARES Act) to _____ ("Recipient").

Section 18004(c) of the CARES Act allows Recipient to use up to 50 percent of the funds received to cover any costs associated with significant changes to the delivery of instruction due to the coronavirus so long as such costs do not include payment to contractors for the provision of pre-enrollment recruitment activities, including marketing and advertising; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship (collectively referred to as "Recipient's Institutional Costs"). Section 18004(c) also requires Recipient to use no less than fifty percent of the funds received to provide emergency financial aid grants to students for expenses related to the disruption of campus operations due to the coronavirus (including eligible expenses under a student's cost of attendance such as food, housing, course materials, technology, health care, and child care). This Certification and Agreement solely concerns Recipient's Institutional Costs, as defined above.

To address Recipient's Institutional Costs, and pursuant to the Secretary's authority under the CARES Act and associated with the coronavirus emergency, as stated in Proclamation 9994 of March 13, 2020, "Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak," *Federal Register* Vol. 85, No. 53 at 15337-38 (hereinafter "Proclamation of National Emergency"), the Secretary and Recipient agree as follows:

1. The Secretary will provide Recipient funds for Recipient's Institutional Costs as authorized under Sections 18004(a)(1) and 18004(c) of the CARES Act.

2. As a condition for receiving funds for Recipient's Institutional Costs, Recipient must have entered into the Funding Certification and Agreement for Emergency Financial Aid Grants to Students under the CARES Act. Recipient may, but is not required to, use funds designated for Recipient's Institutional Costs to provide additional emergency financial aid grants to students for expenses related to the disruption of campus operations due to coronavirus. If Recipient chooses to use funds designated for Recipient's Institutional Costs to provide such emergency financial aid grants to students, then the funds are subject to the requirements in the Funding Certification and Agreement for the Emergency Financial Aid Grants to Students under the CARES Act, entered into between Recipient and the Secretary.

3. The Secretary urges Recipient to devote the maximum amount of funds possible to emergency financial aid grants to students, including some or all of the funds earmarked for Recipient's Institutional Costs, especially if Recipient has significant endowment or other resources

at its disposal. The Secretary urges Recipient to take strong measures to ensure that emergency financial aid grants to students are made to the maximum extent possible.

4. In consideration for the funds and as conditions for their receipt, Recipient warrants, acknowledges, and agrees that:

(a) The funds shall be used solely for the purposes authorized in Section 18004(c) of the CARES Act. In accordance with Section 18004(c) of the CARES Act, Recipient shall not use funds for payment to contractors for the provision of pre-enrollment recruitment activities, which include marketing and advertising; endowments; or capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship.

(b) Recipient retains discretion in determining how to allocate and use the funds provided hereunder, provided that funds will be spent only on those costs for which Recipient has a reasoned basis for concluding such costs have a clear nexus to significant changes to the delivery of instruction due to the coronavirus. It is permissible for Recipient to use the funds for Recipient's Institutional Costs to reimburse itself for costs related to refunds made to students for housing, food, or other services that Recipient could no longer provide, or for hardware, software, or internet connectivity that Recipient may have purchased on behalf of students or provided to students.

(c) Consistent with Section 18006 of the CARES Act, Recipient agrees that to the greatest extent practicable, Recipient will pay all of its employees and contractors during the period of any disruptions or closures related to the coronavirus. The Department would not consider the following Recipient's Institutional Costs to be related to significant changes to the delivery of instruction due to the coronavirus, and therefore would not view them as allowable expenditures: senior administrator and/or executive salaries, benefits, bonuses, contracts, incentives; stock buybacks, shareholder dividends, capital distributions, and stock options; and any other cash or other benefit for a senior administrator or executive.

(d) Recipient's Institutional Costs must have been first incurred on or after March 13, 2020, the date of the Proclamation of National Emergency.

(e) Recipient will comply with all reporting requirements including those in Section 15011(b)(2) of Division B of the CARES Act and submit required quarterly reports to the Secretary, at such time and in such manner and containing such information as the Secretary may reasonably require (See also 2 CFR 200.327-200.329). The Secretary may require additional reporting in the future, including but not limited to reporting on the use of the funds for Recipient's Institutional Costs, demonstrating such use was in accordance with Section 18004(c), accounting for the amount of reimbursements to the Recipient for costs related to refunds made to students for housing, food, or other services that Recipient could no longer provide, and describing any internal controls Recipient has in place to ensure that funds were used for allowable purposes and in accordance with cash management principles.

(f) Recipient shall comply with all requirements in Attachment A to this Certification and Agreement.

(g) Recipient shall promptly and to the greatest extent practicable use the funds for Recipient's Institutional Costs by one year from the date of this Certification and Agreement, and document its efforts to do so as part of the reports specified in subsection (e) above.

(h) Recipient shall cooperate with any examination of records with respect to the funds for Recipient's Institutional Costs by making records and authorized individuals available when requested, whether by (i) the U.S. Department of Education and/or its Inspector General; or (ii) any other federal agency, commission, or department in the lawful exercise of its jurisdiction and authority.

(i) Recipient's failure to comply with this Certification and Agreement, its terms and conditions, and/or all relevant provisions and requirements of the CARES Act or any other applicable law may result in Recipient's liability under the False Claims Act, 31 U.S.C. § 3729, *et seq.*; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; 18 USC § 1001, as appropriate; and all of the laws and regulations referenced in Attachment A, which is incorporated by reference hereto.

RECIPIENT or Authorized Representative of Recipient   _____

OPEID Number                                          _____

DATE                                                  _____

**Attachment A to Recipient's CARES Funding Certification and Agreement**

*Recipient assures and certifies the following:*

- Recipient will comply with all applicable assurances in OMB Standard Forms 424B and D (Assurances for Non-Construction and Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; nondiscrimination; Hatch Act provisions; labor standards; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders and regulations.

- With respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or renewal of Federal grants under this program; Recipient will complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 C.F.R. Part 82, Appendix B); and Recipient will require the full certification, as set forth in 34 C.F.R. Part 82, Appendix A, in the award documents for all subawards at all tiers.

- Recipient will comply with the provisions of all applicable acts, regulations and assurances; the following provisions of Education Department General Administrative Regulations (EDGAR) 34 CFR parts 75, 77, 79, 81, 82, 84, 86, 97, 98, and 99; the OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

**Paperwork Burden Statement**

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1840-0842. The time required to complete this information collection is estimated to be 2,853 total burden hours. If you have any comments concerning the accuracy of the time estimate or suggestions for improving this form, please write to: Hilary Malawer, 400 Maryland Avenue, SW. Washington, D.C. 20202.

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit RR

COMPLAINT

**Coronavirus Response and Relief Supplemental Appropriations Act, 2021**
**Certification and Agreement (CFDA 84.425F) ((a)(1) Institutional Portion)**

## PUBLIC AND NONPROFIT INSTITUTION GRANT FUNDS FOR INSTITUTIONS

The terms, conditions, and requirements governing your institution's (Recipient's) use of these grant funds awarded pursuant to section 314(a)(1) of the Coronavirus Response and Relief Supplemental Appropriations Act, 2021 (CRRSAA) (Pub. L. 116-260) (award or grant) by the U.S. Department of Education (Department) are governed by section 314 of the CRRSAA and the following terms and conditions of this Certification and Agreement (C&A):

**Use of Grant Funds:**

1. As a condition for receiving grant funds for Recipient's Institutional Costs in this Certification and Agreement, Recipient, an institution of higher education as defined in section 101 or 102(c) of the Higher Education Act of 1965, as amended (HEA), 20 USC § 1001 or 1002(c), must have also entered into the Public and Nonprofit Institution Grant Funds for Students Certification and Agreement under the CRRSAA (CFDA 84.425E).

2. Under section 314(c) of the CRRSAA, Recipient may use these grant funds for Recipient's Institutional Costs to defray expenses associated with coronavirus (including lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff trainings, and payroll); carry out student support activities authorized by the Higher Education Act of 1965, as amended (HEA) that address needs related to coronavirus; and make additional financial grants to students, which may be used for any component of the student's cost of attendance or for emergency costs that arise due to coronavirus, such as tuition, food, housing, health care (including mental health care), or child care.

3. Recipient acknowledges that no grant funds may be used to fund contractors for the provision of pre-enrollment recruitment activities; marketing or recruitment; endowments; capital outlays associated with facilities related to athletics, sectarian instruction, or religious worship; senior administrator or executive salaries, benefits, bonuses, contracts, incentives; stock buybacks, shareholder dividends, capital distributions, and stock options; or any other cash or other benefit for a senior administrator or executive.

4. Recipient may, but is not required to, use funds designated for Recipient's Institutional Costs to provide additional financial aid grants to students. If Recipient chooses to use these grant funds designated for Recipient's Institutional Costs to provide additional financial aid grants to students, then those funds are subject to the requirements in the Public and Nonprofit Institution Grant Funds for Students Certification and Agreement.

5. The Secretary urges Recipient to devote the maximum amount of funds possible to financial aid grants to students, including some or all of the funds allocated for

Recipient's Institutional Costs. The Secretary urges Recipient to take strong measures to ensure that financial aid grants to students are made to the maximum extent possible.

6. Recipient must notify the Department within 30 days of making a determination that it is required to remit payment to the Internal Revenue Service for the excise tax paid on investment income of private colleges and universities under section 4968 of the Internal Revenue Code of 1986 for tax year 2019 via the Required Notification of Endowment Excise Tax Paid form, pursuant to section 314(d)(6) of the CRRSAA.  Recipient acknowledges that if it was required to remit payment to the Internal Revenue Service for this excise tax paid, and if it is not an institution that has been designated as an eligible work college under HEA section 448, 20 USC § 1087-58:

   a. Recipient must not draw down more than 50% of its total allocation received under CRRSAA section 314(a)(1) (combined Student Aid Portion and Institutional Portion grants under CFDAs 84.425E and 84.425F), unless a waiver of this condition has requested by Recipient and until approved by the Secretary under CRRSAA section 314(d)(6)(B).

   b. Recipient must use its remaining available funds only for financial aid grants to students consistent with CRRSAA section 314(c)(3), or for sanitation, personal protective equipment, or other expenses associated with the general health and safety of the campus environment related to the qualifying emergency, unless a waiver of this condition has been requested by Recipient and until approved by the Secretary under CRRSAA section 314(d)(6)(B), and subject to other applicable requirements in section 314.

**Grant Administration:**

7. Recipient acknowledges that consistent with 2 CFR § 200.305, it must minimize the time between drawing down funds from G5 and paying incurred obligations (liquidation). Recipient further acknowledges that if it draws down funds and does not pay the incurred obligations (liquidates) within 3 calendar days it may be subject to heightened scrutiny by the Department, Recipient's auditors, and/or the Department's Office of the Inspector General (OIG). Recipient further acknowledges that returning funds pursuant to mistakes in drawing down excessive grant funds in advance of need may also be subject to heightened scrutiny by the Department, Recipient's auditors, and/or the Department's OIG. Finally, Recipient acknowledges that it must maintain drawn down grant funds in an interest-bearing account, and any interest earned on all Federal grant funds above $500 (all Federal grants together) during an institution's fiscal year must be returned (remitted) to the Federal government via a process described here: https://www2.ed.gov/documents/funding-101/g5-returning-interest.pdf.

8. Recipient may charge indirect costs to funds made available under this award consistent with its negotiated indirect cost rate agreement. If Recipient does not have a current negotiated indirect cost rate with its cognizant agency for indirect costs, it may appropriately charge the *de minimis* rate of ten percent of Modified Total Direct Costs

(MTDC). Recipient may also charge reasonable direct administrative costs to funds made available under this award.

9. Recipient acknowledges that any obligation under this grant (pre-award costs pursuant to 2 CFR § 200.458) must have been incurred on or after December 27, 2020, the date of the enactment of the CRRSAA.

10. Recipient must promptly and to the greatest extent practicable expend all grant funds from this award within the one-year period of performance (2 CFR § 200.77) specified in Box 6 of this Grant Award Notification (GAN).

11. Recipient must, to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus pursuant to section 315 of the CRRSAA.

**Reporting and Accountability:**

12. Recipient must promptly and timely report to the Department on the use of funds no later than 6 months after the date of this award in a manner to be specified by the Secretary pursuant to section 314(e) of the CRRSAA. Recipient must also promptly and timely provide a detailed accounting of the use of funds provided by this award in such manner and with such subsequent frequency as the Secretary may require. Recipient will comply with any other applicable reporting requirements including those in Section 15011(b)(2) of Division B of the CARES Act. Recipient acknowledges the Department may require additional or more frequent reporting to be specified by the Secretary.

13. Recipient must comply with all requirements of the Single Audit Act Amendments of 1996, 31 USC § 7501, et seq. (Single Audit Act) and all applicable auditing standards. Considering that the HEERF grant program is a new program not previously audited or subjected to Department oversight, and the inherent risk that comes with a new program, the Department strongly suggests that the HEERF grant program be audited as a major program in the first fiscal year(s) that the institution received a HEERF grant.

14. Recipient acknowledges it is under a continuing affirmative duty to inform the Department if Recipient is to close or terminate operations as an institution or merge with another institution. In such cases, Recipient must promptly notify in writing the assigned education program officer contact in Box 3. Additionally, Recipient must promptly notify the assigned education program officer if the Recipient's Authorized Representative changes.

15. Recipient must cooperate with any examination of records with respect to the advanced funds by making records and authorized individuals available when requested, whether by (i) the Department and/or its OIG; or (ii) any other Federal agency, commission, or department in the lawful exercise of its jurisdiction and authority. Recipient must retain all financial records, supporting documents, statistical records, and all other non-Federal

entity records pertinent to a Federal award for a period of three years from the date of submission of the final expenditure report pursuant to 2 CFR § 200.334.

16. Recipient acknowledges that failure to comply with this Certification and Agreement, its terms and conditions, and/or all relevant provisions and requirements of the CRRSAA or any other applicable law may result in Recipient's liability under the False Claims Act, 31 USC § 3729, et seq.; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; 18 USC § 1001, as appropriate; and all of the laws and regulations referenced in the "Applicable Law" section of this Certification and Agreement, below.

**Applicable Law:**

17. Recipient must comply with all applicable assurances in OMB Standard Forms (SF) SF-424B and SF-424D (Assurances for Non-Construction and Assurances for Construction Programs), including the assurances relating to the legal authority to apply for assistance; access to records; conflict of interest; nondiscrimination; Hatch Act provisions; labor standards; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders, and regulations.

18. Recipient certifies that with respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or supplementing of Federal grants under this program; Recipient must complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR part 82, Appendix B).

19. Recipient must comply with the provisions of all applicable acts, regulations and assurances; the following provisions of *Education Department General Administrative Regulations* (EDGAR) 34 CFR parts 75, 77, 81, 82, 84, 86, 97, 98, and 99; the *OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)* in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

Institution Name: _____

Authorized Representative (typed name): _____

Authorized Representative Title: _____

DUNS Number: _____

OPE ID: _____

Date: _____

**Paperwork Burden Statement**
According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1840-0842. Public reporting burden for this collection of information is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering, and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain benefit (Section 314(a)(1) of the Coronavirus Response and Relief Supplemental Appropriations Act, 2021 (Pub. L. 116-260)). If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Karen Epps, 400 Maryland Avenue, SW. Washington, D.C. 20202 directly.

OMB Number: 1840-0842
Expiration Date: 12/31/2023

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit SS

**American Rescue Plan Act of 2021**
**Certification and Agreement (ALN 84.425F) ((a)(1) Institutional Portion)**

## PUBLIC AND NONPROFIT INSTITUTION GRANT FUNDS FOR INSTITUTIONS

The terms, conditions, and requirements governing your institution's (Recipient's) use of these grant funds awarded pursuant to section 2003 of the American Rescue Plan Act of 2021 (ARP) (Pub. L. 117-2) (award or grant) by the U.S. Department of Education (Department) are governed by section 2003 of the ARP and section 314 of the Coronavirus Response and Relief Supplemental Appropriations Act, 2021 (CRRSAA) (Pub. L. 116-260) and the following terms and conditions of this Certification and Agreement (C&A):

**Use of Grant Funds:**

1. Under section 314(c) of the CRRSAA, Recipient, an institution of higher education as defined in section 101 or 102(c) of the Higher Education Act of 1965, as amended (HEA), 20 USC § 1001 or 1002(c), may use these grant funds for Recipient's Institutional Costs to defray expenses associated with coronavirus (including lost revenue, reimbursement for expenses already incurred, technology costs associated with a transition to distance education, faculty and staff trainings, and payroll); and make additional emergency financial grants to students, which may be used for any component of the student's cost of attendance or for emergency costs that arise due to coronavirus, such as tuition, food, housing, health care (including mental health care), or child care.

2. Under section 2003(5) of the ARP, Recipient must use a portion of their institutional funds received under this award to (a) implement evidence-based practices to monitor and suppress coronavirus in accordance with public health guidelines and (b) conduct direct outreach to financial aid applicants about the opportunity to receive a financial aid adjustment due to the recent unemployment of a family member or independent student, or other circumstances, described in section 479A of the HEA (20 USC § 1087tt).

3. Recipient may, but is not required to, use funds designated for Recipient's Institutional Costs to provide additional emergency financial aid grants to students. If Recipient chooses to use these grant funds designated for Recipient's Institutional Costs to provide additional emergency financial aid grants to students, then those funds are subject to the requirements described in the ARP Grant Funds for Students Agreement.

4. The Secretary urges Recipient to devote the maximum amount of funds possible to emergency financial aid grants to students, including some or all of the funds allocated for Recipient's Institutional Costs. The Secretary urges Recipient to take strong measures to ensure that emergency financial aid grants to students are made to the maximum extent possible.

5. Recipient acknowledges that no grant funds may be used to fund construction; acquisition of real property; contractors for the provision of pre-enrollment recruitment activities; marketing or recruitment; endowments; capital outlays associated with facilities related to

athletics, sectarian instruction, or religious worship; senior administrator or executive salaries, benefits, bonuses, contracts, incentives; stock buybacks, shareholder dividends, capital distributions, and stock options; or any other cash or other benefit for a senior administrator or executive.

6. Recipient acknowledges that it may voluntarily decline all or a portion of its ARP (a)(1) institutional funds. The recipient may indicate this by submitting the Voluntary Decline of HEERF form (OMB Control Number 1840-0856) to the Department by August 11, 2021. Recipient further acknowledges if it submits this form, it will be ineligible for the future redistribution of ARP HEERF grant funds to other institutions with greater needs due to the coronavirus.

**Grant Administration:**

7. Recipient acknowledges that consistent with 2 CFR § 200.305, it must minimize the time between drawing down funds from G5 and paying incurred obligations (liquidation). Recipient further acknowledges that if it draws down funds and does not pay the incurred obligations (liquidates) within 3 calendar days it may be subject to heightened scrutiny by the Department, Recipient's auditors, and/or the Department's Office of the Inspector General (OIG). Recipient further acknowledges that returning funds pursuant to mistakes in drawing down excessive grant funds in advance of need may also be subject to heightened scrutiny by the Department, Recipient's auditors, and/or the Department's OIG. Finally, Recipient acknowledges that it must maintain drawn down grant funds in an interest-bearing account, and any interest earned on all Federal grant funds above $500 (all Federal grants together) during an institution's fiscal year must be returned (remitted) to the Federal government via a process described here: https://www2.ed.gov/documents/funding-101/g5-returning-interest.pdf.

8. Recipient may charge indirect costs to grant funds made available under this award consistent with its negotiated indirect cost rate agreement. If Recipient does not have a current negotiated indirect cost rate with its cognizant agency for indirect costs, it may appropriately charge the *de minimis* rate of ten percent of Modified Total Direct Costs (MTDC) under 2 CFR § 200.414. Recipient may also charge reasonable direct administrative costs to the grant funds made available under this award.

9. Recipient acknowledges that any obligation under this grant (pre-award costs pursuant to 2 CFR § 200.458) must have been incurred on or after March 13, 2020, the date of the declaration of a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (85 FR 15337).

10. Recipient must promptly and to the greatest extent practicable expend all grant funds from this award within the one-year period of performance (2 CFR § 200.77) specified in Box 6 of this Grant Award Notification (GAN).

11. Recipient must, to the greatest extent practicable, continue to pay its employees and contractors during the period of any disruptions or closures related to coronavirus pursuant to section 315 of the CRRSAA.

