1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUDY GEORGE, *et al.*,<br><br>                              Plaintiffs,<br><br>         v.<br><br>GROSSMONT CUYAMACA<br>COMMUNITY COLLEGE DISTRICT<br>BOARD OF GOVERNORS, *et al.*,<br><br>                              Defendants. | Case No. 22-cv-0424-BAS-DDL<br><br>**ORDER DENYING PLAINTIFFS'<br>MOTION FOR A PRELIMINARY<br>INJUNCTION**<br><br>**[ECF No. 40]** |

Plaintiffs bring this action to challenge the requirement imposed by three California Community College Districts ("CCDs")—San Diego Community College District ("SDCCD"), South Orange County Community College District ("SOCCCD"), and Grossmont Cuyamaca Community College District ("GCCCD")—that their employees and students be fully vaccinated against the novel coronavirus 2019 ("COVID-19"), a highly contagious virus that has killed close to 100,000 Californians and sickened many more.  (Compl., ECF No. 1.)  On a myriad of constitutional grounds and under Title VII of the Civil Rights Act of 1964, the Complaint contests the legality of the CCDs' vaccine mandates and the framework for determining accommodations built into those mandates (collectively, the "CCDs' Vaccine Requirements").  (*Id.*)

Approximately three months after commencing this action, and seven months after the final CCD Vaccine Requirement went into effect, Plaintiffs moved *ex parte* for a temporary restraining order, essentially seeking to freeze the CCDs' Vaccine Requirements.  (Mot., ECF No. 40; *see also* Mem. in Supp. of TRO App., Ex. 1 to TRO App. ("Mem."), ECF No. 40-1.)  Defendants opposed (Opp'n, ECF No. 68) and Plaintiffs replied (Reply, ECF No. 71).   The Court converted the request for a temporary restraining order into a motion for a preliminary injunction ("Motion") and held oral argument on November 2, 2022.  (ECF No. 82.)   Having reviewed the record and considered the arguments, the Court **DENIES** the Motion for a preliminary injunction for the following reasons.

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

22cv0424

## I.      BACKGROUND[1]

### A.      COVID-19 and the Vaccines

COVID-19 is a highly contagious virus that spreads from person to person mainly through respiratory droplets produced when an infected person—even an asymptomatic one—speaks, coughs, or sneezes.  *Brach v. Newsom*, 6 F.4th 905, 934 (9th Cir. 2021) (Hurwitz, C.J., dissenting), *vacated on grant of reh'g en banc*, 18 F.4th 1031 (9th Cir. 2021).  People with COVID-19 have reported a wide range of symptoms, with many suffering hospitalization and/or long-term health complications, including death.  *Id.*  Approximately one million Americans—and six million worldwide—have perished from COVID-19 infection and related complications.  *UnifySCC v. Cody*, No. 22-cv-01019-BLF, 2022 WL 2357068, at *1 (N.D. Cal. June 30, 2022).

COVID-19 first reached the United States in winter of 2021; not long after, "infections began popping up across the country."  *South Bay United Pentecostal Church v. Newsom*, 985 F.3d 1128, 1132 (9th Cir.), *rev'd and vacated by South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 2563 (2021).  Due to its highly contagious nature, its propensity to inflict dire health consequences, and its risk of overwhelming hospitals across the country, the virus brought "ordinary life . . . to a grinding halt."  COVID-19 did not spare California institutions of higher learning—including the three

---

[1] The Court recites only those facts relevant to Plaintiffs' pending Motion.  It does not address claims or injuries alleged in the Complaint upon which Plaintiffs have not predicated their request for preliminary relief.  The facts stated here are taken from the Complaint and its exhibits, the documents incorporated by reference to the Complaint, and the declarations submitted by both sides.  This includes the declarations of Aimee Gallagher, Gregory Smith, and Cindy Vyskocil, who serve as the Vice Chancellors of Human Resources at GCCCD, SDCCD, and SOCCCD, respectively.  (*See* Declaration of Aimee Gallagher ("Gallagher Decl.") ¶ 2, Ex. 1 to Opp'n, ECF No. 68-1; Declaration of Gregory Smith ("Smith Decl.") ¶ 1, Ex. 2 to Opp'n, ECF No. 68-2; Declaration of Cindy Vyskocil ("Vyskocil Decl.") ¶ 2, Ex. 3 to Opp'n, ECF No. 68-3.)

The evidentiary standard that governs proceedings for preliminary relief is relaxed.  *Disney Enters. v. VidAngel, Inc.*, 224 F. Supp. 3d 957, 966 n.1 (C.D. Cal. 2016).  The Court "may give even inadmissible evidence some weight, when doing so serves the purpose of preventing irreparable harm."  *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984) (citing 11 C. Wright & Miller, *Federal Practice and Procedure, Civil*, § 2949 at 471 (1973)).

22cv0424

CCDs in this case—from its disruptive effect.  In the early days of the pandemic, the CCDs closed their doors and took their services online to prevent infection and disease among their employees and students.  (Opp'n at 7.)  At that time, there was no widely available or  effective pharmaceutical tool for preventing and treating COVID-19 viral infection.  *Branch*, 6 F.4th at 934.  But since then, science has enabled us not only to better understand the virus but also it has delivered a new weapon to combat it:  widely available vaccines.  *Id.*

Beginning in December 2020, the U.S. Food and Drug Administration ("FDA") approved three COVID-19 vaccines under an Emergency Use Authorization ("EUA"):  a Pfizer-BioNTech vaccine (December 11, 2020), a Moderna vaccine (December 18, 2020), and a Johnson & Johnson vaccine (February 27, 2021).  (Compl. ¶ 69.)   On August 23, 2021, the FDA fully approved the Pfizer-BioNTech vaccine as a two-dose series in persons 16 years or older; it remains under EUA for use in persons below 16. (*Id.* ¶ 57 n. 4.) The Moderna and Johnson & Johnson vaccines were also authorized as a two-dose series, but, as of the time of the TRO Application, remain under EUA. (*Id.*)

### B.  CCDs' Vaccine Requirements

Prior to the 2021-22 school year, each of the CCDs' governing boards resolved to confer their Chancellors with authority to develop and adopt policies requiring compulsory vaccination.  (*See* GCCCD Resolution, Ex. J to Compl.; SDCCD Resolution, Ex. D to Mem.; SOCCCD Resolution, Ex. 1 to Vyskocil Decl.)[2]  While the CCDs' Vaccine Requirements that ultimately materialized are separate and independent policies, their substantial similarity enables this Court to analyze them singularly in the interests of judicial economy and streamlining the constitutional questions at issue.[3]

---

[2] Exhibits attached to the Complaint, the Memorandum, and the Vyskocil Declaration are annexed at ECF Nos. 1, 40-1, and 68-2, respectively.

[3] The Court also observes that Plaintiffs do not claim there exists any constitutional distinction between the CCDs' Vaccine Requirements.  They allege the Requirements are unconstitutional for precisely the same reasons and even refer to them as a singular and uniform policy repeatedly throughout their Complaint and briefing.

The Court further notes that, as precedent has evolved throughout the pandemic, it has become increasingly clear that where, as here, it is claimed a vaccination mandate with religious exemptions derogates fundamental rights secured by the Free Exercise Clause, the policy's component parts—(1) the vaccine mandate and (2) the mechanism for granting accommodations—both must pass constitutional muster. *UnifySCC*, 2022 WL 2357068, at \*5 (collecting authorities) (observing "separately analyzing" the mandate and accommodation frameworks of COVID-19 vaccination policies "aligns with multiple circuit and district courts['] [approach]").   Accordingly, in order to enable proper analysis of Plaintiffs' free exercise claim, *see infra* Sec. III.B.2, this Court separates below the mandate components of the CCDs' Vaccine Requirements from the accommodation frameworks, even though the parties do not do so themselves.

### 1.    The Mandates

The CCDs' Vaccine Requirements mandate—by a date certain—all employees and students either to be fully vaccinated and boosted against COVID-19 or to establish entitlement to an eligible exemption ("Mandates").  The CCDs' Vaccine Requirements all recognize the same two exemptions:  (1) a medical-condition exemption and (2) a sincerely-held religious belief exemption.  (*See* SDCCD Vaccine Requirement, Ex. E to Compl.; SOCCCD Vaccine Requirement, Ex. 2 to Vyskocil Decl.; GCCCD Vaccine Requirement, Ex. A to Gallagher Decl.)[4]  Each CCD grounds its Mandate in guidance and data from the Centers for Disease Control ("CDC")—as well as other federal, state, and local health agencies and organizations—identifying "vaccination against COVID-19 by as many people as possible a[] necessary measure to control and contain serious illness, hospitalization, and loss of life due to COVID-19."  (GCCCD Board Resolution at 1; SDCCD Resolution at 1; *see also* Vyskocil Decl. ¶ 6.)

---

[4]  Vice Chancellors Smith and Gallagher transmitted their respective CCD's Vaccine Requirement to employees via email; SOCCCD's Vaccine Requirement is set forth in a Memorandum of Understanding between SOCCCD, on the one hand, and Chapter 586 of the California School Employees Association, on the other hand ("MOU").

The CCDs prescribe the methods pursuant to which unvaccinated employees and students apply for one of these exemptions to the Mandates.  The record submitted reflects that all three institutions required employees and students seeking a sincerely-held religious belief exemption to complete and submit a vaccination exemption form, from which the CCDs' respective Human Resources Departments would determine whether to grant such an exemption.  (*See*, *e.g.*, GCCCD Vaccination Exemption Form, Ex. J to Compl.; SDCCD Vaccination Exemption Form, Ex. V to Compl.; SOCCCD Vaccination Exemption Form, Ex. DD to Compl.)

In varying terms, the CCDs warned employees who failed either to get vaccinated or obtain an exemption by the date set for doing so would subject them to discipline.  For example, SOCCCD warned that failure to comply with the Mandate by the end of the 2021-22 school year would result in termination of employment.  (SOCCCD Vaccine Requirement § IV.10.)  By contrast, SDCCD and GCCCD were vague as to the exact repercussions employees face for failure to comply with their Mandates.  (SDCCD Vaccine Requirement at 3 ("Employees who do not submit their vaccination documentation and are not approved for an exemption will be subject to discipline."); GCCCD Vaccine Requirement at 3.)