**Reporting and Accountability:**

12. Recipient must promptly and timely provide a detailed accounting of the use and expenditure of the funds provided by this award in such manner and with such frequency as the Secretary may require.

13. Recipient must comply with all requirements of the Single Audit Act Amendments of 1996, 31 USC § 7501, et seq. (Single Audit Act) and all applicable auditing standards. Considering that the HEERF grant program is a new program not previously audited or subjected to Department oversight, and the inherent risk that comes with a new program, the Department strongly suggests that the HEERF grant program be audited as a major program in the first fiscal year(s) that the institution received a HEERF grant.

14. Recipient acknowledges it is under a continuing affirmative duty to inform the Department if Recipient is to close or terminate operations as an institution or merge with another institution. In such cases, Recipient must promptly notify in writing the assigned education program officer contact in Box 3. Additionally, Recipient must promptly notify the assigned education program officer if the Recipient's Authorized Representative changes.

15. Recipient must cooperate with any examination of records with respect to the advanced funds by making records and authorized individuals available when requested, whether by (a) the Department and/or its OIG; or (b) any other Federal agency, commission, or department in the lawful exercise of its jurisdiction and authority. Recipient must retain all financial records, supporting documents, statistical records, and all other non-Federal entity records pertinent to a Federal award for a period of three years from the date of submission of the final expenditure report pursuant to 2 CFR § 200.334.

16. Recipient acknowledges that failure to comply with this Certification and Agreement, its terms and conditions, and/or all relevant provisions and requirements of the CRRSAA or ARP or any other applicable law may result in Recipient's liability under the False Claims Act, 31 USC § 3729, et seq.; OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement) in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; 18 USC § 1001, as appropriate; and all of the laws and regulations referenced in the "Applicable Law" section of this Certification and Agreement, below.

**Applicable Law:**

17. Recipient must comply with all applicable assurances in OMB Standard Forms (SF) SF-424B and SF-424D (Assurances for Non-Construction and Assurances for Construction Programs), including the assurances relating to the legal authority to apply for assistance;

access to records; conflict of interest; nondiscrimination; Hatch Act provisions; labor standards; Single Audit Act; and the general agreement to comply with all applicable Federal laws, executive orders, and regulations.

18. Recipient certifies that with respect to the certification regarding lobbying in Department Form 80-0013, no Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with the making or supplementing of Federal grants under this program; Recipient must complete and submit Standard Form-LLL, "Disclosure Form to Report Lobbying," when required (34 CFR part 82, Appendix B).

19. Recipient must comply with the provisions of all applicable acts, regulations and assurances; the following provisions of *Education Department General Administrative Regulations* (EDGAR) 34 CFR parts 75, 77, 81, 82, 84, 86, 97, 98, and 99; the *OMB Guidelines to Agencies on Governmentwide Debarment and Suspension (Nonprocurement)* in 2 CFR part 180, as adopted and amended as regulations of the Department in 2 CFR part 3485; and the *Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards* in 2 CFR part 200, as adopted and amended as regulations of the Department in 2 CFR part 3474.

**Institution Name:** _____

**Authorized Representative (typed name):** _____

**Authorized Representative Title:** _____

**DUNS Number:** _____

**OPE ID:** _____

**Date:** _____

**Paperwork Burden Statement**
According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. The valid OMB control number for this information collection is 1840-0842. Public reporting burden for this collection of information is estimated to average 5 hours per response, including time for reviewing instructions, searching existing data sources, gathering, and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain a benefit (American Rescue Plan Act of 2021 (Pub. L. 117-2)). If you have any comments concerning the accuracy of the time estimate, suggestions for improving this individual collection, or if you have comments or concerns regarding the status of your individual form, application or survey, please contact Karen Epps, 400 Maryland Avenue, SW. Washington, D.C. 20202 directly.

OMB Number: 1840-0842
Expiration Date: 12/31/2023

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit TT

COMPLAINT

I had to send these separately.

Also, a classified was attacked by Manuel during a GB meeting.  Trying to get that copy to you by end of day today.

Patty

----- Forwarded Message -----

**From:** Patty Sparks <patty.sparks@gcccd.edu>

**To:** pattywk4@yahoo.com <pattywk4@yahoo.com>

**Sent:** Tuesday, March 22, 2022, 10:09:50 AM PDT

**Subject:** Email Manuel

Email chain from Manuel-Mancillas

**From:** Manuel Mancillas-Gomez <Manuel.Mancillas-Gom@gcccd.edu>
**Sent:** Tuesday, November 16, 2021 5:54 PM
**To:** Patty Sparks <Patty.Sparks@gcccd.edu>; Pearl Lopez <Pearl.Lopez@gcccd.edu>; Michele Martens <michele.martens@gcccd.edu>; Katie Cabral <Katie.Cabral@gcccd.edu>; Wayne Branker <Wayne.Branker@gcccd.edu>
**Subject:** Re: Please help!

Hello Patty,

Just Sunday me dear uncle Victor Manuel passed away alone after dealing with COVID 19 for the last 4 months; where my Mom, my aunt and cousin couldn't even see him or be near him at the hospital.

I really don't appreciate any of the anti-vaxxer's misinformation campaigns. As I read at the Governing Board meeting last Tuesday, there's a much more dangerous problem than the spreading of the COVID 19 virus, and it's a propaganda that spreads the same narrative that became famous with Donald Trump and his basket of liars who provided the fertile ground for the virus to continue to kill hundreds of thousands of folks in the richest country in the planet.

At the Board meeting, I mentioned the fact that only 5% of the African nations are vaccinated, and I wondered because these human beings have no choice because there aren't any choices to make; while the rich nations are hoarding the vaccines, Africans and most of the poorer nations can't afford them; while here anti-vaxxers speak of freedom of choice, I guess it would be their choice to get infected and die, but they shouldn't have the freedom to continue spreading the virus, so folks like my uncle wouldn't have to die so tragically because of someone who only thought of their individual freedom.

Our faculty at Cuyamaca voted almost unanimously in support of our joint Academic and Classified Senates' resolution to mandate COVID 19 vaccines for

349

our students,  classified professionals, administrators, and faculty. Our faculty and classified staff made an informed decision to protect the lives of all our students, colleagues and co-workers. If you want to save jobs, just have some solidarity to save the lives of yours and ours and get vaccinated; that will not kill you, misinformation on the vaccine might.

Kind regards,

Manuel

Manuel Mancillas-Gómez, MATESOL

Cuyamaca College Academic Senate President

English as a Second Language, Associate Professor

610 660 4323

**From:** Patty Sparks <Patty.Sparks@gcccd.edu>
**Sent:** Tuesday, November 16, 2021 5:11:03 PM
**To:** Pearl Lopez <Pearl.Lopez@gcccd.edu>; Manuel Mancillas-Gomez <Manuel.Mancillas-Gom@gcccd.edu>; Michele Martens <michele.martens@gcccd.edu>; Katie Cabral <Katie.Cabral@gcccd.edu>; Wayne Branker <Wayne.Branker@gcccd.edu>
**Subject:** Please help!

One more thing – not all faculty are represented by AFT, however, as Academic Senate leaders you can pass this information to all faculty.   It is information and does not require action.

Okay – now I will not bother you again.

Patty

**From:** Patty Sparks
**Sent:** Tuesday, November 16, 2021 5:00 PM
**To:** Pearl Lopez <Pearl.Lopez@gcccd.edu>; Manuel Mancillas-Gomez <Manuel.Mancillas-Gom@gcccd.edu>; Michele Martens <michele.martens@gcccd.edu>; Katie Cabral <Katie.Cabral@gcccd.edu>; Wayne Branker <Wayne.Branker@gcccd.edu>
**Subject:** Please help!

I am so sorry to hear this.  Faculty have no way of getting information regarding protections available to them, as well as instruction and assistance with filling out their exemptions.

These are your colleagues, friends.  There is nothing operational about this, it is however information for those faculty who do not wish to be vaccinated.

I would bet you discussed vaccine events, where to get it, when to get it?

AFT will not provide this information.  I feel bad, actually I am sad that so many people are being hurt as there are more faculty unvaccinated than classified.

I won't bother you again, but I truly believe you are on the wrong side of this and definitely complicit in alienating and segregating those who don't believe as

350

you do. I can't say I am disappointed as I half expected this to be a no.  I did have hope though.

I will never understand this.  Never.  The meeting was to invitation for employees to understand their rights, help with their exemptions, and to be heard and not judge.  The meeting has no affiliation with any organized union.

Patty

**From:** Pearl Lopez <Pearl.Lopez@gcccd.edu>
**Sent:** Tuesday, November 16, 2021 4:30 PM
**To:** Patty Sparks <Patty.Sparks@gcccd.edu>; Manuel Mancillas-Gomez <Manuel.Mancillas-Gom@gcccd.edu>; Michele Martens <michele.martens@gcccd.edu>; Katie Cabral <Katie.Cabral@gcccd.edu>; Wayne Branker <Wayne.Branker@gcccd.edu>
**Subject:** Re: Please help!

Dear Patty,

I apologize for the delay in getting back to you.  I consulted with the Senate Officers and we are in agreement that this is a working condition matter and not Academic Senate.

Also, please note that on Saturday, November 6, the statewide senate (ASCCC) passed a resolution recommending that colleges work with bargaining units to require the vaccination (13.02 F21 In Support of Prevention and Control of COVID-19 in the Interest of Safe Learning Environments, page 18).

We recommend you communicate with Jim Mahler, AFT President.   Thank you Ms. Patty.

Pearl Lopez, Ed.D.

Academic Senate President

EOPS/CARE Counselor

Office Phone: (619) 644-7651

---

**From:** Patty Sparks <Patty.Sparks@gcccd.edu>
**Sent:** Tuesday, November 16, 2021 9:56 AM
**To:** Manuel Mancillas-Gomez <Manuel.Mancillas-Gom@gcccd.edu>; Pearl Lopez <Pearl.Lopez@gcccd.edu>; Michele Martens <michele.martens@gcccd.edu>; Katie Cabral <Katie.Cabral@gcccd.edu>; Wayne Branker <Wayne.Branker@gcccd.edu>
**Subject:** Please help!

Good Morning Leaders:

This email comes to you with a message pleading with you to provide information to your constituent groups.  As leaders of your constituent groups, it is imperative to provide them information, even if you don't agree with the content.

The message is simple, there are approximately 2,400 active employees (excluding student and Nance workers, with those workers there are 3,200) at GCCCD.  Approximately 1,400 are vaccinated.  That leaves a lot of employees scared, and uneducated as to their civil rights and what options are there for them.

I am working with San Diego Community College District employees who are also against the vaccine mandates.  We are holding a meeting on Thursday, November 18, 2021, to explore options for those that do not want to be vaccinated.

Whatever your stance on the vaccine mandate, you represent all your constituents, even those who differ in opinion.  I am pleading with you to share the meeting information.  Information below.

If I can add one thing to help your decision, please note that the CDC is recommending all Americans be vaccinated, a one size fits all, however, there are many of the unvaccinated that have already been exposed to the virus, recovered, and full of antibodies that are long lasting and protective.  Further, the CDC also admitted that there is not one case documented of a person who has had Covid and recovered spreading or infecting another person.

Please, please, please give those who don't believe in the vaccine a chance to explore options.  Please send this information to your constituent groups.  I beg you.

Patty Sparks

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit UU



## Fw: Potentially Unsafe Working Conditions in the Spring

2 messages

**From:** Dora Meza
**Sent:** Monday, January 3, 2022 12:19 PM
**To:** John Gradilla <jgradill@sdccd.edu>; Ricky Shabazz <rshabazz@sdccd.edu>; Marciano Perez <mperez@sdccd.edu>
**Cc:** Josolyn Hill <jhill@sdccd.edu>; Rachel Hernandez <rahernan@sdccd.edu>; Francisco Blas <fblas@sdccd.edu>; Jasmine Vazquez <jvazquez@sdccd.edu>; Lana Kapchinsky <lkapchin@sdccd.edu>; Elena Garduno <egarduno@sdccd.edu>; Lilia Davis < davis001@sdccd.edu>; Teresa Erbacher <terbache@sdccd.edu>; Sonia Lopez <slopez@sdccd.edu>; Janay Patton <jpatton@sdccd.edu>; Carolina Vargas <cvargas@sdccd.edu>; Alyssa Antonio <aantonio@sdccd.edu>; Lilia Davis <ldavis001@sdccd.edu>; sdccdcivilrights@gmail.com; Dan Gutowski <dgutowsk@sdccd.edu>; Megan Soto <msoto@sdccd.edu>
**Subject:** Fw: Potentially Unsafe Working Conditions in the Spring

Dear John,

I understand you sent this to a district colleague, I am not sure what was your intent by sending it. For future references before you decide to send out an email with defamatory statements, I would suggest you reach out to a peer or even your supervisor and ask them if it would be an appropriate email to send.

354

However I feel it's necessary to "fact check" your statement below. Those of you who know me, know I like to address issues swiftly to avoid CHISMES (gossip).

Timeline of event "Fact Check"

I had tested negative weekly since September 1, -December 1, 2021, last negative test.

**December the 6th, HR notified me they believed I had been exposed on December 2, to someone who had tested COVID positive.** Establish COVID protocol requires that I quarantine and test between Dec. 7-9th

**December the 8th, I received a positive COVID result. Being COVID positive and symptomatic. As part of HR determined that my COVID transmissions resulted from on the job transmission due to Dec. 2 interaction.** (I have added Ricky/Marciano to fact check this statement)

Based on the layout of Enrollment Services and the fact that I had not been back on campus since the day of transmissions, HR determined no additional risk of exposure existed for staff or visitors of the office.

As a precaution all staff had the option to test- we had **no positive results** This is the outcome of effective safety measures.

Although I know  I contracted COVID from a **vaccinated employee**. I am not upset because I do not live in a bubble; but I am not going to disclose their name out of privacy. What is important for me to communicate is the following:

**I did not transmit COVID to anyone, I took the necessary precautions.**

- **I didn't require hospitalization,**
- **I didn't require Antibody infusions,**
- **And most important, I didn't die**

355

I simply treated myself with home remedies used in my family for generations. COVID felt like a bad cold, I'm 45, it hasn't been the worst cold I have had in my lifetime. **I didn't survive because I am  a unicorn, I just trust in my GOD.**

What is important to understand, is there is a need to reexamine the misinformation that is guiding the policies.

- **We know both vaccinated/unvaccinated individual can contract and transmit COVID.**
  - Unvaccinated individuals are being classified a THREAT to the public and demonized.  Do not forget there a variety of reasons why one may not be vaccinated for COVID -19, these are protected under Civil Rights Act 1964.
- Two types of individual exist symptomatic and asymptomatic
  - Individual who is symptomatic-easier to isolate and protect others. If you are displaying symptoms you know to stay home and get tested.
  - Individual who is asymptomatic-may display NO symptoms thus not knowing they are positive, and unknowingly transmitting the virus
- 15 minute face to face interactions are the threshold for transmission
  - We need to look at either temporarily or permanently moving services remotely if we know the interaction will  put us close to or over the 15minute mark.

The district has the ability to be transparent. The majority of COVID positive results in the district during fall have been from students/employees who were vaccinated. Yet for some reason this information is intentionally being hidden. Until there is transparency we will continue to struggle is creating a working strategic plan. AFT wants to stand by the safety concern, then we need to start with transparency.

## It is important to understand the term Medical Status, applies to pregnancy, STDS, mental health diagnosis, and vaccine status and are considered <u>confidential</u>.

Although C*ancel Culture feels entitled to everyone's info*.  The reality  is this is not the 80's AIDS era when the media/public use to refer to AIDS as a **"Gay Man's Disease"**, and an portion of our community regardless of status, was viewed as having the plague just for being true to themselves.

In closing I want to leave you with this reminder. Just like so many other things in my private life, an individuals medical status, is **none of your business.**

Sincerely,


Dora A. Meza

Student Services Supervisor, I

San Diego City College

Enrollment Services, A-241

Click Here, to submit & process forms




**From:** John Gradilla <jgradill@sdccd.edu>
**Sent:** Monday, December 20, 2021, 1:00 PM
**To:** Joseph Botticelli
**Subject:** RE: Potentially Unsafe Working Conditions in the Spring


Hello Joseph Botticelli,

I understand what you are saying in regards to people civil rights. Let me give you a copy of an email of was sent out recently "Good evening City College,


We received information that an employee who attended yesterday's campus holiday luncheon tested positive for COVID-19. The employee is asymptomatic. Those who were in close proximity with the employee have been notified. Per the District's COVID-19 Prevention Plan, the employee will not return to work until a minimum of 10 days have passed since the date of specimen collection of their first positive COVID-19 test.


Employees who have had a "close contact" potential exposure as defined in the COVID-19 Prevention Plan are not required to quarantine if

either one of the following applies:

1. The potentially exposed employee tested positive for COVID-19 within the three (3) months preceding the exposure and has fully recovered; and the employee did not develop any symptoms associated with COVID-19 following the recent exposure; or

2. The employee has been fully vaccinated against COVID-19 within the three (3) months preceding the exposure; and the employee did not develop any symptoms associated with COVID-19 following the recent exposure. An employee qualifies as "fully vaccinated" if it has been at least two (2) weeks following receipt of the second (2nd) dose in a two-dose series, or at least two (2) weeks following receipt of one (1) dose of a single-dose vaccine.

As we meet and hold more events in person, please continue to practice ways to help protect yourself and others from COVID-19 – get vaccinated, wear a mask, practice social distancing, meet outdoors or in well-ventilated areas, wash your hands often, cover coughs and sneezes, and monitor your health daily.

Thanks,

**Cesar Gumapas**
*Public Information Officer*
Communications Office
San Diego City College
Direct 619 388 3911

Email cgumapas@sdccd.edu

"

I know for the fact that person had COVID-19 was Supervisor Dora Meza that refused to get the vaccine. Now it this was able to happen on campus during an outside event were people ate without mask which is perfectly fine how is it to ensure that as an employee we don't get another strain of COVID-19 such as OMINCRON? My wife that is a front line worker that works at Sharp Hospital in full PPE had two colleagues get COVID-19 twice and has been vaccinated die and they had no underlying medical issues. We have employees that are mandated to do COVID-19 tested every week. Yet we don't have students do this or have third party contactors come onto campus and not wear masks. I can't find the picture that I took of those individuals. I have been at the meetings and I see both sides. But it is the safety of the work environment and making sure that I don't become a statistic or bring something home.

Sincerely,



**John N Gradilla, MSTMG, A+**
Student Services Assistant
Counseling A-366
Office: (**619) 894-6118**

Pronouns: he, him, his
www.sdcity.edu

1313 Park Boulevard, San Diego, CA 92101-4787

*San Diego City College has as its highest priority student learning and achievement. The college provides lower division and general education courses that lead to certificates, associate degrees or transfer to a four-year college or university; career technical education programs that meet specific industry needs, upgrade the employment skills of students and fulfill licensing requirements of the state of California as well as contribute to the economic development of our region; basic skills instruction to assist all students in meeting their educational goals; and essential student support services for all students.*

**From:** Joseph Botticelli <jbotticelli@sdccd.edu>
**Sent:** Friday, December 17, 2021 11:51 AM
**Cc:** Jim Mahler <aftjim@mac.com>
**Subject:** RE: Potentially Unsafe Working Conditions in the Spring

359

Dear Fellow Employees,

I want to applaud the district for upholding the students Civil Rights to a religious and medical exemption and working with them in allowing them to be able to return to campus in the spring for classes and services. No student or employee should be discriminated against for any reason especially for their religious beliefs or there medical condition. Allowing students back on campus with approved exemptions is not inconsistent with what the district is requiring of its employees. Hundreds of employees have been granted religious or medical exemptions and are now in the accommodation process. For AFT to say that this is inconsistent is deliberate misinformation to push there politically driven agenda.