### 2. Accommodation Frameworks

Employees who successfully established their eligibility for one of the two exemptions partook in an "interactive accommodation process" pursuant to which the CCDs "determine[d] whether a reasonable accommodation to the [Mandates] could be made without posing a health and safety risk to others" ("Accommodation Frameworks").  (GCCCD Vaccine Requirement at 2; SDCCD Vaccine Requirement at 2; *see also* SOCCCD Vaccine Requirement § II.3.)

GCCCD and SDCCD evaluated accommodations "on an individual basis within the specific reasons for an exemption, work performed, environment in which work is performed, and related relevant factors."  (GCCCD Vaccine Requirement at 2; SDCCD Vaccine Requirement.)   The record further reflects that SDCCD employed a

- 6 -

"Vaccination Exemption Accommodation Questionnaire" to evaluate accommodation decisions for exempt employees.   (SDCCD Questionnaire, Ex. AA to Compl.) "[R]easonable accommodations" under the GCCCD and SDCCCD Accommodation Frameworks include "periodic COVID-19 testing, changes in work assignments, changes in work schedules, changes in work location, and other appropriate measures." (GCCCD Requirement at 2; SDCCD Vaccine Requirement at 2.)   The SDCCD Accommodation Framework previously required exempt employees to submit to compulsory, twice-weekly antigen testing, but SDCCD dropped this strand of its policy in May 2022. (Smith Decl. ¶ 5.)

In contrast to GCCCD and SDCCCD, SOCCCD does not disclose how its Accommodation Framework Operates.  The SOCCCD Vaccine Requirement does not list any pertinent factors, nor does Vice Chancellor Vyskocil shed any light on the standard employed by SOCCCD officials to determine accommodations.   (*See* SOCCCD Questionnaire; Vyskocil Decl.)  However, possible accommodations under the SOCCCD Accommodation Framework roughly approximate those offered to exemptees by GCCCD and SDCCCD.  That is, exempt SOCCCD employees "may be subject to other safety measures beyond what is required for vaccinated individuals," including but not limited to "physical/social distancing; avoiding large gatherings; wearing acceptable facial coverings and/or other personal protective equipment; frequent handwashing and cleaning; practicing respiratory etiquette; and/or exclusion from the physical worksite when warranted." (SOCCCD Vaccine Requirement § II.3.)  Moreover, like SDCCD, SOCCCD requires exempt employees to submit to compulsory, weekly antigen testing; it provides that failure to abide by the asymptomatic testing requirement results in adverse employment action, including termination in the event of two missed tests.  (*Id.* § I.8.)

Vice Chancellor Vyskocil did not attest to whether that requirement had been lifted.  (*See* Vyskocil Decl.)[5]

### C.    Plaintiffs

Plaintiffs in this lawsuit are six CCD employees and a student.  (Compl. ¶¶ 4–10.) The CCDs approved all Plaintiffs' requests for sincerely-held religious belief exemptions. (Gallagher Decl. ¶¶ 6–7; Vyskocil Decl. ¶¶ 14–15; Smith Decl. ¶ 8.)   However, the accommodations granted to each Plaintiff differs.

Carlos de la Lama ("Lama"):   Lama is a SDCCD employee who works in the Mathematics  department.    (Compl. ¶ 6.)    SDCCD  approved  Lama's  request  for  a sincerely-held religious belief exemption on October 28, 2021.  (*Id.* ¶ 92; *see* Lama Exemption Determination, Ex. Q to Compl.)     Due to his unvaccinated status, SDCCD restricted Lama's presence on campus for the Spring 2022 semester but accommodated his religious exemption by allowing him to perform all his duties remotely for the semester,  subject  to  the  requirement  he  test  for  COVID-19  weekly—whether symptomatic or not.  (Lama Accommodation Determination, Ex. T to Compl.; Smith Decl. ¶ 5.)  Lama accepted his accommodation.  (Compl. ¶ 95.)  On July 11, 2022, Vice Chancellor Smith attested Lama continues to be covered by his sincerely-held religious belief  exemption,  the  decision  to  restrict  him  from  in-person  instruction  is  being reassessed, and Lama no longer must submit to weekly asymptomatic antigen testing.

---

[5] At oral argument, each of the CCDs indicated slight changes to their Vaccine Requirements. GCCCD indicated that it will eliminate its Vaccine Requirement by the end of the year.  SOCCCD represented that while its Mandate would remain in place, its masking and testing requirements— including those applicable only to exemptees on account of their unvaccinated status—had been lifted on August 29 and October 3, 2022, respectively.  SDCCD stated that its Mandate remains in place.  It further stated that it now requires mask compliance by *all* employees—not just unvaccinated, exempt ones.  Finally, it represented that the two named Plaintiffs who are SDCCD employees have been placed on paid leave as an accommodation to their religious exemptions but warned those employees may face discipline—including termination—if they do not get vaccinated in the Spring 2023 semester.

(*Id.*)  However, at oral argument, SDCCD represented Lama's accommodation has since been switched from remote work to requiring him to take paid leave.[6]

Dora Meza ("Meza"):   Meza is a SDCCD employee who serves as a Student Services Supervisor I.  (Compl. ¶ 7.)  SDCCD approved Meza's request for a sincerely-held religious belief exemption on November 5, 2021.  (*Id.* ¶¶ 103–05; Meza Exemption Determination, Ex. Z to Compl.)   On February 7, 2022, SDCCD determined it could accommodate Meza's religious exemption by permitting her to continue working onsite, provided she, *inter alia*, wear a face-covering at all times and test for COVID-19 weekly—whether symptomatic or not.  (Meza Accommodation Determination, Ex. BB to Compl.)   Meza accepted her accommodation.   (*Id.*)   On July 11, 2022, SDCCD Vice Chancellor Smith attested Meza continues to be covered by her sincerely-held religious belief exemption and she no longer has to submit to asymptomatic antigen testing. (Smith Decl. ¶ 5.)  However, at oral argument, SDCCD represented it recently switched Meza's accommodation from onsite work to requiring her to take paid leave because the new position to which she had recently been promoted does not permit Meza to undertake necessary social distancing measures, nor can its duties be performed remotely.[7]

Mary Kate Planeta:   Planeta is a SDCCD student.   (Compl. ¶ 10.)   SDCCD approved her request for a sincerely-held religious belief exemption in the fall of 2021, thereby enabling her to attend class in person pursuant to SDCCD policy.  (*Id.* ¶¶ 136–37; Planeta's Exemption Determination, Ex. NN to Compl.)   Vice Chancellor Smith attests that SDCCD dropped its Vaccine Requirement for students on May 20, 2022.  (Smith Decl. ¶ 4(b).)  Accordingly, Planeta is not subject to any vaccine mandate.  Nor must she

---

[6] As mentioned at *supra* note 5, SDCCD represented at oral argument Lama may face discipline if he does not get vaccinated by the Spring 2023 semester, including adverse employment action up to termination.

[7] As mentioned at *supra* note 5, SDCCD represented at oral argument Meza may face discipline if she does not get vaccinated by the Spring 2023 semester, including adverse employment action up to termination.

22cv0424

abide by any other testing or masking requirement as a condition of participating in onsite coursework and activities.

<u>Jess Perez ("Perez")</u>:  Perez is a SOCCCD employee who works as a Senior Administrative Assistant. (Vyskocil Decl. ¶ 14.)  SOCCCD approved Perez's request for a sincerely-held religious belief exemption on December 8, 2021.[8]  (Compl. ¶¶ 117–18; Perez Accommodation Determination, Ex. FF to Compl.)  That same day, SOCCCD granted Perez's request for an accommodation to continue working onsite despite his unvaccinated status, subject to the requirement that he test for COVID-19 twice weekly—whether symptomatic or not.  (Perez Exemption Determination.)  SOCCCD informed Perez he could take paid and, then, unpaid leave in the alternative.  (*Id.*; Vyskocil Decl. ¶ 14.)  While it is unclear when and how Perez accepted the terms of his accommodation, Vice Chancellor Vyskocil attested on July 11, 2022 that Perez was "in good standing" and that, "[s]o long as [he] continues to comply with the twice-weekly testing requirement . . ., there is no danger to [his] employment with SOCCCD." (Vyskocil Decl. ¶ 14.)[9]

<u>Paul Bonkowski ("Bonkowski")</u>:  Bonkowski is a SOCCCD employee who works as the Lead Maintenance Worker in the Facilities, Maintenance & Operations department.  (Vyskocil Decl. ¶ 115.)  SOCCCD approved Bonkowski's request for a sincerely-held religious belief exemption on November 17, 2021.  (Compl. ¶ 127; Bonkowski Exemption Determination, Ex. JJ to Compl.)  That same day, SOCCCD granted Bonkowski's request for an accommodation to continue working onsite despite his unvaccinated status, subject to the requirement that he test for COVID-19 twice weekly—whether symptomatic or not.  (Bonkowski Exemption Determination.) SOCCCD informed Bonkowski he could instead take paid and, then, unpaid leave in the

---

[8] SOCCCD also granted Perez's request for a medical-condition exemption to the institution's Mandate. (Compl. ¶ 117.)

[9] At oral argument, SOCCCD proffered, and Perez—who attended the hearing—admitted, that Perez had resigned on October 31, 2022.

alternative.[10]  (*Id.*; Vyskocil Decl. ¶ 15.)  While it is unclear when and how Bonkowski accepted the terms of his accommodation, Vice Chancellor Vyskocil attested on July 11, 2022 that Bonkowski was "in good standing" and that, "[s]o long as [he] continues to comply with the twice-weekly testing requirement . . ., there is no danger to [his] employment with SOCCCD."  (Vyskocil Decl. ¶ 15.)