AFT's statement that they FEEL strongly that this is a safety issue is just that – there feeling! It is not based on facts or current science! Please provide the facts backing your feelings. If this poses a hazardous working condition please prove it! Please explain with numbers, names, incidents and seriousness of illnesses. Please see the recent study from UC Berkeley regarding everyone is just as contagious as the other weather vaccinated or not.

https://www.ucdavis.edu/health/covid-19/news/viral-loads-similar-between-vaccinated-and-unvaccinated-people

Allowing students and employees on campus by granting them there religious and medical Civil Rights is in no way an Unfair Labor Practice! It is an Unfair Labor Practice to deny religious and medical Civil Rights and not allow students and employees on campus. It is not only unfair but it is against the law and morally wrong. SDCCDs main purpose and mission is to educate and serve the students.  Why would we want to fight against our student's right to an education! AFT claims to be a firm believer in equity yet there actions state otherwise. Unfortunately I'm starting to see that AFT's definition of equity is that it only applies if you fall into alignment with their beliefs, feelings, and agenda. AFT should be filing an Unfair Labor Practice Charge against the vaccine mandate! The vaccine mandate has done nothing but divide us and cause hate, discrimination, segregation, and fear.

I will not be participating or supporting this immoral and unlawful cause and I'm hoping that you will choose to fight for the students Civil Rights and for their education!

If AFT no longer represents you and what you believe and stand for than please consider opting out. The form to do this has been attached.

Sincerely,

**SDCCD and GCCCD CIVIL RIGHTS** www.unitedforcivilrights.org/

**From:** Jim Mahler <aftjim@mac.com>
**Sent:** Thursday, December 16, 2021 9:57 AM
**Subject:** Potentially Unsafe Working Conditions in the Spring

Dear AFT Guild Members,

It has come to our attention that the District, regardless of their vaccine mandate, plans to allow unvaccinated students with medical or religious exemptions on campus in the Spring for classes and services while at the same time expecting all employees to resume in-person services/instruction.  This clearly presents a health and safety concern for our members, and is inconsistent with what the District is requiring of its employees.

We feel very strongly that allowing unvaccinated students on our campuses in the spring, **_regardless of reason_**, presents a hazardous working condition for our members that we simply cannot allow to happen.

The Guild is considering filing an Unfair Labor Practice Charge against the District on this matter, which would then provide us with the right to go out on strike over this issue.  We would plan our walkout to begin the first week of the Spring semester if the District refuses to change course on its decision.

Since that is over a month from now, we have some time to plan, to organize for success, and to hear from each of you as to whether or not you would support this job action beginning with the first week of the Spring semester.  Please take 30 seconds to fill out this quick survey letting us know where you stand on this important issue.

In Solidarity,

Jim

Jim Mahler, President
AFT Guild, Local 1931



[Quoted text hidden]


[Quoted text hidden]
[Quoted text hidden]

---

📄 **Jim Mahler.response Todd.pdf**
122K

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit VV

COMPLAINT

SARS CoV 2 Tes ing S ra egy Considera ions for Non Heal hcare Workplaces | COV D 19       h ps //www cdc gov/coronavirus/2019 ncov/communi y/organiza ions/ es ing non heal hcar

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.364   Page 364 of 416





COVID-19

# Interim Guidance for SARS-CoV-2 Testing in Non-Healthcare Workplaces

Updated Oct. 5, 2021

## Summary of Recent Changes

Updates as of October 6, 2021                                                           ∧

- Updated descriptions of test types.
- Updated to align with new antigen testing algorithms, one for community settings ■ and one for congregate settings ■ .
- Updated testing recommendations for fully vaccinated workers who are close contacts of someone with COVID-19.
- Clarified that screening testing recommendations apply to asymptomatic, unvaccinated workers.

View Previous Updates

## Key Points

- Workplace-based testing for SARS-CoV-2, the virus that causes COVID-19, could identify workers with SARS-CoV-2 infection, and thus help prevent or reduce further transmission. The purpose of this guidance is to provide employers with considerations for incorporating testing for SARS-CoV-2 into a workplace COVID-19 preparedness, response, and control plan in non-healthcare workplaces.
- This guidance includes descriptions of different types of SARS-CoV-2 tests; scenarios where SARS-CoV-2 testing may be used; considerations for screening testing (testing asymptomatic and unvaccinated workers with no known or suspected exposure to SARS-CoV-2); and use of antigen tests for serial screening testing.
- Screening testing could be effective in helping to prevent transmission for workplace settings.
- These interim considerations on SARS-CoV-2 testing strategies for non-healthcare workplaces during the COVID-19 pandemic are based on what is currently known about the transmission and severity of COVID-19 and is subject to change as additional information becomes available.

**Note: This document provides guidance on the appropriate use of testing and does not dictate the determination of payment decisions or insurance coverage of such testing, except as may be otherwise referenced (or prescribed) by another entity or federal or state agency.**

## Introduction

The purpose of this document is to provide employers with strategies to consider for incorporating testing for SARS-CoV-2, the virus that causes COVID-19, into workplace preparedness, response, and control plans in non-healthcare workplaces. For workplaces with healthcare personnel, including those that work in nursing homes, please refer to Interim Infection

364

Prevention and Control Recommendations for Healthcare Personnel During the Coronavirus Disease 2019 (COVID-19) Pandemic and Interim Infection Prevention and Control Recommendations to Prevent SARS-CoV-2 Spread in Nursing Homes.

Employers are encouraged to collaborate with state, territorial, tribal, and local health officials to determine whether and how to implement the following testing strategies and which one(s) would be most appropriate for their circumstances. These considerations are meant to supplement, not replace, any federal, state, local, territorial, or tribal health and safety laws, rules, and regulations with which workplaces must comply. These strategies should be carried out in a manner consistent with existing laws and regulations, including laws protecting employee privacy and confidentiality. They should also be carried out consistent with Equal Employment Opportunity Commission (EEOC) guidance ↗ regarding permissible testing policies and procedures. Employers providing testing of employees should put procedures in place for rapid notification of results and establish appropriate measures based on testing results, including instructions regarding self-isolation and restrictions on workplace access.

# Considerations when testing

SARS-CoV-2 testing may be incorporated as part of a comprehensive approach to reducing transmission in non-healthcare workplaces. Testing identifies workers infected with SARS-CoV-2, the virus that causes COVID-19, so that actions can be taken to slow and stop the spread of the virus. For guidance on quarantine and testing of fully vaccinated people for COVID-19, please visit Interim Public Health Recommendations for Fully Vaccinated People.

Employees undergoing testing should receive clear information on:

the manufacturer and name of the test, the type of test, the purpose of the test, the performance specifications of the test, any limitations associated with the test, who will pay for the test, how the test will be performed, how and when they will receive test results, and;

how to understand what the results mean, actions associated with negative or positive results, the difference between testing for workplace screening versus for medical diagnosis, who will receive the results, how the results may be used, and any consequences for declining to be tested.

Individuals tested are required to receive patient fact sheets as part of the test's emergency use authorization ↗ (EUA).

According to the Americans with Disabilities Act (ADA), when employers implement any mandatory testing of employees, it must be "job related and consistent with business necessity." In the context of the COVID-19 pandemic, the U.S. EEOC ↗ notes that testing to determine if an employee has SARS-CoV-2 infection with an "accurate and reliable test" is permissible as a condition to enter the workplace because an employee with the virus will "pose a direct threat to the health of others." EEOC notes that testing administered by employers that is consistent with current CDC guidance will meet the ADA's business necessity standard. Employers who mandate workplace testing for SARS-CoV-2 infection should discuss further with employees who decline testing and consider providing alternatives as feasible and appropriate, such as reassignment to tasks that can be performed via telework.

Under OSHA's recordkeeping requirements in 29 CFR Part 1904 ↗ , COVID-19 can be a recordable illness ↗ . Thus, employers are responsible for recording cases of COVID-19, if the case meets certain requirements. Employers are encouraged to frequently check OSHA's webpage ↗ for updates.

# Test types

## Viral tests

**Viral tests**, including nucleic acid amplification tests (NAATs) and antigen tests, are used as diagnostic tests to **detect infection** with SARS-CoV-2 and to inform an individual's medical care. Viral tests can also be used as screening tests to reduce the transmission of SARS-CoV-2 by identifying infected persons who need to isolate from others. See FDA's list of In Vitro Diagnostics Emergency Use Authorizations ↗ for more information about the performance of specific authorized tests.

NAATs, such as real-time reverse transcription-polymerase chain reaction (RT-PCR), are high-sensitivity, high-specificity tests for diagnosing SARS-CoV-2 infection. NAATs detect genetic material (nucleic acids). NAATs for SARS-CoV-2 specifically identify the ribonucleic acid (RNA) sequences that comprise the genetic material of the virus. Most NAATs

365

SARS CoV 2 Tes ing S ra egy  Considera ions for Non Heal hcare Workplaces l COV D 19        h ps //www cdc gov/coronavirus/2019 ncov/communi y/organiza ions/ es ing non heal hcar

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.366   Page 366 of 416

need to be processed in a laboratory and time to results can vary (~1–3 days), but some NAATs are point-of-care (POC) tests with results available in about 15–45 minutes. Because laboratory-based NAATs are considered the most sensitive tests for detecting SARS-CoV-2, they can also be used to confirm the results of lower sensitivity tests, such as POC NAATs or antigen tests.

Antigen tests are immunoassays that detect the presence of a specific viral antigen. Antigen tests generally have similar specificity but are less sensitive than most NAATs. Most can be processed at the point of care with results available in minutes and thus can be used in screening programs to quickly identify those who are likely to be contagious. Because of the performance characteristics of antigen tests, it may be necessary to confirm some antigen test results (e.g., a negative test in persons with symptoms or a positive test in persons without symptoms) with a laboratory-based NAAT. Furthermore, based on the authorization from FDA ☑ , some point-of-care NAATs cannot be used for confirmatory testing. Use of the appropriate antigen testing algorithm is recommended to determine when confirmatory testing is needed.

## Antibody tests

Antibody (or serology) tests are used to detect previous infection with SARS-CoV-2 and can aid in the diagnosis of multisystem inflammatory syndrome in children (MIS-C) and in adults (MIS-A). CDC does not recommend using antibody testing to diagnose current infection. Depending on the time when someone was infected and the timing of the test, the test might not detect antibodies in someone with a current infection. In addition, it is not currently known whether a positive antibody test result indicates protective immunity against SARS-CoV-2; therefore, at this time, antibody tests should not be used to determine if an individual is immune against reinfection. Antibody testing is being used for public health surveillance and epidemiologic purposes. Because antibody tests can have different targets on the virus, specific tests might be needed to assess for antibodies originating from past infection versus those from vaccination. For more information about COVID-19 vaccines and antibody test results, refer to Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States.

For more information, please refer to Overview of Testing for SARS-CoV-2 (COVID-19).

## Overview of testing scenarios

**Diagnostic testing** is intended to identify current infection in individuals and is performed when a person has signs or symptoms consistent with COVID-19 or when a person is asymptomatic but has a recent known or suspected exposure to SARS-CoV-2.

Examples of diagnostic testing include:

- Testing people who have symptoms consistent with COVID-19 and who present to their healthcare provider
- Testing people as a result of contact tracing efforts
- Testing people who indicate that they were exposed to someone with a confirmed or suspected case of COVID-19.
- Testing people who attended an event where another attendee was later confirmed to have COVID-19

**Screening tests** are intended to identify infected people who are asymptomatic and do not have known, suspected, or reported exposure to SARS-CoV-2. Screening helps to identify unknown cases so that measures can be taken to prevent further transmission.

Examples of screening testing include:

- Testing unvaccinated employees in a workplace setting
- Testing unvaccinated students, faculty, and staff in a K-12 school or institute of higher education setting
- Testing an unvaccinated person before or after travel
- Testing at home for someone who does not have symptoms associated with COVID-19 and no known exposures to someone with COVID-19

## Choosing a test

366

SARS CoV 2 Tes ing S ra egy  Considera ions for Non Heal hcare Workplaces | COV D 19          h ps //www cdc gov/coronavirus/2019 ncov/communi y/organiza ions/ es ing non heal hcar

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.367   Page 367 of 416

When choosing which test to use, it is important to understand the purpose of the testing (e.g., diagnostic vs. screening), analytic performance of the test within the context of the level of community transmission, need for rapid results, and other considerations (See Table 1). The COVID-19 Viral Testing Tool helps healthcare providers and individuals understand their COVID-19 testing options. After test results are in, the tool can help interpret results and guide next steps.

Table 1 summarizes some characteristics of NAATs and antigen tests to consider. Most antigen tests that have received EUA from FDA are authorized for testing symptomatic persons within the first 5, 6, 7, 12, or 14 days of symptom onset. Accumulation of data on the performance of antigen tests in different situations has helped guide the use of these tests as screening tests in asymptomatic people to detect or exclude SARS-CoV-2 infection. See FDA's recommendations for healthcare providers using SARS-CoV-2 diagnostic tests for screening asymptomatic individuals for COVID-19. Also see information from the Centers for Medicare & Medicaid Services (CMS) on Updated CLIA SARS-CoV-2 Molecular and Antigen Point of Care Test Enforcement Discretion. Laboratories that perform screening or diagnostic testing for SARS-CoV-2 must have a Clinical Laboratory Improvement Amendments (CLIA) certificate and meet regulatory requirements. Tests that have received an EUA from FDA for point of care (POC) use can be performed with a CLIA certificate of waiver.

## Table 1. NAAT and Antigen Test Differences to Consider When Planning for Diagnostic or Screening Use

| | |
|---|---|
| **NAATs** | |
| **Antigen Tests** | |
| **Intended Use** | |
| Detect *current* infection | |
| Detect *current* infection | |
| **Analyte Detected** | |
| Viral Ribonucleic Acid (RNA) | |
| Viral Antigens | |
| **Specimen Type(s)** | |
| Nasal, Nasopharyngeal, Oropharyngeal, Sputum, Saliva | |
| Nasal, Nasopharyngeal | |
| **Sensitivity** | |
| Varies by test, but generally high for laboratory-based tests and moderate-to-high for POC tests | |
| Varies depending on the course of infection, but generally moderate-to-high at times of peak viral load* | |

367

SARS CoV 2 Tes ing S ra egy  Considera ions for Non Heal hcare Workplaces I COV D 19          h  ps //www cdc gov/coronavirus/2019 ncov/communi y/organiza ions/ es ing non heal hcar

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.368   Page 368 of 416

**Specificity**

High

High

**Test Complexity**

Varies by test

Relatively easy to use

**Authorized for Use at the Point-of-Care**

Most are not, some are

Most are, some are not

**Turnaround Time**

Most 1-3 days. Some could be rapid in 15 minutes

Ranges from 15 minutes to 30 minutes

**Cost/Test^**

Moderate (~$75-$100/test)

Low (~$5-$50/test)

**Advantages**

Most sensitive test method available

Short turnaround time for NAAT POC tests, but few available

Usually does not need to be repeated to confirm results

Short turnaround time (approximately 15 minutes)*

When performed at or near POC, allows for rapid identification of infected people, thus preventing further virus transmission in the community, workplace, etc.

Comparable performance to NAATs in symptomatic persons and/or if culturable virus present, when the person is presumed to be infectious

**Disadvantages**

Longer turnaround time for lab-based tests (1–3 days)

Higher cost per test

368

A positive NAAT diagnostic test should not be repeated within 90 days, because people may continue to have detectable RNA after risk of transmission has passed

May need confirmatory testing

Less sensitive (more false negative results) compared to NAATs, especially among asymptomatic people

*The decreased sensitivity of antigen tests might be offset if the POC antigen tests are repeated more frequently (i.e., serial testing at least weekly).
^ Costs for: NAATs 🔗
+Refers to point-of-care antigen tests only.

# Considerations for testing in different scenarios

## Diagnostic testing

### Testing persons with signs or symptoms consistent with COVID-19

Employers may consider conducting daily in-person or virtual health checks (e.g., symptom and temperature screening) to identify employees with signs or symptoms consistent with COVID-19 before they enter a facility. Employers should follow guidance from the EEOC 🔗 regarding confidentiality of medical records from health checks.

Vaccinated and unvaccinated workers with COVID-19 symptoms should be immediately separated from other employees, customers, and visitors, and sent home or to a healthcare facility, depending on how severe their symptoms are, and follow CDC guidance for caring for oneself. To prevent stigma and discrimination in the workplace, make employee health screenings as private as possible. CDC recommends that anyone with signs or symptoms of COVID-19 be tested and follow the advice of their healthcare provider. Waiting for test results prior to returning to work is recommended to keep potentially infected workers out of the workplace.

Employers are encouraged to implement flexible sick leave and supportive policies and practices as part of a comprehensive approach to prevent and reduce transmission among employees.

Positive test results using a viral test (NAAT or antigen) in persons with signs or symptoms consistent with COVID-19 indicate that the person has COVID-19 and should not come to work and should isolate at home. Decisions to discontinue isolation for workers with COVID-19 and allow them to return to the workplace may follow either a symptom-based, time-based, or a test-based strategy (see Testing to determine resolution of infection below).

A negative antigen test in persons with signs or symptoms of COVID-19 should be confirmed by a laboratory-based NAAT, a more sensitive test. Results from NAATs are considered the definitive result when there is a discrepancy between the antigen and NAAT test. For more information, see the antigen test algorithms for community settings 📄 and congregate settings 📄 .

### Testing asymptomatic persons with recent known or suspected exposure to SARS-CoV-2

Case investigation is typically initiated when a health department receives a report from a laboratory or testing site of a positive SARS-CoV-2 viral test result, or a report from a healthcare provider of a patient with a confirmed or probable diagnosis of COVID-19 📄 🔗 .

Fully vaccinated people who have come into close contact with someone with COVID-19 should be tested 5-7 days following the date of their exposure and wear a mask in public indoor settings for 14 days or until they receive a negative test result. They should isolate if they test positive. For more guidance on quarantine and testing of fully vaccinated people, please visit Interim Public Health Recommendations for Fully Vaccinated People.

Viral testing is recommended for all unvaccinated close contacts. Because of the potential for asymptomatic (not having symptoms) or pre-symptomatic (not yet showing symptoms) transmission of SARS-CoV-2, it is important that unvaccinated

369

SARS CoV 2 Tes ing S ra egy  Considera ions for Non Heal hcare Workplaces l COV D 19          h  ps //www.cdc.gov/coronavirus/2019 ncov/communi y/organiza ions/ es ing non heal hcar

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.370   Page 370 of 416

individuals exposed to people with known or suspected COVID-19 be quickly identified and quarantined. Viral testing with NAATs or antigen tests can detect if these individuals are currently infected.

The health department may ask the employer for assistance in identifying close contacts of the worker with SARS-CoV-2 infection. Employers are encouraged to work with public health departments investigating cases of COVID-19 and tracing contacts to help reduce the spread of SARS-CoV-2 in their workplaces and communities.

Because there may be a delay between the time a person is exposed to the virus and the time that virus can be detected by testing, early testing after exposure at a single time point may miss many infections. Testing that is repeated at different points in time, also referred to as serial testing, is more likely to detect infection among close contacts of a COVID-19 case than testing done at a single point in time. Viral testing is recommended for unvaccinated close contacts of persons with COVID-19 immediately after being identified, and if negative, again in 5–7 days after last exposure or immediately if symptoms develop during quarantine.

While CDC continues to recommend a 14-day quarantine for unvaccinated individuals who are close contacts of a person with COVID-19, viral testing may also be used as part of an option to shorten the quarantine period. Local public health authorities determine and establish the quarantine options for their jurisdictions. Shortening quarantine may increase willingness to adhere to public health recommendations. However, shortened quarantines with continued symptom monitoring and masking until Day 14 may be less effective in preventing transmission of COVID-19 than the currently recommended 14-day quarantine. In jurisdictions with shortened quarantine options, workplaces with higher risk of SARS-CoV-2 introduction or transmission, or with potential for greater negative impact if employees become infected SARS-CoV-2 (see Types of workplaces below), can consider restricting unvaccinated workers from entering the workplace until 14 days after their exposure.

Viral testing may also be considered for unvaccinated persons who might have been in close contact with persons diagnosed with COVID-19 in collaboration with the local health department if resources permit. A risk-based approach to testing possible contacts of a person with confirmed COVID-19 may be applied. Such an approach should take into consideration the likelihood of exposure, which is affected by the characteristics of the workplace and the results of contact investigations. In some settings, expanded screening testing (i.e., testing beyond individually identified close contacts to those who are possible close contacts), such as targeting workers who worked in the same area and during the same shift, may be considered as part of a strategy to control the transmission of SARS-CoV-2 in the workplace. Employers are encouraged to consult with state, local, territorial, and tribal health departments to help inform decision-making about expanded screening testing.