<u>Judy George ("George")</u>:  George was a GCCCD employee who served as a full-time Chemistry instructor.  (Gallagher Decl. ¶¶ 6, 9.)  GCCCD approved her request for a sincerely-held religious belief exemption on December 1, 2021.  (Compl. ¶ 79; *see also* Gallagher Decl. ¶ 6.)  In early January 2022, GCCCD informed George that, because the "essential functions of her teaching position required proximity to students and staff throughout the workday . . . remote work was not a reasonable accommodation [for her]."  (Gallagher Decl. ¶ 6.)  However, GCCCD informed George that, "while remote work was not a reasonable accommodation, the use of her accrued paid or unpaid leave through June 30, 2022 as an accommodation was approved."  (*Id.*)  Although George accepted this accommodation, she tendered her retirement papers in February 2022; the GCCCD governing board accepted George's resignation in March and her retirement became effective July 2022.  (*Id.* ¶ 9.)  Hence, George is no longer employed by GCCCD.  (*Id.*)

<u>Patricia Sparks ("Sparks")</u>:  Sparks is a GCCCD employee who serves as an Administrative Assistant IV.  (Gallagher Decl. ¶ 7.)  GCCCD approved Sparks' request for a sincerely-held religious belief exemption on January 21, 2022.  (Compl. ¶ 87; Gallagher Decl. ¶ 7; Sparks Exemption Determination, Ex. N to Compl.)  On January 21, 2022, GCCCD determined that, because "the essential functions of her position required

---

[10] During the "interactive accommodation process," Bonkowski raised a religious objection to testing for COVID-19.  (Compl. ¶ 133.)  He is the only Plaintiff alleged to have raised this objection at any stage of the exemption and accommodation process.  Vice Chancellor Vyskocil immediately dismissed Bonkowski's objection, citing statements Bonkowski previously made in his exemption application, which belied the premise he harbored a religious-based objection to antigen testing.  She informed Bonkowksi he had two options:  either agree to SOCCCD's testing requirements or accept paid and/or unpaid leave.  (*See* Email Correspondence between Bonkowski and Vyskocil, Ex. LL to Compl.)

22cv0424

her physical presence at a front desk location . . .[,] remote work was not a reasonable accommodation." (Gallagher Decl. ¶ 7.) However, GCCCD informed Sparks that, "while remote work was not a reasonable accommodation, the use of her accrued paid or unpaid leave through June 30, 2022 as an accommodation was approved." (*Id.*) Vice Chancellor Gallagher attests that GCCCD revised Sparks' accommodation on June 14, 2022, pursuant to an institution-wide reassessment. (*Id.* ¶ 10.) GCCCD determined that Sparks could work onsite, notwithstanding she remains unvaccinated, provided that "she wears a mask." (*Id.*) Sparks accepted these terms and returned from leave on July 5, 2022. (*Id.*) However, GCCCD represented at oral argument that its accommodations requiring testing and, more relevant to Sparks, masking had been eliminated, and that its Mandate would be lifted effective December 2022.

### D.    This Lawsuit

On March 30, 2022, Plaintiffs commenced the instant action, naming as Defendants over thirty individuals and entities associated with the CCDs, including the CCDs themselves. (Compl. ¶¶ 11–47.) The Complaint asserts a facial challenge to the CCDs' Vaccine Requirements premised on a myriad of constitutional grounds and Title VII of the Civil Rights Act.[11] Specifically, the Complaint lodges the following claims:[12]

---

[11] A constitutional challenge to a statute can be either "facial" or "as-applied." Nicholas Quinn Rosenkranz, *The Subjects of the Const.*, 62 Stan. L. Rev. 1209, 1235–42 (2010); *see also Young v. Hawaii*, 992 F.3d 765, 779 (9th Cir. 2021), *vacated on other grounds* 142 S. Ct. 2895 (Mem.) (2022).

A "facial challenge is a challenge to an entire legislative enactment or provision." *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011). "[I]f a [government law, rule, or policy] is found facially defective it 'is void *in toto*, barring all further actions under it, in th[e instant], and every other case[.]" Henry Paul Monaghan, *Overbreadth*, 1981 Sup. Ct. Rev. 1, 5, 32 n.134. For that reason, "[i]t is no secret that a facial challenge to a statute is more difficult to prove than an as-applied challenge." *Young*, 992 F.3d at 779 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Conversely, an as-applied challenge "is a claim directed at the execution of the law as to plaintiff." *Id.*; *see* Richard H. Fallon, Jr., *As-Applied & Facial Challenges & Third-Party Standing*, 113 Harv. L. Rev. 1321, 1334 (2000)).

Here, the Complaint is devoid of allegations that raise even an inference Plaintiffs seek to launch as-applied challenges to the CCDs' Vaccine Requirements. Plaintiffs clearly seek to invalidate them *in toto*. Hence, their challenge is strictly facial.

22cv0424

(1) **Count I:**   The CCDs' Vaccine Requirements violate the Equal Protection Clause of the Fourteenth Amendment because the accommodation regimes require exempt employees to undertake COVID-19 mitigation measures, namely testing and masking, that are not required of vaccinated employees (Compl. ¶¶ 219–28);

(2) **Count II**:   The CCDs' Vaccine Requirements violate Plaintiffs' Substantive Due Process right to liberty under the Fifth Amendment (*id.* ¶¶ 229–34);

(3) **Count III**:   The CCDs' Vaccine Requirements violate Plaintiffs' Substantive Due Process right to bodily integrity under the Fifth Amendment (*id.* ¶¶ 235–55);

(4) **Count IV**:   The CCDs' Vaccine Requirements violate the Free Exercise Clause of the First Amendment (*id.* ¶¶ 256–76)[13];

(5) **Count V**:   The CCDs' Vaccine Requirements violate Plaintiffs' Substantive Due Process rights to privacy under the Fifth Amendment (*id.* ¶¶ 277–86);

(6) **Count VI**:   The CCDs' Vaccine Requirements violate Plaintiffs' Fourth Amendment right against unreasonable search and seizures (*id.* ¶¶ 287–97); and

---

[12] Although the Complaint asserts eight causes of action, the eighth cause of action, which is a claim under 42 U.S.C. § 1983, is not a cognizable, standalone claim. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989).

[13] The Court does not construe the Complaint as alleging any Plaintiff has a religious objection to testing or masking. As explained above, only one Plaintiff—Bonkowski—ever appeared to espouse religious objection to a CCDs' testing and/or masking requirements. (Compl. ¶ 133.) He does not renew that objection in the Complaint. The Complaint contains just a single allegation in its approximately 400 enumerated paragraphs that even suggests Plaintiffs have religious objections to those preventative measures: it is entirely conclusory. (Compl. ¶ 274 ("Their sincerely held religious belief compels [Plaintiffs] to abstain from receiving any of the currently available COVID-19 vaccines *and tests*." (emphasis added)).) The Complaint is otherwise devoid of any facts from which this Court could infer a free exercise claim against the masking and testing components of the CCDs' Vaccine Requirements. *See Walker v. Beard*, 789 F.3d 1125, 1138 (9th Cir. 2015) ("In general, a plaintiff will have stated a free exercise claim if: (1) 'the claimant's proffered belief [is] sincerely held'; and (2) 'the claim [is] rooted in religious belief, not in purely secular philosophical concerns.'" (quoting *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994))).

22cv0424

(7) **Count VII**:  The CCDs' Vaccine Requirements violate Title VII of the Civil Rights Act because the accommodations implemented discriminate on the basis of religion (*id.* ¶¶ 298–308).[14]

After waiting almost three months, Plaintiffs served Defendants with the Complaint on June 20, 2022.  (*See* Certificates of Service, ECF Nos. 3–26; Waivers of Service, ECF Nos. 26–39.)  That same day, Plaintiffs filed the instant TRO Application, *ex parte*, effectively seeking to enjoin the CCDs' Vaccination Requirements.  (TRO App. at 1:17-22.)  On June 23, 2022, this Court ordered Plaintiffs to serve Defendants with their TRO Application, which they did.  (Order, ECF No. 42; Affidavits of Service, ECF Nos. 43–59.)   In support of their TRO Applications, Plaintiffs submitted their Memorandum and 26 declarations, only five of which are on behalf of a named Plaintiff in this case.[15]  Defendants filed their consolidated Opposition on July 12, 2022.  (ECF No. 68.)  Plaintiffs replied on July 20, 2022.  (ECF No. 71.)  The Court held a hearing on Plaintiffs' preliminary injunction and Defendants' pending motion to dismiss (ECF No. 72) on November 2, 2022.

//

//

//

---

[14] Plaintiffs devote substantial space in both their Complaint and Memorandum to attacking the CCDs' authority under California law to issue the Vaccine Requirements.  But Plaintiffs never tie those allegations and legal arguments to one of the above-mentioned federal constitutional or statutory claims.  To the extent Plaintiffs allege the CCDs' Vaccine Requirements overstep the powers conferred to California pursuant to the Tenth Amendment, there does not exist a cognizable claim for violation of a state's police powers under the Constitution; a plaintiff must base their claim on one of the Constitution's restrictions on state government.  *Forbes v. Cty. of San Diego*, No. 20-cv-0998-BAS-JLB, 2021 WL 843175, at *3 (S.D. Cal. Mar. 4, 2021) (citing *Bimber's Delwood, Inc. v. James*, 496 F. Supp. 3d 760 (W.D.N.Y. 2020)).

[15] Plaintiffs' George, Sparks, Meza, Planeta, and Perez annex their declarations to the Memorandum.  (*See* Declaration of Judy George ("George Decl."), Ex. 16 to Mem., ECF No. 40-17; Declaration of Patricia Sparks ("Sparks Decl."), Ex. 17 to Mem., ECF No. 40-18; *see also* Declaration of Dora Meza, Ex. 1 to Mem., ECF No. 40-2; Declaration of Mary Kate Planeta, Ex. 4 to Mem., ECF No. 40-6; Declaration of Jess Perez, Ex. 23 to Mem., ECF No. 40-24.)

- 14 -

## II.   LEGAL STANDARD

It is well-settled the standards for issuing a temporary restraining order and a preliminary injunction are "substantially identical." *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brushy & Co.*, 240 F.3d 832, 839 & n.7 (9th Cir. 2001). A court's power to rearrange the relationship of parties prior to a determination on the merits through the ordinary course of litigation is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to [preliminary relief]." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The moving party has the burden of persuasion. *Hill v. McDonough*, 547 U.S. 573, 584 (2006).