High-risk settings that have demonstrated potential for rapid and widespread dissemination of SARS-CoV-2 include:

- Workplaces where workers are in the workplace for long periods (e.g., for 8–12 hours per shift) and have prolonged close contact with coworkers
- Workplaces where employees live in congregate settings ⧉  (e.g., fishing vessels, offshore oil platforms, farmworker housing, or wildland firefighter camps)
- Workplaces with populations at increased risk for severe illness if they are infected, such as homeless shelters and workplaces with older workers

If employees are tested after close contact or suspected close contact with someone who has a confirmed or probable diagnosis of COVID-19, care should be taken to inform these employees of their possible exposure to SARS-CoV-2 in the workplace while maintaining confidentiality of the individual with COVID-19, as required by the ADA ⧉  and consistent with EEOC guidance regarding What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws ⧉ .

## Testing to determine resolution of infection

The decision to end isolation and return to the workplace for employees with suspected or confirmed SARS-CoV-2 infection should be made in the context of clinical and local circumstances. NAATs have detected SARS-CoV-2 RNA in some recovered people's respiratory specimens for up to 3 months after illness onset but without direct evidence that virus that can replicate or cause disease. Consequently, evidence supports a time-based and symptom-based strategy to determine when to discontinue isolation or other precautions rather than a test-based strategy. For persons who are severely immunocompromised, a test-based strategy could be considered in consultation with infectious disease experts. For al others, a test-based strategy is no longer recommended.

370

Under the ADA, employers are permitted to require a healthcare provider's note ☐ to verify that employees are healthy and able to return to work. However, as a practical matter, employers should be aware that healthcare provider offices and medical facilities may be extremely busy during periods when community COVID-19 indicators are in the moderate to high categories (Table 2) and may not be able to provide such documentation in a timely manner. In such cases, employers should consider not requiring a healthcare provider's note for employees who are sick to validate their illness, qualify for sick leave, or to return to work. Most people with COVID-19 have mild illness, can recover at home without medical care, and can follow CDC recommendations to determine when to discontinue isolation and return to the workplace.

# Screening testing

## Testing asymptomatic persons without known or suspected exposure to SARS-CoV-2 for early identification, isolation, and disease prevention

### When to consider screening testing

Screening testing in non-healthcare settings of unvaccinated workers without known or suspected exposure to SARS-CoV-2 may be useful to detect COVID-19 early and stop transmission quickly, particularly in areas with community COVID-19 indicators in the moderate to high categories (Table 2, Table 3). Screening testing can be used in addition to symptom and temperature checks, which will miss asymptomatic or pre-symptomatic contagious workers. Persons with asymptomatic or pre-symptomatic SARS-CoV-2 infection are significant contributors to SARS-CoV-2 transmission.

In general, fully vaccinated workers should continue to follow employer guidance on screening testing. Please see Interim Public Health Recommendations for Fully Vaccinated People for more information.

### Types of workplaces

Workplace settings for which screening testing of unvaccinated, asymptomatic workers should be considered include:

- Large workplaces
- Workplaces at increased risk of introduction of SARS-CoV-2 (e.g., workplaces where workers are in close contact with the public, such as restaurants or salons, or workplaces in communities with moderate to high transmission)
- Workplaces where there is a higher risk of SARS-CoV-2 transmission (e.g., workplaces where physical distancing is difficult and workers might be in close contact, such as manufacturing or food processing plants, or workplaces that provide congregate housing for employees such as fishing vessels, offshore oil platforms, farmworker housing or wildland firefighter camps)
- Workplaces where SARS-CoV-2 infection among employees will lead to greater negative impact, such as
    - Workplaces in remote settings where medical evaluation or treatment may be delayed
    - Workplaces where continuity of operations is a high priority (e.g., critical infrastructure sectors ☐ )
    - Workplaces with a high proportion of employees at increased risk for severe illness

### Frequency of screening testing

Approaches may include initial testing of all workers before entering a workplace, periodic testing of workers at regular intervals, targeted testing of new workers or those returning from a prolonged absence (such as medical leave or furlough), or some combination of approaches. Given the incubation period for COVID-19 (up to 14 days), CDC recommends conducting screening testing of unvaccinated, asymptomatic workers without known or suspected exposures at least weekly. Employers may find the following factors helpful to consider when determining the interval for periodic testing:

- The availability of testing, turnaround time, and cost
- The latency time period between exposure and development of a positive SARS-CoV-2 viral test
- Type of workplace
- Level of community transmission (Table 2, Table 3)
- Number of employees who tested positive during previous rounds of testing

SARS CoV 2 Tes ing S ra egy  Considera ions for Non Heal hcare Workplaces I COV D 19    h ps //www cdc gov/coronavirus/2019 ncov/communi y/organiza ions/ es ing non heal hcar

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.372   Page 372 of 416

Relevant experience with outbreaks at the workplace

Serial testing used in a screening program could identify workers with SARS-CoV-2 infection, and thus help prevent or reduce further transmission, which is an occupational health measure of great importance in the types of workplaces mentioned above. Outbreak prevention and control is increasingly being thought to depend largely on the frequency of testing and the speed of reporting (an advantage of antigen tests) and is only marginally improved by the higher test sensitivity of NAATs. Serial testing, if implemented, should be integrated as a component of the comprehensive workplace program and not a substitute for other measures, such as COVID-19 vaccination, physical distancing, mask wearing, hand hygiene, and cleaning and disinfection. Engineering controls and improved ventilation in settings such as office buildings and schools are also important.

## Interpretation of screening SARS-CoV-2 test results

For screening testing, some antigen test results should be considered presumptive (preliminary results). A positive antigen screening test result should be considered presumptive when the pretest probability (likelihood that the person being tested actually has the infection) for COVID-19 is low for the purpose of making a clinical diagnosis (e.g., a worker who is asymptomatic and has no known exposures to COVID-19 within the last 14 days, is fully vaccinated, or has had a SARS-CoV-2 infection in the last 3 months). Please see Evaluating the Results of Antigen Testing for SARS-CoV-2.

Asymptomatic employees who have a positive antigen screening test and need a confirmatory NAAT should not come to work and should quarantine during confirmatory testing. For confirmatory testing, CDC recommends using a laboratory-based NAAT that has been evaluated against the FDA reference panel for analytical sensitivity. See FDA's SARS-CoV-2 Reference Panel Comparative Data ⧉ .

NAATs that generate presumptive results are not appropriate for use in confirmatory testing.

Employees with a positive confirmatory NAAT result should isolate at home. A negative confirmatory NAAT result is interpreted as no evidence of SARS-CoV-2 infection at the time when the testing sample was collected. Employees who test negative should continue to take steps to protect themselves and others.

State, local, territorial, and tribal health departments may be able to provide assistance on any local context or guidance impacting the workplace. Before testing a large proportion of asymptomatic workers without known or suspected exposure, employers are encouraged to have a plan in place for how they will ensure access to clinical evaluation and confirmatory testing when needed, ensure test results are reported to public health departments, modify operations based on test results, collaborate with public health departments in workplace case investigation and contact tracing, and manage a higher risk of false positive results in a low prevalence population.

## Table 2. Level of Community Transmission

| Indicator | Low Transmission | Moderate Transmission | Substantial Transmission | High Transmission |
|---|---|---|---|---|
| Cumulative number of new cases per 100,000 persons within the last 7 days* | <10 | 10-49 | 50-99 | ≥100 |
| Percentage of NAATs that are positive during the last 7 days† | <5% | 5%-7.9% | 8%-9.9% | ≥10.0% |

Indicators should be calculated for counties or core based statistical areas, although in rural areas with low population density, multiple jurisdictions might need to be combined to make the indicators more useful for decision-making. The indicators listed can be found by county on CDC's COVID-19 Integrated County View.

* Number of new cases in the county (or other administrative level) in the last 7 days divided by the population in the county (or other administrative level) and multiplying by 100,000.

† Number of positive tests in the county (or other administrative level) during the last 7 days divided by the total number of tests resulted in the county (or other administrative level) during the last 7 days. Calculating Severe Acute Respiratory

372

SARS CoV 2 Tes ing S ra egy  Considera ions for Non Heal hcare Workplaces l COV D 19      h ps //www cdc gov/coronavirus/2019 ncov/communi y/organiza ions/ es ing non heal hcar

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.373   Page 373 of 416

Syndrome Coronavirus 2 (SARS-CoV-2) Laboratory Test Percent Positivity: CDC Methods and Considerations for Comparisons and Interpretation.

## Table 3. Potential Actions Based on Community Transmission Level

| Prevention Strategy | Low Transmission (Blue) | Moderate Transmission (Yellow) | Substantial Transmission (Orange) | High Transmission (Red) |
|---|---|---|---|---|
| Facilitate diagnostic testing for symptomatic persons and all close contacts of cases | | | | |
| Facilitate diagnostic testing for symptomatic persons and all close contacts of cases | | | | |
| Implement screening testing of select groups at least weekly plus facilitate diagnostic testing of symptomatic persons and close contacts | | | | |
| Implement screening testing of select groups at least weekly plus facilitate diagnostic testing of symptomatic persons and close contacts | | | | |

## References

1. Chin ET, Huynh BQ, Chapman LAC, Murrill M, Bash S, Lo NC. Frequency of routine testing for Coronavirus Disease 2019 (COVID-19) in high-risk healthcare environments to reduce outbreaks. Clin Infect Dis: 26 October 2020. https://doi.org /10.1093/cid/ciaa1383 ↗

2. Denny TN, Andrews L, Bonsignori M, Cavanaugh K, Datto MB, Deckard A, DeMarco CT, DeNaeyer N, Epling CA, Gurley T, Haase SB, Hallberg C, Harer J, Kneifel CL, Lee MJ, Louzao R, Moody MA, Moore Z, Polage CR, Puglin J, Spotts PH, Vaughn JA, Wolfe CR. Implementation of a pooled surveillance testing program for asymptomatic SARS-CoV-2 infections on a college campus — Duke University, Durham, North Carolina, August 2–October 11, 2020. MMWR Morb Mortal Wkly Rep 2020;69(46):1743–1747. https://doi.org/10.15585/mmwr.mm6946e1 ↗

3. Grassley NC, Pons-Salort M, Parker EPK, White PJ, Feruson NM; Imperial College COVID-19 Response Team.  Comparison of molecular testing strategies for COVID-19 control: a mathematical modelling study. Lancet Infect Dis 2020; 20(12):1381–1389. https://doi.org/10.1016/S1473-3099(20)30630-7 ↗

4. Kucirka LM, Lauer LA, Laeyendecker O, Boon D, Lessler J. Variation in false-negative rate of reverse transcriptase polymerase chain reaction–based SARS-COV-2 tests by time since exposure. Ann Int Med 2020;173(4):262–267. https://doi.org/10.7326/M20-1495 ↗

5. Larremore DB, Wilder B, Lester E, Shehata S, Burke JM, Hey JA, Tambe M, Mina MJ, Parker R. Test sensitivity is secondary to frequency and turnaround time for COVID-19 screening.  Sci Adv 2021;7(1):eabd5393.https://doi.org/10.1126 /sciadv.abd5393 ↗

# Previous Updates

SARS CoV 2 Tes ing S ra egy  Considera ions for Non Heal hcare Workplaces l COV D 19          h ps //www cdc gov/coronavirus/2019 ncov/communi y/organiza ions/ es ing non heal hcar

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.374   Page 374 of 416

## Updates from Previous Content    ⌃

### Updates as of March 17, 2021

- Added description of nucleic acid amplification tests (NAATs) and antigen tests as types of viral tests to align with the Overview of Testing for SARS-CoV-2.
- Added considerations on incorporating testing of asymptomatic individuals without known or suspected exposure to SARS-CoV-2 (screening testing) in select workplace settings as part of a workplace COVID-19 prevention and control plan.
- Updated considerations on frequency of testing.

### Updates as of October 21, 2020

- Added links to the updated close contact definition.
- Updated language to align with updated definition.

Last Updated Oct. 5, 2021

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit WW





## COVID-19

# COVID-19 Community Levels

A measure of the impact of COVID-19 illness on health and healthcare systems

Updated Mar. 17, 2022

## Overview

More tools than ever before are available to prevent COVID-19 from placing strain on communities and healthcare systems.

With current high levels of vaccination and high levels of population immunity from both vaccination and infections, the risk of medically significant disease, hospitalization, and death from COVID-19 is greatly reduced for most people. At the same time, we know that some people and communities, such as our oldest citizens, people who are immunocompromised, and people with disabilities, are at higher risk for serious illness and face challenging decisions navigating a world with COVID-19.

In addition to protecting those at highest risk of severe outcomes, focusing on reducing medically significant illness and minimizing strain on the healthcare system reflects our current understanding of SARS-CoV-2 infection, immunity from vaccination and infection, and the tools we have available. Vaccines are highly protective against severe disease, and continuing to expand vaccine coverage and ensuring people are up to date with vaccination is essential to protecting individuals against hospitalizations and deaths.

Health officials and individuals should consider current information about COVID-19 hospitalizations in the community, as well as the potential for strain on the local health system and COVID-19 cases in the community, when making decisions about community prevention strategies and individual behaviors. Communities and individuals should also make decisions based on whether they are at high risk for severe disease and take into account inequities in access to prevention strategies.

COVID-19 Community Levels can help communities and individuals make decisions based on their local context and their unique needs. Community vaccination coverage and other local information, like early alerts from surveillance, such as through wastewater or the number of emergency department visits for COVID-19, when available, can also inform decision making for health officials and individuals.

**For Healthcare Facilities:** COVID-19 Community Levels do **not** apply in healthcare settings, such as hospitals and nursing homes. Instead, healthcare settings should continue to use community transmission rates and follow CDC's infection prevention and control recommendations for healthcare workers.



### COVID-19 County Check

Find community levels and prevention steps by county.

Select a Location (all fields required)

| State | ⌄ | County | ⌄ | Go |



**Scientific Brief:** Indicators for Monitoring COVID-19 Community Levels and Making Public Health Recommendations

**Technical Presentation:** Indicators for Monitoring COVID-19 Community Levels and Implementing Prevention Strategies PPT – 8 MB, 28 pages 🖼 | PDF – 5 MB, 28 pages 🔲

# How CDC Measures the COVID-19 Community Levels

CDC looks at the combination of three metrics — new COVID-19 admissions per 100,000 population in the past 7 days, the percent of staffed inpatient beds occupied by COVID-19 patients, and total new COVID-19 cases per 100,000 population in the past 7 days — to determine the COVID-19 community level. New COVID-19 admissions and the percent of staffed inpatient beds occupied represent the current potential for strain on the health system. Data on new cases acts as an early warning indicator of potential increases in health system strain in the event of a COVID-19 surge.

Using these data, the COVID-19 community level is classified as low, medium, or high.

| COVID-19 Community Levels – Use the Highest Level that Applies to Your Community | | | | | |
|---|---|---|---|---|---|
| **New COVID-19 Cases**<br><br>**Per 100,000 people in the past 7 days** | **Indicators** | **Low** | **Medium** | **High** | |
| **Fewer than 200** | New COVID-19 admissions per 100,000 population (7-day total) | <10.0 | 10.0-19.9 | ≥20.0 | |
| | Percent of staffed inpatient beds occupied by COVID-19 patients (7-day average) | <10.0% | 10.0-14.9% | ≥15.0% | |
| **200 or more** | New COVID-19 admissions per 100,000 population (7-day total) | NA | <10.0 | ≥10.0 | |
| | Percent of staffed inpatient beds occupied by COVID-19 patients (7-day average) | NA | <10.0% | ≥10.0% | |

## COVID-19 Community Levels – Use the Highest Level that Applies to Your Community

### Determine the COVID-19 Community Level based on new cases and new COVID-19 admissions

**How many new COVID-19 admissions per 100,000 people (7-day total) are there?**

If the area has **fewer than 200 new COVID-19 cases** per 100,000 people in the past 7 days:

- **< 10.0:** The level is low.
- **10.0 – 19.9:** The level is medium.
- **≥ 20.0:** The level is high.

377

If the area has **200 or more new COVID-19 cases** per 100,000 people in the past 7 days:

> **< 10.0:** The level is medium.
>
> **≥ 10.0:** The level is high.

## Determine the COVID-19 Community Level based on new cases and inpatient beds

### What is the percent of staffed inpatient beds occupied by COVID-19 patients (7-day average)?

If the area has **fewer than 200 new COVID-19 cases** per 100,000 people in the past 7 days:

> **< 10.0%:** The level is low.
>
> **10.0 – 14.9%:** The level is medium.
>
> **≥ 15.0%:** The level is high.

If the area has **200 or more new COVID-19 cases** per 100,000 people in the past 7 days:

> **< 10.0%:** The level is medium.
>
> **≥ 10.0%:** The level is high.

**The COVID-19 community level is determined by the higher of the new admissions and inpatient beds metrics, based on the current level of new cases per 100,000 population in the past 7 days**

To find out the COVID-19 community level:

- First determine whether a county, state, or territory has fewer than 200 new cases per 100,000 people in the past 7 days or 200 new cases or more per 100,000 people in the past 7 days.
- Then, determine the level (low, medium, or high) for the new admissions and inpatient beds and indicators using the scale for the area's number for new cases.
- The COVID-19 Community Level is based on the higher of the new admissions and inpatient beds metrics.
- Check your county's COVID-19 Community Level.

# U.S. COVID-19 Community Levels by County Map

Maps, charts, and data provided by CDC, updates every Thursday by 8 pm ET
**Updated:** March 17, 2022



## Legend

🔴 H gh                         🟡 Med um

🟢 Low

Data Tab e (Scro r ght for add t ona data)           **+**

Down oad Data (CSV)

About These Data                                                                    ⌄

COVID-19 Community Levels were calculated on March 17, 2022

- New COVID-19 cases per 100,000 population (7-day total) are calculated using data from March 10-March 16, 2022
- New COVID-19 admissions per 100,000 population (7-day total) are calculated using data from March 9-March 15, 2022
- Percent of inpatient beds occupied by COVID-19 patients (7-day average) is calculated using data from March 9-March 15, 2022
- To view and download this week and previous weeks data visit United States COVID-19 Community Levels by County as Originally Posted | Data | Centers for Disease Control and Prevention (cdc.gov)

Data for America Samoa, Guam, Commonwealth of the Northern Mariana Islands, and United States Virgin Islands are available in the downloadable CSV file.

**Data Table**

\* Hosp Adm per 100k = New COVID-19 hospital admissions per 100,000 population (7-day total)
\*\* Hosp Beds Occupied = Percent of staffed inpatient beds occupied by COVID-19 patients (7-day average)
\*\*\* HSA Number = Health Service Area Number
\*\*\*\* HSA Name = Health Service Area Name

# COVID-19 Community Level and COVID-19 Prevention

People who are up to date on vaccines have much lower risk of severe illness and death from COVID-19 compared with unvaccinated people. When making decisions about community prevention strategies and individual preventive behaviors in addition to vaccination, health officials and people should consider the COVID-19 Community Level in the county. Layered prevention strategies — like staying up to date on vaccines, screening testing, ventilation and wearing masks — can help limit severe disease and reduce the potential for strain on the healthcare system. CDC recommends using county COVID-19 Community Levels to help determine which COVID-19 prevention measures to use for individuals  and communities.