Plaintiffs seeking preliminary relief "must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forrest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20). In the Ninth Circuit, courts may apply the "sliding scale" analysis as an alternative to the *Winter* test. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) (interpreting *Winter* and explaining that the "sliding scale" test for pre-trial injunctive relief remains valid). Under this analytical framework, "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted; emphasis in original); *see Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984) (defining a "serious question" as one which the plaintiff "has a fair chance of success on the merits").

But even if the court employs the sliding-scale approach, pre-trial injunctive relief may not issue if the movant fails to show the existence of any one *Winter* factor.

22cv0424

*Cottrell*, 632 F.3d at 1132 (providing that all four factors must be satisfied even under a sliding-scale analysis).

## III.   ANALYSIS

### A.   *Jacobson* and Subsequent Supreme Court Precedent

Before delving into the *Winter* factors, the Court takes a moment to paint the legal landscape in which this action takes place.

The Tenth Amendment provides, "The powers not delegated to the United States by the Constitution, nor prohibited to it by the states, are reserved to the states respectively, or the people."   U.S. Const. amend. X.   "The States' traditional police power is defined as the authority to provide for the public health, safety, and morals." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 569 (1991); *Velasquez-Rios v. Wilkinson*, 988 F.3d 1081, 1088–89 (9th Cir. 2021) ("Historically, the states' police powers are broad in permitting state decisions that relate to public health, safety, and welfare, so long as state laws do not violate the federal Constitution." (citing *Chi., B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 584 (1906)).   "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, [and] health . . . of all persons." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) (quoting *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)).

Since *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), it has been well-settled for approximately 115 years that embedded within the States' police power is the power to issue vaccine mandates, as necessary for public health.   *Zucht v. King*, 260 U.S. 174, 176 (1920) ("[It is] settled that it is within the police power of a state to provide for compulsory vaccination.")   At issue in *Jacobson* was a law Massachusetts passed amid a horrific outbreak of smallpox.   In essence, the State authorized its municipalities to institute compulsory vaccination as necessary for public health and safety, and to use criminal penalties as a method to enforce compliance.   Pursuant to this law, Cambridge passed an ordinance mandating smallpox vaccination for all adults within the jurisdiction, without exemption.   Cambridge provided a lone exemption for children whose parents

- 16 -

were able to present a physician-signed certificate excusing them from compulsory vaccination.   But when the time came for Henning Jacobson—a Swedish minister residing in Cambridge—to submit to vaccination, he refused.   Jacobson was arrested, prosecuted, found guilty, and jailed until he agreed to pay the $5.00 criminal fine.   197 U.S. at 13–14, 21.

Following his release, Jacobson challenged the legality of the Massachusetts law authorizing the Cambridge ordinance, eventually reaching the Supreme Court.   *Jacobson*, 197 U.S. at 11.   Jacobson alleged the law derogated rights secured to him via the Fourteenth Amendment because "a compulsory vaccination law is unreasonable, arbitrary, and oppressive, and therefore, hostile to the inherent right of every freeman to care for his own body and health in such way as to him seems best," and that enforcement of a vaccine mandate upon an objector is "nothing short of an assault upon his person," no matter the reason for the objection.[16]   *Id.* at 26.   The Supreme Court rejected Jacobson's challenge, finding "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members."   *Id.* at 27.   Effectively applying what is known in today's modern constitutional framework as "rational basis review," *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring) (comparing *Jacobson*'s "reasonableness" standard with the modern rational basis test), the *Jacobson* Court concluded compulsory vaccination against smallpox—without exception—was a reasonable and appropriate use of Massachusetts' police powers.   Moreover, the Supreme Court reasoned the Massachusetts law did not derogate or infringe upon any fundamental right, *Jacobson*, 197 U.S. at 26. *Id.* ("There is, of course, a sphere within which the individual may assert the supremacy of his own will, and rightfully dispute the authority of any human government— especially of any free government existing under a written constitution, to interfere with

---

[16] Notably, Henning Jacobson did not invoke the fundamental rights under the First Amendment alleged to be at issue here. *See Jacobson*, 197 U.S. at 14.

- 17 -

the exercise of that will.  But it is equally true that in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great danger, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.").

In many ways, the Supreme Court's oldest precedent concerning the constitutionality of compulsory vaccination remains its touchstone.  More than a century after the *Jacobson* decision, courts have consistently applied that precedent throughout the instant pandemic to uphold mandatory vaccination policies.  *Legaretta v. Macias*, --- F. Supp. 3d. ---, 2022 WL 1443014, at *10 (D.N.M. May 6, 2022) (observing "[i]n the context of the current pandemic, courts consistently have applied *Jacobson* to [uphold] mandatory vaccine policies" and collecting similar cases citing *Jacobson* as authoritative); *accord We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 n.35 (2d Cir. 2021) (per curiam) ("[F]or over 100 years [*Jacobson*] has stood firmly for the proposition that the urgent public health needs of the community can outweigh the rights of an individual to refuse vaccination.  *Jacobson* remains binding precedent.").

This Court also finds *Jacobson* instructive for another reason:  it underscores that in assessing States' rationale for imposing compulsory vaccination mandates in the interest of public health and safety, federal courts must remain faithful to the core principle of federalism.  This requires Article III courts to assume the relevant State body was "aware of [] opposing theories" as to how best to mitigate viral outbreak, and was "compelled, of necessity," to institute a vaccination mandate.  *Jacobson*, 197 U.S. at 30–31.  Put differently, *Jacobson* stands for the legal premise that where a challenge fails to allege a State-issued vaccine mandate abuts upon some fundamental right, it is not the federal courts' role to second guess the State's difficult determination that compulsory vaccination is the most effective measure to protect public health.  *Id.* at 30 ("[It is] no part or function of a court . . . to determine which one of the two modes was likely to be the most effective for protection of the public against disease.").

22cv0424

But it would be a mistake to assume *Jacobson* is dispositive of every vaccine mandate to come before a federal court on a constitutional challenge.  *Calvary Chapel Dayton Valley v. Sisolak*, 140 S. Ct. 2603, 2608 (Alito, J., dissenting) ("[I]t is a mistake to take the language in *Jacobson* as the last word on what the [C]onstitution allows public officials to do during the pandemic.").  Recent Supreme Court decisions in *Roman Catholic Diocese*, 141 S. Ct. at 63, and *Calvary Chapel*, 140 S. Ct. at 2603 appear to confirm *Jacobson* does not displace modern constitutional analysis but rather fits within it; "the traditional legal test associated with the right at issue" still governs even challenges to compulsory vaccination.  *Roman Catholic Diocese*, 141 S. Ct. at 70.  Henning Jacobson's Fourteenth Amendment claim did "not involve suspect classifications based on race or some other [suspect class]," nor did Jacobson allege the Massachusetts law infringed upon some other fundamental right secured by the Constitution.  *Id.* (citing *Jacobson*, 197 U.S. at 27).  Hence, in applying a predecessor version of rational basis review, the *Jacobson* Court handled the challenge to Massachusetts' vaccine mandate no differently than would a federal court today under the predominant constitutional framework.  *Id.*

But where different rights are involved, different standards of constitutional analysis must follow.  This approach includes the Free Exercise Clause, which entails strict scrutiny for "law[s] burdening religious practice that is not neutral or not of general application."  *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *Calvary Chapel*, 140 S. Ct. at 2608 ("Language in *Jacobson* must be read in context, and it is important to keep in mind that *Jacobson* primarily involved a substantive due process challenge . . . . It is a considerable stretch to read the decision as establishing the test to be applied when statewide measures of indefinite duration are challenged under the First Amendment or other provisions not at issue in that case.").  It also includes the Equal Protection Clause, which requires more exacting analysis of state laws that classify "suspect" and "quasi-suspect" groups of people.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440–41 (1985).

Simply put, Supreme Court precedent (including *Jacobson*) mandates that this Court assess the nature of each constitutional right alleged to be at stake, and then conduct "a tiered-application of the requisite standard of judicial review and attendant levels of deference to [the CCDs]." *Halgren v. City of Naperville*, 577 F. Supp. 3d 700, 727 (N.D. Ill. 2021).  The Court follows this approach below in assessing the likelihood Plaintiffs will succeed on the merits of the claims on which they predicate their Motion for a preliminary injunction.

### B.   Likelihood of Success on the Merits

The first *Winter* factor requires Plaintiffs to demonstrate "serious questions going to the merits" of their claims, and that they are likely to succeed on those questions of merit.

Plaintiffs predicate their request for pre-trial relief upon three of their seven total claims:  their equal protection claim (Count I); their free exercise claim (Count IV); and their Title VII claim (Count VII).  Because the burden of establishing entitlement to a preliminary injunction rests with Plaintiffs, the Court considers likelihood of success only for those claims Plaintiffs endeavored to show warrant relief.

### 1.   Equal Protection

"The Equal Protection [C]lause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *Cleburne*, 473 U.S. at 439  (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

An equal protection claim may be established in two ways.  First, Plaintiffs may claim Defendants intentionally discriminated against them based upon their membership in a protected class.  *See*, *e.g.*, *Lee v. City of L.A.*, 250 F.3d 668, 686 (9th Cir. 2001); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005).  This theory triggers strict scrutiny review of the subject law, rule, or policy.  *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 307–08 (2013).  Second, Plaintiffs may claim membership of a non-suspect group that Defendants treated differently than similarly situated individuals, without any

rational basis or legitimate governmental purpose for doing so. *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *San Antonio Sch. Dist. v. Rodriguez*, 411 U.S. 1, 93 (1973).

Plaintiffs acknowledge unvaccinated individuals do not constitute a suspect class and, thus, their equal protection claim does not trigger strict scrutiny.  (Compl. ¶ 226 (alleging Plaintiffs' equal protection claim triggers rational basis review).)   Instead, Plaintiffs allege an equal protection claim under the second of the above-mentioned theories.  To prevail on this sort of equal protection claim, Plaintiffs must prove three essential elements:  (1) they are members of an identifiable class; (2) they were treated differently from others similarly situated; and (3) there is no rational basis for the difference in treatment. *Vill. of Willowbrook*, 528 U.S. at 564.