Some community settings such as schools and some high-risk congregate settings such as correctional facilities and homeless shelters might include additional layers of prevention (e.g., physical distancing, contact tracing) based on information and data about the characteristics of the setting. High-risk congregate settings may implement added prevention as needed in the event of a facility outbreak even if COVID-19 Community Levels in the surrounding community are low. Jurisdictions should monitor health equity in vaccine and other prevention efforts and assess hospitalization data where possible to ensure outreach occurs to address any disparities in access to high quality healthcare. Recommendations based on COVID-19 Community Levels may not apply to healthcare settings such as hospitals or long-term care facilities.

| COVID-19 Community Level | Individual- and household-level prevention behaviors | Community-level prevention strategies (as recommended by state or local authorities) |
|---|---|---|
|  | • | • |
|  | • | • |
|  | • | • |
|  | • | |

380

| COVID-19 Community Level | Individual- and household-level prevention behaviors | Community-level prevention strategies (as recommended by state or local authorities) |
|---|---|---|
| **Low** | Stay up to date with COVID-19 vaccines and boosters<br><br>Maintain improved ventilation throughout indoor spaces when possible<br><br>Follow CDC recommendations for isolation and quarantine, including getting tested if you are exposed to COVID-19 or have symptoms of COVID-19<br><br>If you are immunocompromised or high risk for severe disease<br><br>•    Have a plan for rapid testing if needed (e.g., having home tests or access to testing)<br><br>   Talk to your healthcare provider about whether you are a candidate for treatments like oral antivirals, PrEP, and monoclonal antibodies | Distribute and administer vaccines to achieve high community vaccination coverage and ensure health equity<br><br>Maintain improved ventilation in public indoor spaces<br><br>Ensure access to testing, including through point-of-care and at-home tests for all people<br><br>   Communicate with organizations and places that serve people who are immunocompromised or at high risk for severe disease to ensure they know how to get rapid testing<br><br>•    Ensure access and equity in vaccination, testing, treatment, community outreach, support services for disproportionately affected populations |
| **Medium** | If you are immunocompromised or high risk for severe disease<br><br>•    Talk to your healthcare provider about whether you need to wear a mask and take other precautions (e.g., testing)<br><br>   Have a plan for rapid testing if needed (e.g., having home tests or access to testing)<br><br>   Talk to your healthcare provider about whether you are a candidate for treatments like oral antivirals, PrEP, and monoclonal antibodies<br><br>If you have household or social contact with someone at high risk for severe disease<br><br>•    consider self-testing to detect infection before contact<br><br>–    consider wearing a mask when indoors with them<br><br>Stay up to date with COVID-19 vaccines and boosters<br><br>•    Maintain improved ventilation throughout indoor spaces when possible<br><br>•    Follow CDC recommendations for isolation and quarantine, including getting tested if you are exposed to COVID-19 or have symptoms of COVID-19 | Protect people at high risk for severe illness or death by ensuring equitable access to vaccination, testing, treatment, support services, and information<br><br>•    Consider implementing screening testing or other testing strategies for people who are exposed to COVID-19 in workplaces, schools, or other community settings as appropriate<br><br>Implement enhanced prevention measures in high-risk congregate settings (see guidance for correctional facilities and homeless shelters<br><br>•    Distribute and administer vaccines to achieve high community vaccination coverage and ensure health equity<br><br>Maintain improved ventilation in public indoor spaces<br><br>•    Ensure access to testing, including through point-of-care and at-home tests for all people<br><br>   Communicate with organizations and places that serve people who are immunocompromised or at high risk for severe disease to ensure they know how to get rapid testing<br><br>•    Ensure access and equity in vaccination, testing, treatment, community outreach, support services for disproportionately affected populations |

381

| COVID-19 Community Level | Individual- and household-level prevention behaviors | Community-level prevention strategies (as recommended by state or local authorities) |
|---|---|---|
| High | Wear a well-fitting mask[1] indoors in public, regardless of vaccination status (including in K-12 schools and other indoor community settings)<br><br>If you are immunocompromised or high risk for severe disease<br>  - Wear a mask or respirator that provides you with greater protection<br>  - Consider avoiding non-essential indoor activities in public where you could be exposed<br>  - Talk to your healthcare provider about whether you need to take other precautions (e.g., testing)<br>  - Have a plan for rapid testing if needed (e.g., having home tests or access to testing)<br>  - Talk to your healthcare provider about whether you are a candidate for treatments like oral antivirals, PrEP, and monoclonal antibodies<br><br>If you have household or social contact with someone at high risk for severe disease<br>  consider self-testing to detect infection before contact<br>  consider wearing a mask when indoors with them<br><br>Stay up to date with COVID-19 vaccines and | • Consider setting-specific recommendations for prevention strategies based on local factors<br>• Implement healthcare surge support as needed<br>• Protect people at high risk for severe illness or death by ensuring equitable access to vaccination, testing, treatment, support services, and information<br>• Consider implementing screening testing or other testing strategies for people who are exposed to COVID-19 in workplaces, schools, or other community settings as appropriate<br>• Implement enhanced prevention measures in high-risk congregate settings (see guidance for correctional facilities and homeless shelters)<br>• Distribute and administer vaccines to achieve high community vaccination coverage and ensure health equity<br>• Maintain improved ventilation in public indoor spaces<br>• Ensure access to testing, including through point-of-care and at-home tests for all people<br>  Communicate with organizations and places that serve people who are immunocompromised or at high risk for severe disease to ensure they know |

382

| COVID-19 Community Level | Individual- and household-level prevention behaviors | Community-level prevention strategies (as recommended by state or local authorities) |
|---|---|---|
| | boosters<br><br>Maintain improved ventilation throughout indoor spaces when possible<br><br>Follow CDC recommendations for isolation and quarantine, including getting tested if you are exposed to COVID-19 or have symptoms of COVID-19 | how to get rapid testing<br><br>Ensure access and equity in vaccination, testing, treatment, community outreach, support services for disproportionately affected populations |

**[1] At all levels, people can wear a mask based on personal preference, informed by personal level of risk. People with symptoms, a positive test, or exposure to someone with COVID-19 should wear a mask.**



COVID-19 COMMUNITY LEVEL

## Low

### Individual- and household-level prevention behaviors

- Stay up to date with COVID-19 vaccines and boosters
- Maintain improved ventilation throughout indoor spaces when possible
- Follow CDC recommendations for isolation and quarantine, including getting tested if you are exposed to COVID-19 or have symptoms of COVID-19
- If you are immunocompromised or high risk for severe disease
    - Have a plan for rapid testing if needed (e.g., having home tests or access to testing)
    - Talk to your healthcare provider about whether you are a candidate for treatments like oral antivirals, PrEP, and monoclonal antibodies

### Community-level prevention strategies (as recommended by state or local authorities)

- Distribute and administer vaccines to achieve high community vaccination coverage and ensure health equity
- Maintain improved ventilation in public indoor spaces
- Ensure access to testing, including through point-of-care and at-home tests for all people
    - Communicate with organizations and places that serve people who are immunocompromised or at high risk for severe disease to ensure they know how to get rapid testing
- Ensure access and equity in vaccination, testing, treatment, community outreach, support services for disproportionately affected populations



COVID-19 COMMUNITY LEVEL

## Medium

### Individual- and household-level prevention behaviors

- If you are immunocompromised or high risk for severe disease
    - Talk to your healthcare provider about whether you need to wear a mask and take other precautions (e.g., testing)
    - Have a plan for rapid testing if needed (e.g., having home tests or access to testing)
    - Talk to your healthcare provider about whether you are a candidate for treatments like oral antivirals, PrEP, and monoclonal antibodies
- If you have household or social contact with someone at high risk for severe disease
    - consider self-testing to detect infection before contact
    -

383

consider wearing a mask when indoors with them

Stay up to date with COVID-19 vaccines and boosters

Maintain improved ventilation throughout indoor spaces when possible

Follow CDC recommendations for isolation and quarantine, including getting tested if you are exposed to COVID-19 or have symptoms of COVID-19

### Community-level prevention strategies (as recommended by state or local authorities)

Protect people at high risk for severe illness or death by ensuring equitable access to vaccination, testing, treatment, support services, and information

Consider implementing screening testing or other testing strategies for people who are exposed to COVID-19 in workplaces, schools, or other community settings as appropriate

Implement enhanced prevention measures in high-risk congregate settings (see guidance for correctional facilities and homeless shelters)

Distribute and administer vaccines to achieve high community vaccination coverage and ensure health equity

- Maintain improved ventilation in public indoor spaces

- Ensure access to testing, including through point-of-care and at-home tests for all people

- Communicate with organizations and places that serve people who are immunocompromised or at high risk for severe disease to ensure they know how to get rapid testing

Ensure access and equity in vaccination, testing, treatment, community outreach, support services for disproportionately affected populations

-



COVID-19 COMMUNITY LEVEL

## High

### Individual- and household-level prevention behaviors

- Wear a well-fitting mask [1] indoors in public, regardless of vaccination status (including in K-12 schools and other indoor community settings)

- If you are immunocompromised or high risk for severe disease
  - Wear a mask or respirator that provides you with greater protection
  - Consider avoiding non-essential indoor activities in public where you could be exposed
  - Talk to your healthcare provider about whether you need to wear a mask and take other precautions (e.g., testing)
  - Have a plan for rapid testing if needed (e.g., having home tests or access to testing)
  - Talk to your healthcare provider about whether you are a candidate for treatments like oral antivirals, PrEP, and monoclonal antibodies

- If you have household or social contact with someone at high risk for severe disease
  - consider self-testing to detect infection before contact
  - consider wearing a mask when indoors with them

- Stay up to date with COVID-19 vaccines and boosters

- Maintain improved ventilation throughout indoor spaces when possible

- Follow CDC recommendations for isolation and quarantine, including getting tested if you are exposed to COVID-19 or have symptoms of COVID-19

### Community-level prevention strategies (as recommended by state or local authorities)

- Consider setting-specific recommendations for prevention strategies based on local factors

- Implement healthcare surge support as needed

- Protect people at high risk for severe illness or death by ensuring equitable access to vaccination, testing,

treatment, support services, and information

Consider implementing screening testing or other testing strategies for people who are exposed to COVID-19 in workplaces, schools, or other community settings as appropriate

Implement enhanced prevention measures in high-risk congregate settings (see guidance for correctional facilities and homeless shelters)

Distribute and administer vaccines to achieve high community vaccination coverage and ensure health equity

Maintain improved ventilation in public indoor spaces

Ensure access to testing, including through point-of-care and at-home tests for all people

Communicate with organizations and places that serve people who are immunocompromised or at high risk for severe disease to ensure they know how to get rapid testing

Ensure access and equity in vaccination, testing, treatment, community outreach, support services for disproportionately affected populations

---

[1] At all levels, people can wear a mask based on personal preference, informed by personal level of risk. People with symptoms, a positive test, or exposure to someone with COVID-19 should wear a mask.

# Additional Resources

Visit COVID Data Tracker* to learn more about the indicators and metrics used for COVID-19 community level in your county. Please note that county-level data are not available for territories. For the most accurate and up-to-date data for any county or state, visit the relevant health department website.

*COVID Data Tracker may display data that differ from state and local websites. This can be due to differences in how data were collected, how metrics were calculated, or the timing of web updates.

Last Updated Mar. 17, 2022

Exhibit XX

COMPLAINT

 **Centers for Disease Control and Prevention**



## COVID-19

# COVID-19 by County

Updated Mar. 17, 2022

## Know Your COVID-19 Community Level

COVID-19 Community Levels are a new tool to help communities decide what prevention steps to take based on the latest data. Levels can be low, medium, or high and are determined by looking at hospital beds being used, hospital admissions, and the total number of new COVID-19 cases in an area. Take precautions to protect yourself and others from COVID-19 based on the COVID-19 Community Level in your area.



**COVID-19 County Check**

Find community levels and prevention steps by county.

Select a Location (all fields required)

| California | San Diego County | Go |

< Start Over

🟢 **Low**

In **San Diego County, California**, community level is **Low**.

- Stay up to date with COVID-19 vaccines
- Get tested if you have symptoms

People may choose to mask at any time. People with symptoms, a positive test, or exposure to someone with COVID-19 should wear a mask.

If you are immunocompromised, learn more about how to protect yourself.

March 17, 2022

Data Provided by CDC with updates every Thursday by 8 pm ET
How are these data measured?

Add This Widget To Your Site ▸

## What Prevention Steps Should You Take Based on Your COVID-19 Community Level?

COVID-19 COMMUNITY LEVEL                                387


## Low

Stay up to date with COVID-19 vaccines

Get tested if you have symptoms


COVID-19 COMMUNITY LEVEL
## Medium

- If you are at high risk for severe illness, talk to your healthcare provider about whether you need to wear a mask and take other precautions
- Stay up to date with COVID-19 vaccines
- Get tested if you have symptoms


COVID-19 COMMUNITY LEVEL
## High

- Wear a mask indoors in public
- Stay up to date with COVID-19 vaccines
- Get tested if you have symptoms
- Additional precautions may be needed for people at high risk for severe illness

People may choose to mask at any time. People with symptoms, a positive test, or exposure to someone with COVID-19 should wear a mask.

| Low | Medium | High |
|---|---|---|
| - Stay up to date with COVID-19 vaccines<br>- Get tested if you have symptoms | - If you are at high risk for severe illness, talk to your healthcare provider about whether you need to wear a mask and take other precautions<br>- Stay up to date with COVID-19 vaccines<br>- Get tested if you have symptoms | - Wear a mask indoors in public<br>- Stay up to date with COVID-19 vaccines<br>- Get tested if you have symptoms<br>- Additional precautions may be needed for people at high risk for severe illness |

People may choose to mask at any time. People with symptoms, a positive test, or exposure to someone with COVID-19 should wear a mask. Masks are required on public transportation and may be required in other places by local or state authorities.

If you are immunocompromised or high risk for severe disease, learn more about how to protect yourself with additional CDC recommendations for each COVID-19 Community Level.

# U.S. COVID-19 Community Levels by County Map

Maps, charts, and data provided by CDC, updates every Thursday by 8 pm ET

**Updated:** March 17, 2022



### Legend

🔴 H gh                              🟡 Med um

🟢 Low

Data Tab e (Scro  r ght for add t ona  data)                              **+**

Down oad Data (CSV)

## About These Data          ⌄

COVID-19 Community Levels were calculated on March 17, 2022

- New COVID-19 cases per 100,000 population (7-day total) are calculated using data from March 10-March 16, 2022
- New COVID-19 admissions per 100,000 population (7-day total) are calculated using data from March 9-March 15, 2022
- Percent of inpatient beds occupied by COVID-19 patients (7-day average) is calculated using data from March 9-March 15, 2022
- To view and download this week and previous weeks data visit United States COVID-19 Community Levels by County as Originally Posted | Data | Centers for Disease Control and Prevention (cdc.gov)

Data for America Samoa, Guam, Commonwealth of the Northern Mariana Islands, and United States Virgin Islands are available in the downloadable CSV file.

### Data Table

\* Hosp Adm per 100k = New COVID-19 hospital admissions per 100,000 population (7-day total)
\*\* Hosp Beds Occupied = Percent of staffed inpatient beds occupied by COVID-19 patients (7-day average)
\*\*\* HSA Number = Health Service Area Number
\*\*\*\* HSA Name = Health Service Area Name

Learn more about how COVID-19 Community Levels are measured and view CDC's full list of individual and community recommendations for each level.

## Related Pages

› How to Protect Yourself and Others

› Vaccines for COVID-19

› Masks

› Frequently Asked Questions about Data and Surveillance

Last Updated Mar. 17, 2022

390

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit YY

COMPLAINT

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.392   Page 392 of 416

 

## COVID-19

# COVID-19 by County

Updated Mar. 17, 2022

## Know Your COVID-19 Community Level

COVID-19 Community Levels are a new tool to help communities decide what prevention steps to take based on the latest data. Levels can be low, medium, or high and are determined by looking at hospital beds being used, hospital admissions, and the total number of new COVID-19 cases in an area. Take precautions to protect yourself and others from COVID-19 based on the COVID-19 Community Level in your area.



## What Prevention Steps Should You Take Based on Your COVID-19 Community Level?

COVID-19 COMMUNITY LEVEL                          392


## Low

Stay up to date with COVID-19 vaccines

Get tested if you have symptoms


COVID-19 COMMUNITY LEVEL
## Medium

- If you are at high risk for severe illness, talk to your healthcare provider about whether you need to wear a mask and take other precautions
- Stay up to date with COVID-19 vaccines
- Get tested if you have symptoms


COVID-19 COMMUNITY LEVEL
## High

- Wear a mask indoors in public
- Stay up to date with COVID-19 vaccines
- Get tested if you have symptoms
- Additional precautions may be needed for people at high risk for severe illness

People may choose to mask at any time. People with symptoms, a positive test, or exposure to someone with COVID-19 should wear a mask.

| Low | Medium | High |
|-----|--------|------|
| • Stay up to date with COVID-19 vaccines<br>• Get tested if you have symptoms | • If you are at high risk for severe illness, talk to your healthcare provider about whether you need to wear a mask and take other precautions<br>• Stay up to date with COVID-19 vaccines<br>• Get tested if you have symptoms | • Wear a mask indoors in public<br>• Stay up to date with COVID-19 vaccines<br>• Get tested if you have symptoms<br>• Additional precautions may be needed for people at high risk for severe illness |

People may choose to mask at any time. People with symptoms, a positive test, or exposure to someone with COVID-19 should wear a mask. Masks are required on public transportation and may be required in other places by local or state authorities.

If you are immunocompromised or high risk for severe disease, learn more about how to protect yourself with additional CDC recommendations for each COVID-19 Community Level.

# U.S. COVID–19 Community Levels by County Map

Maps, charts, and data provided by CDC, updates every Thursday by 8 pm ET
**Updated:** March 17, 2022

393



### Legend

🔴 H gh          🟡 Med um

🟢 Low

Data Tab e (Scro  r ght for add t ona  data)                                    +

Down oad Data (CSV)

## About These Data                                                                                    ⌄

COVID-19 Community Levels were calculated on March 17, 2022

- New COVID-19 cases per 100,000 population (7-day total) are calculated using data from March 10-March 16, 2022
- New COVID-19 admissions per 100,000 population (7-day total) are calculated using data from March 9-March 15, 2022
- Percent of inpatient beds occupied by COVID-19 patients (7-day average) is calculated using data from March 9-March 15, 2022
- To view and download this week and previous weeks data visit United States COVID-19 Community Levels by County as Originally Posted | Data | Centers for Disease Control and Prevention (cdc.gov)

Data for America Samoa, Guam, Commonwealth of the Northern Mariana Islands, and United States Virgin Islands are available in the downloadable CSV file.

### Data Table

\* Hosp Adm per 100k = New COVID-19 hospital admissions per 100,000 population (7-day total)
\*\* Hosp Beds Occupied = Percent of staffed inpatient beds occupied by COVID-19 patients (7-day average)
\*\*\* HSA Number = Health Service Area Number
\*\*\*\* HSA Name = Health Service Area Name

Learn more about how COVID-19 Community Levels are measured and view CDC's full list of individual and community recommendations for each level.

## Related Pages

- › How to Protect Yourself and Others

- › Vaccines for COVID-19

- › Masks

- › Frequently Asked Questions about Data and Surveillance

Last Updated Mar. 17, 2022

Exhibit ZZ

COMPLAINT

COV D 19 Cases and Hospi aliza ions by COV D 19 Vaccina ion S a us and Previous COV    h ps //www cdc gov/mmwr/volumes/71/wr/mm7104e1 h m?s_cid=mm7104e1 w#con ribAff

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.397   Page 397 of 416



*Weekly* / January 28, 2022 / 71(4);125–131

*On January 19, 2022, this report was posted online as an* MMWR *Early Release.*

Tomás M. León, PhD[1]; Vajeera Dorabawila, PhD[2]; Lauren Nelson, MPH[1]; Emily Lutterloh, MD[2,3]; Ursula E. Bauer, PhD[2]; Bryon Backenson, MPH[2,3]; Mary T. Bassett, MD[2]; Hannah Henry, MPH[1]; Brooke Bregman, MPH[1]; Claire M. Midgley, PhD[4]; Jennifer F. Myers, MPH[1]; Ian D. Plumb, MBBS[4]; Heather E. Reese, PhD[4]; Rui Zhao, MPH[1]; Melissa Briggs-Hagen, MD[4]; Dina Hoefer, PhD[2]; James P. Watt, MD[1]; Benjamin J. Silk, PhD[4]; Seema Jain, MD[1]; Eli S. Rosenberg, PhD[2,3] (View author affiliations)

View suggested citation

## Summary

### What is already known about this topic?

Data are limited regarding the risks for SARS-CoV-2 infection and hospitalization after COVID-19 vaccination and previous infection.

### What is added by this report?

During May–November 2021, case and hospitalization rates were highest among persons who were unvaccinated without a previous diagnosis. Before Delta became the predominant variant in June, case rates were higher among persons who survived a previous infection than persons who were vaccinated alone. By early October, persons who survived a previous infection had lower case rates than persons who were vaccinated alone.

### What are the implications for public health practice?

Although the epidemiology of COVID-19 might change as new variants emerge, vaccination remains the safest strategy for averting future SARS-CoV-2 infections, hospitalizations, long-term sequelae, and death. Primary vaccination, additional doses, and booster doses are recommended for all eligible persons. Additional future recommendations for vaccine doses might be warranted as the virus and immunity levels change.