Plaintiffs concede the CCDs have a legitimate interest in "control[ling] the exposure and minimiz[ing] the spread of COVID-19 in the workplace" (Compl. ¶ 268) but contend requiring only unvaccinated CCD employees to undertake additional preventative measures, like testing and masking, is an "arbitrary and irrational" means to that end (*id.* ¶¶ 226–27).  According to Plaintiffs, the "[c]urrent scientific understanding of the COVID-19 [] is that both [vaccinated and unvaccinated individuals] may contract and spread the virus," and, thus, both groups are equally capable of causing a COVID-19 campus outbreak.  (*Id.* ¶ 227.)  Hence, COVID-19 mitigation measures that target only the unvaccinated violate the Equal Protection Clause.

Plaintiffs' assertion vaccinated and unvaccinated CCD employees and students are similarly situated regarding the risk of transmitting COVID-19 rests upon their contentions about vaccine efficacy.  They interpret various CDC statements and data as essentially demonstrating vaccines do not provide any material protection against Delta-variant derived infection and, therefore, largely are useless in stemming the spread of COVID-19.  In particular, Plaintiffs proffer:

- A statement, dated July 30, 2021, from CDC Director Rochelle P. Walensky, MD, MPH, indicating the CDC now "recommend[s] that

- 21 -

everyone wear a mask in indoor public settings in areas of substantial and high transmission, *regardless of vaccination status*," in light of data indicating that, "unlike with other variants, vaccinated people infected with Delta can [catch and] transmit the virus."  Statement of CDC Director Rochelle P. Walensky, MD, MPH, on Today's Morbidity and Mortality Weekly Report ("Walensky Statement"), *available at* https://www.cdc.gov/media/releases/2021/s0730-mmwr-covid-19.html (last accessed October 28, 2022); (*see* Compl. ¶ 52 (citing Walensky Statement).)

- An August 5, 2021 interview of Walensky by Wolf Blitzer on CNN, during which she stated "[vaccines] continue to work well with 'Delta' with regard to severe illness and death, but what they can't do anymore is prevent transmission."  (Compl. ¶ 54.)

- A  document published by the CDC to its website on September 15, 2021, entitled "Science Brief: COVID-19 Vaccines and Vaccination" ("Science Brief"), which states, "For the Delta variant, early data indicate vaccinated and unvaccinated persons infected with Delta have similar levels of viral RNA and culturable virus detected, indicating that some vaccinated people infected with the Delta variant . . . may be able to transmit the virus to others." Science Brief, *available at* https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/fully-vaccinated-people.html (last accessed October 28, 2022); (Compl. ¶ 57.)

- CDC's "Morbidity and Mortality Weekly Report" for January 28, 2022 ("MMWR"), finding that data from New York and California indicated "infection-derived protection was higher after the Delta variant became predominant, a time when vaccine-induced immunity for many persons declined because of immune evasion and immunological waning." CDC MMWR, *available at* https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm (last accessed October 28, 2022); (Compl. ¶ 67.)

"The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citing *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)); *Wright v. Incline Vill. Gen. Improvement*

22cv0424

*Dist.*, 665 F.3d 1128, 1140 (9th Cir. 2011) ("Evidence of different treatment of unlike groups does not support an equal protection claim."). As a matter of logic, unvaccinated and vaccinated persons are "in all relevant respects alike" only if they pose an approximately equal risk of transmitting COVID-19 to others. The Science Report and MMWR Plaintiffs proffer do not support that premise. In fact, they belie it. MMWR ("[V]accination remains the safest and primary strategy to prevent [COVID-19] infections.").

For example, the Science Brief states, "data show fully vaccinated persons are less likely than unvaccinated persons to acquire [COVID-19]," and that "[i]nfections with the Delta variant in vaccinated persons potentially have reduced transmissibility than infections in unvaccinated persons, although additional studies are needed." Science Brief. It further states that although "[e]arly evidence suggests infections in fully vaccinated persons caused by the Delta variant . . . may be transmissible to others . . ., [COVID-19] transmission between unvaccinated persons is *the primary cause of continued spread*." *Id.* (emphasis added).

While the MMWR's findings are more nuanced, they, too, fail to buttress Plaintiffs' allegations of substantial similarity. As an initial matter, Plaintiffs appear to rely heavily upon the MMWR's findings that—once the Delta variant became "predominant" in October 2021—case rates among those who had survived a prior infection—both vaccinated and unvaccinated—were lower than among those who had never caught the virus. MMWR ("Rates among vaccinated persons without a previous COVID-19 diagnosis were consistently higher than rates among unvaccinated persons with a history of COVID-19 (3.1-fold higher . . . in California and 1.9-fold higher in New York)."). But this information is inapposite to Plaintiffs' substantial similarity allegations. Plaintiffs do not allege they have infection-derived immunity. Nor do they allege membership in a more circumscribed class of unvaccinated individuals consisting only of those with a prior COVID-19 diagnosis.

- 23 -

22cv0424

Even if Plaintiffs had, the MMWR still militates against a finding the groups are similarly situated.   The MMWR shows that for individuals with a prior COVID-19 diagnosis, case rates among vaccinated persons were multi-fold lower than unvaccinated persons.   MMWR ("[C]ompared with COVID-19 case rates among unvaccinated persons without a previous COVID-19 diagnosis, case rates were . . . 29.0-fold lower (California) and 14.7-fold lower (New York) among unvaccinated persons with a previous diagnosis, and 32.5-fold (California) and 19.8-fold lower (New York) among vaccinated persons with a previous diagnosis[.]").   Thus, the MMWR suggests vaccination provides an additional layer of immunological protection against the Delta variant beyond infection-derived immunity.   It cannot be said that vaccinated and unvaccinated individuals are "in all relevant respects alike" if the key evidence proffered by Plaintiffs demonstrates the degree of transmission is materially higher among unvaccinated individuals.

Plaintiffs' equal protection claim is doomed if all they can proffer to show unvaccinated and vaccinated CCD employees and students are similarly situated is the Science Brief and MMWR.   Accordingly, the Court concludes Plaintiffs fail to satisfy the first *Winter* factor as to Count I.

### 2.   Free Exercise

The Free Exercise Clause of the First Amendment provides, "Congress shall make no law . . . prohibiting the free exercise [of religion]."   U.S. Const. amend. I.   "[L]aws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise [C]lause so long as they are neutral and generally applicable."   *Fulton v. City of Philadelphia*, --- U.S. ----, 141 S. Ct. 1868, 1876 (2021) (citing *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 878–82 (1990)).

If a challenged rule or policy is neutral and generally applicable, the Ninth Circuit instructs its district courts to employ rational basis review, which asks whether the government action at issue is "rationally related to a legitimate governmental purpose." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1084 (9th Cir. 2015).   Rational basis review is the lightest and most deferential form of constitutional scrutiny.   *See* Jane R. Bambauer &

- 24 -

Toni M. Massaro, *Outrageous and Irrational*, 100 Minn. L. Rev. 281, 340 (2015) (describing rational basis review as "the lightest of checks on government power"—a "floor test[] [that is] hard for the government to flunk").  However, if a challenged rule or policy is not neutral or is not generally applicable, strict scrutiny applies.  *Lukumi*, 508 U.S. at 531–34.  This rigorous standard requires the government to "demonstrate its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest."  *Kennedy v. Bremerton Sch. Dist.*, --- U.S. ----, 142 S. Ct. 2407, 2422 (2022) (citing *Lukumi*, 508 U.S. at 546).

The Court now separately considers whether the Mandates and the Accommodation Frameworks of the CCDs' Vaccine Requirements are neutral and generally applicable, and then applies the appropriate tier of scrutiny.

### a.   Mandates

#### i.   *Fulton* Analysis

Plaintiffs do not contest the Mandates are neutral.  Instead, they aver the Mandates are not generally applicable because they include religious exemptions.  Nevertheless, the Court analyzes both neutrality and generally applicability in the interest of completeness.

<u>Neutrality</u>:  "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 141 S. Ct. at 1877 (citing *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights. Comm'n*, --- U.S.---, 138 S. Ct. 1719, 1730–32 (2018)).  Neutrality encapsulates two separate but related concepts:  "facial neutrality" and "operational neutrality."  *Lukumi*, 508 U.S. at 533–40.  "A policy must be both facially and operationally neutral to avoid strict scrutiny."  *UnifySCC*, 2022 WL 2357068, at *6.

"A law lacks facial neutrality if it refers to a religious practice without secular meaning discernable from the language or context."  *Stormans*, 794 F.3d at 1076 (quoting *Lukumi*, 508 U.S. at 533).  In the domain of COVID-19 vaccine requirements, the Ninth Circuit instructed in *Doe v. San Diego Unified School District*, 19 F.4th 1173, 1178 (9th Cir. 2021), that a mandate which makes no reference to religion is facially neutral.  Other

circuit courts have provided additional color concerning the hallmarks of a facially neutral vaccine requirement.  For example, the Second Circuit in *We The Patriots USA*, 17 F.4th at 281, held COVID-19 vaccine mandates that "do[] not single out employees who decline vaccination on religious grounds" but rather "appl[y] to all 'personnel'" qualify as "facially neutral" under *Fulton* and its predecessors.  *See also Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021) (holding COVID-19 vaccine mandate is "neutral on its face" because it applies to "all" staff and contractors).