Article Metrics

Altmetric:

7733

News (233)
Blogs (11)
Twitter (8041)
Facebook (5)
Wikipedia (1)
Reddit (18)
Video (10)
Mendeley (63)

Citations:

Views:
*Views equals page views plus PDF downloads*

Metric Details

By November 30, 2021, approximately 130,781 COVID-19–associated deaths, one in six of all U.S. deaths from COVID-19, had occurred in California and New York.* COVID-19 vaccination protects against infection with SARS-CoV-2 (the virus that causes COVID-19), associated severe illness, and death (*1,2*); among those who survive, previous SARS-CoV-2 infection also confers

397

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.398   Page 398 of 416

## Related Materials

PDF  ■ [423K]

protection against severe outcomes in the event of reinfection (3,4). The relative magnitude and duration of infection- and vaccine-derived protection, alone and together, can guide public health planning and epidemic forecasting. To examine the impact of primary COVID-19 vaccination and previous SARS-CoV-2 infection on COVID-19 incidence and hospitalization rates, statewide testing, surveillance, and COVID-19 immunization data from California and New York (which account for 18% of the U.S. population) were analyzed. Four cohorts of adults aged ≥18 years were considered: persons who were 1) unvaccinated with no previous laboratory-confirmed COVID-19 diagnosis, 2) vaccinated (14 days after completion of a primary COVID-19 vaccination series) with no previous COVID-19 diagnosis, 3) unvaccinated with a previous COVID-19 diagnosis, and 4) vaccinated with a previous COVID-19 diagnosis. Age-adjusted hazard rates of incident laboratory-confirmed COVID-19 cases in both states were compared among cohorts, and in California, hospitalizations during May 30–November 20, 2021, were also compared. During the study period, COVID-19 incidence in both states was highest among unvaccinated persons without a previous COVID-19 diagnosis compared with that among the other three groups. During the week beginning May 30, 2021, compared with COVID-19 case rates among unvaccinated persons without a previous COVID-19 diagnosis, COVID-19 case rates were 19.9-fold (California) and 18.4-fold (New York) lower among vaccinated persons without a previous diagnosis; 7.2-fold (California) and 9.9-fold lower (New York) among unvaccinated persons with a previous COVID-19 diagnosis; and 9.6-fold (California) and 8.5-fold lower (New York) among vaccinated persons with a previous COVID-19 diagnosis. During the same period, compared with hospitalization rates among unvaccinated persons without a previous COVID-19 diagnosis, hospitalization rates in California followed a similar pattern. These relationships changed after the SARS-CoV-2 Delta variant became predominant (i.e., accounted for >50% of sequenced isolates) in late June and July. By the week beginning October 3, compared with COVID-19 cases rates among unvaccinated persons without a previous COVID-19 diagnosis, case rates among vaccinated persons without a previous COVID-19 diagnosis were 6.2-fold (California) and 4.5-fold (New York) lower; rates were substantially lower among both groups with previous COVID-19 diagnoses, including 29.0-fold (California) and 14.7-fold lower (New York) among unvaccinated persons with a previous diagnosis, and 32.5-fold (California) and 19.8-fold lower (New York) among vaccinated persons with a previous diagnosis of COVID-19. During the same period, compared with hospitalization rates among unvaccinated persons without a previous COVID-19 diagnosis, hospitalization rates in California followed a similar pattern. These results demonstrate that vaccination protects against COVID-19 and related hospitalization, and that surviving a previous infection protects against a reinfection and related hospitalization. Importantly, infection-derived protection was higher after the Delta variant became predominant, a time when vaccine-induced immunity for many persons declined because of immune evasion and immunologic waning (2,5,6). Similar cohort data accounting for booster doses needs to be assessed, as new variants, including Omicron, circulate. Although the epidemiology of COVID-19 might change with the emergence of new variants, vaccination remains the safest strategy to prevent SARS-CoV-2 infections and associated complications; all eligible persons should be up to date with COVID-19 vaccination. Additional recommendations for vaccine doses might be warranted in the future as the virus and immunity levels change.

Four cohorts of persons aged ≥18 years were assembled via linkages of records from electronic laboratory reporting databases and state-specific immunization information systems.[†] Persons were classified based on whether they had had a laboratory-confirmed SARS-CoV-2 infection by March 1, 2021 (i.e., previous COVID-19 diagnosis)[§]; had received at least the primary COVID-19 vaccination series[¶] by May 16, 2021; had a previous COVID-19 diagnosis and were fully vaccinated[**]; or had neither received a previous COVID-19 diagnosis by March 1 nor received a first COVID-19 vaccine dose by the end of the analysis period. The size of the unvaccinated group without a previous diagnosis was derived by subtracting the observed groups from U.S. Census estimates.[††] To maintain each defined cohort, persons who received a COVID-19 diagnosis during March 1–May 30, 2021, or who died before May 30, 2021, were excluded (to maintain eligibility for incident cases for all cohorts on May 30, 2021),[§§] as were persons who received a first vaccine dose during May 30–November 20, 2021. During May 30–November 20, 2021, incident cases were defined using a positive nucleic acid amplification test (NAAT) result from the California COVID-19 Reporting System (CCRS) or a positive NAAT or antigen test result from the New York Electronic Clinical Laboratory Reporting System. In California, person-level hospitalization data from CCRS and supplementary hospitalization reports were used to identify COVID-19–associated hospitalizations. A lifetable method was used to calculate hazard rates (average daily cases during a 7-day interval or hospitalizations over a 14-day interval), hazard ratios, and 95% CIs for each cohort. Rates were age-adjusted to 2000 U.S. Census data using direct standardization.[¶¶] Supplementary analyses stratified case rates by timing of previous diagnoses and primary series vaccine product. SAS (version 9.4; SAS Institute) and R (version 4.0.4; The R Foundation) were used to conduct all analyses. Institutional review boards (IRBs) in both states determined this surveillance activity to be necessary for public health work, and therefore, it did not require IRB review.

398

COV D 19 Cases and Hospi aliza ions by COV D 19 Vaccina ion S a us and Previous COV    h ps //www cdc gov/mmwr/volumes/71/wr/mm7104e1 h m?s_cid=mm7104e1_w#con ribAff

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.399   Page 399 of 416

Approximately three quarters of adults from California (71.2%) and New York (72.2%) included in this analysis were vaccinated and did not have a previous COVID-19 diagnosis; however, 18.0% of California residents and 18.4% of New York residents were unvaccinated with no previous COVID-19 diagnosis (Table 1). In both states, 4.5% of persons were vaccinated and had a previous COVID-19 diagnosis; 6.3% in California and 4.9% in New York were unvaccinated with a previous diagnosis. Among 1,108,600 incident COVID-19 cases in these cohorts (752,781 in California and 355,819 in New York), the median intervals from vaccination or previous COVID-19 diagnosis to incident diagnosis were slightly shorter in California (138–150 days) than in New York (162–171 days).

Before the Delta variant became predominant in each state's U.S. Department of Health and Human Services region (June 26 in Region 9 [California] and July 3 in Region 2 [New York]),*** the highest incidence was among unvaccinated persons without a previous COVID-19 diagnosis; during this time, case rates were relatively low among the three groups with either previous infection or vaccination and were lowest among vaccinated persons without a previous COVID-19 diagnosis (Supplementary Figure 1, https://stacks.cdc.gov/view/cdc/113253) (Supplementary Figure 2, https://stacks.cdc.gov/view/cdc/113253). During the week beginning May 30, 2021, compared with COVID-19 case rates among unvaccinated persons without a previous COVID-19 diagnosis, COVID-19 case rates were 19.9-fold (California) and 18.4-fold (New York) lower among vaccinated persons without a previous diagnosis; rates were 7.2-fold (California) and 9.9-fold (New York) lower among unvaccinated persons with a previous COVID-19 diagnosis and 9.6-fold (California) and 8.5-fold (New York) lower among vaccinated persons with a previous COVID-19 diagnosis (Table 2).

As the Delta variant prevalence increased to >95% (97% in Region 9 and 98% in Region 2 on August 1), rates increased more rapidly among the vaccinated group with no previous COVID-19 diagnosis than among both the vaccinated and unvaccinated groups with a previous COVID-19 diagnosis (Supplementary Figure 1, https://stacks.cdc.gov/view/cdc/113253) (Supplementary Figure 2, https://stacks.cdc.gov/view/cdc/113253). For example, during the week of October 3, compared with rates among unvaccinated persons without a previous COVID-19 diagnosis, rates among vaccinated persons without a previous diagnosis were 6.2-fold lower (95% CI = 6.0–6.4) in California and 4.5-fold lower (95% CI = 4.3–4.7) in New York (Table 2). Further, rates among unvaccinated persons with a previous COVID-19 diagnosis were 29-fold lower (95% CI = 25.0–33.1) than rates among unvaccinated persons without a previous COVID-19 diagnosis in California and 14.7-fold lower (95% CI = 12.6–16.9) in New York. Rates among vaccinated persons who had had COVID-19 were 32.5-fold lower (95% CI = 27.5–37.6) than rates among unvaccinated persons without a previous COVID-19 diagnosis in California and 19.8-fold lower (95% CI = 16.2–23.5) in New York. Rates among vaccinated persons without a previous COVID-19 diagnosis were consistently higher than rates among unvaccinated persons with a history of COVID-19 (3.1-fold higher [95% CI = 2.6–3.7] in California and 1.9-fold higher [95% CI = 1.5–2.3] in New York) and rates among vaccinated persons with a history of COVID-19 (3.6-fold higher [95% CI = 2.9–4.3] in California and 2.8-fold higher [95% CI = 2.1–3.4] in New York).

COVID-19 hospitalization rates in California were always highest among unvaccinated persons without a previous COVID-19 diagnosis (Table 2) (Figure). In the pre-Delta period during June 13–June 26, for example, compared with hospitalization rates among unvaccinated persons without a previous COVID-19 diagnosis, hospitalization rates were 27.7-fold lower (95% CI = 22.4–33.0) among vaccinated persons without a previous COVID-19 diagnosis, 6.0-fold lower (95% CI = 3.3–8.7) among unvaccinated persons with a previous COVID-19 diagnosis, and 7.1-fold lower (95% CI = 4.0–10.3) among vaccinated persons with a previous COVID-19 diagnosis. However, this pattern also shifted as the Delta variant became predominant. During October 3–16, compared with hospitalization rates among unvaccinated persons without a previous COVID-19 diagnosis, hospitalization rates were 19.8-fold lower (95% CI = 18.2–21.4) among vaccinated persons without a previous COVID-19 diagnosis, 55.3-fold lower (95% CI = 27.3–83.3) among unvaccinated persons with a previous COVID-19 diagnosis, and 57.5-fold lower (95% CI = 29.2–85.8) among vaccinated persons with a previous COVID-19 diagnosis.

Among the two cohorts with a previous COVID-19 diagnosis, no consistent incidence gradient by time since the previous diagnosis was observed (Supplementary Figure 3, https://stacks.cdc.gov/view/cdc/113253). When the vaccinated cohorts were stratified by the vaccine product received, among vaccinated persons without a previous COVID-19 diagnosis, the highest incidences were observed among persons receiving the Janssen (Johnson & Johnson), followed by Pfizer-BioNTech, then Moderna vaccines (Supplementary Figure 4, https://stacks.cdc.gov/view/cdc/113253). No pattern by product was observed among vaccinated persons with a previous COVID-19 diagnosis.

Top

# Discussion

This analysis integrated laboratory testing, hospitalization surveillance, and immunization registry data in two large states during May–November 2021, before widespread circulation of the SARS-CoV-2 Omicron variant and before most persons had received additional or booster COVID-19 vaccine doses to protect against waning immunity. Rate estimates from the analysis describe different experiences stratified by COVID-19 vaccination status and previous COVID-19 diagnosis and during times

399

COV D 19 Cases and Hospi aliza ions by COV D 19 Vaccina ion S a us and Previous COV    h ps //www cdc gov/mmwr/volumes/71/wr/mm7104e1 h m?s_cid=mm7104e1_w#con ribAff

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.400   Page 400 of 416

when different SARS-CoV-2 variants predominated. Case rates were initially lowest among vaccinated persons without a previous COVID-19 diagnosis; however, after emergence of the Delta variant and over the course of time, incidence increased sharply in this group, but only slightly among both vaccinated and unvaccinated persons with previously diagnosed COVID-19 (6). Across the entire study period, persons with vaccine- and infection-derived immunity had much lower rates of hospitalization compared with those in unvaccinated persons. These results suggest that vaccination protects against COVID-19 and related hospitalization and that surviving a previous infection protects against a reinfection. Importantly, infection-derived protection was greater after the highly transmissible Delta variant became predominant, coinciding with early declining of vaccine-induced immunity in many persons (5). Similar data accounting for booster doses and as new variants, including Omicron, circulate will need to be assessed.

The understanding and epidemiology of COVID-19 has shifted substantially over time with the emergence and circulation of new SARS-CoV-2 variants, introduction of vaccines, and changing immunity as a result. Similar to the early period of this study, two previous U.S. studies found more protection from vaccination than from previous infection during periods before Delta predominance (3,7). As was observed in the present study after July, recent international studies have also demonstrated increased protection in persons with previous infection, with or without vaccination, relative to vaccination alone[†††,§§§] (4). This might be due to differential stimulation of the immune response by either exposure type.[¶¶¶] Whereas French and Israeli population-based studies noted waning protection from previous infection, this was not apparent in the results from this or other large U.K. and U.S. studies[****] (4,8). Further studies are needed to establish duration of protection from previous infection by variant type, severity, and symptomatology, including for the Omicron variant.

The findings in this report are subject to at least seven limitations. First, analyses were not stratified by time since vaccine receipt, but only by time since previous diagnosis, although earlier studies have examined waning of vaccine-induced immunity (Supplementary Figure 3, https://stacks.cdc.gov/view/cdc/113253) (2). Second, persons with undiagnosed infection are misclassified as having no previous COVID-19 diagnosis; however, this misclassification likely results in a conservative bias (i.e., the magnitude of difference in rates would be even larger if misclassified persons were not included among unvaccinated persons without a previous COVID-19 diagnosis). California seroprevalence data during this period indicate that the ratio of actual (presumptive) infections to diagnosed cases among adults was 2.6 (95% CI = 2.2–2.9).[††††] Further, California only included NAAT results, whereas New York included both NAAT and antigen test results. However, antigen testing made up a smaller percentage of overall testing volume reported in California (7% of cases) compared with New York (25% of cases) during the study period. Neither state included self-tests, which are not easily reportable to public health. State-specific hazard ratios were generally comparable, although differences in rates among unvaccinated persons with a previous COVID-19 diagnosis were noteworthy. Third, potential exists for bias related to unmeasured confounding (e.g., behavioral or geographic differences in exposure risk) and uncertainty in the population size of the unvaccinated group without a previous COVID-19 diagnosis. Persons might be more or less likely to receive testing based on previous diagnosis or vaccination status; however, different trajectories between vaccinated persons with and without a previous COVID-19 diagnosis, and similar findings for cases and hospitalizations, suggest that these biases were minimal. Fourth, this analysis did not include information on the severity of initial infection and does not account for the full range of morbidity and mortality represented by the groups with previous infections. Fifth, this analysis did not ascertain receipt of additional or booster COVID-19 vaccine doses and was conducted before many persons were eligible or had received additional or booster vaccine doses, which have been shown to confer additional protection.[§§§§] Sixth, some estimates lacked precision because of sample size limitations. Finally, this analysis was conducted before the emergence of the Omicron variant, for which vaccine or infection-derived immunity might be diminished.[¶¶¶¶] This study offers a surveillance data framework to help evaluate both infections in vaccinated persons and reinfections as new variants continue to emerge.

Vaccination protected against COVID-19 and related hospitalization, and surviving a previous infection protected against a reinfection and related hospitalization during periods of predominantly Alpha and Delta variant transmission, before the emergence of Omicron; evidence suggests decreased protection from both vaccine- and infection-induced immunity against Omicron infections, although additional protection with widespread receipt of booster COVID-19 vaccine doses is expected. Initial infection among unvaccinated persons increases risk for serious illness, hospitalization, long-term sequelae, and death; by November 30, 2021, approximately 130,781 residents of California and New York had died from COVID-19. Thus, vaccination remains the safest and primary strategy to prevent SARS-CoV-2 infections, associated complications, and onward transmission. Primary COVID-19 vaccination, additional doses, and booster doses are recommended by CDC's Advisory Committee on Immunization Practices to ensure that all eligible persons are up to date with COVID-19 vaccination, which provides the most robust protection against initial infection, severe illness, hospitalization, long-term sequelae, and death.[*****] Additional recommendations for vaccine doses might be warranted in the future as the virus and immunity levels change.

Top

# Acknowledgments

COV D 19 Cases and Hospi aliza ions by COV D 19 Vaccina ion S a us and Previous COV          h ps //www cdc gov/mmwr/volumes/71/wr/mm7104e1 h m?s_cid=mm7104e1_w#con ribAff

Case 3:22-cv-00424-L-BLM   Document 1   Filed 03/30/22   PageID.401   Page 401 of 416

Dana Jaffe, California Department of Public Health; Rebecca Hoen, Meng Wu, New York State Department of Health; Citywide Immunization Registry Program, New York City Department of Health and Mental Hygiene.

Top

Corresponding author: Tomás M. León, tomas.leon@cdph.ca.gov.

Top

¹California Department of Public Health; ²New York State Department of Health; ³University at Albany School of Public Health, SUNY, Rensselaer, New York; ⁴CDC.

Top

All authors have completed and submitted the International Committee of Medical Journal Editors form for disclosure of potential conflicts of interest. No potential conflicts of interest were disclosed.

Top

\* https://covid.cdc.gov/covid-data-tracker/#cases_deathsper100klast7days

† Statewide immunization databases in California are the California Immunization Registry, Regional Immunization Data Exchange, and San Diego Immunization Registry; the laboratory system is the California COVID Reporting System (CCRS). In New York, immunization information systems include Citywide Immunization Registry and the New York State Immunization Information System; the laboratory system is the Electronic Clinical Laboratory Reporting System (ECLRS). California data were matched between the immunization and case registries using a probabilistic algorithm with exact match for zip code and date of birth and fuzzy match on first name and last name. New York data were matched to the ECLRS with the use of a deterministic algorithm based on first name, last name, and date of birth. In California, person-level hospitalization data from CCRS and supplementary hospitalization reports were used to identify COVID-19–associated hospitalizations.

§ For both classification into cohorts of persons with previous COVID-19 diagnoses and for measuring incident cases, laboratory-confirmed infection was defined as the receipt of a new positive SARS-CoV-2 nucleic acid amplification test (NAAT) or antigen test (both for New York and NAAT only for California) result, but not within 90 days of a previous positive result.

¶ Fully vaccinated with the primary vaccination series is defined as receipt of a second dose of an mRNA COVID-19 vaccine (Pfizer-BioNTech or Moderna) or 1 dose of the Janssen (Johnson & Johnson) vaccine ≥14 days before May 30, 2021.

\*\* Because of the timing of full vaccination, the cohort definitions, and analysis timeframe, this cohort consisted nearly exclusively of persons who had previously received a laboratory-confirmed diagnosis of COVID-19 and later were fully vaccinated (California: 99.9%, New York: 99.7%), as opposed to the reverse order.

†† Whereas vaccinated cohorts were directly observed in the immunization information system databases, unvaccinated persons without a previous COVID-19 diagnosis were defined using U.S. Census population estimates minus the number of persons partially or fully vaccinated by December 11, 2021, and unvaccinated persons with a previous laboratory-confirmed infection before May 30, 2021. In California, the California Department of Finance population estimates were used for 2020, and the 2018 CDC National Center for Health Statistics Bridged Race file for U.S. Census population estimates were used in New York, consistent with other COVID-19 surveillance reporting.

§§ In California, a person-level match was performed to exclude deaths in each cohort before May 30, 2021. In New York, COVID-19 deaths were removed in aggregate from the starting number of unvaccinated persons with a previous COVID-19 diagnosis on May 30, 2021.