A rule lacks operational neutrality if, despite being facially neutral, it operates in such a way that "impermissibly attempt[s] to target religious practices through careful legislative drafting." *Lukumi*, 508 U.S. at 534–35.  Put differently, the operational neutrality inquiry is essentially a stopgap; it forecloses application of rational basis review to government action that, despite not referencing religion, is designed to target "religious conduct for distinctive treatment" through its operation, not to accomplish legitimate policy objects. *Id.*

The Court is persuaded by the reasoning of the Honorable Beth Labson Freeman, Northern District of California, in *UnifySCC*, 2022 WL 2357068, at **8–10, where she assessed the neutrality of a substantially similar workplace vaccine mandate instituted by the county of Santa Clara.  Like the Mandates here, in *UnifySCC*, Santa Clara instituted a compulsory vaccination policy making no reference to religion—beyond providing an exemption for religious reasons—and that did not "single out employees who decline vaccination on religious grounds." *Id.* (quoting *We The Patriots*, 17 F.4th at 281).  There, as here, the *UnifySCC* plaintiffs did not present an iota of evidence showing the true object of the facially neutral mandate was to attack protected religious conduct.  *Id.* From these facts, District Judge Freeman concluded the Santa Clara COVID-19 policy would likely be found to be entirely neutral.  Similarly, this Court concludes Plaintiffs have failed to demonstrate they are likely to succeed in proving the Mandates are not facially or operationally neutral.

22cv0424

General Applicability:  "A government policy will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'"  *Kennedy*, 142 S. Ct. at 2422 (quoting *Fulton*, 141 S. Ct. at 1877).  This Court's survey of case law elucidates the use of amorphous standards, like "good cause," to administer exemptions, *Smith*, 494 U.S. at 878–82, or the conferral of wide latitude to government officials to grant or deny exemptions, *Fulton*, 141 S. Ct. at 1877–78, typically precludes a finding of general applicability and triggers strict scrutiny.  These mechanisms confer too much discretion to government actors, impermissibly inviting them "to decide which reasons for not complying with [a] policy are worthy of solicitude."  *Fulton*, 141 S. Ct. at 1879.  Conversely, a rule that administers exemptions only to "objectively defined categories of persons" is generally applicable. *Id.*

First, based on the record before it, the Court finds Plaintiffs are unlikely to show the CCDs' Mandates "prohibit religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Kennedy*, 142 S. Ct. at 2422 (quoting *Fulton*, 141 S. Ct. at 1877).  The record demonstrates the Mandates do the opposite:  they explicitly accommodate employees with sincerely-held religious objections to vaccination by permitting them to apply for an exemption from the Mandates on that basis.  *Cf. UnifySCC*, 2022 WL 2357068, at *6 (finding generally applicable a workplace COVID-19 vaccine mandate that employed a religious-belief exemption).

Second, Plaintiffs are unlikely to demonstrate the Mandates employed "a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877–78. Again, *UnifySCC* is instructive.  There, like here, exemptions to Santa Clara's workplace COVID-19 vaccine mandate were determined based upon employees' responses to a form questionnaire all applicants needed to fill and submit to obtain an exception.  And there, like here, plaintiffs challenging the mandate presented no evidence that defendants

- 27 -

looked beyond the face of those forms and exercised their own discretion to make exemption determinations.  Nor did they provide evidence showing Santa Clara provided a different standard for administering exemptions to a select group of employees. Accordingly, the Court reaches the same conclusion here as District Judge Freeman did in *UnifySCC* and concludes the Mandates do not appear to employ an impermissible mechanism for individualized and discretionary exemptions.  2022 WL 2357068, at *8.

Plaintiffs argue the mere inclusion of a sincerely-held religious exemption defeats the Mandates' general applicability.  (Mem. at 17:26–18:6.)  The Court is unpersuaded. Taking Plaintiffs' argument to its logical conclusion, rules that provide no religious exemption at all are on stronger footing under the Free Exercise clause than rules that provide exceptions on religious grounds and, thus, treat religious conduct more favorably. This cannot be.   Were this true, governments would be perversely incentivized "to provide no religious exemption process in order to avoid strict scrutiny."   *UnifySCC*, 2022 WL 2357068, at *8 (quoting *Ferrelli v. Unified Ct. Sys.*, No. 1:22-cv-0068 (LEK/CFH), 2022 WL 673863, at *7 (N.D.N.Y. Mar. 7, 2022)).   More importantly, Plaintiffs rely principally on *Fulton* for the notion inclusion of a religious exemption to an otherwise neutral rule triggers strict scrutiny, but that case provides no such support. *Fulton* merely held a mechanism for exemptions that confers "sole discretion" to a government official to approve or deny fails the general applicability test.  141 S. Ct. at 1878.   For the reasons described above, the mechanism for granting exemptions employed by the rule at issue in *Fulton* is not remotely similar to the mechanism employed by the CCDs for administering exemptions to their Mandates.

Accordingly, Plaintiffs have not shown they are likely to prevail in proving the Mandates are not generally applicable.

### ii.   Tiers of Review

Having found the Mandates appear to be both neutral and generally applicable, the Court easily concludes rational basis review applies.  *Stormans*, 794 F.3d at 1084.

22cv0424

"Rational basis review is highly deferential to the government, allowing any conceivable rational basis to suffice." *Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*, 880 F.3d 450, 457 (9th Cir.), *amended*, 881 F.3d 792 (9th Cir. 2018). Rational basis review entails a two-step analysis.  First, "[d]oes the challenged [rule] have a legitimate purpose?" *W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 668 (1981).  Second, "[w]as it reasonable for the [government] to believe that use of the challenged [rule] would promote that purpose." *Id.*  Under this test, the Mandates are "not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993).

As alluded to above, *see supra* Sec. III.A, in the context of challenges to State-issued vaccine mandates that do not abridge any fundamental right, Article III courts must conduct rational basis review with a keen eye towards federalism principles. *Cf. Halgren*, 577 F. Supp. 3d at 724 (opining one of the "three significant concepts" underscored in *Jacobson* "that continue to shape the controlling body of law" is "concerns of federalism").  *Jacobson* requires courts to assume the relevant State body was aware "opposing theories" concerning a vaccine's efficacy, and was "compelled, of necessity," to choose to institute a mandate as opposed to alternative mitigation and prevention measures. *Jacobson* warns courts that it is not their role to insert themselves in these debates, which are reserved for the States pursuant to the Tenth Amendment. *Jacobson*, 197 U.S. at 30–31 ("[It is] no part of the function of a court . . . to determine which one of the two modes was likely to be the most effective for protection of the public against disease.").  To insert itself in these difficult decisions would effectively contravene core principles of federalism. *Halgren*, 577 F. Supp. 3d at 724.

Plaintiffs acknowledge the CCDs have a legitimate interest in "control[ling] the exposure and minimiz[ing] the spread of COVID-19 in the workplace." (Compl. ¶ 268.) In *Roman Catholic Diocese of Brooklyn*, Justice Gorsuch observed "[s]temming the spread of COVID-19 is unquestionably a compelling interest," not just a legitimate one.

141 S. Ct. at 67; *Slidewaters LLC v. Wash. State Dep't of Lab. & Indus.*, 4 F.4th 747, 758 (9th Cir. 2021). The Ninth Circuit similarly has concluded that states have a compelling interest "in reducing community spread of COVID-19, protecting high-risk individuals from infection, and preventing the overwhelming of its healthcare system as a result of increased hospitalizations." *South Bay*, 985 F.3d at 1142 (9th Cir. 2021).

Like Plaintiffs' equal protection claim, their free exercise claim rises and falls with the veracity of their assertions about the COVID-19 vaccines efficacy. Plaintiffs argue mass vaccination no longer is a rational means to achieve the State's legitimate interest in disease prevention because data suggests vaccines are ineffective against the Delta variant—the predominant strain at the time of the pending Motion.   But Plaintiffs essentially ask this Court to do what the Supreme Court in *Jacobson* explicitly cautions against:   to examine the veracity of "opposing theories" about vaccine efficacy and invalidate the relevant State body's decision to authorize compulsory vaccination on that basis.  The Court will not do this.  "Rational speculation" is enough to support the CCDs' decision to institute their Mandates.  *Beach Commc'ns, Inc.*, 508 U.S. at 315.

Here, "rational speculation" supports the notion that mass vaccination against a contagious disease like COVID-19 limits the incidence of infection, hospitalization, and death.   In concluding vaccine mandates are a rational method to reduce COVID-19 infection and the risk of serious illness, hospitalization, and death related thereto, the Court rests on all fours with its sister courts in the Ninth Circuit and other circuit courts. *Williams v. Brown*, 567 F. Supp. 3d 1213, 1228 (D. Ore. 2021); *see also UnifySCC*, 2022 WL 2357068, at *8 (collecting cases); *see also Legaretta*, 2022 WL 1443014, at **8–12 ("The requirements set forth in the Vaccine Directive, thus grounded in guidance from local health authorities, are rationally related to Defendants' legitimate purpose of protecting the community 'against an epidemic of disease [that] threatens the safety of its members.'" (quoting *Jacobson*, 197 U.S. at 27) (alteration in original)); *Does 1–6 v. Mills*, 566 F. Supp. 3d 34, 52 (D. Me. 2021) (finding vaccine mandate survived rational basis review because "unvaccinated individuals substantially more likely both to contract

22cv0424

COVID-19 and to suffer serious medical consequences as a result"); *see also Norris v. Stanley*, 567 F. Supp. 3d 818, 823 (W.D. Mich. 2021) ("Put plainly, even if there is vigorous ongoing discussion about the effectiveness of natural immunity, it is rational for [Michigan State University] to rely on present federal and state guidance in creating its vaccine mandate." (footnote omitted)).

The result would be the same even if this Court were to wade into the factual morass of Plaintiffs' claim about COVID-19 vaccines. Plaintiffs own evidence demonstrates COVID-19 vaccines reduce the risk of contracting and spreading the virus, *see supra* Sec. III.B.1, and, moreover, drastically reduce the incidence of serious illness, hospitalization, and death among those infected with COVID-19. *See* MMWR ("These results suggest that vaccination protects against COVID-19 *and related hospitalization*."); *id.* ("COVID-19 vaccination . . . provides the most robust potential against initial infection, severe illness, hospitalization, long-term sequelae, and death."); Science Report ("Available evidence suggests the currently approved or authorized COVID-19 vaccines are highly effective against hospitalization and death for a variety of strains, including Alpha (B.1.1.7), Beta (B.1.351), Gamma P.1) and Delta (B.1.617.2)."); *id.* ("All approved or authorized COVID-19 vaccines demonstrated high efficacy ($\geq$89%) against COIVD-19 severe enough to require hospitalization.").