¶¶ https://www.cdc.gov/nchs/data/statnt/statnt20.pdf 🔒

\*\*\* https://covid.cdc.gov/covid-data-tracker/#variant-proportions

††† https://www.medrxiv.org/content/10.1101/2021.09.12.21263461v1 ⧉

§§§ https://www.medrxiv.org/content/10.1101/2021.11.29.21267006v1 ⧉

¶¶¶ https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/vaccine-induced-immunity.html#anchor_1635540449320

\*\*\*\* https://www.medrxiv.org/content/10.1101/2021.12.04.21267114v1 ⧉

401

†††† https://www.medrxiv.org/content/10.1101/2021.12.09.21267565v1 ⧉

§§§§ https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status

¶¶¶¶ https://www.medrxiv.org/content/10.1101/2021.12.30.21268565v1 ⧉; https://www.medrxiv.org/content/10.1101/2022.01.07.22268919v1 ⧉

***** https://www.cdc.gov/vaccines/covid-19/clinical-considerations/covid-19-vaccines-us.html

Top

# References

1. Rosenberg ES, Holtgrave DR, Dorabawila V, et al. New COVID-19 cases and hospitalizations among adults, by vaccination status—New York, May 3–July 25, 2021. MMWR Morb Mortal Wkly Rep 2021;70:1306–11. https://doi.org/10.15585/mmwr.mm7037a7 ⧉ PMID:34529645 ⧉

2. Rosenberg ES, Dorabawila V, Easton D, et al. Covid-19 vaccine effectiveness in New York State. N Engl J Med 2021. Epub December 1, 2021. https://doi.org/10.1056/NEJMoa2116063 ⧉ PMID:34942067 ⧉

3. Cavanaugh AM, Spicer KB, Thoroughman D, Glick C, Winter K. Reduced risk of reinfection with SARS-CoV-2 after COVID-19 vaccination—Kentucky, May–June 2021. MMWR Morb Mortal Wkly Rep 2021;70:1081–3. https://doi.org/10.15585/mmwr.mm7032e1 ⧉ PMID:34383732 ⧉

4. Grant R, Charmet T, Schaeffer L, et al. Impact of SARS-CoV-2 Delta variant on incubation, transmission settings and vaccine effectiveness: Results from a nationwide case-control study in France. Lancet Reg Health Eur 2021. Epub November 26, 2021. https://doi.org/10.1016/j.lanepe.2021.100278 ⧉

5. Self WH, Tenforde MW, Rhoads JP, et al.; IVY Network. Comparative effectiveness of Moderna, Pfizer-BioNTech, and Janssen (Johnson & Johnson) vaccines in preventing COVID-19 hospitalizations among adults without immunocompromising conditions—United States. MMWR Morb Mortal Wkly Rep 2021;70:1337–43. https://doi.org/10.15585/mmwr.mm7038e1 ⧉ PMID:34555004 ⧉

6. Lin D-Y, Gu Y, Wheeler B, et al. Effectiveness of Covid-19 vaccines in the United States over 9 months: surveillance data from the state of North Carolina. [Preprint posted online October 26, 2021.] https://www.medrxiv.org/content/10.1101/2021.10.25.21265304v1 ⧉

7. Bozio CH, Grannis SJ, Naleway AL, et al. Laboratory-confirmed COVID-19 among adults hospitalized with COVID-19–like illness with infection-induced or mRNA vaccine-induced SARS-CoV-2 immunity—nine states, January–September 2021. MMWR Morb Mortal Wkly Rep 2021;70:1539–44. https://doi.org/10.15585/mmwr.mm7044e1 ⧉ PMID:34735425 ⧉

8. Kim P, Gordon SM, Sheehan MM, Rothberg MB. Duration of SARS-CoV-2 natural immunity and protection against the Delta variant: a retrospective cohort study. Clin Infect Dis 2021. Epub December 3, 2021. https://doi.org/10.1093/cid/ciab999 ⧉ PMID:34864907 ⧉

Top

**TABLE 1. Cohort sizes and cohort–specific incident laboratory–confirmed COVID–19 cases in California (N = 752,781) and New York (N = 355,819) and hospitalizations in California (N = 56,177) — May 30–November 20, 2021**

Return

| State/Vaccination and diagnosis status*,† | No. of persons in each cohort (%) | Incident laboratory-confirmed COVID-19 cases | | | Incident COVID-19 hospitalizations** |
|---|---|---|---|---|---|
| | | No. (cumulative incidence)§,¶ | Median (IQR) interval from vaccination to positive test, days | Median (IQR) interval from previous diagnosis to positive test, days | No. (cumulative incidence)§,¶ |
| California | | | | | |
| Vaccinated | | | | | |

402

| State/Vaccination and diagnosis status*,† | No. of persons in each cohort (%) | Incident laboratory-confirmed COVID-19 cases | | | Incident COVID-19 hospitalizations** |
| --- | --- | --- | --- | --- | --- |
| | | No. (cumulative incidence)§,¶ | Median (IQR) interval from vaccination to positive test, days | Median (IQR) interval from previous diagnosis to positive test, days | No. (cumulative incidence)§,¶ |
| Previous COVID-19 diagnosis | 968,167 (4.5) | 3,471 (3.6) | 138 (95–181) | 262 (218–322) | 273 (0.3) |
| No previous diagnosis | 15,484,235 (71.2) | 240,045 (15.5) | 150 (112–189) | NA | 10,737 (0.7) |
| **Unvaccinated** | | | | | |
| Previous COVID-19 diagnosis | 1,370,782 (6.3) | 6,805 (5.0) | NA | 277 (229–356) | 378 (0.3) |
| No previous diagnosis | 3,911,146 (18.0) | 502,460 (128.5) | NA | NA | 44,789 (11.5) |
| **New York** | | | | | |
| **Vaccinated** | | | | | |
| Previous COVID-19 diagnosis | 485,649 (4.5) | 2,355 (4.9) | 162 (118–201) | 276 (227–348) | NA |
| No previous diagnosis | 7,809,968 (72.2) | 142,388 (18.2) | 171 (133–203) | NA | NA |
| **Unvaccinated** | | | | | |
| Previous COVID-19 diagnosis | 527,140 (4.9) | 3,250 (6.2) | NA | 295 (242–427) | NA |
| No previous diagnosis | 1,993,709 (18.4) | 207,826 (104.2) | NA | NA | NA |

**Abbreviations:** NA = not applicable; NAAT = nucleic acid amplification test.

* Statewide immunization databases in California are the California Immunization Registry, Regional Immunization Data Exchange, and San Diego Immunization Registry, and the laboratory system is the California COVID Reporting System; in New York, Immunization Information Systems include Citywide Immunization Registry and the New York State Immunization Information System; the laboratory system is the Electronic Clinical Laboratory Reporting System. California data were matched between the immunization and case registries using a probabilistic algorithm with exact match for zip code and date of birth and fuzzy match on first name and last name. New York data were matched to the Electronic Clinical Laboratory Reporting System with the use of a deterministic algorithm based on first name, last name, and date of birth. In California, person-level hospitalization data from the California COVID Reporting System and supplemental hospitalization reports were used to identify COVID-19-associated hospitalizations.

† For both classification into cohorts of persons with previous COVID-19 diagnoses and for measuring incident cases, laboratory-confirmed infection was defined as the receipt of a new positive SARS-CoV-2 NAAT or antigen test (both for New York and NAAT only for California) result, but not within 90 days of a previous positive result. Fully vaccinated is defined as having received a second dose of an mRNA COVID-19 vaccine (Pfizer-BioNTech or Moderna) or 1 dose of the Janssen (Johnson & Johnson) vaccine ≥14 days before May 30, 2021. Whereas vaccinated cohorts were directly observed in the immunization

information system databases, unvaccinated persons without a previous COVID-19 diagnosis were defined using U.S. Census population estimates minus persons partially or fully vaccinated by December 11, 2021, and unvaccinated persons with a previous laboratory-confirmed infection before May 30, 2021. In California, the California Department of Finance population estimates were used for 2020, and the 2018 CDC National Center for Health Statistics Bridged Race file for census population estimates were used in New York, consistent with other COVID-19 surveillance reporting.

§ Cumulative cases per 1,000 persons.

¶ These summaries of cumulative incidence are estimated across a period of variability in the epidemic for all cohorts.

** Hospitalization data for New York are not included in this analysis.

Top

### TABLE 2. Hazard ratios for incident laboratory-confirmed COVID-19 cases — New York and California and hospitalizations* — California, May 30–November 20, 2021

Return

| State and date range | Hazard ratio (95% CI)† | | | | | |
| | Unvaccinated, no previous COVID-19 diagnosis versus | | | Vaccinated, no previous COVID-19 diagnosis versus | |
| | Vaccinated, no previous COVID-19 diagnosis | Unvaccinated, previous COVID-19 diagnosis | Vaccinated, previous COVID-19 diagnosis | Unvaccinated, previous COVID-19 diagnosis | Vaccinated, previous COVID-19 diagnosis |
|---|---|---|---|---|---|
| **Cases, California** | | | | | |
| May 30–Jun 5 | 20.9 (18.9–22.9) | 8.2 (6.6–9.9) | 10.6 (8.1–13.2) | 0.4 (0.3–0.5) | 0.5 (0.4–0.6) |
| Jun 6–12 | 17.9 (16.2–19.5) | 8.6 (6.8–10.4) | 10.5 (7.9–13.0) | 0.5 (0.4–0.6) | 0.6 (0.4–0.7) |
| Jun 13–19 | 16.0 (14.7–17.4) | 10.8 (8.5–13.2) | 10.6 (8.2–13.1) | 0.7 (0.5–0.8) | 0.7 (0.5–0.8) |
| Jun 20–26 | 12.3 (11.4–13.1) | 14.5 (11.2–17.8) | 17.3 (12.8–21.8) | 1.2 (0.9–1.5) | 1.4 (1.0–1.8) |
| Jun 27–Jul 3 | 9.7 (9.2–10.2) | 16.6 (13.5–19.7) | 20.9 (16.0–25.8) | 1.7 (1.4–2.0) | 2.2 (1.6–2.7) |
| Jul 4–10 | 8.7 (8.4–9.0) | 24.0 (20.1–28.0) | 29.3 (23.1–35.6) | 2.8 (2.3–3.2) | 3.4 (2.6–4.1) |
| Jul 11–17 | 7.8 (7.5–8.0) | 29.0 (25.0–32.9) | 33.4 (27.3–39.4) | 3.7 (3.2–4.2) | 4.3 (3.5–5.1) |
| Jul 18–24 | 7.4 (7.2–7.6) | 31.8 (28.1–35.6) | 35.2 (29.8–40.6) | 4.3 (3.8–4.8) | 4.7 (4.0–5.5) |
| Jul 25–31 | 7.5 (7.4–7.7) | 26.5 (24.1–29.0) | 38.6 (33.3–43.9) | 3.5 (3.2–3.8) | 5.1 (4.4–5.8) |
| Aug 1–7 | 7.8 (7.6–7.9) | 32.6 (29.5–35.6) | 42.2 (36.7–47.7) | 4.2 (3.8–4.6) | 5.4 (4.7–6.1) |
| Aug 8–14 | 8.1 (7.9–8.2) | 33.4 (30.4–36.5) | 43.1 (37.6–48.6) | 4.1 (3.8–4.5) | 5.3 (4.7–6.0) |
| Aug 15–21 | 8.4 (8.3–8.6) | 31.3 (28.5–34.1) | 42.0 (36.7–47.3) | 3.7 (3.4–4.0) | 5.0 (4.3–5.6) |
| Aug 22–28 | 8.4 (8.3–8.6) | 31.3 (28.4–34.3) | 41.0 (35.5–46.5) | 3.7 (3.4–4.1) | 4.9 (4.2–5.5) |

404

| | Hazard ratio (95% CI)† | | | | |
| | Unvaccinated, no previous COVID-19 diagnosis versus | | | Vaccinated, no previous COVID-19 diagnosis versus | |
| State and date range | Vaccinated, no previous COVID-19 diagnosis | Unvaccinated, previous COVID-19 diagnosis | Vaccinated, previous COVID-19 diagnosis | Unvaccinated, previous COVID-19 diagnosis | Vaccinated, previous COVID-19 diagnosis |
|---|---|---|---|---|---|
| Aug 29–Sep 4 | 8.5 (8.3–8.6) | 31.2 (28.1–34.3) | 42.0 (36.1–48.0) | 3.7 (3.3–4.1) | 5.0 (4.3–5.7) |
| Sep 5–11 | 8.3 (8.1–8.5) | 35.0 (31.0–39.0) | 48.0 (40.2–55.9) | 4.2 (3.7–4.7) | 5.8 (4.8–6.7) |
| Sep 12–18 | 8.4 (8.2–8.6) | 33.8 (29.9–37.8) | 48.0 (39.8–56.2) | 4.0 (3.6–4.5) | 5.7 (4.7–6.7) |
| Sep 19–25 | 8.0 (7.8–8.2) | 27.0 (23.8–30.1) | 37.8 (31.5–44.1) | 3.4 (3.0–3.8) | 4.7 (4.0–5.5) |
| Sep 26–Oct 2 | 7.7 (7.5–7.9) | 28.6 (24.9–32.2) | 34.8 (28.9–40.7) | 3.7 (3.2–4.2) | 4.5 (3.7–5.3) |
| Oct 3–9 | 7.2 (7.0–7.4) | 30.0 (26.0–34.1) | 33.5 (28.5–38.6) | 4.1 (3.6–4.7) | 4.6 (3.9–5.3) |
| Oct 10–16 | 7.2 (7.0–7.4) | 31.2 (26.8–35.7) | 33.9 (27.8–40.0) | 4.3 (3.7–5.0) | 4.7 (3.9–5.5) |
| Oct 17–23 | 7.1 (7.0–7.3) | 31.9 (27.6–36.1) | 40.7 (33.3–48.1) | 4.5 (3.9–5.0) | 5.7 (4.7–6.7) |
| Oct 24–30 | 7.1 (6.9–7.3) | 26.6 (23.3–29.9) | 40.1 (32.9–47.3) | 3.7 (3.3–4.2) | 5.6 (4.6–6.6) |
| Oct 31–Nov 6 | 6.8 (6.6–7.0) | 33.1 (28.7–37.6) | 37.9 (31.0–44.7) | 4.9 (4.2–5.5) | 5.5 (4.5–6.6) |
| Nov 7–13 | 7.1 (6.9–7.3) | 30.6 (26.3–35.0) | 41.2 (33.0–49.5) | 4.3 (3.7–4.9) | 5.8 (4.6–7.0) |
| Nov 14–20 | 7.3 (7.0–7.5) | 25.4 (21.4–29.3) | 32.5 (25.5–39.5) | 3.5 (2.9–4.0) | 4.5 (3.5–5.5) |
| **Cases, New York** | | | | | |
| May 30–Jun 5 | 19.4 (16.9–21.8) | 10.9 (7.5–14.3) | 9.5 (6.7–12.4) | 0.6 (0.4–0.7) | 0.5 (0.3–0.7) |
| Jun 6–12 | 15.2 (13.2–17.2) | 8.0 (5.5–10.6) | 10.4 (6.6–14.3) | 0.5 (0.4–0.7) | 0.7 (0.4–0.9) |
| Jun 13–19 | 12.8 (11–14.5) | 8.2 (5.3–11.2) | 5.4 (3.7–7.0) | 0.6 (0.4–0.9) | 0.4 (0.3–0.6) |
| Jun 20–26 | 10.1 (8.8–11.4) | 7.9 (5.1–10.7) | 6.0 (4.0–8.0) | 0.8 (0.5–1.1) | 0.6 (0.4–0.8) |

| | Hazard ratio (95% CI)[†] | | | | |
|---|---|---|---|---|---|
| | **Unvaccinated, no previous COVID-19 diagnosis versus** | | | **Vaccinated, no previous COVID-19 diagnosis versus** | |
| **State and date range** | **Vaccinated, no previous COVID-19 diagnosis** | **Unvaccinated, previous COVID-19 diagnosis** | **Vaccinated, previous COVID-19 diagnosis** | **Unvaccinated, previous COVID-19 diagnosis** | **Vaccinated, previous COVID-19 diagnosis** |
| Jun 27–Jul 3 | 7.3 (6.5–8.1) | 8.8 (5.8–11.8) | 11.2 (6.7–15.7) | 1.2 (0.8–1.6) | 1.5 (0.9–2.2) |
| Jul 4–10 | 6.1 (5.6–6.7) | 17.8 (10.6–25.0) | 11.5 (7.5–15.6) | 2.9 (1.7–4.1) | 1.9 (1.2–2.6) |
| Jul 11–17 | 4.5 (4.2–4.8) | 11.7 (8.5–15.0) | 14.7 (9.9–19.6) | 2.6 (1.9–3.3) | 3.2 (2.2–4.3) |
| Jul 18–24 | 4.7 (4.5–5.0) | 21.7 (15.6–27.8) | 14.1 (10.5–17.7) | 4.6 (3.3–5.9) | 3.0 (2.2–3.8) |
| Jul 25–31 | 5.1 (4.9–5.3) | 16.1 (13.1–19.2) | 18.3 (14.1–22.6) | 3.2 (2.6–3.8) | 3.6 (2.8–4.4) |
| Aug 1–7 | 5.3 (5.2–5.5) | 19.2 (15.9–22.6) | 18.3 (14.7–21.9) | 3.6 (3.0–4.2) | 3.4 (2.7–4.1) |
| Aug 8–14 | 5.3 (5.2–5.5) | 16.2 (13.8–18.6) | 19.2 (15.6–22.7) | 3.0 (2.6–3.5) | 3.6 (2.9–4.3) |
| Aug 15–21 | 5.5 (5.3–5.7) | 19.5 (16.5–22.6) | 22.7 (18.4–26.9) | 3.6 (3.0–4.1) | 4.1 (3.4–4.9) |
| Aug 22–28 | 5.4 (5.2–5.6) | 19.2 (16.4–22.1) | 26.5 (21.2–31.8) | 3.6 (3.0–4.1) | 4.9 (3.9–5.9) |
| Aug 29–Sep 4 | 5.5 (5.3–5.6) | 17.9 (15.3–20.5) | 20.9 (17.2–24.6) | 3.3 (2.8–3.8) | 3.8 (3.1–4.5) |
| Sep 5–11 | 5.4 (5.2–5.5) | 18.9 (16.1–21.6) | 22.3 (18.3–26.4) | 3.5 (3.0–4.0) | 4.2 (3.4–4.9) |
| Sep 12–18 | 5.8 (5.6–5.9) | 15.0 (13.1–16.9) | 23.2 (19.1–27.4) | 2.6 (2.3–2.9) | 4.0 (3.3–4.8) |
| Sep 19–25 | 5.6 (5.4–5.7) | 15.4 (13.3–17.5) | 23.8 (19.3–28.3) | 2.8 (2.4–3.1) | 4.3 (3.5–5.1) |
| Sep 26–Oct 2 | 5.4 (5.2–5.5) | 18.4 (15.5–21.2) | 24.2 (19.3–29.1) | 3.4 (2.9–4.0) | 4.5 (3.6–5.4) |
| Oct 3–9 | 5.5 (5.3–5.7) | 15.7 (13.6–17.9) | 20.8 (17.2–24.5) | 2.9 (2.5–3.3) | 3.8 (3.1–4.4) |
| Oct 10–16 | 5.5 (5.3–5.6) | 17.2 (14.7–19.8) | 25.9 (20.6–31.1) | 3.2 (2.7–3.6) | 4.7 (3.8–5.7) |
| Oct 17–23 | 5.4 (5.2–5.6) | 18.9 (15.7–22.1) | 27.6 (21.2–34.0) | 3.5 (2.9–4.1) | 5.1 (3.9–6.3) |
| Oct 24–30 | 5.2 (5.0–5.4) | 21.0 (17.2–24.7) | 25.9 (20.2–31.6) | 4.0 (3.3–4.7) | 5.0 (3.9–6.1) |