Accordingly, Plaintiffs have failed to show a likelihood of success on the merits of their free exercise claim against the Mandates. The evidence produced shows that it is more likely than not the mandates are neutral and generally applicable and survive rational basis review.

### b.    Accommodation Frameworks

Having concluded the CCDs' Vaccine Requirements' Mandates pass constitutional muster, the Court now separately considers their Accommodation Frameworks.

#### i.    *Fulton* Analysis

Neutrality:  The Court once again considers the facial and operational neutrality, this time as to the Accommodation Frameworks.

The Accommodation Frameworks appear entirely neutral. The objective criteria for considering accommodation determinations listed in SDCCD and GCCCD's Frameworks do not include religion.  Hence, the SDCCD and GCCCD Accommodation Frameworks likely are facially neutral.  So, too, is the SOCCCD Framework.  While it does not list what criteria are considered, it is still neutral on its face because it does not "refer[] to a religious practice without secular meaning discernible from the language or context." *Stormans*, 794 F.3d at 1076.  Plaintiffs do not contend—nor do they offer any evidence indicating—that the religion of an employee (or the fact that an employee has a religious exemption) influences the CCDs' accommodations decisions.  For example, Plaintiffs do not allege employees who obtained medical-condition exemptions were treated favorably, *e.g.*, did not have to submit to weekly COVID-19 testing, as compared to employees who obtained an exemption on religious grounds.  Thus, the Court has no basis to find Plaintiffs are likely to succeed in showing the Accommodation Frameworks operate as "religious gerrymander[s]" that "target religious practices through careful legislative drafting." *See Id.* (quoting *Lukumi*, 508 U.S. at 535–37).  Hence, the Accommodation Frameworks are likely operationally neutral.

General Applicability:  The Court has no difficulty discerning the SDCCD and GCCCD Accommodation Frameworks appear generally applicable.  Under these Frameworks, SDCCD and GCCCD determine exempt employees' accommodations based on their position and the environment in which they perform their duties.  There is no evidence the nature of the exemption—*i.e.*, religious or medical—influences the type of accommodation granted, nor is there evidence that certain individuals are excused from the Accommodation Framework that otherwise applies to all exempt employees.  Thus, Plaintiffs fail to raise even a serious question these Frameworks "prohibit religious conduct while permitting secular conduct that undermines the government's assessed interests in a similar way" or employ "a mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1877.

Although Plaintiffs do not argue as much, SOCCCD's Accommodation Framework poses a more difficult question. On the one hand, the SOCCCD Vaccine Policy provides SOCCCD employees "who obtain an exemption may be subject to other safety measures beyond what is required for vaccinated individuals," including but not limited to "physical/social distancing, avoiding large gatherings, wearing acceptable facial coverings and/or other personal protective equipment; frequent handwashing and cleaning, practicing respiratory etiquette, and/or exclusion from the physical worksite when warranted." (SOCCCD Vaccine Requirement § II.3.) Yet it does not describe *how* SOCCCD administers these additional safety measures and restrictions. Nor does the Vyskocil Declaration state what factors are relevant. In that sense, SOCCCD's Accommodation Framework is a black box; it clouds this Court's insight into whether SOCCCD administers accommodations based on objective criteria. This raises a potential general applicability issue because it does not foreclose the possibility SOCCCD's Framework treats medical-condition exemptees better than religious ones, or that there exists within the SOCCCD Framework a "mechanism for individualized exemptions." *Fulton*, 141 S. Ct. at 1878.

On the other hand, at this stage of proceedings it is Plaintiffs' burden to establish— at a minimum—there exist serious questions going to the merits of its clam. Plaintiffs do not contest, nor have they presented evidence showing, SOCCCD's Accommodation Framework operates in a manner that "prohibits religious conduct while permitting secular conduct that undermines the government's interests in a similar way" or that SOCCCD officials exercise their own discretion in selecting the additional protective measures with which religious exemptees must comply. *Kennedy*, 142 S. Ct. at 2422. Simply put, Plaintiffs do not provide sufficient evidence to raise serious questions about the SOCCCD Accommodation Frameworks' general applicability.[17]

---

[17] SOCCCD represented at the hearing that its Framework operates to accommodate its exempt employees by permitting them to continue to work onsite, subject to testing and/or masking

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### ii.   Tiers of Scrutiny

Because it is more likely than not the Accommodation Frameworks are neutral and generally applicable, they would be subject to rational basis review. *Fulton*, 141 S. Ct. at 1876.  Like the Mandates, the Court finds the Accommodation Frameworks appear "rationally related to a legitimate"—if not compelling—governmental purpose, *Stormans*, 794 F.3d at 1084:  "[s]temming the spread of COVID-19," *Roman Catholic Diocese*, 141 S. Ct. at 67.  Plaintiffs' own evidence suggests that "unvaccinated persons are the *primary cause of continued spread*" of COVID-19.  Hence, requiring unvaccinated CCD employees to submit to additional protective measures that reduce the incidence of infection, like testing and masking, is more likely to be found to be "rationally related" to the interest in preventing the virus' spread.  *Cf. Forbes v. Cty. of San Diego*, No. 20-cv-00998-BAS-JLB, 2021 WL 843175, at *5 (S.D. Cal. Mar. 4, 2021) ("At minimum, 'rational speculation' could support the use of masks to reinforce physical distancing and limit the spread of infected droplets during a pandemic." (citing *Beach Commc'ns*, 508 U.S. at 315)).

Plaintiffs fail to raise serious questions about the neutrality and general applicability of the Accommodation Frameworks, or that those Frameworks fail rational basis review.  Accordingly, Plaintiffs do not satisfy the first *Winter* factor as it relates to their free exercise claim.

### 3.   Title VII

"Title VII of the Civil Rights Act of 1964 proscribes discrimination in employment on the basis of race, color, religion, sex or national origin . . . [and] prohibits retaliation against persons who assert rights under the statute."  *Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1846 (2019); *see* 42 U.S.C § 2000e.  In *Lawson v. Washington*, 296 F.3d 800, 804 (9th Cir. 2002), the Ninth Circuit instructs trial courts to analyze Title VII religious

---

requirements, which are now defunct.  This is consistent with the evidence before the Court:  both Perez and Bonkowski were granted as accommodations to their religious exemptions the ability to continue working on campus, subject to a twice-weekly testing requirement.  (Vyskocil Decl. ¶¶ 14–15.)

accommodation claims under a two-part framework.  At the first step, the plaintiff must show:  (1) they had a "*bona fide* religious belief," the practice of which conflicted with a duty of employment; (2) they informed their employer of that belief and conflict; and (3) the employer threatened the[m] with or subjected [them] to discriminatory treatment because of plaintiff's inability to fulfill job requirements." *Id.* (emphasis added).  At the second step, the burden shifts to the employer to "prove that [it] made good faith efforts to accommodate [the plaintiff's] religious beliefs, and, if those efforts were unsuccessful, to demonstrate that [it was] unable reasonably to accommodate [the plaintiff's] beliefs without undue hardship." *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 614 (9th Cir. 1988).

Plaintiffs Title VII claim is directed at the Mandates specifically, not the accommodations ultimately administered to Plaintiffs.  They allege "CCDs have shown a pattern and practice of not recognizing an employee or student's religious belief against mandatory vaccination" in violation of 42 U.S.C. 2000(e).  (Compl. ¶ 300.)  But it is well-settled that to establish a Title VII claim based on discriminatory treatment, a plaintiff must identify some adverse employment action—threatened or actual.  This Plaintiffs cannot do because all have received religious exemptions to the Mandates.  *See Burcham v. City of Los Angeles*, 562 F. Supp. 3d 694, 708 (N.D. Cal. 2022) ("Without allegations that Defendants have not, or are not likely to, deny Plaintiffs' requests for accommodation, Plaintiffs do not plausibly allege that Defendants have discriminated, or threatened to discriminate, against them."); *accord Beckerich v. St. Elizabeth Med. Ctr.*, 563 F. Supp. 3d 633, 642–43 (E.D. Ky. 2021) (opining that by obtaining a religious exemption to a vaccine mandate, plaintiffs were precluded from satisfying the third element of Title VII challenge to said vaccine mandate).[18]

---

[18] The parties dispute as a threshold matter whether Plaintiffs have adequately exhausted their administrative remedies by filing charges with the Department of Fair Employment and Housing or Equal Employment Opportunity Commission, which also is a requirement for a Title VII claim. *O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1307–08 (D. Haw. 2022) (citing *Alexander*

1   Accordingly, Plaintiffs fail to raise even serious questions going to the merits of
2   their Title VII claim.

3   *   *   *   *

4   Having concluded that Plaintiffs entirely fail to establish the first *Winter* factor,
5   this Court need not analyze the remaining factors in order to conclude Plaintiffs' request
6   for a preliminary injunction is doomed.  *Cottrell*, 632 F.3d at 1132.  Nevertheless, in the
7   interest of completeness, the Court considers Plaintiffs' purported irreparable harm and
8   the public interest served by a preliminary injunction below.

9   **C.    Irreparable Harm**

10   The second *Winter* factor requires Plaintiffs to establish they are likely to suffer
11   irreparable harm absent a preliminary injunction.  *Sierra Forest Legacy*, 577 F.3d at 1021
12   (holding a plaintiff must show it is "likely to suffer irreparable harm in the absence of
13   [preliminary] relief" to prevail on the *Winter* test); *see also Herb Reed Enters., LLC v.*
14   *Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1251 (9th Cir. 2013) (concluding irreparable
15   harm is indispensable under both the *Winter* test and sliding-scale analysis).