| State and date range | Hazard ratio (95% CI)† | | | | |
| | Unvaccinated, no previous COVID-19 diagnosis versus | | | Vaccinated, no previous COVID-19 diagnosis versus | |
| | Vaccinated, no previous COVID-19 diagnosis | Unvaccinated, previous COVID-19 diagnosis | Vaccinated, previous COVID-19 diagnosis | Unvaccinated, previous COVID-19 diagnosis | Vaccinated, previous COVID-19 diagnosis |
|---|---|---|---|---|---|
| Oct 31–Nov 6 | 4.8 (4.6–4.9) | 17.3 (14.7–20.0) | 20.1 (16.3–23.8) | 3.6 (3.1–4.2) | 4.2 (3.4–5.0) |
| Nov 7–13 | 4.8 (4.7–4.9) | 23.9 (20.1–27.6) | 24.5 (20.1–28.9) | 5.0 (4.2–5.8) | 5.1 (4.2–6.1) |
| Nov 14–20 | 4.8 (4.6–4.9) | 22.6 (19.4–25.7) | 23.0 (19.3–26.6) | 4.7 (4.1–5.4) | 4.8 (4.1–5.6) |
| **Hospitalizations, California** | | | | | |
| May 30–Jun 12 | 29.8 (23.5–36.1) | 3.7 (2.5–5.0) | 7.2 (4.2–10.1) | 0.1 (0.1–0.2) | 0.2 (0.1–0.3) |
| Jun 13–26 | 28.7 (23.4–34.0) | 7.0 (4.3–9.7) | 8.1 (5.0–11.3) | 0.2 (0.1–0.3) | 0.3 (0.2–0.4) |
| Jun 27–10 | 30.1 (26.1–34.0) | 16.4 (10.0–22.8) | 16.0 (10.0–22.1) | 0.5 (0.3–0.8) | 0.5 (0.3–0.7) |
| Jul 11–24 | 25.8 (23.7–28.0) | 45.0 (27.6–62.4) | 41.5 (25.2–57.8) | 1.7 (1.1–2.4) | 1.6 (1.0–2.2) |
| Jul 25–Aug 7 | 28.8 (27.1–30.6) | 41.7 (29.2–54.1) | 72.9 (44.4–101.4) | 1.4 (1.0–1.9) | 2.5 (1.5–3.5) |
| Aug 8–21 | 29.7 (28.0–31.4) | 49.0 (35.0–62.9) | 64.0 (43.0–85.1) | 1.6 (1.2–2.1) | 2.2 (1.4–2.9) |
| Aug 22–Sep 4 | 29.1 (27.4–30.8) | 62.4 (41.4–83.3) | 63.9 (42.2–85.5) | 2.1 (1.4–2.9) | 2.2 (1.4–2.9) |
| Sep 5–18 | 26.3 (24.6–28.1) | 74.4 (40.9–107.9) | 96.4 (48.3–144.4) | 2.8 (1.5–4.1) | 3.7 (1.8–5.5) |
| Sep 19–Oct 2 | 25.0 (23.1–26.9) | 61.9 (34.5–89.3) | 99.4 (43.8–155.0) | 2.5 (1.4–3.6) | 4.0 (1.7–6.2) |
| Oct 3–16 | 20.8 (19.2–22.4) | 56.3 (28.3–84.3) | 58.5 (30.2–86.8) | 2.7 (1.4–4.1) | 2.8 (1.4–4.2) |
| Oct 17–30 | 21.5 (19.9–23.0) | 56.5 (31.5–81.5) | 92.1 (39.1–145.1) | 2.6 (1.5–3.8) | 4.3 (1.8–6.8) |
| Oct 31–Nov 13 | 22.7 (20.8–24.6) | 70.7 (32.0–109.4) | 86.1 (34.2–138.1) | 3.1 (1.4–4.8) | 3.8 (1.5–6.1) |

\* Life tables estimated at 7-day intervals for cases and 14-day intervals for hospitalizations.
† Hazard ratios and 95% CIs reported in this table differ numerically from presentation of corresponding results in the text as
"X-fold lower" rates (i.e., a hazard rate of 1.0 is zero-fold lower). For example, a hazard ratio of 20.9 (95% CI = 18.9–22.9) for

407

those "Unvaccinated–no previous COVID-19 diagnosis" versus "Vaccinated, no previous COVID-19 diagnosis" is equivalent to a 19.9-fold lower (95% CI = 17.9–21.9) rate for those "Vaccinated, no previous COVID-19 diagnosis" relative to those "Unvaccinated, no previous COVID-19 diagnosis."

Top

Return 

**FIGURE. Incident laboratory-confirmed COVID-19-associated hospitalizations among immunologic cohorts defined by vaccination and previous diagnosis histories — California, May 30-November 13, 2021\*,†**



\* The SARS-CoV-2 Delta variant exceeded 50% of sequences in U.S. Department of Health and Human Services Region 9 (containing California) during the week of June 26. https://covid.cdc.gov/covid-data-tracker/#variant-proportions

† Estimated hazard rate is laboratory-confirmed COVID-19-associated hospitalizations per 100,000 person-days visualized at midpoint of each reporting interval.

Top

**Suggested citation for this article:** León TM, Dorabawila V, Nelson L, et al. COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis — California and New York, May–November 2021. MMWR Morb Mortal Wkly Rep 2022;71:125–131. DOI: http://dx.doi.org/10.15585/mmwr.mm7104e1 ☑ .

*MMWR* and *Morbidity and Mortality Weekly Report* are service marks of the U.S. Department of Health and Human Services.
Use of trade names and commercial sources is for identification only and does not imply endorsement by the U.S. Department of Health and Human Services.
References to non-CDC sites on the Internet are provided as a service to *MMWR* readers and do not constitute or imply endorsement of these organizations or their programs by CDC or the U S. Department of Health and Human Services. CDC is not responsible for the content of pages found at these sites. URL addresses listed in *MMWR* were current as of the date of publication.

All HTML versions of *MMWR* articles are generated from final proofs through an automated process. This conversion might result in character translation or format errors in the HTML version. Users are referred to the electronic PDF version (https://www.cdc.gov/mmwr) and/or the original *MMWR* paper copy for printable versions of official text, figures, and tables.

Questions or messages regarding errors in formatting should be addressed to mmwrq@cdc.gov.

Page last reviewed: January 27, 2022

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Exhibit AAA

COMPLAINT



**From:** Jim Mahler <aftjim@mac.com>
**Date:** Thursday, August 12, 2021 at 5:16 PM
**To:** Carlos DelaLama <cdelalam@sdccd.edu>
**Subject:** Re: Reminder: SDCCD Über-Chair Meeting, Tuesday, August 17th, 9:00-12:00

We elect people to office outside of the District, correct?

On Aug 12, 2021, at 3:06 PM, Carlos DelaLama <cdelalam@sdccd.edu> wrote:

But Jim… when did we get into the business of how to mandate others on how to live their lives outside of school?  This is a slippery slope…Where is the line?  Many would argue that this is already crossing that line?

Again, on campuses, we do have some level of responsibility, I am in agreement.  But outside of campus when there is literally no risk to campus population?  That is getting dictatorial.

--
*Carlos de la Lama*
*Department of Mathematics, Chair*
*San Diego City College*
*cdelalam@sdccd.edu*
*619-388-3362*


**From:** Jim Mahler <aftjim@mac.com>
**Date:** Thursday, August 12, 2021 at 2:58 PM

416

**To:** Carlos DelaLama <cdelalam@sdccd.edu>
**Subject:** Re: Reminder: SDCCD Uber-Chair Meeting, Tuesday, August 17th, 9:00-12:00

Because we want to able to use our leverage to protect the community at-large so we can end this mess.  It's not just a workplace issue.

On Aug 12, 2021, at 2:50 PM, Carlos DelaLama <cdelalam@sdccd.edu> wrote:

I do not disagree with what you are point out, but what does that have to do with people that are not going to be on campus?  That is the part that doesn't make sense.

For example, for many different reasons, I will need to go from time to time to campus, so it would make sense that I would need at that time a test.  But someone like Misael, who lives in Temecula, and who literally has not stepped on campus until this past Monday during this entire remote working environment started, and only did so because he was helping out someone else, having this requirement serves literally no purpose.  Furthermore, in cases like him, who has already recovered from Covid where natural immunity is 8 times greater than vaccine immunity, the testing just seems completely unnecessary and arbitrary.

This is what I am trying to get at.  Again, I am trying to bring reason to all of this.  When things make sense, there is nothing to contend, but situations like Misael, need to be brought into the policy making process.

--
*Carlos de la Lama*
*Department of Mathematics, Chair*
*San Diego City College*
*cdelalam@sdccd.edu*
*619-388-3362*


**From:** Jim Mahler <aftjim@mac.com>
**Date:** Thursday, August 12, 2021 at 2:22 PM
**To:** Carlos DelaLama <cdelalam@sdccd.edu>
**Subject:** Re: Reminder: SDCCD Uber-Chair Meeting, Tuesday, August 17th, 9:00-12:00

The data and studies conducted by the CDC and other health/scientific entities indicate that the unvaccinated are more likely to get infected and transmit the virus, especially the Delta variant. Although breakthrough infections happen, it happens at a far less percentage compared to the unvaccinated (around 1% of the fully vaccinated population, which means even a lesser percentage of the larger total population) and they are infectious for a shorter period of time. Unvaccinated also currently make up about 99.5% of deaths by COVID-19.  Simply stated, the risks are higher where the unvaccinated are concerned.

411

On Aug 12, 2021, at 2:01 PM, Carlos DelaLama <cdelalam@sdccd.edu> wrote:

Jim,
Regarding the last point on your email…

I do understand we were informed of this recently by the district, but what is not being considered and thus promotes a discriminatory status, is that vaccinated individuals can transmit the disease just as well as unvaccinated ones. I know the district knows this, because I have conversations with our VC's where this has come up.

So, if the intent is to really minimize such a risk, then that would imply EVERYONE needs to be tested weekly, since everyone promotes a health risk, albeit at different levels. What is illogical is to have even those that are working remotely have to be tested weekly when these folks do not pose ANY risk to anyone on-campus since they are simply not on campus. So, there seems to be a different agenda with this requirement.

Given that testing everyone is absurdly unmanageable, what does make logical sense and equitable is for anyone that is working or on occasion doing business on campus and is symptomatic, to be tested. Below is a study by the NIH itself, on how there was literally no asymptomatic transmission in this study published a year ago. And a second study by the School of Medicine in Indiana University that shows basically the same thing in adults.

https://pubmed.ncbi.nlm.nih.gov/32513410/

https://medicine.iu.edu/news/2020/08/asymptomatic-covid-19-study-contains-important-information-for-parents-and-children

So, being logical and rational here, I would advocate for information of this nature to be included in decision making policies.

I am also very aware that entities like Politifact, huffington post, USNews, even at a smaller level, Time magazine have weakly claimed otherwise. However, I would opt for actually reviewing the primary sources, than something second hand.

Basically I wanted to bring some sense of reason to this circumstance. So, while I agree that we all should do our part when working or having business to take care of at school, having mandates that inevitably will infringe on someone's home life is beyond the scope of the district or any other entity. Is there a possibility for discussion and review of this

at the district level?  Thanks

--
*Carlos de la Lama*
*Department of Mathematics, Chair*
*San Diego City College*
*cdelalam@sdccd.edu*
*619-388-3362*


**From:** Jim Mahler <aftjim@mac.com>
**Date:** Wednesday, August 11, 2021 at 2:39 PM
**To:** Leslie Easton <leaston@sdccd.edu>, Dotti Cordell
<dcordell@sdccd.edu>, Deanna Shelton <dshelton@sdccd.edu>,
Soon-Ah Fadness <sfadness@sdccd.edu>, Jennifer Boots
<jboots@sdccd.edu>, Nadia Mandilawi <nmandila@sdccd.edu>,
Patricia McGhee <pmcghee@sdccd.edu>, Philippe Patto
<ppattosd@gmail.com>, Terry Wilson <twilson@sdccd.edu>, Katherine
Rodda <krodda@sdccd.edu>, "Sean B. Bacon"
<sbbacon@sdccd.edu>, Kim Sweeney <ksweeney@sdccd.edu>,
Wendy Wiehl <wwiehl@sdccd.edu>, Darius Spearman
<dspearma@sdccd.edu>, Rebecca Collins-Bernardino
<rcollins@sdccd.edu>, Leroy Brady <lbrady@sdccd.edu>, James
Covalt <jcovalt@sdccd.edu>, Justin Akers <jakers@sdccd.edu>, Sofia
Laurein <slaurein@sdccd.edu>, Berta Harris <bharris@sdccd.edu>,
Theresa Savarese <tsavares@sdccd.edu>, Sudabeh Phillips
<sphillip@sdccd.edu>, "Georgina M. Garcia" <gmgarcia@sdccd.edu>,
Fred Julian <fjulian@sdccd.edu>, Erin McConnell
<emcconne@sdccd.edu>, Kevin Jagnandan
<kjagnandan@sdccd.edu>, Carlos DelaLama <cdelalam@sdccd.edu>,
Nick Slinglend <nslingle@sdccd.edu>, Paul Young
<pyoung@sdccd.edu>, Tracey Kiser <tkiser@sdccd.edu>, Erelyn
Vinegas <evinegas@sdccd.edu>, Andrea Milburn
<amilburn@sdccd.edu>, Barbara Ring <bring@sdccd.edu>, Brianne
Kennedy <bkennedy@sdccd.edu>, "N. Scott Robinson"
<nsrobins@sdccd.edu>, Alison Primoza <aprimoza@sdccd.edu>,
Michael Harrison <mharriso@sdccd.edu>, Todd Curran
<tcurran@sdccd.edu>, Nathan Resch <nresch@sdccd.edu>, Chris
Sullivan <csulliva@sdccd.edu>, Bruce Naschak
<bnaschak@sdccd.edu>, Jill Moreno Ikari <jmorenoi@sdccd.edu>,

Donna Duchow <dduchow@sdccd.edu>, Jill Chagnon
<jchagnon@sdccd.edu>, Amanda Johnston <ajohnsto@sdccd.edu>,
Connie Renda <crenda@sdccd.edu>, Carlos Toth <jtoth@sdccd.edu>,
Nellie Dougherty <ndougher@sdccd.edu>, Bryan Malinis
<bmalinis@sdccd.edu>, Erika Higginbotham <ehigginb@sdccd.edu>,
Nathan Betschart <nbetscha@sdccd.edu>, Mario Lara
<mlara@sdccd.edu>, Barbara Sexton <bsexton@sdccd.edu>, Jesse
Keller <jkeller001@sdccd.edu>, George Ye <gye@sdccd.edu>,
Jennifer Carmichael <jcarmich@sdccd.edu>, Todd White
<twhite@sdccd.edu>, Paula Gustin <pgustin@sdccd.edu>, Donna
Budzynski <dbudzyns@sdccd.edu>, Saloua Saidane
<ssaidane@sdccd.edu>, Irena Stojimirovic <istojimi@sdccd.edu>,
Jennifer Snyder <jlsnyder@sdccd.edu>, Claude Mona
<cmona@sdccd.edu>, Michael Crivello <mcrivell@sdccd.edu>, Irena
Stojimirovic <istojimi@sdccd.edu>, Jarred Collins
<jcollins@sdccd.edu>, Alison Gurganus <agurganus@sdccd.edu>,
Walter Wesley <wwesley@sdccd.edu>, Tara Maciel
<tmaciel@sdccd.edu>, Mark Abajian <mabajian@sdccd.edu>, Tonya
Whitfield <twhitfie@sdccd.edu>, Meegan Feori <mfeori@sdccd.edu>,
Howard Eskew <heskew@sdccd.edu>, Brian Lesson
<blesson@sdccd.edu>, Xiaochuan Song <xsong@sdccd.edu>,
Amanda Horner <ahorner@sdccd.edu>, Cynthia Rico
<crico@sdccd.edu>, Evan Adelson <eadelson@sdccd.edu>, Christine
DuPraw <cdupraw@sdccd.edu>, Dina Miyoshi
<dmiyoshi@sdccd.edu>, Jennifer Sime <jsime@sdccd.edu>, Ryan
Mongelluzzo <rmongell@sdccd.edu>, Thekima Mayasa
<tmayasa@sdccd.edu>, Ken Kuniyuki <kkuniyuk@sdccd.edu>, Sandra
Belew <sbelew@sdccd.edu>, Manuel Velez <mvelez@sdccd.edu>,
John Crocitti <jcrocitt@sdccd.edu>, George Ye <gye@sdccd.edu>, Ian
Duckles <iduckles@sdccd.edu>, Sharon Hughes
<shughes@sdccd.edu>, "Oscar V. Torres" <otorres002@sdccd.edu>,
Robert Wong <rowong@sdccd.edu>, Helen Greenbergs
<hegreenb@sdccd.edu>, Duane Short <dshort@sdccd.edu>, Wahid
Hamidy <whamidy@sdccd.edu>, Anne Gloag <agloag@sdccd.edu>,
Julia McMenamin <jmcmenam@sdccd.edu>, Kevin Petti
<kpetti@sdccd.edu>, Jae Calanog <jcalanog@sdccd.edu>, Jordan
Omens <jomens@sdccd.edu>, Scott Moller <smoller@sdccd.edu>,
Mary Kjartanson <mkjartan@sdccd.edu>, Darren Hall
<nadocaptain@me.com>, Max Moore <mmmoore@sdccd.edu>,
Rebecca Bowers-Gentry <rbowersg@sdccd.edu>, Dan Willkie

<dwillkie@sdccd.edu>, Mary Hart <mhart@sdccd.edu>, Joseph Young <jyoung@sdccd.edu>, Kandice Brandt <kbrandt@sdccd.edu>, Namphol Sinkaset <nsinkase@sdccd.edu>, David Mehlhoff <dmehlhof@sdccd.edu>, Andrew Lowe <alowe@sdccd.edu>, Daniel Igou <digou@sdccd.edu>, Wai-Ling Rubic <wrubic@sdccd.edu>, Molly Fassler <mfassler@sdccd.edu>, Jessica McCambly <jmccambly@sdccd.edu>, Carmen Jay <cjay@sdccd.edu>, Adrian Arancibia <aarancib@sdccd.edu>, Rodrigo Gomez <rgomez001@sdccd.edu>, Alex Mata <amata@sdccd.edu>, Kirk Webley <kwebley@sdccd.edu>
**Cc:** Kelly Mayhew <kellysm99@icloud.com>, Ian Duckles <imduckles@gmail.com>, Kevin Petti <kpetti@mac.com>, Darius Spearman <dspearma@sdccd.edu>, John Crocitti <jcrocitt@sdccd.edu>, Laura Murphy <lmurphy@sdccd.edu>
**Subject:** Reminder: SDCCD Über-Chair Meeting, Tuesday, August 17th, 9:00-12:00

Dear SDCCD Chairs and Coordinators,

Just a friendly reminder of our meeting scheduled for **Tuesday, August 17th, from 9-12** via Zoom (connection info. below).

**\*\*\*Please let me know if you have any items for inclusion on the agenda.\*\*\***

To get ahead of the wave a bit, here are some answers to questions I have been receiving on email lately (all of which we can revisit when we meet):

• If an overload assignment is canceled due to low enrollment, the faculty member does not have the right to bump someone to recover their overload.  That's up to the Dean to decide.

• Paid office hours for adjunct faculty continue.

• Adjunct faculty who do not average 50% FTEF for their Spring 2020 (not a typo) and Fall 2021 assignments will have their healthcare terminated as of September 30, 2021.

• As you cancel classes, you need to ensure that your most senior adjunct faculty with POA get their full load ahead of anyone less senior.  That may mean some get nothing at the expense of the more senior faculty maintaining their entitled load.

• As a result of our sideletter with the District, any adjunct faculty who loses an

assignment due to situations beyond their control (e.g., budget or low enrollment) will maintain their full POA rights through December 2022.  After that the 18 month clock will begin (absent a subsequent sideletter).

• Adjunct faculty who voluntarily want to reduce their assigned load must get permission from the Dean if they don't want to lose their POA rights.

• Any changes to the class schedule in terms of course modality, i.e., face-to-face being converted to online or vice-versa, need to be approved by the VPI.

• **Vaccines are going to be mandatory for everyone, students and employees alike.  This rule also applies to all employees working fully remotely.  If there is an approved medical or religious exemption to getting vaccinated, then that employee will be subjected to weekly testing.  If the employee doesn't comply with either, the District will place the employee on Leave Without Pay.**

**(I highlighted and bold faced the statement that applies)**

And on that happy note, I look forward to seeing you all virtually next Tuesday! 

In Solidarity,

*Jim*

Jim Mahler, President
AFT Guild, Local 1931

[Quoted text hidden]

416