16   "Irreparable harm" encapsulates two separate components.  First, the injury upon
17   which preliminary relief is predicated must not be speculative or too contingent upon
18   events that may or may not occur.  *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d
19   668, 674 (9th Cir. 1988) ("Speculative injury does not constitute irreparable injury
20   sufficient to warrant granting a preliminary injunction."); *Sywula v. DaCosta*, No. 21-cv-
21   0145-BAS-AGS, 2021 WL 5280616, at *3 (S.D. Cal. Oct. 13, 2021) (explaining a
22   plaintiff must provide a factual foundation for court to infer defendant will take some step
23   in the future to inflict irreparable injury); *accord Varsames v. Palazzolo*, 96 F. Supp. 2d
24   361, 365 (S.D.N.Y. 2000) (denying preliminary injunction where the harms alleged were

25

26   *v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)).  Defendants aver this deficiency dooms Plaintiffs'
27   Title VII claim, and Plaintiffs contend they need not have exhausted their administrative remedies to
     show a likelihood of success on the ultimate merits of their Title VII claim.  The Court need not reach
28   this dispute because Plaintiffs' Title VII claim is so fundamentally deficient on the merits.

- 36 -

"both contingent upon a series of other events which may or may not occur and is not without possibility of redress"). That is, a plaintiff must demonstrate an immediacy to the harm alleged to befall him or her: the harm must be "likely" to inure, and not merely speculative. *Winter*, 555 U.S. at 21–22.

Second, the imminent injury must qualify as "irreparable." "Irreparable harm is traditionally defined as a harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2004) (citing *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)). Generally speaking, "economic damages are not traditionally considered irreparable *because the injury can later be remedied by a damage award*." *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) (emphasis in original) (collecting Ninth Circuit and Supreme Court decisional law reflecting the proscription against injunctive relief to rectify economic injuries alone), *vacated and remanded on other grounds by Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 471 (9th Cir. 1984) ("Mere financial injury . . . will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation.").

Here, Plaintiffs' moving papers do not identify explicitly the irreparable harms they will suffer absent preliminary relief. Rather they identify two general categories of irreparable harm that purportedly will inure if the CCDs' Vaccine Requirements are not enjoined: (1) constitutional injury and (2) financial injury. (Mot. at 1:21-23 ("CCD[s] will irreversibly place Plaintiffs at risk of imminent financial duress."); Mem. at 21:6-19 (arguing that constitutional violations constitute irreparable harm and asserting "[t]he unequal treatment of unvaccinated [e]mployees and [s]tudents compared to vaccinated [e]mployees and [s]tudents is irreparable harm").)

### 1.    Constitutional Injury

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)

(quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)); *Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008) ("[C]onstitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm."), *rev'd on other grounds NASA v. Nelson*, 562 U.S. 134 (2011).  "This is especially true when the constitutional violations complained of are actively ongoing through the enforcement of an unconstitutional law." *Menges v. Knudsen*, 538 F.3d 1082, 1120 (D. Mont. 2021) (citation omitted).  However, "in cases involving a claim by a movant for interference with protected freedoms or other constitutional rights, the finding of irreparable injury cannot meaningfully be rested on a mere contention of a litigant, but depends on an appraisal of the validity, or at least the probable validity, of the legal premise underlying the claim of right in jeopardy of impairment." *Del. & H. Ry. Co. v. United Transp. Union*, 450 F.2d 603, 619–20 (D.C.C. 1971) (citing *Green v. Kennedy*, 309 F. Supp. 1127, 1138–39 (D.D.C. 1970)).

Having determined Plaintiffs failed even to raise serious questions going to the heart of the constitutional claims upon which the present Motion is predicated—Plaintiffs' equal protection and free exercise claims—the Court concludes Plaintiffs necessarily have failed show irreparable injuries of a constitutional dimension warranting pre-trial relief.

### 2.  Financial Injury

As an antecedent, independent, and separate theory of irreparable injury, Plaintiffs appear to aver they will suffer financial harms absent preliminary relief.  The Court discerns two principal financial injuries from Plaintiffs' briefing.  First, Plaintiffs Lama, Meza, Perez, and Sparks allege they are "concerned" they will be terminated from their employment "in the future" *if* the CCDs revoke their religious exemptions or *if* they fail to abide by the testing and masking requirements of their accommodations.  (*See* Compl. ¶¶ 88 (Sparks), 95 (Lama), 107–08 (Meza), 123 (Perez), 134 (Bonkowski).)

This injury is far too speculative and contingent:  the record is devoid of any factual foundation from which this Court could infer Defendants will revoke Plaintiffs'

religious exemptions or discipline Plaintiffs for noncompliance with testing and masking requirements.  In fact, the evidence in the record reflecting Defendants' conduct since this lawsuit commenced supports an equal—if not stronger—inference the threat of termination is far from imminent.[19]  *See Solar Integrated Roofing Corp. v. Ballew*, No. 22-cv-0028-BAS-JLB, 2022 WL 902602, at *8 (S.D. Cal. Mar. 28, 2022) (identifying defendant's "past behavior" as relevant consideration in assessing likelihood of irreparable harm (citing *Prizant v. Abbott*, No. 3:20-cv-01604-H-LL, 2020 WL 6204629, at *6 (S.D. Cal. Sept. 9, 2020)).  Since Plaintiffs commenced this action in March 2022, the CCDs have not revoked a single religious exemption.  Moreover, Vice Chancellors Smith, Vyskocil, and Gallagher all attest that those exemptions will remain in place for the 2022-23 school year.  (Smith Decl. ¶¶ 4(a), 8; Vyskocil Decl. ¶¶ 14–15; Gallagher Decl. ¶ 10.)  Nor have Plaintiffs demonstrated propensity for failing to comply with testing and masking requirements built into their accommodations.  Indeed, the record demonstrates Meza, Perez, Bonkowski, and Sparks—the Plaintiffs who must either wear face masks or submit to asymptomatic testing due to their unvaccinated status—have accepted and uniformly complied with their accommodations.  For that reason, they remain in good standing with their respective institutions.  (*See*, *e.g.*, Smith Decl. ¶ 8; Vyskocil Decl. ¶¶ 14–15; Gallagher Decl. ¶ 10.)  Accordingly, Plaintiffs fail to demonstrate any sense of immediacy to their purported financial injuries.

Even assuming *arguendo* Plaintiffs establish an immediate threat of termination, the Supreme Court instructs that only in "genuinely extraordinary situation[s]" do loss of employment and its attendant consequences qualify as irreparable harm.  *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974).  Those injuries are principally pecuniary in nature.  Hence "adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation."  *Id.* Nothing about the circumstances in which

---

[19] As mentioned at *supra* note 5, SDCCD mentioned at oral argument Lama and Meza could face termination in the Spring 2023 for failure to get vaccinated. Still, this injury is too speculative to warrant pre-trial relief. *Varsames*, 96 F. Supp. 2d at 365.

22cv0424

Plaintiffs find themselves—having to choose between continued employment or taking a vaccine they do not want—renders the instant case a "genuinely extraordinary" one warranting imposition of preliminary injunctive relief to rectify the threat of discharge. There remain the adequate legal remedies of reinstatement and backpay, should Plaintiffs ultimately succeed on their claims during the ordinary course of litigation. *Navy SEAL 1 v. Austin*, --- F. Supp. 3d ---, 2022 WL 1294486, at *4 (D.D.C. Apr. 29, 2022) (holding separation from military for failure to comply with COVID-19 vaccine mandate "would likely not be *irreparable* harm because Plaintiff would be entitled to reinstatement and backpay should he ultimately succeed on the merits").

In so concluding, this Court's analysis is in accordance with its sister tribunals, which have concluded with near uniformity that the pressure of having to comply with a COVID-19 vaccine mandate as a condition of employment does not invoke an exception to the general proscription against issuing preliminary relief when the discharge of probationary employees is at issue. *O'Hailpin*, 583 F. Supp. 3d at 1302–03 (collecting cases); *see also Keene v. City & Cty. of San Francisco*, No. 22-cv-01587-JSW, 2022 WL 4454362, at *4 (N.D. Cal. Sept. 23, 2022); *SNL Workforce Freedom All. v. Nat'l Tech. & Eng'g Solutions of Sandia, LLC*, No. 1:22-cv-00001-KWR-SCY, 2022 WL 2065062, at *3 (D.N.M. June 8, 2022); *Roth v. Austin*, 8:22-cv-3038, 2022 WL 1568830, at *29 (D. Neb. May 18, 2022); *accord Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1325 (7th Cir. 2022) ("The 'CMS vaccine mandate,' [plaintiff] advances, 'puts legal and economic pressure on healthcare providers to only hire vaccinated individuals.' Perhaps. But career jeopardy alone does not amount to irreparable harm.").

Second, Plaintiffs George and Sparks allege GCCCD forced them to accrue unwanted paid leave, resulting in a loss of benefits. (*See* George Statement, Ex. 1 to George Decl.; Sparks Statement, Ex. 1 to Sparks Decl.) Because this injury is purely economic, it is *per se* not irreparable. *Short v. Berger*, --- F. Supp. 3d ---, 2022 WL 1203876, at *7 & n.7 (D. Ariz. Apr. 22, 2022) (holding "tangible employment-related harms," including the loss of benefits, "do not qualify as irreparable under Ninth Circuit

22cv0424

law because they can be remedied through retrospective relief." (citing *Hartikka v. United States*, 754 F.2d 1516, 1517 (9th Cir. 1985))); *accord Murray v. District of Columbia*, No. 06-02013 (HHK), 2011 WL 13377078, at *2 (D.D.C. Feb. 14, 2011) ("[Plaintiff]'s allegations regarding paid leave and loss of pay, standing alone, are, by definition, not irreparable harm." (citing *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985))).

### D. Balance of the Equities and Public Interest

When the State is the opposing party, the final two *Winter* factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because Plaintiffs have not established a likelihood of success on the merits of their free exercise and equal protection claims, there is no public interest related to the prevention of continuing constitutional injuries. *Cf. Melendres*, 695 F.3d at 1002 ("[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury . . . ."). Moreover, the Court finds the public would not be well-served by hampering the CCDs from implementing COVID-19 mitigation measures, which Plaintiffs' own evidence suggests not only are endorsed by the CDC but are proven to have a material degree of effectiveness against viral outbreak.

Accordingly, the Court cannot find granting Plaintiffs' request would be in the public interest.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** in its entirety Plaintiffs' request for a preliminary injunction enjoining the CCDs' Vaccine Requirements. (ECF No. 40.)

**IT IS SO ORDERED.**

DATED: November 3, 2022

Hon. Cynthia Bashant
United States District Judge

22cv0424